UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Ana Flores, Rene Flores, Maria Magdalena Hernandez, Magali Roman, Make the Road New York, and New York Communities for Change,<br><br>                                    Plaintiffs,<br><br>                          v.<br><br>Town of Islip, Islip Town Board, Suffolk County Board of Elections,<br><br>                                    Defendants. | **COMPLAINT**<br><br>18-CV-3549 |

Plaintiffs, by their attorneys, Paul, Weiss, Rifkind, Wharton & Garrison LLP,

Law Offices of Frederick K. Brewington, and Newman Ferrara LLP, allege as follows:

## NATURE OF THE ACTION

1.     This case presents a challenge under the Voting Rights Act to the "at-large" voting system currently in effect in the Town of Islip, Long Island (the "Town" or "Islip").  That system has for many years systematically prevented members of the Town's minority Latino community from electing any candidates of their choice to the Islip Town Board, thus denying the members of that community their most basic rights.  Lacking any representation on the Town Board, members of the Town's Latino community have been demoted to second-class citizens.  Among other things, the Town Board is responsible for failing to respond to the dumping of construction debris in the Latino community's only park and failing to provide the Latino community with suitable municipal services.  The Town's at-large voting system must be promptly changed to remedy the inequitable treatment of Islip's minority Latino community and ensure that the community is no longer denied the adequate electoral representation they are guaranteed by law.

2.     Plaintiffs are members of Islip's large and vibrant minority Latino community and bring this lawsuit to challenge Islip's at-large election scheme for its Town Board, which unlawfully dilutes the vote of Islip's Latino community and denies its members an equal opportunity to elect the candidates of their choice.

3.     Despite comprising almost a third of Islip's population, and despite voting cohesively in Town Board elections, Islip's Latino residents are not able to elect a candidate of their choice to the Town Board.  No Latino residents, nor any other minority residents, have ever been elected to the Town Board. Town Board members have also generally not lived in Islip's Latino communities: Over the last three decades, none of the 30 residences belonging to members of the Town Board has been located in a Latino community, with the sole exception of one Republican Town Board member who owned three residences, one of which was in a Latino community.

4.     The political disenfranchisement of the Latino community is guaranteed by the Town's at-large voting system, which has allowed Islip's white majority, by voting as a bloc, to deprive the Town's Latino residents their right to elect their candidate of choice in every seat in every election for the Town Board.  This system thereby dilutes the voting power of the Islip Latino community, is incompatible with the guarantees of our democratic system, and violates Section 2 of the Voting Rights Act.  An alternative system of single-member districts, in which each member of the Town Board is elected by a specific district, would vindicate the right of Islip's large Latino community to elect candidates of their choice to the Town Board.  In fact, a number of towns on Long Island, including Hempstead, North Hempstead, and Brookhaven, use exactly this kind of system.

5.     Without any electoral accountability, the Town has been and continues to be unresponsive to the needs of both its large Latino community and other minority communities, and fails to serve their community.  This unresponsiveness is demonstrated by the failure of the Town Board to address the particular needs of the Latino community. From denying them adequate street cleaning and garbage removal, to ignoring their requests to repair potholes and broken street lights, to failing to respond to waste being dumped in their parks, the Town has repeatedly failed to afford its Latino communities the same rights and services that it provides to its more affluent communities, and in fact has affirmatively treated Latino communities worse than other communities.  For example:

- When Latino residents reach out to their local police departments, fire departments, and municipal services for help, they are often met with hostile and unresponsive officials who ignore or mistreat them, often during emergencies, leaving them with no effective government at the time that they are supposed to be able to rely on government most.

- The community in Brentwood and Central Islip have repeatedly asked police and local officials to provide basic protection and support in response to a recent spate of violence from the MS-13 gang.  Town officials ignored these requests.  After press coverage reached a frenzy, state and federal authorities were compelled to intervene to begin addressing the violence that local law enforcement had ignored.

- The Department of Public Works ignores basic work requests from Latino residents, such as requests to repair potholes, traffic lights, or stop signs.

- The Department of Sanitation fails to clean Brentwood's streets and pick up Brentwood residents' trash as frequently as it does in more affluent, whiter neighborhoods.

6.      Socioeconomic statistics show that Islip's minority Latino residents face the brunt of discrimination in Town employment, education, and policing, and have significantly lower median incomes, lower graduation rates, and higher crime rates than white residents:

- The predominantly Latino communities of Central Islip and Brentwood have median household incomes of $66,467 and $69,457, a stark contrast with the neighboring predominately white communities of East Islip and West Islip, which have median household incomes of $116,487 and $111,970.

- The public schools and libraries in minority communities in Islip, especially Brentwood, are poorly funded and resourced.  As a result, Islip's Latino residents have worse education outcomes:  Brentwood High School (in a majority Latino area) has a graduation rate of 74% and dropout rate of 7%, compared to the high schools in East Islip and West Islip, which serve predominantly white students and have graduation rates of 95% and dropout rates of 1-2%.

- Minority residents within Islip have also suffered a long history of discriminatory policing.  In 2009, the Civil Rights Division of the United States Department of Justice began investigating allegations that the Suffolk County Police Department failed to investigate hate crimes against Latino victims and discouraged Latino crime victims from filing complaints.  In 2011, the Department of Justice issued over 100 recommendations for correcting the discriminatory policies and practices of the Suffolk County Police Department, and has been overseeing a

4

settlement to correct the Police Department's practices since 2014.   Nearly four years later, the Suffolk County Police Department is still under Department of Justice supervision and still has not fully complied with many of the settlement's requirements, including bias-free policing, handling allegations of police misconduct, and engaging the Latino community.

- The health outcomes within Islip are worse than in the surrounding communities—Islip has a higher rate of premature deaths of individuals under the age of 65, as well as higher homicide and emergency room visit and hospitalization rates than Suffolk County at large—with Islip's minority communities bearing the brunt of these outcomes.

7.      The Town's neglect of its Latino community has most clearly manifested itself in a number of high-profile incidents.  In 2005, the Town of Islip was sued for refusing to allow a Salvadoran/Central American Parade in Islip; only after litigation did it agree to do so.  In 2013, the Town shut down the only community pool that was easily accessible to Latino residents.  And in 2014, corporations with political connections to Town politicians dumped almost 40,000 tons of debris into Roberto Clemente Park, the park that had, until that time, primarily served the Town's Latino community.  The debris contained asbestos, pesticides, and other hazardous substances, including chlordane, DDT, and an acutely hazardous insecticide called dialdine.  The Town failed to appropriately communicate with residents about the danger in the park, and Town officials dragged their feet for four years to clean up the park.  The Islip Parks Commissioner and his assistant were criminally convicted in Suffolk County Supreme Court for their roles in the dumping.

8.      Officials within the Town of Islip cling to the at-large structure not for any legitimate policy reasons, but because it preserves and protects bloated government salaries, unchecked corruption, and political power.  For example, the Town of Islip has the most highly paid Town Board members (all of whom are white) of any town on Long Island—a salary of $77,200 for each *part-time* Town Board member.  The unchecked corruption and inflated salaries in Islip, as well as the resulting damage to both Islip's minority communities and the Town as a whole, might be avoided in the future if the minority communities have the opportunity to nominate and elect candidates of their choice.

9.      Plaintiffs bring this action in order to dismantle Islip's current at-large scheme for electing members to the Town Board and replace it with single-member districts, which would give members of Islip's Latino community an equal opportunity to elect a candidate of their choice to the Town Board who will be responsive to their needs and concerns and serve their community.

10.     As set forth below, Plaintiffs allege that the current at-large system of electing members to Islip's Town Board has, in violation of Section 2 of the Voting Rights Act, denied Latino residents an equal opportunity to elect candidates of their choice to the Town Board.  Plaintiffs have been unable to elect a candidate of their choice to the Town Board, despite the facts that (1) Latino citizens of voting age reside in Islip in substantial numbers in a geographically compact area sufficient to form a citizen voting age majority in a single-member district; (2) Latino residents' voting patterns are politically cohesive in elections involving candidates to the Town Board; and (3) no Latino candidate or candidate of choice of the Latino community has consistently ever been elected to that body.  Islip's at-large voting system, in combination with the levels of racially polarized voting in the Town, guarantees this result.  The

at-large system thereby dilutes the electoral strength of Islip's Latino community and results in the election of exclusively white candidates from predominantly white neighborhoods to the Town Board, in violation of Section 2.

11.     Under a reasonable and properly apportioned single-member districting plan, at least one single-member district can be created within Islip in which Latino residents comprise a majority of the citizen voting age population, total voting age population, and total population, and, given the voter turnout rates and the degree of racially polarized voting in Islip, a candidate preferred by Latino voters could win in this single-member district.

12.     A fair examination of the "totality of the circumstances"—including the historical, socioeconomic, and other conditions prevalent in Islip—only further supports the conclusion that the Town Board's at-large election scheme impairs the ability of Latino voters to participate equally in the political process and to elect candidates of their choice, in violation of Section 2.

13.     For these reasons, and as further alleged in detail below, Plaintiffs seek, among other things, declaratory and injunctive relief against the Town of Islip under Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 ("Section 2"), prohibiting the further utilization of an at-large scheme for electing members of the Islip Town Board and ordering the implementation of a reasonable and properly apportioned single-member districting plan, and any other relief the Court deems just and proper.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343, because this action seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act.  This Court also has jurisdiction over this

action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States.

15.     This Court has authority to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

16.     This Court has authority to award costs and attorneys' fees pursuant to 52 U.S.C. § 10310(e).

17.     This Court has personal jurisdiction over the Defendants, all of whom reside or are located in the district.

18.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein have occurred in this district and because the Defendants reside or are located in the district.

## PARTIES

19.     Plaintiff Make the Road New York ("MRNY") is an organization registered under 26 U.S.C. § 501(c)(3) of the Internal Revenue Code.  MRNY's mission is to build the power of Latino and working class communities to achieve dignity and justice through organizing, policy innovation, transformative education, and survival services.  MRNY has members who are Latino voters and who reside in areas of the Town of Islip that could constitute a single-member district in which Latino voters are a majority of the citizen voting age population, total voting age population, and total population, and who could elect their preferred candidates if the elections were not held using an at-large scheme.

20.     Plaintiff New York Communities for Change ("NYCC") is an organization registered under 26 U.S.C. § 501(c)(4) of the Internal Revenue Code.  NYCC's mission is to use direct action to defend and uplift its members' communities and fight back against racist structures and economic policies that continue to extract wealth from its members'

communities and neighborhoods.  NYCC has members who are Latino voters and who reside in areas of the Town of Islip that could constitute a single-member district in which Latino voters are a majority of the citizen voting age population, total voting age population, and total population, and who could elect their preferred candidates if the elections were not held using an at-large scheme.

21.     Ana Flores is Latina, an American citizen, a registered voter, a member of NYCC, and is a resident of Brentwood within the Town of Islip, New York.

22.     Rene Flores is Latino, an American citizen, a registered voter, and is a resident of Brentwood within the Town of Islip, New York.

23.     Maria Magdalena Hernandez is Latina, an American citizen, a registered voter, a member of MRNY, and is a resident of Brentwood within the Town of Islip, New York.

24.     Magali Roman is Latina, an American citizen, a registered voter, and is a resident of Brentwood within the Town of Islip, New York.

25.     Plaintiffs Ana Flores, Rene Flores, Maria Magdalena Hernandez, and Magali Roman are Latino voters who reside in areas of the Town of Islip that could constitute a single-member district in which Latino voters are a majority of the citizen voting age population, total voting age population, and total population, and could elect their preferred candidates if the elections were not held using an at-large scheme.

26.     Defendant Town of Islip is a town in the County of Suffolk, State of New York, organized and operating under New York Town Law and the laws of the State of New York.  The Town of Islip is a municipal corporation of the State of New York and oversees, maintains, supports, manages, supervises, and controls several departments, agencies, bodies,

and employees including, but not limited to, the Islip Town Board.  The Town has its offices at 655 Main Street, Islip, New York 11751.

27.     Defendant Islip Town Board is a legislative body and the governing authority of the Town of Islip, New York.  As described in more detail below, the Town Board exercises general and specific legislative powers, and is comprised of four councilpersons, who are elected at-large by all voters within the Town of Islip, and the Islip Town Supervisor, who is also elected at-large.

28.     Defendant Suffolk County Board of Elections is joined here as a necessary party, pursuant to Federal Rule of Civil Procedure 19(a).  The County Board of Elections is the County agency charged with the implementation of elections and creation of new or altered legislative districts in the County of Suffolk.

## BACKGROUND

29.     The Town of Islip is one of ten towns in Suffolk County, New York, and is considered a "first class town," a distinction reserved for larger towns and suburban communities, under New York Town Law.

30.     Islip contains four incorporated villages and all or part of twenty-four unincorporated hamlets, as well as several other small communities.  Several of these villages and hamlets, such as Brentwood, Central Islip, and North Bay Shore, are predominantly minority and Latino communities.

31.     Islip has used the system of government set forth in N.Y. Town Law § 20 since Islip became a first class town in 1958.

32.     Under this system, Islip is governed by a Supervisor, Town Clerk, Receiver of Taxes, and four Councilpersons.  The Town Board, which has jurisdiction over governmental affairs within the Town, is comprised of the Supervisor and the four

Councilpersons.  The Town Board's principal function is to regulate land use within the Town and protect the health, safety, and general welfare of Islip residents.  Among its duties, the Town Board approves the budget and exercises general and specific legislative powers to control Town finances, enact legislation, levy taxes, and provide services (including, among other things, construction and maintenance of parks, pools, and other public spaces, maintaining roads and transportation infrastructure, garbage removal, and snow removal).

33.    The Islip Supervisor, Town Clerk, and Receiver of Taxes are elected to four-year terms by the residents of Islip.  The next election will be held in November 2019.  The Councilpersons are also elected to four-year terms, which are staggered so that in odd-numbered years, only two of the four council seats are up for election.  Each of the Town's elected officials is elected at-large, town-wide, in a plurality voting system.

34.    Under New York Town Law § 81(2)(b), Islip can transition from its current at-large system to a "ward" election system, in which each member of the Town Board represents an individual district or ward.

35.    One mechanism through which towns in New York State may transition from an at-large system to a ward system is through a referendum at a special or biennial town election.  On Long Island, Brookhaven and North Hempstead have both transitioned from at-large systems to ward systems via referenda.

36.    Islip held a referendum in 2006, which failed with 21,371 votes in favor (46.02%) and 25,063 votes opposed (53.98%).  Voters in most hamlets and villages within Islip voted against the referendum; however, Brentwood was one of the few hamlets or villages in which a majority of voters supported the referendum.

37.     Another mechanism through which towns in New York State can transition from an at-large system to a ward system is in response to a court order finding that a town's at-large system violates the Voting Rights Act.   The nearby Town of Hempstead transitioned from an at-large system to a ward system as a result of such a court order.   *See Goosby* v. *Town of Hempstead*, 180 F.3d 476 (2d Cir. 1999).

38.     According to the American Community Survey, which is conducted by the Census Bureau, the total population of Islip is 333,743, of which 113,398 (33.98%) are Latino, 176,581 (52.91%) are non-Latino white, and 28,130 (8.43%) are black.   The total citizen voting age population is 221,395, of which 50,806 (22.95%) are Latino, 141,429 (63.88%) are white, and 21,457 (9.69%) are black.

39.     From 2006 through 2016, Islip has gained an estimated 35,000 Latino individuals, while the Town lost an estimated 28,000 non-Latino white individuals.   During that same time period, Islip has gained an estimated 17,000 Latino citizens of voting age and lost approximately 14,000 non-Latino white citizens of voting age population.   The growth in the Latino community as a whole, as well as growth in Latino citizens of voting age, has been steady and significant.

40.    As illustrated in the map below, as a result of steering and other discriminatory practices, Islip exhibits high levels of segregation, with Islip's Latino voters concentrated in or around the contiguous hamlets of Brentwood, Central Islip, and North Bay Shore.



Percent Hispanic Population in Islip Town and Hamlets and Villages

41.    According to the American Community Survey, the total population of Brentwood is 61,438, of which 39,511 (64.3%) are Latino, 11,099 (18.1%) are non-Latino white, and 8,886 (14.5%) are black.  The population of Central Islip is 34,724, of whom 16,634 (47.9%)

are Latino, 7,816 (22.5%) are non-Latino white, and 8,710 (25.1%) are black. Finally, the population of North Bay Shore is 21,377, of which 13,088 (61.2%) are Latino, 2,442 (11.4%) are non-Latino white, and 4,288 (20.1%) are black.

42.     Islip's increasing diversity is also reflected in a wide range of community groups, cultural organizations, and festivals that reflect minority populations in these hamlets and in the Town as a whole. This rich diversity is not, however, reflected on the Islip Town Board. This lack of representation has led to disastrous results for the minority communities in Islip.

### The Town Board Election Structure in Islip Violates Section 2 of the VRA

43.     The Town of Islip's at-large election system violates Section 2 of the VRA, 52 U.S.C. § 10301(a), under the Supreme Court's vote dilution test set forth in *Thornburg* v. *Gingles*, 478 U.S. 30 (1986). That test identified three "necessary preconditions" that plaintiffs must demonstrate by a preponderance of the evidence for a court to find unlawful vote dilution under Section 2 of the VRA: (1) The minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 38.

44.     If these preconditions are satisfied, the plaintiffs must establish, "based on the totality of circumstances," that minority residents "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). As discussed in detail below, to evaluate the "totality of the circumstances," the Court in *Gingles* relied primarily on a set of factors enumerated by the Senate Judiciary Committee Report (the "Senate Factors") that accompanied the 1982 amendments to Section 2 of the Voting Rights Act, which are listed *infra* ¶ 58.

45.     In Islip, both the *Gingles* preconditions and the Senate Factors are satisfied, because Islip's at-large system gives Islip's minority voters less opportunity than other members of Islip's electorate to participate in the political process and deprives them of the opportunity to elect a candidate of their choice to the Town Board.

A.     *Gingles* **Precondition #1:  Latino Voters Are Sufficiently Large and Geographically Compact to Constitute a Majority in a Single-Member District**

46.     Latinos are sufficiently numerous and geographically compact to form a majority of the total population, voting age population, and citizen voting age population in at least one district of a reasonable and properly apportioned district-based election system.

47.     It is possible to draw districting maps for the Town of Islip that comport with traditional districting principles in which Latino voters would form a majority of the citizen voting age population, total voting age population, and total population of a single district in a district-based elections system.  For instance, without using race as the predominant factor, it is possible to draw a four-district Town Board map that has minimal population deviation and contains one district located predominantly in the Brentwood neighborhood in which the Latino population, the Latino voting age population, and the Latino citizen voting age population would each be in excess of 50%.

B.     *Gingles* **Precondition #2:  Latino Voters Are Politically Cohesive**

48.     The minority Latino community is politically cohesive and consistently and collectively votes for its most preferred candidates.

49.     For instance, Philip Ramos—the current New York State Assembly member representing Brentwood, Central Islip, and North Bay Shore—was first elected in 2002 to a new seat created after the 2000 census.  He is of Latino descent and ran unopposed in 2016.  In previous elections, he has garnered substantial majorities of the vote.  Similarly, Suffolk

County Legislator Monica Martinez, a Latina, was elected in a district that included predominantly Latino communities within the Town of Islip.  Prior to Martinez, Ricardo Montano ran unopposed for Suffolk County Legislator in four consecutive elections after defeating his Republican challenger, William Menendez, in 2003 with the support of Islip's Latino community.  Accordingly, the fact that Islip's Latino community has never had success electing a candidate at the Town level is not for lack of political cohesion.  To the contrary, the fact that these communities are represented by Latinos at the county and state level further demonstrates that they are politically cohesive.

     C.    *Gingles* **Precondition #3:  Majority Bloc Voting Usually Defeats the Latino Minority's Preferred Candidate**

    50.    Islip's predominately white majority electorate votes as a bloc in support of different candidates and issues than those supported by the Latino minority community. Members of this predominantly white majority tend to vote similarly and are sufficient as a bloc to defeat the minority's preferred candidate.  As a result, notwithstanding the fact that the Town of Islip has a substantial minority Latino population, Latino candidates have ***never*** won any seats on the Town Board.

    51.    Each Latino candidate for the Town Board since 2003 received less support from white voters than all other major party candidates for the Town Board running at the same time, including white Democratic candidates.

    52.    For example, in 2011, Renee Ortiz, a Jewish Central Islip resident of Puerto Rican and German descent, ran for one of the two open seats on the Islip Town Board as a Democrat.  At the time, she stated that, "[f]or too long, diverse communities were left in the dark

and feeling like they weren't part of the political process."[1]   Neither the town party nor the county party invested in her campaign, and she was told that she could only campaign in Islip's Latino neighborhoods—Central Islip, Brentwood, and North Bay Shore.  Despite receiving the support of the vast majority of Latino voters, she lost the election, which was plagued by patterns of racially polarized voting.

53.    In 2017, Brentwood resident Samuel Gonzalez ran for one of the two open seats on the Islip Town Board as a Democrat.  During the campaign, Gonzalez stated that his "number one goal is to give a voice for the Brentwood, Central Islip, and North Bay Shore area."[2]  Gonzalez lost due to the patterns of racially polarized voting in Islip:  He received the support of approximately 80% of Hispanic voters, but nevertheless was defeated by the majority white bloc voting.

54.    The inability of Latino candidates to win Town of Islip elections is not limited to the Town Board—in fact, *no* Latino candidates have been elected to *any* Town office within the Town of Islip.[3]  Only one minority candidate has ever won any Town election within Islip.[4]

55.    In addition to having never elected a Latino candidate to the Town Board, with only one exception, Islip has never elected any candidate **supported by** Islip's Latino community to the Town Board.

---

[1]    Yamiche Alcindor, *Islip Towns: Breaking Barriers; Voters Who Have Urged Racial Diversity on Board May Get Wish*, Newsday, June 1, 2011, at A19.

[2]    Samuel Gonzalez for Islip, Facebook, https:www.facebook.com/Gonzalez4Islip.

[3]    Although Islip has no Latino representation at the Town level, there is, as noted, representation at the state and county level.

[4]    The *only* minority candidate to ever win any Town election within Islip is Joan B. Johnson, an African American Republican who was elected Town Clerk in the 1990s.  Joan Johnson was not the candidate of choice for Islip's Latino voters.  In addition, Johnson opposed efforts that would have expanded representation for the Latino minority community:  In her role as Town Clerk, she refused to approve a 2004 petition seeking a ballot referendum to replace Islip's at-large Town Board with individual districts.

56.     The only time candidates supported by Islip's Latino community were elected to the Town Board came immediately after the Republican Supervisor Peter McGowan was arrested for a corruption scandal in March 2006, discussed in more detail *infra* ¶ 164.  On November 7, 2006, Democratic Supervisor Phil Nolan was able to win a narrow victory in a special election with 49.83% of the vote—the first Democratic Town Supervisor in over 40 years and the first Supervisor supported by the minority Latino community.  Nolan received the support of the vast majority of Latino voters in this election.  In November 2007, the year immediately following this highly publicized scandal, for the first and only time in the Town of Islip's history, Town Board candidates that were supported by the minority Latino community— Democrats John H. Edwards and Gene Parrington—eked out narrow victories and collectively received 55.59% of the vote.  This election was characterized by relatively low levels of racially polarized voting.  In spite of this short-lived success, the two Democrats who were elected were not members of the minority community, nor did they live in the same areas where the minority Latino community predominantly resides.  Four years later, Edwards and Parrington were replaced by Republicans, and no candidates preferred by the Latino community have won since then.

### Based on the Totality of the Circumstances, Islip's Latino Voters Have Less Opportunity to Participate in the Political Process and to Elect Preferred Candidates of Their Choice

57.     Based on the totality of circumstances, Islip's minority residents also "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).

58.     The Supreme Court in *Gingles* identified a list of non-dispositive, non-exclusive factors that are relevant to this inquiry.  *See* 478 U.S. at 36-37.  The factors are largely

set forth in the Senate Judiciary Committee Report that accompanied the 1982 amendments to

Section 2 of the Voting Rights Act.  They are:

- Senate Factor #1: "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process";

- Senate Factor #2: "the extent to which voting in the elections of the state or political subdivision is racially polarized";

- Senate Factor #3: "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group";

- Senate Factor #4: "if there is a candidate slating process, whether the members of the minority group have been denied access to that process";

- Senate Factor #5: "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process";

- Senate Factor #6: "whether political campaigns have been characterized by overt or subtle racial appeals";

- Senate Factor #7: "the extent to which members of the minority group have been elected to public office in the jurisdiction";

- Senate Factor #8: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group"; and

- Senate Factor #9: "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."  478 U.S. at 36–37.

59.     As evident in these factors, when evaluating whether a minority

community's ability to participate equally in the political process is impaired, courts consider not

only discrimination committed by the relevant political subdivision, but also historical factors,

socioeconomic conditions, and discrimination committed by parties other than the relevant subdivision.[5]

60.     An application of the nine Senate factors to the conditions in Islip reveals that the ability of Latino voters to participate equally in the political process in Islip has been impaired.

**A.     Senate Factor #1:  History of Voting-Related Discrimination**

61.     Islip has a long and troubled history of racially discriminatory voting practices.

62.     Latino residents within Islip's minority communities have historically faced various forms of voter suppression.  Most recently, on Election Day in 2016, the Town of Islip attempted to close down traffic lanes in important thoroughfares in Latino communities.

63.     As a result of this history of voting-related discrimination, in 2016 the New York Civil Liberties Union and Common Cause partnered to monitor polling places and serve as a buffer against voter intimidation in five locations across the state.  One of those five locations—and the only location in Suffolk County—was Central Islip.

**B.     Senate Factor #2:  Racially Polarized Voting Patterns**

64.     As discussed *supra* ¶¶ 50–56, voting in the elections of the Town Board is racially polarized, as evidenced by the bloc voting patterns that have largely prevented Latino minority voters from electing their preferred candidates.

---

[5]     *See Goosby* v. *Town Bd. of Hempstead*, 180 F.3d 476, 488 (2d Cir. 1999); *Gomez* v. *City of Watsonville*, 863 F.2d 1407, 1418 (9th Cir. 1988).

C.      **Senate Factor #3:  Voting Structures Enhance Minority Discrimination**

65.      In addition to the dilutive at-large election structure at issue here, there are other voting mechanisms in place that further enhance discrimination against Latino minority voters.

66.      Islip Town Board elections are conducted in odd years.  Minority voter turnout is generally lower in odd-year elections than it is in even-year elections, when prominent candidates for state or federal office are also on the ballot.  This trend is true in Town Board elections in Islip.  Lower voter turnout resulting from the odd-year elections makes it more difficult for the minority community in Islip to elect their candidate of choice to the Town Board.

67.      Town Board members serve four-year staggered terms, and two members are elected at-large each election cycle.  Staggered terms ensure that a majority of the Board cannot be replaced in a single election year, thus requiring sustained electoral success for at least two election cycles in order for a particular agenda to gain majority support on the Board.  This structure makes it more difficult for the Latino minority community to be effectively represented on the Town Board.

68.      The dilutive effect of these election structures, and most importantly, the at-large election structure, is further aggravated by the geographic size and population of Islip. The Town of Islip is the third largest town in the State of New York by population and is in the New York City media market.  Campaigning across the whole of Islip, which is necessary in an at-large election structure, requires more resources and greater political connectivity, both of which minority candidates tend to lack, than campaigning in a single district.  Latino minority candidates in Islip would be able to campaign much more effectively in a single district.

### D. Senate Factor #4: The Candidate Slating Process Has Denied Access to Latino Minority Voters

69.     For decades, local community leaders seeking to represent the minority communities in Islip have had to overcome additional obstacles imposed by the candidate slating process.  This is because the process for selecting Town Board candidates is not democratic or transparent.  Rather, candidates are typically selected by the leadership in each political party.

70.     In 1988, Frank Jones, Islip's Republican Town Supervisor at the time, conceded that representation of the Latino community within the Town of Islip was "not in proportion to the influential numbers growing in the community.  We need to do more."[6] However, for the nearly three decades since this honest concession, Republican and Democratic leaders have stymied attempts by minority candidates from Islip's substantial minority communities to secure representation on the Town Board.

71.     In 1989, Joseph S. Fenollol, a Latino community leader, petitioned to run for the Democratic nomination for a seat on the Town Board.  But his petition was challenged in court by members of his own party, thus denying him access to the ballot.

72.     In 1990, Carmen Hines, a Latina Republican from Brentwood, applied for an appointment to the Town Board after the resignation of Anne Pfifferling, a white Republican. Hines was passed over for the seat in favor of a white Republican from another part of Islip. Candidates were screened by the 20-member Islip Republican Party's executive committee and were ultimately selected by the all-white, all-Republican Town Board, which chose Pamela Greene, a white Republican woman, over Hines.  Despite his earlier comments stressing the importance of minority representation, Jones, still the Republican Islip Town Supervisor, minimized the significance of appointing a minority to the Town Board by telling the Islip

---

[6]     Edna Negron, *Hispanic Pride On Parade; Puerto Rican Day Brings out 30,000*, Newsday, June 6, 1988, at 21.

community it would be "impossible to measure the political impact of not selecting a minority for a seat."[7]

73.     After the 1990 appointment of Pamela Greene was announced, Jones pledged that he and other Republican leaders would "consider nominating a black or [Latino] as a town-board candidate in 1991."[8]  Despite this, Islip Republicans did not nominate a black or Latino candidate as a Town Board candidate in 1991.  In fact, in the more than twenty-five years since, they have *never* nominated a Latino candidate for the Town Board.

74.     Within the last 15 years, the Islip Democratic Party has selected 11 nominees for the Town Board, the vast majority of whom have not been minority candidates.  In 2008, Latino leaders within the Islip Democratic Party agreed to endorse Phil Nolan's all-white slate in exchange for the party's agreement to include African American or Latino candidates on the 2009 slate.  In 2009, Phil Nolan and the Islip Democratic Party reneged on this promise, leaving Islip without diverse representation and discrediting Latino leaders in the community.

75.     In his campaigns for public office in Islip, Democrat Phil Nolan also promised to support transitioning to a district-based system in order to increase Latino representation among Democratic candidates.  He reneged on this promise as well.

76.     In fact, Islip Democrats are actually *disincentivized* from nominating minority candidates for the Town Board as a result of the at-large system.  In the last 50 years, the only Democratic candidates to win an election to the Town Board were white Democrats from the white communities within the Town of Islip.  Democratic candidates from Islip's minority communities, meanwhile, have been roundly defeated at the polls.

---

[7]     Katti Gray, *Greene Joins Islip's Town Board*, Newsday, Dec. 19, 1990, at 31.

[8]     *Id.*

E.    **Senate Factor #5:  The Latino Minority Community Bears the Effects of Discrimination**

*Effects of Discrimination in Employment*

77.    Latino minority employees in Islip and surrounding communities have long been denied the ability to work in a discrimination-free environment.   Numerous employment discrimination claims are filed in towns and villages across Nassau and Suffolk Counties (including in the Town of Islip) with the U.S. Equal Employment Opportunity Commission annually.  Schools, police departments, and corrections facilities across Long Island have been named as defendants in race, age, pregnancy, sexual orientation, and disability discrimination cases in recent years.

78.    Minorities employed by public entities within the Town of Islip have, in particular, struggled to be treated equally by white officials in control of hiring and promotion, including elected representatives.   For example, in 2010 and 2011, six employees of the Brentwood Union Free School District brought lawsuits against George Talley, Brentwood's elected School Board President.  They alleged that Talley, along with other white officials, repeatedly favored whites over minorities in hiring and promotion decisions, disciplined and fired  minority employees for actions that similarly went unpunished when committed by white employees, and uttered racial slurs.  They also claimed that Talley referred to Colin Edwards, an African American mechanic, as a "porch monkey" and a "dumb spook [who] will never be promoted as long as I'm Board president."[9]  Talley also reportedly attempted to pressure Carlos Sanchez, the district's head of security, to fire two Latino security guards.  When Sanchez refused, Talley was alleged to have told Sanchez, "I am going to fire you," and used racial

---

[9]    Compl. at 3–4 ¶¶ 16, 22, 26, *Edwards* v. *Brentwood Union Free Sch. Dist.*, 10-CV-5454 (E.D.N.Y. Nov. 24, 2010).

epithets.[10]  Of the six individual lawsuits filed against Talley, he was forced to settle four of them, including one in which the court denied Talley's motion for summary judgment.

79.     At the time, the residents of Brentwood had little recourse to dispose of Talley.  Although Talley was confronted with significant pressure to resign from his post as School Board President once the lawsuits were filed in 2010, he refused, stating that "[i]t is my intent to serve this district until the voters tell me it's time to go."[11]  Talley continued to serve until he was voted out overwhelmingly in the next election, which did not occur until 2013.

80.     A common complaint among Long Island educators is that the school districts "hire few minority teachers and are slow to promote them."[12]  Islip is not immune to this type of discrimination; for instance, in 2003, Dr. Gloria Graves Holmes, an African American woman who taught English in Brentwood for over 30 years, filed a lawsuit against the Brentwood School District under Title VII of the Civil Rights Act of 1964 claiming that race and sex discrimination prevented her promotion into the district's administrative ranks.  42 U.S.C. §2000e *et seq.*  Dr. Holmes applied for 11 administrator positions over the course of eight years and never advanced beyond the classroom.  In almost every instance, the individual selected for the position was both white and male.  On at least one occasion, the school district decided to leave a position unfilled instead of promoting Dr. Holmes.  These decisions were not merit-based—the Equal Employment Opportunity Commission determined that "there was no evidence that [Dr. Holmes] 'lacked the skills required for a successful candidate.'"[13]  At the time Dr. Holmes sought promotion in the late 1990s, only 28.8% of Brentwood's students were white.

---

[10]    John Hildebrand, *Brentwood: School Board Leader Accused of Bias*, Newsday, Nov. 10, 2010, at A28.

[11]    John Hildebrand, *District Tensions Flare; Hostile Greeting for Brentwood Schools Prez; He Denies Bias Claim, Says He Won't Step Down*, Newsday, Nov. 19, 2010, at A7.

[12]    Martin C. Evans, *Ex-Teacher Files $46M Suit*, Newsday, Mar. 17, 2003.

[13]    *Id.*

However, 90.6% of Brentwood's principals, 86.1% of its assistant principals, 94.9% of its teachers, and 92.2% of its professional staff were white.[14]  Dr. Holmes and the Brentwood School District settled the case in 2007, after Judge Platt of the Eastern District of New York denied the school district's motion for summary judgment in part.

81.     As a result of employment discrimination and other structural challenges, the Town suffers from a staggering level of income inequality, which has a direct effect on the ability of the poorer minority Latino community to have a voice in its elections and Town government.  Two communities with significant minority Latino populations, Central Islip and Brentwood, have median household incomes of $66,467 and $69,457, and poverty rates of 14.0% and 12.5%, respectively.  This is a stark contrast with the neighboring predominately white communities of East Islip and West Islip, which have median household incomes of $116,487, and $111,970, and poverty rates of 6.9% and 5.3%.

*Effects of Discrimination in Education*

82.     Minority school districts in Islip have worse outcomes in education than school districts in other areas of the Town.  These schools consistently have lower budgets and spending per student, and their high school graduation rates are disproportionately lower.

83.     Because the requirements for high school graduation in New York are determined at the state level, graduation rates can provide a consistent means of comparing the success of particular school districts.  As set forth in the chart below, the graduation rate in school districts with a higher percentage of Latino students is generally lower.

---

[14]     *See id.*

| High Schools | Percent Latino (2016) | 4 Year Graduation Rate (2016) |
|---|---|---|
| Brentwood | 80% | 74% |
| Central Islip | 70% | 86% |
| Bay Shore | 37% | 88% |
| Islip | 21% | 98% |
| East Islip | 14% | 95% |
| West Islip | 5% | 95% |

84.     Similarly, the dropout rate in Brentwood is significantly higher than in the rest of the district.  In Brentwood, which is 80% Latino, the dropout rate is 7%, compared to dropout rates of 1-2% in Islip, West Islip, Central Islip, East Islip and Bay Shore.

85.     The school districts with a higher percentage of Latino students are also significantly more crowded than the other schools in Islip.  In the 2015-2016 school year, Brentwood High School had 4,561 students and Central Islip High School had 2,076 students. The predominantly white high schools tend to be significantly smaller:  Islip High School had 960 students, East Islip High School had 1,244 students, and West Islip Senior High School had 1,515 students.

86.     As set forth in the chart below, the school districts with a higher percentage of Latino students also contain more economically disadvantaged students (defined by New York State as "those who participate in, or whose family participates in, economic assistance programs"[15]) as well as more students eligible for reduced or free lunch than the other

---

[15]     *Glossary of Terms - Report Cards Data*, N.Y. State Educ. Dep't., https://data.nysed.gov/glossary.php?report=reportcards.

schools in Islip.  For instance, in Brentwood, which is 80% Latino, 80% of students are classified as "economically disadvantaged," whereas in East Islip, which is 14% Latino, only 21% of students are classified as "economically disadvantaged."

| High Schools | Percent Latino (2016) | Percentage of Economically Disadvantaged Students | Percentage of Students Eligible for Free or Reduced Lunch (2015-16) |
|---|---|---|---|
| Brentwood | 80% | 80% | 72% |
| Central Islip | 70% | 73% | 73% |
| Bay Shore | 37% | 47% | 45% |
| Islip | 21% | 26% | 27% |
| East Islip | 14% | 21% | 24% |
| West Islip | 5% | 18% | 15% |

87.    The school districts with a higher percentage of Latino students also have fewer students who take Advanced Placement ("A.P.") exams.  In Brentwood, only 16% of students took A.P. tests, and in Central Islip Senior High School, only 19% of students took A.P. tests.  In contrast, in West Islip Senior High School, 41% of students took at least one A.P. test in the most recent school year.

88.    Furthermore, the schools in Islip suffer from racial tension.  In 2006, 14 white and Latino students from East Islip High School were suspended following a fight.  The Latino students said that white students, both those involved in the brawl and those uninvolved, used racial slurs to refer to the Latino students.  Furthermore, the Latino students alleged that teachers, administrators, and security guards engaged in racist behaviors and that they were

treated as second-class citizens dating back years to when the school refused to call the police during a fight between two ethnic groups and let the perpetrators walk free.

89.     Islip's predominantly Latino schools suffer from substandard learning conditions.  Classes are routinely overcrowded at the beginning of the school year and often lack enough seats or books for all of the students.  Brentwood High School sometimes lacks heating during the winter, forcing students to wear their coats and gloves throughout the school day.

90.     Moreover, the racial disparities in Islip's educational services extend outside of the classroom.  For example, the Brentwood School District lacks a sufficient number of social workers, and the Brentwood Library is underfunded, lacks computers in good condition, and has far fewer books than other public libraries in the Town.

*Effects of Discrimination in Health*

91.     Islip's health outcomes are worse than surrounding communities, and Islip's Latino community disproportionately bears the brunt of these bad health outcomes. Compared to Suffolk County, the Town of Islip has more premature deaths of individuals under the age of 65, more low birthweight births, a higher rate of emergency room visits and hospitalizations due to falls of infants and the elderly, more hospitalizations due to assault, more emergency room visits due to asthma, more hospitalizations due to short-term diabetes complications, and higher rates of breast and colorectal cancer as well as sexually transmitted diseases.  Even waiting times at hospitals that primarily serve Islip's Latino neighborhoods are longer than the hospitals that serve neighboring communities.

92.     Socioeconomic disparities, residential segregation, and structural racism drive the poor healthcare that minority communities receive in Islip.

93.     The USDA designated part of Brentwood as a food desert because a significant number of residents in low-income census tracts live more than one mile from the nearest supermarket.  No other community in Islip received a similar designation.

94.     In a study conducted by the Community Alliance for Research Empowering Social Change, researchers examined the health outcomes of 232 residents of Brentwood, with a particular focus on barriers to healthcare.  The study found that 34% of Hispanic respondents struggled to access adequate healthcare because of costs, a number more than twice as high as the white residents of Brentwood.  Additionally, Hispanic respondents were much less likely to be able to afford healthcare insurance, reporting an uninsured rate of 38% compared to 13% for white respondents.[16]

*Effects of Discrimination in Policing and Law Enforcement*

95.     Islip has suffered a long history of discriminatory policing, which has impaired the ability of Latino residents to participate equally in the political process.[17]

96.     According to a report from the Southern Poverty Law Center ("SPLC") on hate crimes against Latino immigrants in Suffolk County, Latino victims often do not report bias-motivated harassments, threats, assaults, or even severe beatings because police officers refuse to take action in response to them.  In fact, according to individuals interviewed by the SPLC, when officers arrive on the scene of an alleged hate crime, they frequently accept the

---

[16]  *See* Melody S. Goodman et al., *Brentwood Community Health Care Assessment*, 8 Progress in Cmty. Health P'ship 29 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4394008/pdf/nihms646380.pdf.

[17]  As discussed *supra* ¶ 59, evidence of discrimination by entities other than the Town of Islip (for instance, the Suffolk County Police Department) is relevant to evaluating whether the Latino community's ability to participate equally in the political process has been impaired.

version of events given by the assailant(s) and will even arrest the victim in response to counter-allegations that the immigrant started the fight.[18]

97.     Furthermore, despite making up only 14% of the Suffolk County population, the SPLC reported that Latino immigrants accounted for more than half of motor vehicle code violations, suggesting a pattern of unequal enforcement of the law by police officers.[19]

98.     In 2009, the Civil Rights Division of the United States Department of Justice and the U.S. Attorney's Office for the Eastern District of New York jointly investigated complaints that the Suffolk County Police Department ("SCPD") engages in discriminatory policing, that its approach to the Latino community "discourage[s] Latino victims from filing complaints and cooperating with the police, and [that it fails] to investigate crimes and hate crime incidents involving Latinos."[20] The investigation was commenced after the fatal stabbing of Marcelo Lucero, an Ecuadorian national, by a group of teenagers in Patchogue, New York. The investigation resulted in the Department of Justice making over 100 recommendations for correcting the discriminatory policies and practices of the Suffolk County Police Department, and sending a letter to SCPD to explain how some of those recommendations could help resolve the problems with the Latino community.[21]   These recommendations included, but were not limited to, the following:

---

[18]   *Climate of Fear*, *in* Southern Poverty Law Center, Climate of Fear: Latino Immigrants in Suffolk County, N.Y. (Sept. 2009), https://www.splcenter.org/sites/default/files/splc_suffolk_report.pdf.

[19]   *Id.*

[20]   Press Release, U.S. Dep't of Justice, United States Agrees to Comprehensive Settlement with Suffolk County Police Department to Resolve Investigation of Discriminatory Policing Against Latinos (Dec. 3, 2013), https://www.justice.gov/opa/pr/united-states-agrees-comprehensive-settlement-suffolk-county-police-department-resolve.

[21]   Editorial, *Justice and the Suffolk County Police*, N.Y. Times, Sept. 25, 2011, http://www.nytimes.com/2011/09/26/opinion/justice-and-the-suffolk-county-police.html; Michael J. Goldberger

a.  Revising vague policies regarding questioning suspects about their immigration status or place of birth to determine whether there is reason to believe that they are undocumented, due to "the possibility that this [practice] may raise fears in the Latino community"[22];

b.  Revising the practices and policies of the SCPD Hate Crimes Unit based on reports from the immigrant community that "'immigrant bashing' was abetted by SCPD through inaction" and a review of policies that did not appropriately train officers on the scope of potential hate crimes or hate-based actions that could give rise to future hate crimes[23];

c.  Improving the accessibility of complaint forms, incident reports, department policies, and community relations materials for individuals with limited proficiency with the English language, particularly for Spanish speakers and based on reliable translation services (as opposed to Google Translate);

d.  Similarly improving the availability of officers with Spanish language proficiency and familiarity with minority cultural norms, as some members of the community "claimed that officers declined to assist them where language was a barrier to communication"[24];

---

et al., *Suffolk County Police Department Technical Assistance Letter*, U.S. Dep't of Justice (Sept. 13, 2011), https://www.justice.gov/sites/default/files/crt/legacy/2011/09/14/suffolkPD_TA_9-13-11.pdf.

22  *Id.* at 3.

23  *Id.* at 6.

24  *Id.* at 15.

e.  Improving the process for accepting and processing complaints against SCPD officers alleging discriminatory conduct or excessive force (previously the process referred complaints to the Human Rights Commission, which did not actually conduct an independent investigation and thus gave the public a "false impression" regarding the government's response to such complaints)[25];

f.  Using SCPD's existing early warning database system to "gather and track data for each officer's arrests by race or ethnicity of the subject"[26];

g.  Enhancing SCPD's "community relations and outreach programs, particularly to cultivate relationships with Latino communities in Suffolk County," with the hope that, "[o]ver time, Latino residents may consider SCPD officers as more approachable, thereby bridging the distrust that currently exists"[27]; and

h.  Changing the existing practice of using drunk driving roadblocks "primarily to request documentation of citizenship. . . [which] is not an acceptable practice."[28]

99.  In January 2014, Suffolk County entered into a Settlement Agreement with the United States that called for SCPD to "implement new and enhanced policies and procedures to ensure nondiscrimination in the provision of police services to Latino communities

---

[25]  *Id.* at 13.

[26]  *Id.* at 16.

[27]  *Id.* at 20-21.

[28]  *Id.* at 24-25.

in Suffolk County."[29]   Since June 2015, the Department of Justice has issued six reports assessing SCPD's compliance with the Settlement Agreement.   The most recent report, dated March 13, 2018, found that SCPD is only partially compliant with many terms of the Agreement, including requirements for bias-free policing, handling allegations of police misconduct, and engaging the Latino community.[30]

100.   Symptomatic of SCPD's enduring problems, former Suffolk County Police Sergeant Scott Greene was arrested in January 2014 and convicted of stealing money from Latino motorists in Suffolk County.   Greene pulled over more than two dozen Latino motorists, and instead of issuing tickets, he stole money from them.

101.   To this day, members of the minority Latino community in Islip are not treated fairly or served adequately by the Suffolk County Police Department.   The police are often unresponsive, dismissive of community concerns, hostile or discriminatory, or fail to properly execute basic duties when serving minority residents (such as preparing comprehensive and accurate police reports).   The police often fail to provide translators or officers who understand Spanish when responding in areas where the population predominately speaks Spanish.   Local Latino residents also report that the SCPD has failed to protect them when they attempt to exercise their First Amendment rights in peaceful protests.

102.   For years, the communities in Brentwood and Central Islip have suffered from MS-13 gang activity.   Community members have consistently asked police and local officials to provide basic protection and support to the community in response to rising violent

---

[29]   Press Release, U.S. Dep't of Justice, United States Agrees to Comprehensive Settlement with Suffolk County Police Department to Resolve Investigation of Discriminatory Policing Against Latinos (Dec. 3, 2013), https://www.justice.gov/opa/pr/united-states-agrees-comprehensive-settlement-suffolk-county-police-department-resolve.

[30]   *Sixth Report Assessing Settlement Agreement Compliance by Suffolk County Police Department*, U.S. Dep't of Justice (Mar. 13, 2018), https://www.justice.gov/crt/case-document/file/1054396/download.

gang activity.  The Town ignored their requests for help, however, and gang violence has continued to expand.  Recently, there has been a dramatic rise in gang-related killings in the minority Latino community in Islip, including the killing of four young people in April 2017.  Only after these incidents garnered national press coverage did state and federal authorities intervene to begin addressing the violence that local law enforcement has been ignoring for years.

103.    Recent efforts by local law enforcement to combat MS-13 have generally been harmful, rather than helpful, to Islip's Latino community.  SCPD has failed to adequately engage with Latino residents and has instead has taken what is viewed as a brute force approach.  While the Town provides youth and family recreation services in other parts of the Town, such as transportation for summer youth programs and for seniors, it has failed to provide resources to protect Islip's Latino youth from MS-13.

104.    On July 28, 2017, President Trump delivered a speech at Suffolk County Community College in Brentwood regarding, among other things, violent crimes perpetrated by immigrant gangs such as MS-13.  Standing in front of a group of SCPD officers, the President endorsed the assault of immigrant criminal suspects during their arrests:

> Now, we're getting [immigrant gang members] out anyway, but we'd like to get them out a lot faster.  And when you see these towns and when you see these thugs being thrown into the back of a paddy wagon – you just see them thrown in, rough – I said, please don't be too nice.  (Laughter.)  Like when you guys put somebody in the car and you're protecting their head, you know, the way you put their hand over?  Like, don't hit their head and they've just killed somebody – don't hit their head.  I said, you can take the hand away, okay?  (Laughter and applause.)[31]

The SCPD officers behind the President cheered and applauded these remarks.

---

[31]  The White House Office of the Press Secretary, Transcript: Remarks by President Trump to Law Enforcement Officials on MS-13, Newsday (July 28, 2017, 4:12PM), https://www.newsday.com/news/nation/transcript-remarks-by-president-trump-to-law-enforcement-officials-on-ms-13-1.13863979.

105.    In contrast, the President's comments drew immediate and repeated condemnations by law enforcement officials across the country.  Hours after its police officers were seen on national television applauding these comments, the SCPD tried to control the reputational damage caused by its officers' implied endorsement of violence against criminal suspects by tweeting: "The SCPD has strict rules & procedures relating to the handling of prisoners.  Violations of those rules are treated extremely seriously."  A follow-up tweet stressed that SCPD "do[es] not and will not tolerate roughing up of prisoners."  At no point did SCPD apologize or express regret for its officers' cheering and applause of the President's remarks.

*The Roberto Clemente Park Dumping Scandal*

106.    The Roberto Clemente Park (the "Park"), formerly known as Timberline Park, is a public park owned by the Town.  The Park sits on 25 acres of land at 400 Broadway in Brentwood, New York.

107.    When the Park was open, nearby residents enjoyed outdoor recreational activities including basketball tournaments, soccer, baseball, family gatherings, playground outings, and movie nights.  The Park had a swimming pool that—although neglected by the Town—was used by residents, including many children.

108.    Starting in June of 2013, two politically connected companies began transporting tens of thousands of tons of waste from construction sites in New York City into the Park in order to evade regulatory requirements regarding the disposal of waste.  During this time, Town officials and law enforcement agencies in Islip received an anonymous complaint informing them that a "private contractor may have spread illegal fill during the construction of donated athletic fields on Town-owned parkland."[32]  However, no prompt action was taken, and

---

[32]    *Roberto Clemente Park Temporarily Closed to the Public*, Town of Islip, http://www.townofislip-ny.gov/news/news/2629-roberto-clemente-park-temporarily-closed-to-the-public.

the dumping continued unabated for nearly ten months.  The Park remained open during this time and residents continued to use the Park, oblivious to the hazardous effects of the waste.

109.    On or around January 23, 2014, Town officials eventually closed the Park. Even then, they failed to provide any notice or explanation of the fact that residents had been using a park contaminated by toxic waste.  Residents instead learned of the illegal dumping and toxic chemicals through word-of-mouth, the media, and volunteers from community organizations who went door-to-door to spread the word about the incident.

110.    The Town had to remove close to 40,000 tons of debris and hazardous material that were dumped into the Park.  In April 2014, the Suffolk County District Attorney's Office began investigating and brought criminal charges against the contractors directly responsible for the illegal dumping.  Drawing attention to the municipal neglect that enabled the contractors' conduct, a defense attorney for the contractors spoke about the "soft racism in the Town of Islip which budgets park improvements primarily to affluent residents living on the right side of the tracks, certainly not those living in Brentwood."[33]

111.    During the course of the criminal proceedings, it came to light that asbestos and pesticides were contained in the debris.  Prosecutors explained that the debris was "chock full of hazardous substances,"[34] such as chlordane, DDT, and an acutely hazardous insecticide called dialdine.  Describing the carcinogens found in the debris that can leach into groundwater, New York State Department of Environmental Conservation Captain Timothy Huss explained that the toxic chemicals "linger for decades" and "don't break down readily."

---

[33]    Sarah Armaghan, *Islip: Democrats Demand End of 'Pay to Play,'* Newsday, Oct. 27, 2015, at A24.

[34]    *Man Pleads Guilty to Dumping Toxic Debris at 4 Long Island Locations*, CBS New York (Mar. 30, 2016), http://newyork.cbslocal.com/2016/03/30/suffolk-county-dumping-guilty/.

112.     The dumping effectively poisoned the drinking water in the Brentwood community.  Studies conducted after the incident revealed that the water near the Park contained elevated levels of lead, cobalt, and zinc.  Brentwood resident and grandmother Marie Zmroczek said that after 40 years of living in the neighborhood, she turned on her faucet and all she saw was brown water.[35]  Brentwood resident Stephen D'Giff told reporters that his property value dropped by more than $100,000 since news of the toxic dumping broke.[36]  Brentwood resident Ebony Hartman told reporters that her main concern was "the health ramifications that will come back to haunt" the community later.[37]

113.     Months after closing the Park and remaining silent, the Town of Islip organized a community meeting on or around May 20, 2014.  More than 100 Brentwood residents attended, many of whom could not understand the meeting because the Town failed to secure a proper Spanish translator.  But Town officials remained dismissive during the meeting, refusing to take oral questions or recognize that toxins in the Park could harm people in the area. The Town never held another meeting to specifically discuss the dumping.

114.     Over three years after the Park's closure, little progress was made. Eventually, Brentwood residents took matters into their own hands, attending Town Board meetings and compiling petitions with hundreds of signatures calling on the Town Board to speed up construction.  In June 2017, Brentwood resident Samuel Gonzalez told reporters that

---

[35]   *See id.* ("Prosecutors said that the Datres were motivated by greed, avoiding fees and permits while endangering Long Island's drinking water.").

[36]   *Residents to Sue Town of Islip Over Toxic Dumping at Roberto Clemente Park*, CBS New York (July 23, 2014), http://newyork.cbslocal.com/2014/07/23/residents-to-sue-town-of-islip-over-toxic-dumping-at-roberto-clemente-park/.

[37]   *Officials: Cleanup of Roberto Clemente Park Could Take at Least 6 Months*, CBS New York (June 18, 2014), http://newyork.cbslocal.com/2014/06/18/officials-cleanup-of-roberto-clemente-park-could-take-at-least-6-months/.

"for the past four years the Town Board has been holding press conferences promising the Brentwood community that Roberto Clemente Park, including its pool, would open soon."[38]

115.    The Town did not reopen the Park for four years, and even the process of reopening was mired in scandal.  The Town opened the Park on July 31, 2017 without completing construction, leaving critical parts of the Park (such as the pavement and the parking lot) unfinished.  Residents complained that opening the Park in this condition was unsafe for children.

116.    Two Islip officials, Islip Parks Commissioner Joseph Montuori Jr. and his former executive secretary Brett Robinson, pleaded guilty to criminal charges for their involvement in the dumping scandal.  Montuori and Robinson knew about the dumping for months before it came to light, and not only permitted the dumping to continue, but sought to conceal evidence of it.  Montuori and Robinson were accused of deliberately looking the other way on at least five separate visits to the Park as dumpers continued to poison Park soil. Montuori even admitted to investigators that he planned to cover the debris with top soil to hide it from view.  Even though both men ultimately pleaded guilty to criminal charges stemming from their illegal conduct, a spokeswoman for the Town of Islip told reporters that the Town denied any responsibility for the dumping.

*The Pool Closing Scandal*

117.    Even before the dumping scandal, the Town of Islip defunded and closed down the Olympic-size pool located in Roberto Clemente Park (the "Pool") without giving notice to or consulting with the predominantly minority community that used the Pool.

---

[38]    Priscila Korb, *Brentwood Officials, Residents Call for Reopening of Roberto Clemente Park*, West Islip Patch, June 29, 2017, https://patch.com/new-york/westislip/brentwood-officials-residents-call-reopening-roberto-clemente-park.

118.    For generations, the Pool had been a key gathering place for Brentwood and Central Islip families.  Originally opened in 1981, the Pool was in dire need of a new pumping and filtration system—an issue that Town officials acknowledged.  In 2011, given the Pool's age and deteriorating condition, the Town promised Islip's minority community that they would execute key improvements to the facility.

119.    Instead, in 2013 following Superstorm Sandy, Islip officials quietly defunded the Pool, along with another Town pool, the Casamento pool, amid a $26 million budget deficit that triggered a 28 percent tax hike.  The Town Supervisor claimed that the money previously earmarked for capital improvements of these two pools was redirected to Sandy relief.  Sandy mostly devastated the communities on the Atlantic Ocean and the Great South Bay, which tended to be wealthier and predominately white.

120.    Brentwood residents, noticing that the funds for their pool had disappeared, began crowding Town Board meetings to voice their concerns.  They demanded to know why Brentwood's pool was targeted for closure while the Town was pouring money into other community parks and recreation facilities in white, affluent parts of town.  Following the protests, the Town Board managed to find the funds to reopen the Casamento Pool, on the border of West Islip and West Bay Shore (predominately white communities), even though it acknowledged that the Roberto Clemente Park was the ideal choice because it was further away from the other Town pools.  When questioned about why the Town Board could not keep open all of its pools, the Town Board refused to disclose the Town's plans for funding operations.

121.    In spite of the Town Board's indifference, Brentwood residents continued to advocate for the reopening of the Pool.  In March 2013, the Town's Community Development

Agency provided a $300,000 grant to pay for repairs to the Pool and a "grand reopening" of the Pool was scheduled for the summer of 2014.

122.    Notwithstanding the scheduled reopening, as of the filing of this Complaint, the Pool is still closed.  The Town claims that the Pool will reopen this summer.

123.    In the meantime, the Town reluctantly agreed to provide buses to bring Brentwood residents to the community pool in the majority-white neighborhood in West Islip. But in order to ride the bus, residents must have a Town of Islip Recreation Card, which costs $30 and can only be obtained if residents travel in-person to one of a handful of locations in the Town during working hours on a weekday.  Additionally, residents need to provide either a New York State driver's license or a non-driver photo ID and proof of residency, and must then go through a long waiting process just to ride the bus to the other pool.

124.    The Roberto Clemente Park dumping scandal and the Pool closing scandal are just two incidents that are part of Islip's broader failure to provide suitable recreational spaces to its minority communities, despite the fact that it provides them for other communities.

*Effects of Discrimination in Land Use and Environmental Policies*

125.    In addition to the dumping and contamination in Roberto Clemente Park, Brentwood and Central Islip are home to a disproportionate number of other undesirable environmental hazard and waste sites.  These sites include U.S. Environmental Protection Agency ("EPA") designated Superfund sites, Brownfield sites, New York State designated Inactive Hazardous Waste Disposal Sites, and private gravel mines.  The Brentwood and Central Islip environmental hazard and waste sites are often located in the hearts of residential communities and are not well-maintained, thereby posing serious risks of contaminating local water sources and other community resources.

126.    One of the Town of Islip's five Superfund sites—and the only Superfund site in the Town of Islip that is located in a residential community—is MacKenzie Chemical Works in Central Islip.  Through the late 1980s, MacKenzie Chemical Works was used for the manufacturing of chemical products, including fuel additives and metal acetylacetonates, and it was designated a Superfund site in 2001.  According to the EPA, the site's historical sources of pollution are leaking drums, waste lagoons, cesspools and stormwater drywells, and the site has suffered through spills, explosions, and fires.  As of May 2017, the EPA continues to treat soil and groundwater on the site.

127.    Unlike the MacKenzie Chemical Works site in Central Islip, Islip's Superfund sites that are located in predominantly white communities are far away from residential neighborhoods and are significantly further along in their remediation.

128.    All five of Islip's Brownfield sites—properties for which New York State has determined that expansion, development, or reuse may be complicated by the presence of a hazardous substance, pollutant, or containment—are located in the Brentwood area or in close proximity to minority Latino communities.

129.    Two inactive hazardous waste sites—properties in which consequential amounts of hazardous waste may exist—are located in the heart of Brentwood or in close proximity to minority Latino communities, one of which has been tax delinquent for 20 years.

130.    In addition, in July 2015, the Islip Town Board voted to place a scrap metal processing facility in Brentwood, immediately next to a residential neighborhood.  The Suffolk County Planning Commission disapproved of this facility due to its proximity to a residential area, suggesting that a traffic study be completed prior to any construction.  The Town Board disregarded the Planning Commission's recommendation, refusing to commission a

full traffic study and choosing instead to move ahead with the project.  In response, Suffolk County Legislator Monica Martinez issued a press release criticizing the Town of Islip for "demonstrat[ing] once again that it does not respect the opinion of the residents of Brentwood, Central Islip and North Bay Shore; they treat us like second class citizens and are more interested in paying attention to political contributors than their constituents."[39]

### F.    Senate Factor #6:  Racial Appeals by Candidates in Campaigns

131.    Candidates and elected officials running for office in Islip have used both subtle and explicit appeals to race during their campaigns in the form of policy proposals and attempts to rally voters.

132.    Politicians in Suffolk County draw on a longstanding climate of racial animus and violence targeted towards Latino residents.  According to the SPLC's report, "Latino immigrants in Suffolk County are regularly harassed, taunted, and pelted with objects hurled from cars. They are frequently run off the road while riding bicycles, and many report being beaten with baseball bats and other objects."[40]  The story of Carlos Morales is just one example of many: Morales was a Latino immigrant community organizer in Suffolk County who was beaten on the street, called a "dirty Mexican," and told to "go back to where [he] came from." He was hospitalized to treat a dislocated shoulder and fractured knees.  Another Latino immigrant in Suffolk was thrown against a building and called a "[f]ucking immigrant," and incurred substantial out-of-pocket hospital bills to treat his injured shoulder.

133.    In that environment, racial appeals in campaigns and in the rhetoric of elected officials in Islip and Suffolk County have persisted and evolved.  For example, the

---

[39]    Press Release, Monica R. Martinez, Monica Martinez is Outraged at the Approval of a Scrap Metal Facility by the Town of Islip Board (June 25, 2015).

[40]    *Climate of Fear*, *in* Southern Poverty Law Center, Climate of Fear: Latino Immigrants in Suffolk County, N.Y. (Sept. 2009), https://www.splcenter.org/sites/default/files/splc_suffolk_report.pdf.

former Suffolk County Executive, Steve Levy, who was elected in 2003 and served until 2011, used explicit racial appeals in his campaigns and throughout his administration.

134.    In 2006, Levy stated that illegal immigrants' "anchor babies" were forcing Southampton Hospital to close its maternity ward.  His allegation was refuted by the hospital.

135.    In 2008, in response to public outcry over the tragic murder of an Ecuadorian immigrant in Patchogue, Levy allegedly commented that the murder would be a "one-day story" anywhere else.

136.    According to the New York Daily News, at an event in the Town of Islip in 2009, Levy asked someone in an audience if he was a U.S. citizen.  When the man answered that he was, Levy responded that if he was not, "I'd have to deport you, like the guys back there in the kitchen."[41]

137.    Levy's racial appeals were so egregious that, at one point, thirty state legislators from his own party accused him of promoting policies that "instigate divisiveness, hatred and intolerant behavior toward immigrants."[42]

138.    Levy's rhetoric—which was understood by minority communities to be motivated by racial animus—is similar to other rhetoric used by elected officials throughout the region.  In 2001, Suffolk County Legislator Michael D'Andre said that if the number of Latino day laborers increased in his community, "We'll be out with baseball bats."[43]  In 2007, Suffolk County Legislator Elie Mystal said of Latino day laborers, "If I'm living in a neighborhood and

---

[41]    Albor Ruiz, *Suffolk County Executive Steve Levy's Immigration Joke No Laughing Matter*, N.Y. Daily News, Aug. 9, 2009, http://www.nydailynews.com/new-york/bronx/suffolk-county-executive-steve-levy-immigration-joke-no-laughing-matter-article-1.398149.

[42]    Paul Vitello, *Suffolk's Leader Wins a Following on Immigration*, N.Y. Times, June 13, 2007, http://www.nytimes.com/2007/06/13/nyregion/13levy.html?mcubz=3.

[43]    Alice Miranda Ollstein, *Amid Trump's Rise, Long Islanders Fear a Return to Violence Against Immigrants*, Think Progress, Oct. 7, 2016, https://thinkprogress.org/amid-trumps-rise-long-islanders-fear-a-return-to-violence-against-immigrants-a30866875eb4.

people are gathering like that, I would load my gun and start shooting, period."[44]  In 2007, news reports covered George Talley's campaign for Brentwood School Board President that included the use of "code words" for racist beliefs, including "illegals," "outsiders," and "taking care of our own."

---

[44]  *Id.*

139.    To this day, campaigns on Long Island continue to use both subtle and explicit appeals to race.  In 2017, the New York State Republican Committee sent out a mailer showing three men portrayed as bare-chested, menacing, heavily-tattooed Latino gang members with the claim that the Democratic candidate for Nassau County Executive was "MS-13's choice for County Executive" and that she would "roll out the welcome mat for violent gangs like MS-13."  The New York Times called the mailer "a blatant race-based appeal to fear."[45]  Rather than disavowing the incendiary mailer, the Republican candidate positively approved of the mailer and stated that it was "not a time to put political correctness above public safety."[46]  The state Republican Committee also refused to disavow the mailer.



140.    In the 2017 campaign for the Islip Town Board, one candidate used language that was understood by minority communities to be an appeal to racial animus. Republican Jim O'Connor ran on the slogan, "Why Jim O'Connor? Because he's one of us." The mailer features O'Connor pictured with his white family and with Angie Carpenter, the Islip

---

[45]   Editorial, *Willie Horton, Updated for the Trump Era*, N.Y. Times, Nov. 5, 2017, https://www.nytimes.com/2017/11/05/opinion/jack-martins-long-island-ad.html.

[46]   Michael Gormley, *Martins Defends MS-13 Mailer Against Curran; Others Cry Foul*, Newsday, Nov. 1, 2017, at 8.

Town Supervisor, who is also white.  Jim O'Connor was elected to one of the at-large seats on

Islip Town Board on Election Day 2017 and defeated, among others, Latino Brentwood resident

Samuel Gonzalez.





141.     On January 19, 2018, shortly after President Trump reportedly referred to El Salvador, Haiti, and other African Nations as "shithole countries," Islip Councilwoman Trish Bergin Weichbrodt posted on her Facebook page that she was "looking at warm getaways for [her] kids['] February break.    I'm wondering about El Salvador, Haiti or Somalia #recommendations?"[47]

142.     In response to rising outcry over her remark, Bergin Weichbrodt deleted it from Facebook and apologized that her post "offended some of you."   In the subsequent days and weeks, Islip residents repeatedly called on Bergin Weichbrodt to resign.  She has not, in fact, resigned.

---

[47]   *Protesters Call for Islip Councilwoman to Step Down over Facebook Post*, News12 Long Island (Jan. 23, 2018), http://longisland.news12.com/story/37333018/protesters-call-for-islip-councilwoman-to-step-down-over-facebook-post.

143.   Racial discrimination has also shaped policy proposals made during political campaigns.  For example, over the last several decades, certain elected officials and candidates in Islip have campaigned and advocated for "English-only" policies, which would have required most government publications to be printed solely in English and would have required all business with any government contractors to be conducted solely in English.  The minority communities understand this sort of message to be racially discriminatory.

G.   **Senate Factor #7:  Latino Candidates Have Never Been Elected to the Islip Town Board**

144.   As discussed *supra* ¶ 50, Latino candidates have never been elected to the Islip Town Board.

H.   **Senate Factor #8:  Elected Officials Are Less Responsive to the Needs of Islip's Minority Communities**

145.   The inadequate representation of Latinos on the Town Board has severely impacted the Town's responsiveness to the Latino community.  The many municipal agencies governed by the Town Board are frequently unresponsive to the needs of the Latino community, which receives second-class public services compared with Islip's majority white population.

146.   The Town of Islip Department of Public Works ("DPW"), governed by the Town Board, is consistently unresponsive to the issues faced by Islip's Latino community.  DPW does not suitably maintain Town roads in Brentwood and Central Islip, which are covered in potholes and damage, lack proper street lighting, and lack traffic lights or stop signs at key intersections.   A short drive from the white communities to Brentwood and Central Islip highlights the stark difference:  Crossing into the Latino communities reveals crumbling roads and dark streets.  DPW also often fails to trim branches and overgrowth in proximity to power cables in Latino community areas.   This neglect exposes Islip's Latino community to a considerably greater risk of downed wires, power outages, fires, and other hazards during storms.

Police neglect combined with the lack of proper lighting creates areas littered with hypodermic needles, where drug dealing occurs with impunity.  Even the Brentwood Long Island Railroad station parking lot, which the Town is responsible for maintaining, has fallen into disrepair, while other train stations within the Town are well maintained.

147.   DPW is similarly unresponsive to the needs of the Latino communities during snowstorms.  After each snowstorm that hits the region, minority communities are usually last on the list for the plows, if they even make it on the list at all.  After the snowstorms in February 2017, the Town completely disregarded Brentwood and entire streets were left covered in ice and bus stops were left impassable.  When residents call the Town to complain, they are often told that the Town cannot help because there are too many other streets to clean up.

148.   Islip's Department of Sanitation is also unresponsive to the minority Latino community.  In Brentwood, the Department of Sanitation cleans streets less frequently than in the white neighborhoods, often fails to collect garbage, and sometimes leaves trash on the side of the road for weeks at a time.  In one particularly egregious instance of the Town's neglect, in May 2017, Brentwood residents found that a local construction company had dumped roofing materials, wood, and plastic buckets in a local skate park.  The Town did nothing to clean up this dumping, leaving the residents themselves to remove the debris.

149.   Fire departments in Islip are similarly unresponsive to calls that come from Spanish speakers.  Residents report that fire departments often take in excess of 30 minutes to respond to a call and, even when they arrive, they fail to provide adequate services.

150.   The Town's Events Calendar, which offers a wide variety of events and programs (including, but not limited to, cultural events, festivals, expositions, youth activities, and programs for seniors) rarely take place in the predominantly Latino areas within Islip.  The

vast majority of summer camp programs are also located far from these areas, making it difficult for members of the Latino minority community to access Town programs. Additionally, of the nine summer events offered on the 2017 Islip Summer Recreation calendar, none was located in Latino neighborhoods.

151. The Town has also limited the opportunity to use the public streets for parades in honor of Latino heritage. In 2005, the Salvadoran American Alliance and the Costa Rican Chamber of Commerce attempted to host the Third Annual Salvadoran/Central American Parade/Festival in Islip. At first, the Town refused to permit the parade/festival until the police and fire services in Brentwood also approved. Over a month later, and a month before the event, the Town suddenly insisted that the parade organizers obtain additional approval from four other agencies before giving final permission. The parade organizers were forced to file a lawsuit against the Town alleging that its refusal to approve the parade was discriminatory, at which point the Town relented and approved the parade.

152. Even cable service in Islip's minority communities was sub-par when compared to the rest of Islip. In 2007, Islip entered into a contract with Verizon that many viewed as shortchanging the minority communities—the original contract only required that 73 percent of the Town be covered for cable service within five years, and this plan would have meant that the minority communities in Brentwood and Central Islip would not have received cable service for years. It wasn't until the customers complained and politicians such as Suffolk County Legislator Ricardo Montano intervened did the Town reach a new agreement that covered Brentwood and Central Islip.

153. Most recently, on April 24, 2018, the Islip Town Board appointed three new members to the five-member Community Development Agency ("CDA") Board of

Directors, an independent agency that, among other things, administers federal housing funds, and primarily serves the Town's less affluent neighborhoods of Brentwood and Central Islip.[48] The new members—all of whom are white and live in affluent and predominantly white communities in Islip—replaced two of the Latino members, leaving just one Latino member on CDA's Board.

---

[48]   Rachelle Blinder, *Islip Split on Community Development Agency Appointments*, Newsday, May 6, 2018, https://www.newsday.com/long-island/suffolk/islip-community-development-agency-1.18373686.

154.    It stands to reason that the Town Board is unresponsive to the needs of Islip's Latino community, given that members of the Town Board do not live in Islip's minority communities.   As illustrated in the map below, over the last three decades, none of the 30 residences belonging to members of Town Board has been located in Brentwood.



I.      **Senate Factor #9:  Islip's At-Large Structure Is Not Justified**

155.    There is no legitimate justification for maintaining the at-large election structure in the Town of Islip.  Town officials cling to the at-large structure because it preserves and protects those in power, rewards them and their allies with the highest salaries of any town on Long Island, and shields corrupt officials from accountability, all of which harm the Town's minority communities.

156.    Good government advocates in Islip have long campaigned for a transition to a ward election system in order to promote accountability and representation.  One such agency, the Committee for Council Districts in Islip, twice submitted petitions to put the question of ward elections on the ballot as a referendum.  Each time, the petitioners gathered more than enough signatures to qualify, but the Islip Town Clerk failed to recognize the petition due to "technicalities."  Each time, the Islip Town Board has also resisted these efforts.

157.    In 2005, the Town Board voted 3-2 to reject a proposal for a special election in April 2006 that would have permitted Islip citizens to vote on whether the Town of Islip should end the at-large election system.  The referendum was delayed until November 2006, where it was defeated with 21,373 votes in favor (46.02%) and 25,063 votes opposed (53.98%).  Voters in most hamlets and villages within Islip voted against the referendum; however, Brentwood was one of the few hamlets or villages in which a majority of voters supported the referendum.  In fact, the referendum received more support in Brentwood than any part of Islip.

158.    Even those who have defended Islip's at-large elections have recognized elsewhere that it lacks any legitimate policy basis.  In 2016, the Town of Islip Republican Party supported a referendum to transition the neighboring Town of Babylon, where Democrats held a narrow majority, to a ward-based system.  The Islip Republican Party encouraged its volunteers to canvass for signatures supporting the referendum in Babylon.  Yet the Republican Party

resisted exactly the same initiative when it was proposed in Islip (where Republicans held a majority) and would have provided representation to Islip's minority communities.

159.    The only reason why the at-large structure remains in Islip is that it enables Town officials to protect their power and inflate salaries with no dissenting voice to hold them accountable.  That is why the members of the Islip Town Board have the highest salaries of any town on Long Island.  In 2016, the salary for each Board member (which is a part-time position only requiring attendance at meetings once or twice per month) was $77,200.  In contrast, the neighboring Town of Babylon only paid its Town Board members $58,400.95 in 2016.  Town Board members in Brookhaven, which has 150,000 more residents than Islip, were paid only $67,986 in 2016.  Town Board members in Hempstead, which is almost double the size of Islip, were paid only $71,000 in 2016.

160.    Moreover, the Islip Town Board voted in 2016 to automatically increase their salaries each year.  This vote was widely criticized, and one resident felt the need to remind the Board to "keep in mind [that] your part-time position brings in a much higher [annual] salary than many you represent."[49]  But Town Board members have consistently prioritized their own gains over benefits for their constituents.  For example, Islip Town Board members have rewarded themselves complimentary town cars for decades while simultaneously cutting town services.  Access to these cars was so abused that, in 2007, GPS units were installed to prevent Town Board members from using them for personal purposes.

161.    The bloated salaries do not stop with the Town Board:  In 2016, the Town Board also gave raises to seven high level management employees under the guise of "budget-

---

[49]    Rick Chalifoux, *Automatic Raises for Town Board Approved*, The Islip Bulletin, Mar. 10, 2016, https://www.islipbulletin.net/2968/Automatic-raises-for-town-board-approved.

related transfers."[50]   At least six of the seven beneficiaries are white. The Town Board was accused of providing these raises without transparency by "mask[ing]" them in the Town Budget.  All seven of the employees who received these "masked" raises from the Town Board have made political contributions to Islip politicians or to the Town of Islip Republican Party.[51] The raises for these seven employees cost taxpayers over $150,000.

162.   Exacerbating the problem, the Town Board financed these salary increases through across-the-board tax hikes.  In 2017, the Town Board approved a budget with a 9.9% tax increase.  The Board was accused of "completely ignor[ing] the will of the people," and "break[ing] the backs" of local families that are already struggling to make ends meet.[52]

163.   In addition to allowing unchecked salary increases, by eliminating the possibility of dissenting voices demanding accountability, the at-large structure has also contributed to a culture of corruption in Islip.  The Town's recent history is replete with examples of local officials exploiting their positions for profit in violation of the law.  For example, former Islip Town Public Safety Commissioner John J. Carney and Islip Town Fire Marshal Michael Allen were indicted for corruption.  They were alleged to have coerced Civil Service candidates into declining job offers so that provisional employees could be hired.

---

[50]   Joye Brown, *Islip Managers' Raises Legal, But Not Transparent*, Newsday, Oct. 25, 2016, at 14.

[51]   For example, Arthur Abbate, Director of Labor Relations, has made nearly 50 political contributions totaling thousands of dollars to Republican candidates and party committees, including multiple contributions to Republican members of the Islip Town Board in the years leading up to his masked raise.  James Heil, the Environmental Control Coordinator, has given over one thousand dollars to Islip Republican politicians, including multiple contributions to Republican members of the Islip Town Board in the months leading up to and immediately after his masked raise.  Thomas Owens, Director of Parks and Public Works, has made more than ten political contributions to Republican candidates in Suffolk County, including members of the Islip Town Board.  Tracey Krut, Islip Supervisor Angie Carpenter's Chief of Staff, has made numerous political contributions to Republican members of the Islip Town Board since 2013.  William Mannix, the Director of Industrial Development, has made more than ten political contributions to the Islip Republican Party and Islip Republican politicians, including members of the Town Board.

[52]   Priscilla Korb, *Town of Islip's Proposed 2017 Budget Includes 9.9 Percent Tax Increase*, West Islip Patch, Oct. 18, 2016; *see also* Priscilla Korb, *Islip Town Board Votes to Approve $223.5 Million Budget With Over 9 Percent Tax Increase*, West Islip Patch, Nov. 14, 2016.

Carney was convicted of three misdemeanor coercion charges on April 26, 2017.  Michael Allen pled guilty to a misdemeanor coercion charge on July 11, 2017.  The Islip Town Board appointed Carney, a Republican, in 2013.  Prior to his conviction, Carney was briefly appointed to the position of Deputy Town Supervisor by the current Town Supervisor, Angie Carpenter.  Carney has donated to the Town of Islip Republican Committee annually since 2009.  Approximately $4,000 or about 20% of his overall contributions, have gone to Carpenter.  He also has consistently donated to at least five Republican candidates running for the Town Board.  Allen is also a political donor, including to the Town of Islip Republican Committee.

164.   Former Town Supervisor Peter McGowan was also convicted of corruption.  The New York Times described McGowan as "rul[ing] Islip and its all-Republican Town Board with an iron fist . . . little happened in the Suffolk Republican Party without his consent or at least his comment."[53]  McGowan was found to have used his campaign fund to pay for personal and non-campaign related expenses including restaurants, vacations to Florida and Ireland, spa treatments, massages, and $26,000 on a lease of a Mercedes-Benz.  McGowan was ultimately charged with receiving bribes in excess of $50,000.  McGowan resigned on March 9, 2006 and pleaded guilty to receiving a bribe, grand larceny, offering a false instrument for filing, and witness tampering.  He admitted that he "fil[ed] falsified campaign disclosure forms, strong-arm[ed] a campaign consultant into helping him launder kickbacks through his campaign account, and pressur[ed] the consultant to lie to the district attorney's office and the grand jury."[54]

---

[53]   Vivian S. Toy, *In Islip, a Big Man Besieged by Opposition and Scrutiny*, N.Y. Times, Feb. 19, 2006, https://www.nytimes.com/2006/02/19/nyregion/nyregionspecial2/in-islip-a-big-man-besieged-by-opposition-and.html.

[54]   Julia C. Mead, *Ex-Supervisor of Islip Gets 3 Months, a Light Term*, N.Y. Times, May 5, 2006, at B5.

165.     The Roberto Clemente Park dumping scandal is yet another example of corruption in Islip.  Tom Datre Sr., one of several individuals alleged to have been involved in dumping 40,000 tons of debris in Roberto Clemente Park while the Town turned a blind eye, had raised and contributed hundreds of dollars to the Islip Republican party in the years leading up to the dumping.  Two Town officials were even convicted for their roles in failing to protect a park that served as the center of the Latino community in Brentwood.

166.     These examples of corruption are indicative of a political culture in which abuses of power are commonplace, and in which Town officials can, and often do, profit from the positions of public trust, often to the detriment of Islip's minority population.

167.     By allowing unchecked compensation and corruption, Islip's at-large structure does a disservice to all of the people of Islip, including its minority communities.  It has also led to high-profile scandals, such as the dumping in Roberto Clemente Park, which disproportionately harm Islip's minority residents.  Transitioning to single-member districts would not only give Latino voters an equal opportunity to elect candidates of their choice, but might also avoid the corruption and waste that stems from the at-large system, which lacks any legitimate basis.

## COUNT I

**Violation of Section 2 of the Voting Rights Act of 1965**

168.    Plaintiffs repeat and incorporate herein the allegations set forth in paragraphs 1 through 167 above, as if fully set forth herein.

169.    The minority Latino population in the Town of Islip is sufficiently numerous and geographically compact to allow for the creation of at least one properly-apportioned, single-member district for electing a member of the Islip Town Board in which minority voters would constitute a majority of both the total population and the voting age population.

170.    The Town of Islip's minority Latino voters are politically cohesive and elections within the Town of Islip show a clear pattern of racially polarized voting.

171.    The totality of the circumstances establishes that the at-large election scheme currently in place has the effect of impairing the Town of Islip's minority Latino voters an equal opportunity to participate in the political process and to elect representatives of their choice by diluting their voting strength, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

172.    Unless enjoined by order of this Court, Defendants will continue to act in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Town Board using the current, unlawful at-large scheme.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment from the Court:

(a)      Declaring that the use of an at-large system to elect members of the Islip Town Board violates Section 2 of the Voting Rights Act;

(b)      Ordering injunctive relief enjoining Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections for members of the Town Board of Islip under the current at-large method of election;

(c)      Ordering the implementation of a new method of election and districting plan for the Islip Town Board that complies with Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

(d)      Awarding Plaintiffs their reasonable attorneys' fees, pursuant to 52 U.S.C. § 10310(e), and the costs and disbursements of maintaining this action, such as expert fees;

(e)      Retaining jurisdiction to render any and all further orders that this Court may deem appropriate; and

(f)      Ordering such other relief that the Court deems just and reasonable.


Dated: June 18, 2018

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:      /s/ Gregory F. Laufer

Gregory F. Laufer
Paul A. Paterson
Amy K. Nemetz
Michael J. Pernick
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
glaufer@paulweiss.com

ppaterson@paulweiss.com
anemetz@paulweiss.com
mpernick@paulweiss.com

THE LAW OFFICES
OF FREDERICK K. BREWINGTON
Frederick K. Brewington
Tricia S. Lindsay
556 Peninsula Blvd.
Hempstead, New York 11550
(516) 489-6959
fred@brewingtonlaw.com
tricia.lindsay@brewingtonlaw.com

NEWMAN FERRARA LLP
Randolph M. McLaughlin
Debra S. Cohen
Danielle B. Sullivan
Frank H. Foster
1250 Broadway, 27th Floor
New York, New York 10001
(212) 619-5400
rmclaughlin@nfllp.com
dcohen@nfllp.com
dsullivan@nfllp.com
ffoster@nfllp.com

Attorneys for Plaintiffs