UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

Ana Flores, Rene Flores, Maria Magdalena Hernandez,
Magali Roman, Make the Road New York, and New York
Communities for Change,

Plaintiffs,

v.

Town of Islip, Islip Town Board, and Suffolk County
Board of Elections,

Defendants.

---

2:18-cv-03549 (ADS) (GRB)

## DECLARATION OF DANIEL ALTSCHULER

DANIEL ALTSCHULER declares pursuant to 28 U.S.C. § 1746:

1.     I am submitting this declaration in support of Plaintiffs' motion for a preliminary injunction in this case.

2.     I am a political scientist, community organizer, and writer.  I received my undergraduate degree from Amherst College.  I hold a doctorate in Politics and a Masters in Developmental Studies from the University of Oxford, where I studied as a Rhodes Scholar.  I have recently held positions as a Copeland Fellow at Amherst College and as a Visiting Scholar at the Milano School for International Affairs, Management, and Public Policy at the New School for Public Engagement.  I am currently an Adjunct Assistant Professor of Public Service at New York University's Robert F. Wagner Graduate School of Public Service.  My academic research has focused on civic and political participation and civil society in Honduras and Guatemala.  I co-authored *The Promise of Participation: Experiments in Participatory Governance in Honduras and Guatemala* (Palgrave-MacMillan, 2013) with Javier Corrales, as well as other academic articles.

3.      Currently, I am the Director of Civic Engagement and Research at Plaintiff Make the Road New York ("MRNY"), as well as the Managing Director of Make the Road Action, which has offices in five states, including one in Brooklyn, New York. From 2011 to early 2014, I led the Long Island Civic Engagement Table ("LICET"), a coalition led by community organizations including MRNY and Plaintiff New York Communities for Change ("NYCC"), which works to increase civic participation among working-class communities of color. From early 2014 to early 2015, I was MRNY's Long Island Coordinator, working out of MRNY's Brentwood office in Suffolk County. In early 2015, I assumed my current role at MRNY, though I continued to take an active role in the work MRNY has been doing in Long Island.

4.      Since I joined MRNY in 2011, we have worked to grow our membership in minority communities in Long Island. Today, we have over 1,000 members on Long Island, many of whom live and vote in the Town of Islip. MRNY's work in Islip includes, but is not limited to, increasing civic participation through voter registration, nonpartisan get-out-the-vote efforts, and educating community members about how the political system works. Since 2011, MRNY, in partnership with LICET, has reached out to over 150,000 voters in Brentwood and Central Islip through phone calls and door-to-door canvassing in order to educate voters in these communities (which have had historically low voter turnout) about upcoming elections. MRNY also provides English classes, workshops about immigration law and workplace rights, and legal counseling, as well as advocates on behalf of our members on the local, state, and federal levels on issues ranging from immigration to housing to health to education.

5.      Through our concerted organizing efforts during the 2011 and 2012 election cycles, we were able to achieve significant increases in the percentage of minority voters

who voted relative to previous comparable election years. Despite these efforts, however, Latino engagement in Town elections remained much lower than engagement among white voters. This has remained true for subsequent election cycles, particularly those held in odd years, when Town Board elections take place. In my experience, the Latino community in Islip is widely aware of presidential elections held every four years. A smaller subset is aware of federal elections held every two years, and very few are aware of state and municipal elections in off-cycle odd years. The off-cycle odd year elections, which are not as widely advertised or promoted as federal elections, exacerbate an already significant information deficit among Latino communities. On top of this, many members of Latino communities are immigrants and either speak no English or very limited English. The result of holding Town Board elections in off-cycle odd years is that communities that are already largely disenfranchised by a lack of information face a further disadvantage in accessing information about local elections.

6.      Another reason that Latino voter participation still lags behind white voter participation on the local level, despite the success of our civic engagement efforts, is that the Latino community has been unable to elect a candidate of its choice in the past decade. In fact, the Latino community has never come close to doing so. It is my belief that it would be virtually impossible for Islip's Latino community to elect a candidate of its choice to the Islip Town Board under the current at-large system. It is also my belief that the unrepresentative Board elected by the at-large structure has had a chilling effect on political engagement and community engagement of the Latino population in the Town. It is difficult to get the Latino community excited about Town Board elections because the white community generally votes against Latino candidates and the white community is sufficiently large to outvote the Latino community in every election.

7.    Furthermore, Islip is a very large town of over 100 square miles, which means that it requires significant funds to effectively campaign for public office. The communities of color in Islip are not as affluent as the white communities, so it is difficult for political candidates from Islip's Latino communities to raise money. As a result, candidates from these communities will always be at a distinct disadvantage in terms of fundraising and mobilization when running for Town-wide office.

8.    During my time at LICET and MRNY, I have helped lead multiple Election Protection efforts in Suffolk County. I believe that protecting the right to vote is essential to ensuring that our democracy functions properly. People in more impoverished immigrant communities are particularly susceptible to having their right to vote threatened and denied. They face numerous barriers to voting beyond the information gap, including transportation issues and long lines at polling places. I therefore think that it is particularly important to provide robust Election Protection services in these areas. As part of these efforts, I supervised an Election Protection hotline that that was staffed from 6am to 9pm on Election Day in certain years. These hotlines are typically staffed by attorneys, law students, or other individuals such as myself who have expertise with voting issues. It is LICET and MRNY practice to document and memorialize calls that we receive from voters. I coordinated trainings for our voter protection volunteers and full-time staff on how to best assist voters calling the hotline. A true and accurate copy of a blank "Problem Log" form from 2012 is attached as **Exhibit A**. This log is the typical form that our Election Protection hotline would use to memorialize calls from voters at or near the time that a particular call was made. It is the regular practice of LICET and MRNY to keep and maintain completed Problem Logs. We would also typically provide our hotline volunteers with a script. **Exhibit B** is a true and accurate copy of

4

an email from November 4, 2012 that I sent to my colleague Ana Maria Archila with a script

attached, beginning on page 2, that, among other things, instructs the volunteers what to do if

someone calls with questions about the location of their polling place, issues about registration,

or voter ID requests.

        9.      On Election Day 2011, Election Protection volunteers under my

supervision fielded numerous calls from voters.  I also personally fielded calls that year.  I

learned there were poll sites in predominantly Spanish-speaking communities in Suffolk County

that were closed without warning and some lacked translation services.

        10.     Our most robust non-partisan Election Protection operation was in 2012,

which I organized and supervised in collaboration with the New York Civil Liberties Union

("NYCLU") and Common Cause New York.  On November 6, 2012, Election Day, we learned

of a multitude of problems that suppressed, intimidated, or otherwise impeded the ability of

Latino voters to cast ballots.

        11.     For example, I learned of an instance of voter intimidation that occurred in

Brentwood.  This incident was reported by an Election Protection hotline volunteer directly

under my supervision and recorded in our Problem Log.  A true and accurate copy of the log is

attached as pages 1 and 2 of **Exhibit C**.  The hotline volunteer prepared the log at or near the

time that the voter complaint was made, and it is the regular practice of NYCLU and Common

Cause to keep and maintain problem logs.  The log records an incident of voter intimidation

recorded at 8:00am at a polling place located at the North Elementary School in Brentwood, in

which a white male poll worker with gray hair in his late fifties, wearing a blue jacket, gave

instructions to a Latina woman to vote for Mitt Romney.  According to the log, the man pointed

at Romney's name four times and instructed the woman to show her ballot to him.  The log

describes that the volunteer spoke with Anita Katz of the Suffolk County Board of Elections ("BOE") and wrote that Ms. Katz would send over the police.

12.      In 2012 we also received numerous calls about poll workers in Brentwood inappropriately telling Latino voters to have their IDs ready for inspection. I recall personally fielding at least one of those calls myself from a voter who was told to present ID at his or her polling place.

13.      At the end of Election Day 2012, the volunteers and other staff submitted their logs to me, and I summarized them in an email, a true and accurate copy of which is attached as **Exhibit D**. I wrote this email on Wednesday, November 7, 2012, the day after the election, based on information I learned through my own experiences supervising the hotline, from hotline volunteers reporting to me, emails sent to me by other supervisors, or from the problem logs submitted to me at the end of Election Day. It is my routine practice, and the routine practice of employees of MRNY, when coordinating Election Day operations like our Voter Protection hotline, to prepare and send an email to our team within one day in order to memorialize the issues that we identified during the course of our efforts. Some of the topics the email describes are instances of poll workers requesting identification from first time voters, the instance of voter intimidation detailed in **Exhibit C**, and an issue with online voter registration, described in detail in the following paragraphs.

14.      In 2012, the Suffolk County BOE implemented a policy to reject voter registrations submitted through the New York Department of Motor Vehicles' ("DMV") online voter registration system. When this issue came to light, a number of organizations, including the Brennan Center for Justice at New York University School of Law, NYCLU, MRNY, and LICET worked to try to convince the BOE to fix the issue, because we believed it would affect

the ability of many people in the Latino community to vote.  On November 1, 2012, the Brennan

Center sent a letter to Anita Katz and Wayne Rodgers, who were the Commissioners of the

Suffolk County BOE.  A true and accurate copy of this letter is attached as **Exhibit E**.  On

November 5, 2012, the Brennan Center sent letters to Gail Lolis, who was the General Litigation

Bureau Chief at Suffolk County BOE, and to the New York State BOE.  True and accurate

copies of these letters are attached as **Exhibit F** and **Exhibit G**, respectively.  All three letters

were sent to me by Amol Sinha at NYCLU on November 6, Election Day 2012.  The letters

warned that the Suffolk County BOE registration policy risked disenfranchising thousands of

voters.  Notwithstanding these warnings, the Suffolk County BOE did not correct the issue.  I

worked with NYCLU to publicize this issue and hold Suffolk County accountable.  On

November 6, 2012, NYCLU and MRNY issued a press release condemning the registration

policy, to which I contributed the following quote: "It is unconscionable that Suffolk County's

Board of Elections would deny people the right to vote who have registered according to the

state's online procedures.  We demand that the Board of Elections rectify this appalling act of

disenfranchisement."  A true and accurate copy of this press release is attached as **Exhibit H**.

15.     On November 14, 2012, I ghostwrote an op-ed in *Newsday*, which was

authored by Amol Sinha and my colleague Karino Claudio, that described these issues.  A true

and accurate copy of this op-ed is attached as **Exhibit I**.  In the op-ed, I recounted how,

according to one Suffolk County BOE official, 3,200 Suffolk County residents registered using

the online DMV system in 2012, but their registrations were disqualified because of a software

error that made the signatures illegible.  Although the Suffolk County BOE claimed it followed

up with these voters, I wrote that at least 500 people were unable to re-register and thus were

potentially disenfranchised.  I also wrote about how callers to the Election Day hotline we

operated reported several incidents of poll workers asking for identification from voters without legal grounds.

16.     On December 19, 2012, MRNY, NYCLU, LICET, and NYCC presented a memorandum that I, along with others, wrote to County Executive Steve Bellone, a true and accurate copy of which is attached as **Exhibit J**. The memorandum detailed problems with the Suffolk County BOE during the 2012 election, including thousands of voters being disenfranchised due to the failure of the Suffolk County BOE to accept DMV online voter registrations.

17.     On December 9, 2013, I testified before the New York State Assembly Standing Committee on Election Law at the Assembly Subcommittee Hearing on Election Day Operations and Voter Disenfranchisement about the voter suppression issues we learned about during the 2012 Election Protection operation. A true and accurate copy of my testimony is attached as **Exhibit K**. I told the Committee:

> [T]hrough our voter protection hotline in 2012, advocates received several complaints from Long Island voters who were inappropriately asked for identification when trying to vote, particularly in communities of color, without legal grounds to do so. Moreover, when advocates called the Suffolk County BOE to address this issue, we received troubling responses. One BOE staff member told us that all first time voters must present identification when voting, clearly inconsistent with state law. Another BOE official began by giving the same response, but only recanted when an advocate reminded her of the law. Election officials and poll workers who are demanding identification inappropriately are frustrating a policy choice and breaking the law.

18.     In 2013, administrators in the Brentwood School District proposed consolidating poll sites from nine elementary schools into just four middle schools. This proposal was prompted by safety concerns because the elementary schools did not have separate entrances, as well as cost considerations. I was concerned that both the relocation and dramatic reduction in the number of poll sites would further depress voter participation in Brentwood,

which was already plagued by low voter turnout. I feared that many voters would not know

where to vote, would have to travel farther to vote, or would be inconvenienced by long lines. I

attended at least one meeting with officials from the Brentwood School District to discuss this

issue. On August 15, 2013, I sent an email to Billy Easton from the Alliance for Quality

Education to solicit his advice on this issue, a true and accurate copy of which is attached as

**Exhibit L**. On August 26, 2013, I spoke to New York University Professor Carson Whitelemons

to seek his advice on the issue, and sent him an email explaining the issue. A true and accurate

copy of my email to Professor Whitelemons is attached as **Exhibit M**. On August 26, 2013, I

also emailed Susan Lerner from Common Cause to seek her advice on the issue, a true and

accurate copy of which is attached as **Exhibit N**. Finally, on August 26, 2013, I emailed Kathy

Hoey and Robert Feliciano from the Brentwood School Board to advise them that reducing the

number of poll sites would make it more difficult for Brentwood voters to vote, thus depressing

turnout. A true and accurate copy of that email is attached as **Exhibit O**. In December 2013, I

learned that the Brentwood School Board voted not to move the poll sites.

      19.     In addition to the voting issues in the Town of Islip, the Town has

consistently neglected the Latino community and failed to provide it with basic services. The

starkest example of the Town's neglect of the Latino community in recent years has been the

closure of the pool at Roberto Clemente Park, and then later the entire Park due to toxic

dumping. On January 29, 2013, the Islip Town Board voted to close the pools at Roberto

Clemente Park and Casamento Park due to budget cuts as a result of Hurricane Sandy. These

pools were the only ones easily accessible to children of the Latino community in Islip. In

response to the pool closures, NYCC issued a report in March 2013 that I reviewed and edited

arguing that, by closing the pools that served communities of color, the Town Board was "setting

a precedent of racist and classist policy-making that will further disenfranchise the already struggling communities they represent." A true and accurate copy of this report, which I edited, is attached as **Exhibit P**.

20.    In early 2014, the Town closed Roberto Clemente Park entirely. On May 6, 2014, MRNY learned that the Suffolk County District Attorney's Office was investigating the dumping of tens of thousands of tons of hazardous asbestos-ridden waste in Roberto Clemente Park. For the next several years, MRNY, along with a number of partner organizations, worked to demand accountability, educate the community, and advocate for the reopening of Roberto Clemente Park. This work became a significant focus of MRNY.

21.    **Exhibit Q** is a true and accurate copy of a memorandum that I helped write that was sent from MRNY and NYCC to Islip Deputy Supervisor Eric Hofmeister and Councilman and Town Parks liaison Anthony Senft on May 14, 2014. The memorandum details the "broader pattern of neglect" faced by Islip's Latino community, and explains that not only did the Town allow toxic waste to be dumped at Roberto Clemente Park, but also had by that point taken over a year to re-open the pool in Roberto Clemente Park after Hurricane Sandy hit the Town in 2013. Further, because the Town had failed to provide adequate language services for Spanish speakers in the past, the memorandum demands that the Town inform local residents of the cleanup progress on Roberto Clemente Park in all languages.

22.    On May 16, 2014, then-Suffolk County Legislator Monica Martinez, who represented Brentwood, sent a letter to Councilman Senft, copying Acting Supervisor Hofmeister and Town Board Members John Cochran, Steve Flotteron, and Trish Bergin Weichbrodt, requesting that the Town disseminate information to residents of Brentwood in Spanish and English at a meeting concerning Roberto Clemente Park scheduled for May 20, 2014. On May

18, 2014, Legislator Martinez emailed me a copy of the letter she sent to Councilman Senft. A true and accurate copy of the email and attached letter are attached as **Exhibit R**.

23.     The Town did not comply with either the MRNY demands for interpretation services made in the May 14, 2014 letter sent to Deputy Supervisor Hofmeister and Town Councilman Senft or Legislator Martinez's demands in the May 16, 2014 letter to Councilman Senft. On the night of May 20, 2014, I, along with MRNY members, attended a public meeting hosted by the Town of Islip concerning the toxic dumping in Roberto Clemente Park. Representatives of the Town, including Deputy Supervisor Hofmeister and Councilman Senft, refused to take responsibility for allowing the dumping to occur, and did not allow residents to ask them questions directly. The Town did not even allow Legislator Martinez to speak on behalf of the residents of Brentwood. Furthermore, notwithstanding the fact that many community members did not speak English, the Town failed to provide adequate language translation services at the meeting. Instead, people who spoke limited English, including MRNY members, were asked to go to the back of the room to speak to an interpreter, who, by her own admission, was not competent. Following this meeting, I helped prepare a press release, a true and accurate copy of which is attached as **Exhibit S**, issued by MRNY and NYCC on May 21, 2014. The press release sought to hold the Town accountable for its disrespect of Brentwood residents and failure to provide adequate translation services at such an important meeting.

24.     On June 17, 2014, at 6:30pm, I, along with NYCC and MRNY employees and members and other community organizations, held a vigil at the entrance to Roberto Clemente Park. On June 13, 2014, we circulated a notice that I wrote, a true and accurate copy of which is attached as **Exhibit T**, asking community members to wear black and bring flowers. The purpose of the vigil was to demand that the Town immediately clean up Roberto Clemente

Park, allocate funds for free summer youth programs in affected areas, and keep all residents informed in all languages spoken by local residents.

25.     Also on June 17, 2014, the official email account of the Town of Islip sent out an update that I received, a true and accurate copy of which is attached as **Exhibit U**.  The update was digitally signed by Town Board members Anthony Senft, John Cochrane, Steve Flotteron, and Trish Bergin Weichbrodt.  The update confirmed an earlier *Newsday* report that the Town Board had passed a $6 million bond resolution to clean up and repair the Park.  Most notably, in the update, the Town announced that the cleanup period would end by approximately January 1, 2015.  This deadline was never met.  The Town also announced that it had earmarked almost $2 million in funds to improve the Roberto Clemente pools and Park.

26.     On July 9, 2014, I, in coordination with NYLPI and NYCC, sent a Freedom of Information Law ("FOIL") application to the Town.  A true and accurate copy of this application, which was later sent as an attachment to an email to Town Supervisor Tom Croci, is attached as **Exhibit V**, pages 4 through 7.  The application requests "[a]ny records related to the dumping of construction debris and other materials from approximately April 2013 to June 2014 at Roberto Clemente Park in Brentwood, Long Island . . . including, but not limited to, test results of soil, air, and water for each site, and remediation plans."  The FOIL application was drafted and sent by NYLPI, based on conversations I had with attorneys from NYLPI about the issues at Roberto Clemente Park.  We filed this request because the Town had failed to provide transparency to community residents seeking to understand the contamination risk and cleanup plans for the Park.

27.     On July 15, 2014, I, in coordination with NYLPI and NYCC, sent a second FOIL application to the Town.  A true and accurate copy of this application, which was

later sent as an attachment to an email to Town Supervisor Tom Croci, is attached as **Exhibit V**,
pages 9 and 10.  The FOIL application requested copies of all remedial investigation reports for
Roberto Clemente Park, including, but not limited to, the June Enviroscience report, which we
learned about not from the Town, but from a *Newsday* article published on July 13, 2014.  A true
and accurate copy of the article is attached as **Exhibit W**.  The FOIL application was drafted and
sent by NYLPI, based on conversations I had with attorneys from NYLPI about the issues at
Roberto Clemente Park.

        28.    On July 17, 2014, I and other MRNY staff, along with NYPLI and NYCC,
emailed then-Town Supervisor Tom Croci a letter, a true and accurate copy of which is attached
as **Exhibit V**, pages 1 and 2, which contained the previously sent FOIL requests at pages 4
through 10.  The letter demanded a copy of the Enviroscience study concerning the soil and
water contamination at the Park, which we had been unable to obtain from the Town despite the
numerous attempts documented above.

        29.    On September 23, 2014, at 6:30pm, I helped lead a rally cohosted by
MRNY and NYCC at Islip Town Hall to demand transparency and community involvement in
the clean-up of Roberto Clemente Park.  Prior to this rally, we circulated a press advisory in an
email on September 22, 2014, a true and accurate copy of which is attached as **Exhibit X**.  I had
an opportunity to review and edit the press advisory before it was sent out.  In this press
advisory, we demanded that the Town share its draft remedial proposal, make its investigation
and planning documents available to the public, hold a public hearing and a public comment
period, and provide meaningful language access services.  Though the Town ultimately set up a
working group that included members of community organizations, I and MRNY continued to
struggle to get information about cleanup efforts directly from the Town.

30.     By early January 2015, having not even begun work on cleaning up Roberto Clemente Park, the Town finally announced that it had finalized a cleanup plan, about a year after closing the Park. On January 6, 2015, a *Newsday* article came out about Suffolk County investigating potential groundwater contamination from the hazardous dumping. A true and accurate copy of this article is attached as **Exhibit Y**. Though the Department of Environmental Control ultimately concluded that there was no risk to Park users or people living close to the Park, the Town's failure to inform Brentwood residents that their drinking water potentially contained chemical waste was emblematic of the Town's lack of accountability to the Latino community.

31.     During the first several months after the dumping scandal became public, the Town occasionally would make attempts to communicate with community members about the efforts to clean up Roberto Clemente Park, but the attempts at communication were woefully insufficient. Mail and other communications coming from the Town often failed to reach MRNY members, and even when the Town did successfully reach to our members, the communications were often in English and failed to include Spanish translations. In addition, I recall numerous meetings over that period, including Town Board meetings, during which our members requested interpretation services but were told that the Town was not required to provide an interpreter because interpretation was not requested in advance. As a result of the Town's unwillingness to effectively communicate with the Latino community, MRNY employees and volunteers took it upon ourselves to go door-to-door and conduct phone banks in order to learn how people in the community were being directly affected by the Park dumping.

32.     Initially, when the toxic dumping first became public in May 2014, the Town announced that it would raise up to $6 million for the cleanup of the Park and that it would

14

take about four months to remove the polluted dumping.  In June 2014, the Town said that it would rebuild the fields and repair and upgrade the pool in Roberto Clemente Park.  When the Park finally reopened in mid-2017, all that the Town had accomplished was to remove the contaminated material from the dumping.  The Town did not visibly upgrade the Park.  Before the dumping, the Town had made plans to update the Park; all they ended up doing was fixing a mistake that never should have happened.  Throughout the process, the Town demonstrated total disregard and disrespect towards the Latino community through its poor communication, repeated delays, and failure to commit sufficient financial resources towards the project.

33.     In addition to the dumping incident at Roberto Clemente Park, the Town has failed to provide its Latino community with a number of other basic services.  The roads in the predominantly Latino communities in Islip are not maintained as well as the roads in the predominantly white communities in Islip.  On my daily commute to the MRNY office in Brentwood, I would drive through Brentwood on Fulton Street from the Long Island Expressway towards Suffolk Avenue.  Fulton Street and the area between Suffolk Avenue and the Southern State Highway were always riddled with potholes.  In addition, in my role at MRNY, I routinely drove throughout Brentwood and Central Islip and the residential roads in these communities were also in a state of disrepair.  Similarly, on days when there were snowstorms, snow clearing was not comprehensive.  These conditions were always worse in the predominantly Latino neighborhoods than the wealthier and whiter areas of Islip.  In particular, from time to time, I would drive through the roads close to the Town Hall in Islip and the southern parts of Bay Shore, which are predominantly white communities in the Town of Islip and have always been well maintained.

15

34. The street lighting in Brentwood is inadequate. When LICET and MRNY volunteers have gone door-to-door, many have complained that they felt unsafe after sunset because the streets are so dark. They also complained that due to the poor lighting, they would trip and fall because the streets were unevenly paved. I have personally observed that the street lighting in predominantly white communities in Islip is significantly better.

35. MRNY members report that the Town selectively enforces housing codes and specifically targets the Latino community with housing code enforcement actions. MRNY members report repeated, oftentimes harassing, visits from Town officials. In December 2014, the Town passed amendments to the Town Code that criminalized the existence of peeling paint, clogged gutters, and the presence of cockroaches and mice. Violations of these rules could subject homeowners to fines of up to $5,000 and incarceration for up to one year. Further, the amendments contained provisions that were often vague and excessively discretionary and lacked any due process requirements such as standards of proof or an opportunity to defend against and appeal the Town's determinations. The amendments also exempted recordkeeping from disclosure under FOIL. MRNY members raised serious concerns about these amendments. In large part due to these amendments to the Town Code and the harm they would inflict upon our members, on April 20, 2015, MRNY applied for a grant to advocate against these amendments, among other projects. I had an opportunity to review the grant proposal before it was sent. A true and accurate copy of the grant proposal is attached as **Exhibit Z**.

36. When I started at MRNY in 2011, I became aware of lawsuits that had been brought against George Talley, the Brentwood School Board President, and other school officials for racist comments and race-based employment discrimination. Partially because of these allegations, I helped organize a candidate forum for candidates for the Brentwood School

16

Board on May 9, 2012. A true and accurate copy of the email I sent on May 7, 2012 to Brentwood residents inviting them to attend the forum is attached as **Exhibit AA**. The email states that the forum is in part being held because the Brentwood School Board has been repeatedly accused of racial discrimination.

37.     I have personally observed racial appeals made by members of the Islip Town Board and other elected officials in Suffolk County. On January 19, 2018, Islip Councilwoman Trish Bergin Weichbrodt posted on Facebook: "I'm looking at warm getaways for kids February break. I'm wondering about El Salvador, Haiti, or Somalia #recommendations?" I viewed this offensive post on Facebook. A true and accurate copy of this post is attached as **Exhibit BB**. Councilwoman Bergin Weichbrodt posted this statement on Facebook shortly after President Trump derided protections for people from "shithole" countries such as El Salvador, Haiti, and African nations. I interpreted this Facebook post as an example of clear "dog-whistle" racism because it denigrated the country of origin of many members of the community. Members of Islip's Latino community expressed how horrified they were and how openly disrespectful it was to people of color.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at: Brooklyn, New York

February 28, 2019

DANIEL ALTSCHULER

17