**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

Ana Flores, Rene Flores, Maria Magdalena Hernandez,
Magali Roman, Make the Road New York, and New York
Communities for Change,

Plaintiffs,

v.

Town of Islip, Islip Town Board, Suffolk County Board of
Elections,

Defendants.

2:18-CV-3549 (ADS) (GRB)

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................2

    A.    The Islip Town Board and the At-Large Election Structure.............................2

    B.    The Latino Community in Islip .................................................................3

    C.    Procedural History of This Action...............................................................4

ARGUMENT.........................................................................................................4

  I.  PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
      MERITS .................................................................................................5

    A.    Islip's Latino Community Is Sufficiently Large and Geographically Compact
            to Constitute a Majority in a Single-Member District ....................................7

    B.    Islip's Latino Community Is Politically Cohesive.............................................9

    C.    Islip's White Majority Votes Sufficiently as a Bloc and Usually Defeats the
            Preferred Candidate of the Latino Minority Community ................................11

    D.    The Totality of the Circumstances Favors Plaintiffs ......................................13

  II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT A
       PRELIMINARY INJUNCTION.................................................................27

  III.  THIS CASE INVOLVES SERIOUS QUESTIONS ON THE MERITS AND THE
        BALANCE OF HARDSHIPS DECIDEDLY FAVORS PLAINTIFFS................27

  IV.  THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION ...........29

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *Cty. of Albany*,
  2003 WL 21524820 (N.D.N.Y. July 7, 2003) ................................................................27

*Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *Cty. of Albany*,
  281 F. Supp. 2d 436 (N.D.N.Y. 2003).........................................................4, 27, 28, 29

*Benavidez* v. *City of Irving*,
  638 F. Supp. 2d 709 (N.D. Tex. 2009) ..................................................................8

*U.S.* v. *Berks Cty., Pa.*,
  277 F. Supp. 2d 570 (E.D. Pa. 2003) ....................................................................14

*Cisneros* v. *Pasadena Indep. Sch. Dist.*,
  2014 WL 1668500 (S.D. Tex. Apr. 25, 2014) ......................................................8

*City of Rome* v. *United States*,
  446 U.S. 156 (1980).....................................................................................15, 16

*Clingman* v. *Beaver*,
  544 U.S. 581 (2005)..........................................................................................29

*United States* v. *Euclid City Sch. Bd.*,
  632 F. Supp. 2d 740 (N.D. Ohio 2009) ................................................................8

*Garza* v. *Cty. of L.A., Cal.*,
  756 F. Supp. 1298 (C.D. Cal. 1990) .....................................................................23

*Georgia State Conference of the N.A.A.C.P.* v. *Fayette Cty. Bd. of
  Comm'rs*,
  118 F. Supp. 3d 1338 (N.D. Ga. 2015)..................................................................5

*Goosby* v. *Town Bd. of the Town of Hempstead*,
  180 F.3d 476 (2d Cir. 1999) .............................................................................passim

*Goosby* v. *Town Bd. of the Town of Hempstead*,
  956 F. Supp. 326 (E.D.N.Y. 1997) ....................................................................passim

*Green Party of New York State* v. *New York State Bd. of Elections*,
  389 F.3d 411 (2d Cir. 2004) ..................................................................................5

*Hoblock* v. *Albany County Bd. of Elections*,
  422 F.3d 77 (2d Cir. 2005) ....................................................................................4

**Page(s)**

*Jordan* v. *Winter,*
    604 F. Supp. 807 (N.D. Miss. 1984)...........................................................23

*Lockhart* v. *United States,*
    460 U.S. 125 (1983).................................................................................15, 16

*LULAC* v. *Perry,*
    548 U.S. 399 (2006)........................................................................................8

*United States* v. *Marengo County Comm.,*
    731 F.2d 1546 (11th Cir. 1984) ...................................................................22

*McNeil* v. *City of Springfield, Ill.,*
    658 F. Supp. 1015 (C.D. Ill. 1987) ..............................................................25

*Montano* v. *Suffolk Cty. Legislature*, 268 F. Supp. 2d 243 (E.D.N.Y 2003)....................27

*Montes* v. *City of Yakima,*
    40 F. Supp. 3d 1377 (E.D. Wa. 2014) ...........................................................8

*N.A.A.C.P.-Greensboro Branch* v. *Guilford Cty. Bd. of Elections,*
    858 F. Supp. 2d 516 (M.D.N.C. 2012) ..........................................................5

*N.A.A.C.P., Inc.* v. *City of Columbia, S.C.,*
    850 F. Supp. 404 (D.S.C. 1993) ..................................................................25

*N. Am. Soccer League, LLC* v. *U.S. Soccer Fedn., Inc.,*
    883 F. 3d 32 (2d Cir. 2018) ...........................................................................4

*Ortiz* v. *City of Phil. Off. of Cty. Comm'rs Voter Registration Div.,*
    824 F. Supp. 514 (E.D. Pa. 1993), *aff'd,* 28 F.3d 306 (3d Cir. 1994) ........23

*Patino* v. *City of Pasadena,*
    230 F. Supp. 3d 667 (S.D. Tex. 2017)..........................................................24

*Pope* v. *County of Albany,*
    94 F. Supp. 3d 302 (N.D.N.Y. 2015)...............................................11, 18, 21

*Puerto Rican Legal Def. & Educ. Fund, Inc.* v. *New York,*
    769 F. Supp. 74 (E.D.N.Y. 1991) ...........................................................27, 29

*Purcell* v. *Gonzalez,*
    549 U.S. 1 (2006).........................................................................................29

*Rodriguez* v. *Pataki,*
    308 F. Supp. 2d 346 (S.D.N.Y. 2004) ...........................................................9

*Rossito-Canty* v. *Cuomo,*
    86 F. Supp. 3d 175 (E.D.N.Y. 2015) ...........................................................27

**Page(s)**

*Thornburg* v. *Gingles*,
   478 U.S. 30 (1986)...........................................................................passim

*Uno* v. *City of Holyoke*,
   880 F. Supp. 911 (D. Mass.), *vacated on other grounds*, 72 F.3d 973
   (1st Cir. 1995)..............................................................................................22

*United States* v. *Vill. of Port Chester*,
   704 F. Supp. 2d 411 (S.D.N.Y. 2010) ................................................passim

*Wright* v. *Sumter Cty. Bd. of Elections & Registration*,
   301 F. Supp. 3d 1297 (M.D. Ga. 2018) ........................................................5

**STATUTES**

52 U.S.C. § 10301.............................................................................................1, 5

N.Y. Elec. Law § 8-100(1)(a) ...............................................................................4

N.Y. Town Law .....................................................................................................2

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65.............................................................................................1, 4

S. Rep. No. 97–417 (1982) ...........................................................................18, 22

Plaintiffs Ana Flores, Rene Flores, Maria Magdalena Hernandez, Magali Roman, Make the Road New York, and New York Communities for Change respectfully submit this Memorandum of Law, pursuant to Rule 65, in support of their Motion for a Preliminary Injunction.

## PRELIMINARY STATEMENT

Plaintiffs seek to enjoin the Town of Islip ("Islip" or the "Town") and the Suffolk County Board of Elections ("BOE") from holding any elections for the Islip Town Board ("Town Board") under the current at-large system because that system violates Section 2 of the Voting Rights Act of 1965 ("VRA"). 52 U.S.C. § 10301. Nothing about this is extraordinary: courts have repeatedly enforced Section 2 to require that at-large election structures be replaced with single-member districts when substantially large minority populations, such as the Latino community in Islip, are unable to elect candidates of their choice. Similarly, preliminary injunctions are frequently used in voting rights litigation where decisions must be made in accordance with a pre-established election calendar.

What is extraordinary are the facts underlying Plaintiffs' claim. Despite an ever-growing Latino population in Islip that now comprises over one third of the Town's overall population, not a single Latino has ever been elected to the Town Board or any other Town office. Every Town Board candidate preferred by the Latino community in the past decade has lost to an opponent who was supported primarily by Islip's majority white population. The votes of Latinos in Islip are thus diluted by an election structure that permits just over half of the population to elect all of their local representatives. This dilution is compounded by a political context rife with anti-Latino appeals in campaigns, discriminatory voting practices (such as inappropriate requests for identification), political parties that do not recruit Latino candidates,

socioeconomic inequality in education, employment, health, and other areas, as well as a culture of corruption and self-dealing by past Town officials.

The next threat to Latino voters in Islip is already on the horizon: without relief, two more Islip Town Board members will be elected under the at-large system this year, and at-large primary elections may be held as early as June 2019. Without a preliminary injunction enjoining elections held under the at-large election structure, Latino voters will be irreparably harmed. As required by *Thornburg* v. *Gingles*, 478 U.S. 30 (1986), Plaintiffs can demonstrate a substantial likelihood of success on the merits because Latino voters in Islip are sufficiently large in number, geographically concentrated, and politically cohesive, enabling them to elect a candidate of their choice in a single-member district, while white voters consistently vote as a bloc against Latino-preferred candidates. Because the right to vote freely without any infringement is at stake, a preliminary injunction against the at-large structure is warranted.

## STATEMENT OF FACTS

### A.  The Islip Town Board and the At-Large Election Structure

Islip is governed by a Supervisor, Town Clerk, Receiver of Taxes, and four Councilpersons. N.Y. Town Law § 20. The Supervisor and Councilpersons serve on the Town Board, which governs affairs within the Town. *Id.* § 60. The Supervisor and Councilpersons are elected to four-year terms, and the elections for Councilperson are staggered so that two of the four council seats are up for election every two years. *Id.* § 24. The elections are held "off year," or in odd-numbered years. *Id.* § 80. The Supervisor, Town Clerk, Receiver of Taxes, and four Councilpersons are all elected at-large, so candidates are elected by all voters in the Town, rather than by single-member districts.

2

**B.  The Latino Community in Islip**

Islip's Latino population is highly geographically concentrated in the northwest portion of Islip in the hamlets of Brentwood, Central Islip, and North Bay Shore.  (Andrew A. Beveridge Declaration, Mar. 1, 2019, Ex. A ("Beveridge Rpt.") at ¶ 57 (Map 8).)  According to data from the 2017 one-year American Community Survey ("ACS"), which is conducted by the United States Census Bureau, the total population of Islip is 333,701, of which 115,233 (34.5%) are Latino and 174,303 (52.2%) are non-Latino white.  (*Id.* at ¶ 53 (Table 3).)  The total citizen voting age population ("CVAP") is 228,156, of which 59,124 (25.9%) are Latino and 138,613 (60.7%) are non-Latino white.  (*Id.* at ¶¶ 54–55 (Table 5).)  Islip's Latino CVAP has been rising and will continue to rise over the coming years, in part because Islip's citizens under the age of 18 are 39% Latino and only 46.5% non-Latino white.  (*Id.* at ¶ 60.)

Notwithstanding Islip's significant Latino population, no Latinos have ever been elected to the Town Board.  (*See* Michael  D. McDonald Declaration, Mar. 1, 2019, Ex. A ("McDonald Rpt.") at ¶ 49.)  In fact, no Latino has ever been elected to any position in Islip government.  (*Id.* at ¶¶ 13–14 (Tables 1, 2), 49.)  In at-large Town elections, including those for the Town Board, the Latino community is consistently outvoted by the white majority and is unable to elect the candidate they prefer.  (*Id.* at ¶ 68.)  None of the current members of the Town Board, who were elected by the same white majority of voters, even live in the same neighborhoods as most of the Latino population.  (Phil Ramos Declaration, Feb. 25, 2019 ("Ramos Decl.") ¶ 13; Renee Ortiz Declaration, Feb. 28, 2019 ("Ortiz Decl.") ¶ 11.)  Further, a majority of Latinos did not vote for any of the current Town Board members (McDonald Rpt. at ¶¶ 48–49 (Tables 6, 7).)  The lack of representation for Islip's Latino community has led to disastrous results, as detailed below and in the numerous declarations filed in support of this motion.

3

C. **Procedural History of This Action**

Plaintiffs filed the complaint in this action on June 18, 2018.  (Compl., ECF No. 1.)  On December 20, 2018, Magistrate Judge Brown issued a scheduling order requiring completion of all discovery by June 21, 2019.  (Scheduling Ord., ECF No. 22.)  Under this schedule, it would have been possible to obtain final relief in advance of the at-large primary election for the Town Board, which was previously scheduled for September 10, 2019.  On January 24, 2019, however, Governor Andrew Cuomo signed legislation advancing the date of all primary elections in New York State to June 25, 2019.  *See* N.Y. Elec. Law § 8-100(1)(a). This change eliminated any possibility for Plaintiffs to obtain relief on a full factual record in advance of the primary election.

## ARGUMENT

To obtain a preliminary injunction pursuant to Rule 65, the moving party must show: (1) irreparable harm in the absence of an injunction; (2) "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party"; and (3) that granting an injunction is in the public interest.  *N. Am. Soccer League, LLC* v. *U.S. Soccer Fedn., Inc.*, 883 F. 3d 32, 37 (2d Cir. 2018).  To meet the second element, a party seeking a mandatory injunction that will "alter the status quo," *Hoblock* v. *Albany County Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005), must demonstrate "a clear or substantial likelihood of success on the merits."  *N. Am. Soccer*, 883 F.3d at 37 (citation and internal quotation marks omitted).

Courts in the Second Circuit do not hesitate to grant preliminary injunctions in cases implicating constitutional and civil rights, including VRA cases.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *Cty. of Albany*, 281 F. Supp. 2d 436, 457 (N.D.N.Y. 2003) (granting preliminary injunction under Section 2 requiring creation of majority-minority

4

district); *United States* v. *Vill. of Port Chester*, 704 F. Supp. 2d 411, 416 (S.D.N.Y. 2010); *see also Green Party of New York State* v. *New York State Bd. of Elections*, 389 F.3d 411, 420 (2d Cir. 2004) (upholding preliminary injunction against New York's voter enrollment scheme).  The same is true of other federal courts, many of which have issued preliminary injunctions in voting rights cases.  *See, e.g.*, *Georgia State Conference of the N.A.A.C.P.* v. *Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338 (N.D. Ga. 2015); *N.A.A.C.P.-Greensboro Branch* v. *Guilford Cty. Bd. of Elections*, 858 F. Supp. 2d 516 (M.D.N.C. 2012); *Wright* v. *Sumter Cty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297 (M.D. Ga. 2018).

## I.  PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS

Plaintiffs allege that the Town of Islip's election structure dilutes the voting strength of the Latino population and discriminates against them in violation of Section 2 of the VRA.  Section 2, as amended, states in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. . . .

52 U.S.C. § 10301.  In *Thornburg* v. *Gingles*, the Supreme Court held that Plaintiffs must prove three preconditions to demonstrate vote dilution that violates Section 2 of the VRA:

1. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district;

2. Second, the minority group must be able to show that it is politically cohesive;

3. Third, the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances,

> such as the minority candidate running unopposed—usually to defeat the
> minority's preferred candidate.

*Gingles*, 478 U.S. 50–51; *Goosby* v. *Town Bd. of the Town of Hempstead*, 180 F.3d 476, 491 (2d

Cir. 1999).  "[I]nquiry into the *cause* of white bloc voting is not relevant to a consideration of the

*Gingles* preconditions."  *Goosby*, 180 F.3d at 493 (emphasis in original).

In addition, the Court must also analyze the "totality of circumstances" with

reference to the following factors:

1. whether there is a history of official discrimination in the political unit;

2. whether voting is racially polarized;

3. whether current electoral mechanisms enhance vote dilution;

4. if there is a candidate slating process, whether access to such a process is denied to minorities;

5. the extent to which members of the minority group in question bear the effects of discrimination in education, employment, and health, that hinder their ability to participate in the political process;

6. whether racial appeals have formed part of political campaigns;

7. whether minorities have been elected to public office in the jurisdiction;

8. whether  elected officials have failed to respond to minority needs; and

9. whether the policy underlying the contested practice or structure is tenuous

*Gingles*, 478 U.S. at 36–37 (citing S. Rep. No. 97-417, at 28–29 (1982)); *Goosby*, 180 F.3d at

491–92.

Plaintiffs need not prove any particular number of factors or that a majority of the

factors "point one way or the other."  *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 28

(1982)).  The "list of factors is neither comprehensive nor exclusive;" rather, in determining

whether Section 2 has been violated, courts should engage in "a searching practical evaluation of

the past and present reality."  *Gingles*, 478 U.S. at 45.  However, "it will only be the very

unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but

still have failed to establish a violation of § 2 under the totality of circumstances."  *Goosby* v.

*Town Bd. of the Town of Hempstead*, 956 F. Supp. 326, 330 (E.D.N.Y. 1997), *aff'd sub nom.*

*Goosby* v. *Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476 (2d Cir. 1999) (quoting *Niagara*

*Falls*, 65 F.3d at 1019 n.21).  Because Plaintiffs meet the *Gingles* preconditions, for the reasons

set forth below, there is a clear likelihood of success on the merits and a preliminary injunction

should be granted.

## A. Islip's Latino Community Is Sufficiently Large and Geographically Compact to Constitute a Majority in a Single-Member District

The first *Gingles* precondition requires that a minority population is "sufficiently

large and geographically compact to constitute a majority in a single-member district."  *Gingles*

478 U.S. at 50.  Plaintiffs have demonstrated a substantial likelihood of successfully proving this

precondition, primarily based on demonstrative districts drawn by expert Dr. Andrew Beveridge.

Islip's Latino population is geographically compact, large, and growing.  Based

on the 2017 one-year ACS, Islip's total population is over 34.5% Latino and CVAP is 25.9%

Latino.  (Beveridge Rpt. at ¶¶ 48, 53 (Table 3).)  Based on the 2013–2017 five-year ACS, Islip's

total population is 30.8% Latino and its CVAP is 20.4% Latino.  (*Id.* at ¶ 48.)  Moreover,

Dr. Beveridge concludes that these figures understate the size of the current Latino population in

Islip:  Islip's Latino CVAP has consistently grown over time and, given that over 39% of Islip

citizens under the age of 18 are Latino, Islip's Latino CVAP will only continue to rise.  (*Id.*

¶¶ 51, 60.)  Latinos are geographically concentrated in the northwest portion of Islip in the

hamlets of Brentwood, North Bay Shore, and Central Islip.  (*Id.* at ¶¶ 56–58.)

Dr. Beveridge confirms that Islip's large and geographically compact Latino

population satisfies the first *Gingles* precondition.  He prepared two demonstrative four-district

plans for Islip, each including one district with a majority-Latino CVAP.  (Beveridge Rpt. at

7

¶¶ 62–88.)  Because "a CVAP majority will typically constitute an effective majority for the purposes of the first *Gingles* precondition," each of Dr. Beveridge's plans is sufficient.  *U.S.* v. *Village of Port Chester*, 704 F. Supp. 2d 411, 440 (S.D.N.Y. 2010); *see also LULAC* v. *Perry*, 548 U.S. 399, 402 (2006).

Dr. Beveridge analyzed Islip as a whole, as well as the demonstrative districting plans, using the ACS, a common source of data that is generally and consistently accepted as reliable in voting cases, particularly for CVAP data.  *See* Beveridge Rpt. at ¶¶ 17, 29–31 & n.11; *see also, e.g.*, *Montes* v. *City of Yakima*, 40 F. Supp. 3d 1377, 1392–93 (E.D. Wa. 2014); *Cisneros* v. *Pasadena Indep. Sch. Dist.*, 2014 WL 1668500 (S.D. Tex. Apr. 25, 2014); *United States* v. *Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 745, 745 n.3 (N.D. Ohio 2009); *Benavidez* v. *City of Irving*, 638 F. Supp. 2d 709, 721 (N.D. Tex. 2009).  Dr. Beveridge utilized both the 2017 one-year ACS, the most current data available, as well as the 2013–2017 five-year ACS, which is the most reliable data available.  (Beveridge Rpt. at ¶ 31.)

Dr. Beveridge used traditional districting principles to draw two demonstrative districting plans.  (*Id.* at ¶¶ 64, 66, 74, 89); *see also Goosby*, 180 F.3d at 498 (finding districting plan drawn using traditional districting principles properly remedied Section 2 violation).  Both plans preserve existing political boundaries:  the "ED Based Plan" preserves Election Districts ("EDs"), which requires at least one Census Block to be split, whereas the "Block Based Plan" preserves Census Blocks, which requires at least one ED to be split.  (*Id.* at ¶¶ 66, 78, 85.)

Both demonstrative plans contain one district with a Latino CVAP majority as a natural result of applying traditional districting principles because of Islip's large and geographically compact Latino population.  (*Id.* at ¶ 62.)  Both plans contain districts of roughly equal population, and both are highly compact according to multiple measures of compactness.

8

(*Id.* at ¶¶ 75, 77, 82, 84.)  District 1 in each plan contains a Latino CVAP of 54.4% based on the 2013–2017 five-year ACS.  (*Id.* at ¶¶ 79, 86.)  Furthermore, Dr. McDonald concludes that a Town Board candidate preferred by the Latino community would consistently be elected under the ED Based Plan.  (McDonald Rpt. at ¶¶ 57, 62 (Table 16).)

**B.  Islip's Latino Community Is Politically Cohesive**

Plaintiffs have demonstrated a substantial likelihood of successfully proving the second *Gingles* precondition that the Latino community is politically cohesive.  *Gingles*, 478 U.S. at 51.  In the Second Circuit, a minority group is politically cohesive when a majority of the group regularly supports a particular candidate in each election cycle.  *Goosby*, 956 F. Supp. at 350 (finding political cohesion when majority of black voters supported a particular candidate in each election cycle analyzed).  Dr. McDonald evaluated all elections in the Town since 2005 and concludes that Latinos vote cohesively nearly 100% of the time.

Dr. McDonald analyzed all of the elections for candidates representing all or part of Islip since 2005 using two well-recognized methods of analysis (ecological inference and bivariate ecological regression analysis) and concluded that the Latino community votes cohesively for its candidates of choice.  (McDonald Rpt. at ¶ 49.)  Numerous courts have accepted both ecological inference and bivariate ecological regression analysis as reliable methods for proving political cohesion in Section 2 cases.  *See, e.g.*, *Gingles*, 478 U.S. at 52–53 (accepting bivariate ecological regression analysis as an acceptable method of proving political cohesion); *U.S.* v. *Village of Port Chester*, 704 F. Supp. 2d 441; *Rodriguez* v. *Pataki*, 308 F. Supp. 2d 346, 388 (S.D.N.Y. 2004) (accepting ecological inference to show political cohesion).

Elections within the electoral scheme challenged by the litigation ("endogenous elections") are the most relevant to determining political cohesion under Section 2.  *See Goosby*, 180 F.3d at 497 (citing *Clark* v. *Calhoun County*, Miss., 88 F.3d 1393, 1397 (5th Cir. 1996))

(holding "exogenous elections are less probative than elections involving the specific office that is the subject of the litigation.").  Here, the Islip Town Board Elections are endogenous elections. Dr. McDonald's analysis demonstrates that, according to both bivariate ecological regression and ecological interference, a majority of Latinos have preferred the same candidate in every Town Board election since 2005.  (McDonald Rpt. at ¶ 48 (Tables 6, 7).)  The same is true of every other office elected Town-wide since 2006.  (*Id.* at ¶¶ 51 (Table 9), 53 (Table 10).)

Dr. McDonald also analyzed elections for positions other than the Islip Town Board ("exogenous elections").  Exogenous elections are also probative for demonstrating political cohesion.  *See Goosby*, 180 F.3d at 497.  Dr. McDonald concludes that greater than 50% of Latino voters in Islip supported the same candidate in 28 exogenous elections for other county, state, and federal positions since 2005.  (McDonald Rpt. at ¶¶ 63–65.)  Of particular note is Suffolk County Legislative District 9, which is located entirely within Islip and includes the Latino neighborhoods of Brentwood, Central Islip, and North Bay Shore, where Latino-preferred candidates are consistently elected by overwhelming margins.  (*Id.* at ¶ 59.)

Evidence of political cohesion among the Latino community is also borne out by personal experience: Assemblyman Phil Ramos is frequently called upon by other candidates to help court the "Latino vote" in Islip, which is politically unified.  (Ramos Decl. ¶¶ 4–6.)  Latino candidates who have run for the Town Board, and lost, report that the Latino community was unified in support of their candidacies.  (Ortiz Decl. ¶ 12; Samuel Gonzalez Declaration, Feb. 26, 2019 ("Gonzalez Decl.") ¶ 7; *see also* Magali Roman Declaration, Feb. 27, 2019 ("Roman Decl.") ¶ 3.)

**C.  Islip's White Majority Votes Sufficiently as a Bloc and Usually Defeats the Preferred Candidate of the Latino Minority Community**

The third *Gingles* precondition concerns whether "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51.  To demonstrate this factor, Plaintiffs must show the minority group's "submergence in a white multimember district impedes its ability to elect its chosen representatives."  *Id.*  Plaintiffs have demonstrated substantial likelihood of successfully proving this condition, again on the basis of Dr. McDonald's conclusion that elections in Islip are characterized by frequent and high degrees of racial polarization.

The Second Circuit uses a bright line rule: a candidate who received more than 50% of the minority population's vote and who did not defeat a candidate in the primary who received more support from minority voters is the minority-preferred candidate for purposes of the third *Gingles* precondition.  *Goosby*, 180 F.3d at 493.  The lack of success by minority-preferred candidates is a key element.  *Pope* v. *County of Albany*, 94 F. Supp. 3d 302, 337 (N.D.N.Y. 2015).  The "critical point" of the third *Gingles* factor analysis is "whether [w]hite voters are voting for other candidates to such a degree that Hispanic-preferred candidates are consistently defeated."  *Port Chester*, 704 F. Supp. at 442; *see also Pope*, 94 F. Supp. 3d at 335. In addition, the Second Circuit has found that the third *Gingles* precondition was met even when two minority-preferred candidates had won an election to the City Council.  *Id.* at 337.

Dr. McDonald analyzed 16 Town Board elections and 9 elections for Town positions since 2005, the results of which demonstrate the same pattern of racial polarization in which the white majority voted cohesively and consistently for different candidates than Latino voters did.  Consequently, the Latino candidates of choice lost 15 out of 16 and 8 out of 9

11

elections, respectively.  (McDonald Rpt. at ¶ 48 (Tables 6, 7).)  The same pattern was observed in 21 out of 28 exogenous elections analyzed by Dr. McDonald.  (*Id.* at ¶¶ 51 (Table 9), 53 (Table 10).)

Only once, in the 2007 general election, did any Latino-preferred Town Board candidate win.  This was the result of special circumstance—a high profile corruption scandal involving the previous Town Supervisor, Peter McGowan—which drove an unusually large number of white voters to abandon candidates affiliated with McGowan.  (*See* Ramos Decl. ¶¶ 7–9).  Outlier election results that can be explained by special circumstances do not diminish an otherwise valid showing of majority bloc voting.  *See Gingles*, 478 U.S. at 57, 57 n.26.  Two years later, the Latino candidates of choice lost to the same majority of white voters who have controlled the outcome of every Town Board election ever since.  (McDonald Rpt. at ¶ 48 (Tables 6, 7).)  The fact that the Latino-preferred candidate tends to be a Democrat, while the elected candidate tends to be a Republican, is not significant for the purposes of this analysis.  *See Gingles*, 478 U.S. at 62.

Finally, Dr. McDonald further demonstrates that the existence of the at-large election structure in combination with white bloc voting makes it impossible for Latinos to elect their candidates of choice to the Town Board.  Based on election data from Legislative District 9—where majority white bloc voting is not an obstacle—Dr. McDonald projected that the same Latino voters would have consistently elected their preferred candidate to the Town Board in every election since 2005 if the elections were conducted under single-member districts.  (McDonald Rpt. at ¶ 61.)

\*       \*       \*

Having demonstrated a likelihood of success on the merits of all three *Gingles* preconditions, preliminary relief should be granted.  *See Goosby*, 956 F. Supp. at 330 ("[I]t will only be the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances.") (quoting *Niagara Falls*, 65 F.3d at 1020 n.21).

### D.  **The Totality of the Circumstances Favors Plaintiffs**

The list of factors provided by the 1982 Senate Report is "neither exclusive nor comprehensive" in that "no specified number of factors need be proved" and "it is not necessary for a majority of the factors to favor one position or another."  *Goosby*, 180 F.3d at 492. According to the Supreme Court, the two most important totality of the circumstances factors are: (1) the "extent to which minority group members have been elected to public office in the jurisdiction" and (2) the "extent to which voting in the elections of the state or political subdivision is racially polarized."  *Gingles*, 478 U.S. at 48 n.15.  When these factors are satisfied, the other Senate Factors "are supportive of, but not essential to, a minority voter's claim."  *Id.*

In this case, Plaintiffs have nevertheless demonstrated a likelihood of success in proving on the merits that the totality of the circumstances suggests Latinos in Islip have less opportunity than other citizens to elect representatives of their choice to the Islip Town Board.

#### 1.  No Latino Has Ever Been Elected to the Town Board or Any Other Town Office

Latino voters in Islip have never succeeded in electing a Latino candidate to a single Town office, including the Town Board.  (McDonald Rpt. at ¶¶ 13–14 (Tables 1, 2), 49.) The court in *Port Chester* faced identical circumstances and concluded:  "there cannot be any more compelling case in support of Senate Factor seven."  *Port Chester*, 704 F. Supp. 2d at 446 (discussing fact that no Hispanic candidate had ever been elected to any village office).

13

2.   Voting in Islip Is Racially Polarized

Voting in Islip is racially polarized.  *Supra* §§ I.C.  Based on the same election results discussed with respect to the second and third *Gingles* preconditions, Dr. McDonald concluded that Latinos have a preferred candidate in each Town Board election who received over 50% of the Latino vote, and in almost every election the Latino-preferred candidate lost to the candidate preferred by a majority of white voters.  This is sufficient to demonstrate this Senate Factor favors Plaintiffs.  *See Goosby*, 180 F.3d at 492 (upholding district court's finding of racially polarized voting based on the same factual elements).

3.   Islip's Latino Community Has Suffered from Official Discrimination in Voting

There is specific—and extensive—evidence of recent, voting-related, official discrimination against Latinos in the Town of Islip.  The subjection of minority voters "to unequal treatment at the polls, including being required to show photo identification where white voters have not been required to do so," is a form of discrimination that satisfies this factor.  *U.S. v. Berks Cty., Pa.*, 277 F. Supp. 2d 570, 581 (E.D. Pa. 2003); *see also Goosby*, 956 F. Supp. at 337–38 (finding the "discriminatory impact" of a facially neutral voter roll purging procedure to be an "appropriate consideration in evaluating" the first factor).

Plaintiffs' evidence includes the observations of numerous witnesses that Latino voters in Islip have been: told they always needed identification or a passport to vote; denied the opportunity to cast an affidavit ballot; deprived of Spanish translation services; intimidated by poll workers; and turned away at the polls.  (Daniel Altschuler Declaration, Feb. 28, 2019 ("Altschuler Decl.") ¶¶ 8–17; Walter Alfredo Barrientos Perez Declaration, Feb. 27, 2019 ("Barrientos Decl.") ¶ 13; Ortiz Decl. ¶¶ 38–40; Ramos Decl. ¶ 28; Gonzalez Decl. ¶ 21.)  In addition, in 2012 the BOE refused to accept the online registrations of thousands of voters submitted through the New York Department of Motor Vehicles (Altschuler Decl. ¶¶ 13–15.)

14

Moreover, Latinos in the region have suffered a long history of official discrimination at the hands of their local government. (*See* Ramos Decl. ¶¶ 26–27 (describing anti-Latino policies espoused by former County Executive Steve Levy and other Suffolk County politicians); Ricardo Montano Declaration, Feb. 27, 2019) ("Montano Decl.") ¶¶ 16–20 (same); Ortiz Decl. ¶ 6, 15–16 (same); Barrientos Decl. ¶ 38–40 (same; also describing a history of racial discrimination against Latinos on Long Island).)

4.  <u>Unusually Large Election Districts, Off-Year Elections, and Staggered Terms Enhance Dilution of the Latino Community's Vote</u>

The third Senate Factor is the use of "voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group. . . ." *Gingles*, 478 U.S. at 45. Islip's Town Board elections utilize several such practices and procedures, including "unusually large election districts," *Id.* at 37 (citing S. Rep. No. 97–417 at 29), staggered terms, *see, e.g.*, *City of Rome* v. *United States*, 446 U.S. 156, 183–85 (1980); *Lockhart* v. *United States*, 460 U.S. 125, 135 (1983), and off-cycle elections, *see Port Chester*, 704 F. Supp. 2d at 444.

The size of Islip further enhances the dilutive effect of the at-large structure and makes it more difficult for Latino-preferred candidates to campaign effectively. Because white crossover votes are necessary for Latino-preferred candidates to win, but Latino crossover voting is not necessary for white-preferred candidates to win, Latino-preferred candidates must campaign across a larger area and voter base, which requires greater financial resources. (*See* Gonzalez Decl. ¶ 6; Montano Decl. ¶¶ 13–16; Altschuler Decl. ¶ 6.) This dilutes the strength of the Latino vote. *Gingles*, 478 U.S. at 45; *Goosby*, 180 F.3d at 488 ("[T]he sheer geographical size of the Town is a barrier to black voting strength" because "campaigning is made more difficult because of the resources required to visit, distribute literature to, and address issues in all parts of the Town."). In addition, Latinos frequently elect candidates of their choice in

Suffolk County Legislative District 9, which covers only a portion of Islip, but are unable to elect anyone to Town-wide positions in at-large elections, including the Town Board. (McDonald Rpt. at ¶¶ 12, 51 (Table 9), 59, 67.)

Islip's odd-year elections enhance the opportunity for discrimination against Latinos because Latino voters are less likely to vote when elections are held at unusual times. (*See* McDonald Rpt. at ¶ 65; Altschuler Decl. ¶ 5.) Courts recognize that local elections that are held at separate times federal elections may enhance the opportunity for discrimination. *See Port Chester*, 704 F. Supp. 2d at 444 ("[H]olding local elections at a time when only the most engaged and politically astute citizens . . . are likely to vote will almost certainly result in the diminished influence of groups who feel generally excluded from the political fabric of the community.") Furthermore, Islip's Town Board elections are staggered, which the Supreme Court has recognized can have a discriminatory effect on minorities. *See City of Rome*, 446 U.S. at 183–185; *Lockhart*, 460 U.S. at 135; *see also Port Chester*, 704 F. Supp. 2d at 444.

5.  Latinos in Islip Are Denied or Discouraged from Accessing the Slating Process

The fourth Senate Factor relates to the inability of Latino candidates to gain access to the ballot for Town Board seats through slating processes instituted by the political parties. *Gingles*, 478 U.S. at 37. The nature of the slating process may enhance vote dilution by posing an obstacle to Latino candidates running for office. *See Goosby*, 180 F.3d at 496. Slating processes that favor candidates with political ties will generally disfavor minority candidates because minorities tend not to enjoy the same institutional support as majority-preferred and majority-race candidates. *Port Chester*, 704 F. Supp. 2d at 435.

In Islip, Latinos running for office face significant hurdles because access to the party endorsement favors individuals with ties to the political establishment, which has been usually dominated by white individuals. (*See* Greg Laufer Declaration, Mar. 1, 2019 ("Laufer

Decl."), Ex. E, Deposition of Nick LaLota ("LaLota Dep.") at 37:16–19) (agreeing that it is more difficult for individuals who are not connected to the party establishment to be nominated).) This is particularly true of the Republican Party, which has held power in the Town for decades, but has never endorsed a Latino candidate for Town Board and operates in an environment that alienates such candidates. (William Garbarino Declaration, Feb. 27, 2019 ("Garbarino Decl.") ¶¶ 15 (describing an email he received begging him to "start a process to find Republican Hispanics"); ¶ 6–7.) It is difficult for Latinos and individuals from the Latino community to develop connections with the Islip Republican Party when the vast majority of Islip Republican events are not held in Latino neighborhoods, and all Republican candidates on the Party's website are white. (Garbarino Decl. ¶¶ 6–7, 14.)

The at-large structure further amplifies these challenges due to the number of petition signatures candidates need in order to get on the ballot, which is difficult to achieve without the resources and backing of a political party. (*See* LaLota Dep. at 18:11-19:4.) Single-member districts would make it easier for candidates who are not affiliated with the political establishment to get on the ballot because "by definition there would be less signatures required." (LaLota Dep. at 151:21-22.)

Although the Islip Democratic Party has endorsed Latino Town Board candidates such as Renee Ortiz and Samuel Gonzalez, it was not easy for these candidates to secure their party's support. (Ortiz Decl. ¶ 7 (noting that she was pressured to run for Town Clerk, which is not as substantive of a position as Town Board member); Gonzalez Decl. ¶ 4 (stating that he had to tell the Democratic Party that he would "run with or without their endorsement").) Ms. Ortiz, in particular, felt taken advantage of by her own party because she believed she was endorsed

only in order to bolster Latino turnout to advance the white Democratic candidates.  (Ortiz Decl. ¶¶ 7–10; Montano Decl. ¶ 16.)

      6.   <u>Latinos in Islip Bear the Effects of Discrimination in Many Socioeconomic Areas</u>

The fifth Senate Factor is "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." S. Rep. No. 97–417 at 29.  This factor is met when a minority group suffers both the socioeconomic effects of past discrimination and exhibits depressed political participation.  *See, e.g.*, *Pope*, 94 F. Supp. 3d at 345.  Plaintiffs have demonstrated that Latinos experience the effects of discrimination and participate in the political process at depressed rates in Islip.

Socioeconomic factors that courts consider in connection with this Senate Factor include, but are not limited to: lower levels of educational achievement; lower income levels; greater likelihoods of living in overcrowded housing, renting homes, and living in homes for less than five years; greater levels of poverty; and the persistence of these issues despite comparable or higher rates of labor force participation.  *See Port Chester*, 704 F. Supp. 2d at 435; *see also*, *Pope*, 94 F. Supp. 3d at 326.  Disparate rates of adverse health outcomes such as "HIV, diabetes, and asthma, [and] barriers to accessing health services" are also relevant.  *Id.*

Plaintiffs' expert, Dr. John Logan, conducted a comprehensive analysis of these issues in Islip and concludes that Islip's Latino community bears the effects of discrimination with regard to a wide array of socioeconomic characteristics and other outcomes, which contribute to their diminished ability to participate in the political process.

Dr. Logan determined that Islip's Latino residents are disadvantaged on every metric he analyzed, such as English language proficiency (approximately 60% of Latinos can speak English well compared to 98% of white residents), homeownership (62.3% compared to

83.1%), and median household income (about $75k for Latinos compared to about $94k for white residents). (John R. Logan Declaration, Mar. 1, 2019, Ex. A ("Logan Rpt.") at ¶¶ 21–25.) Although Latinos are not more likely to be unemployed than white Islip residents, their share of professional or managerial occupations is considerably lower (62% compared to 85%). (*Id.* at ¶ 23.) Dr. Logan finds that Islip's Latino residents are only half as likely as white residents to have any post-secondary education. (*Id.*) Dr. Logan concludes that "Latino residents of Islip exhibit, without exception, poorer socioeconomic characteristics than white residents." (*Id.* at ¶ 25.)

Dr. Logan also concludes that Latinos are disadvantaged with respect to public health outcomes. Latinos in Islip are over four times more likely to be uninsured than white residents, and there are significant disparities in birth outcomes between whites and Latinos, which is "a sensitive indicator of the general public health status of a community." (*Id.* at ¶¶ 33–35.) Finally, Dr. Logan reported that a census tract in Brentwood is considered by the U.S. Department of Agriculture to be a "food desert," where a significant portion of households live more than a mile from a supermarket. (*Id.* at ¶ 34.) This is the only food desert in Islip. (*Id.*).

Dr. Logan further finds that Latinos are disadvantaged with respect to public education based on staggering disparities between Islip's predominantly white and predominantly Latino school districts. (*Id.* at ¶¶ 48–51.) The average Latino student in Islip attends a high school with a 77.8% graduation rate, while the average white student attends a high school with a 92.3% graduation rate. (*Id.* at ¶¶ 52–53.) In the Brentwood School District, where over 80% of the students are Latino and over 70% are eligible for free lunch (a common indicator of poverty concentration), nearly two-thirds of middle school students score in the lowest level in mathematics and nearly half score in the lowest level in English. (*Id.* at ¶¶ 49–

51.)  In contrast, in the West Islip School District, where less than 10% of the students are Latino

and less than 15% are eligible for free lunch, less than 14% of middle students score in the

lowest level in mathematics and less than 12% score in the lowest level in English.  (*Id.*)

With respect to policing and public safety, Dr. Logan concludes that Latinos are

systematically subjected to harassment, hostility, racial profiling, and hate crimes, and found that

the Suffolk County Police Department's ("SCPD") policies increase the likelihood of

discriminatory policing.  (*Id.* at ¶¶ 59–75.)  Dr. Logan explained that "[t]he depth of these

problems is illustrated by how long it is taking for them to be corrected."  (*Id.* at ¶ 73.)  SCPD

has been under the supervision of the Department of Justice ("DOJ") since 2009, and still has not

fully complied with the terms of a DOJ settlement agreement relating to nondiscrimination in the

provision of police services to Latino communities.  (*Id.* at ¶ 74.)  Dr. Logan concludes that law

enforcement has not established sufficient trust within the Latino community, which contributes

to feelings of marginality among Latinos that hinder political participation.  (*Id.* at ¶ 75.)

Finally, Dr. Logan examined how Islip's Latino community is disadvantaged with

respect to environmental hazards.  Dr. Logan found that 10 out of 14 decommissioned hazardous

waste sites in Islip are located in or immediately adjacent to predominantly Latino hamlets, six of

which are still designated by State authorities as posing a "significant threat."  (*Id.* at ¶¶ 81–85.)

Dr. Logan also concludes that the illegal dumping of tens of thousands of tons of toxic debris in

Roberto Clemente Park, a major recreational space in Brentwood, posed serious health and

safety risks, and, because of Town officials' involvement in the dumping, exacerbated Latinos'

sense of political disempowerment.  (*Id.* at ¶¶ 86–90.)

These disparities are corroborated by members of the Islip Latino community and

organizations that advocate on their behalf:

- Insufficient educational support, including insufficient English language services, numbers of desks, heating and air conditioning, and lighting (Ana Flores Declaration, Feb. 27, 2019 ("Flores Decl.") ¶¶ 14–16);

- Significant allegations of employment discrimination within the Brentwood school district (Altschuler Decl. ¶ 37);

- Unequal treatment in emergency health services, including ambulance and emergency room waiting times, and the Town's cuts in funding for a drug rehabilitation program primarily used by the Latino community (Flores Decl. ¶ 24; Ortiz Decl. ¶¶ 26–27);

- A crisis in the shortage of appropriate housing, a high number of abandoned homes, and increasing levels of homelessness (Flores Decl. ¶ 2; Roman Decl. ¶¶ 10–11). Latino homeowners are also unfairly targeted by municipal regulations that impose thousands of dollars in fines for minor infractions, such as peeling paint (Altschuler Decl. ¶ 35);

- Police interactions with the Latino community in Islip are characterized by apathy and brutality, as years of rampant discriminatory policing continue, despite the fact that the SCPD is subject to oversight by the DOJ under a 2014 settlement (*see* Barrientos Decl. ¶¶ 29–34; Roman Decl. ¶¶ 22–25; Ramos Decl. ¶ 33);

- Land use and zoning decisions resulted in scrap metal processing plants and other environmental hazards being placed in or near Latino residential communities (Lucas Sanchez Declaration, Feb. 28, 2019 ("Sanchez Decl.") ¶ 17; Ramos Decl. ¶¶ 23–25); and

- Lack of sufficient youth and recreation programs, which is exacerbated by the Town's decisions to close pools and parks in Latino neighborhoods for extended periods of time (*e.g.*, Barrientos Decl. ¶ 36; Gonzalez Decl. ¶¶ 12–15; Ramos Decl. ¶¶ 21–22).

Plaintiffs need not establish a causal connection or nexus between socioeconomic effects of prior discrimination and depressed political participation. *See Pope*, 94 F. Supp. 3d at 344; *Port Chester*, 704 F. Supp. 2d at 445 ("[a]ccording to the Senate Report, voting rights plaintiffs need not establish [a causal] nexus where both disparate socioeconomic conditions and depressed political participation are shown to exist.") (*quoting Niagara Falls*, 65 F.3d at 1021). The Senate Report clearly states that where socioeconomic disparities "are shown, and where the level of [minority] participation in politics is depressed, plaintiffs need not prove any further

causal nexus between their disparate socioeconomic status and the depressed level of political participation." S. Rep. No. 97–417 at 29 n.114 (1982). In determining whether minority political participation is depressed, courts consider, among other things, whether minority citizens have lower rates of voter registration or voter turnout. *Port Chester*, 704 F. Supp. 2d at 426; *United States* v. *Marengo County Comm.*, 731 F.2d 1546, 1568 (11th Cir. 1984).

Voter participation by Latinos in Islip is depressed, particularly at the local level. Dr. McDonald concludes that the proportion of Latino turnout in federal elections can be as high as 45% in presidential elections, but can be as low as 5% for local elections. (McDonald Rpt. at ¶¶ 50 (Table 8), 65 (Table 22).) Dr. Logan's examination of Latino registration and turnout rates for the 2017 Town elections finds that only about 17% of Latinos were registered to vote, and that Latinos were less than half as likely as white residents to vote. (Logan Rpt. at ¶ 28.) Dr. Logan and Dr. McDonald thus demonstrate that Islip's Latino residents exhibit both lower socioeconomic characteristics and lower levels of political participation.

7. Both Overt and Subtle Racial Appeals Are Used in Islip Political Campaigns

The sixth Senate Factor concerns "whether political campaigns have been characterized by overt or subtle racial appeals." S. Rep. No. 97–417, at 29 (1982). Subtle appeals satisfy this factor even where the language is "subject to different interpretations," when the context makes clear that these appeals are "thinly veiled" code for anti-minority sentiment. *Goosby*, 956 F. Supp. at 343. Examples of subtle racial appeals that courts consider to be strong evidence supporting this factor include: associating minorities with crime in campaign brochures; efforts to link a minority candidate with polarizing organizations or figures; statements referencing a candidate being (or not being) "one of us"; advertisements "expressing concern that 'our' residents were being mistreated" where the "'us' was fairly clearly the longtime white residential community, [and] the 'them' the more recent Hispanic minority," *Uno*

22

v. *City of Holyoke*, 880 F. Supp. 911, 922 (D. Mass.), *vacated on other grounds*, 72 F.3d 973 (1st

Cir. 1995); and candidate statements on racially charged issues such as undocumented aliens.

*Goosby*, 956 F. Supp. at 343; *Ortiz* v. *City of Phil. Off. of Cty. Comm'rs Voter Registration Div.*,

824 F. Supp. 514, 536 (E.D. Pa. 1993), *aff'd,* 28 F.3d 306 (3d Cir. 1994); *Garza* v. *Cty. of L.A.,*

*Cal.*, 756 F. Supp. 1298, 1341 (C.D. Cal. 1990); *Jordan* v. *Winter*, 604 F. Supp. 807, 813 n.8

(N.D. Miss. 1984), *aff'd sub nom. Mississippi Republican Exec. Comm.* v. *Brooks*, 469 U.S.

1002 (1984).

Political campaigns in Islip, including those for the Town Board, frequently

employ anti-Latino appeals to voters.  For example, two current Town Board members,

Ms. Bergin Weichbrodt and Mr. O'Connor, used "us vs. them" language to refer to a Latino

candidate, Samuel Gonzalez, in the most recent Town Board election.  (*E.g.*, Gonzalez Decl. ¶¶

8-9 (describing one campaign mailer that read: "Why Jim O'Connor? Because He's One of

Us."); Garbarino Decl. ¶ 13, Ex. I at FLORES000003457–58).  Ms. Bergin Weichbrodt also

posted the following to her Facebook account after President Trump referred to El Salvador as

one of three "shithole countries": "I'm looking at warm getaways for kids February break. I'm

wondering about El Salvador, Haiti, or Somalia #recommendations?"  Ms. Bergin Weichbrodt's

comments were understood to be a racial appeal because they parroted a disparaging reference to

El Salvador, where many of her constituents are from.  (Altschuler Decl. ¶ 37; Barrientos Decl.

¶ 40; Flores Decl. ¶ 27; Sanchez Decl. ¶ 19.)  Other candidates in Islip and surrounding

jurisdictions have used campaign materials premised on racial stereotypes of Latinos as gang

members, drug dealers, and illegal immigrants.  (Flores Decl. ¶ 30; Ortiz Decl. ¶ 16; Sanchez

Decl. ¶ 19; Gonzalez Decl. ¶ 10.)

23

8. <u>Elected Officials in Islip Are Not Responsive to the Latino Community's Needs</u>

Senate Factor Eight relates to the Town's unresponsiveness to the particularized needs of the Latino community.   Many members of the Latino community feel ignored and unheard by the local government in Islip.  (*E.g.* Flores Decl. ¶ 31; Roman Decl. ¶¶ 2, 15; Sanchez Decl. ¶ 4.)  The Town fails to provide the most basic municipal services, such as pothole repairs, snow removal, street lighting, and garbage collection, on an equal basis to Latino areas.  (*E.g.*, Gonzalez Decl. ¶¶ 16–19; Barrientos Decl. ¶¶ 22–26; Flores Decl. ¶¶ 19–23; Altschuler Decl. ¶¶ 33–34.)  Such evidence is highly relevant to demonstrating lack of responsiveness.  *See Patino* v. *City of Pasadena*, 230 F. Supp. 3d 667, 684, 708 (S.D. Tex. 2017) (holding that the City was unresponsive because "streets, sewage, recreation areas, and other basic infrastructure [we]re much better" in areas where white residents lived than where most Latino residents lived."); *see also Goosby*, 956 F. Supp. at 344.

A pointed example of the Town's inattention to the Latino community was the dumping of 40,000 tons of toxic debris in Roberto Clemente Park, located in the Latino neighborhood of Brentwood.  After the hazardous dumping came to light, information about health risks and cleanup efforts was not properly communicated to residents by Town officials, and it took the Town over four years to clean and fully reopen the Park.  Throughout the process, the Town was unprepared to manage the situation and provide substitute recreational services for thousands of Latino residents.  (*See generally* Barrientos Decl. ¶¶ 14–21; Flores Decl. ¶¶ 7–13; Ortiz Decl. ¶¶ 28–34; ¶¶ Sanchez Decl. ¶¶ 5–15; Ramos Decl. ¶¶ 16–22; Altschuler Decl. ¶¶ 19–32; Gonzalez Decl. ¶¶ 13–15.)

The Town is also unresponsive to the language access needs of the Latino community, failing to consistently provide translation services at events in Latino neighborhoods or concerning programs relevant to Latino residents.  (*See* Barrientos Decl. ¶¶ 22–23; Ortiz

Decl. ¶ 27; Altschuler Decl. ¶¶ 21–23.)  This failure is significant: without suitable translation, it is difficult or impossible for many people in the Latino community to effectively engage with their local government.

When Latinos attempt to advocate for themselves at community meetings, they are frequently met with hostility and defensiveness.  (*See* Roman Decl. ¶¶ 19–21 (describing a recording of Town Supervisor Carpenter's interaction with concerned Latino voters); Barrientos Decl. ¶ 20; Sanchez Decl. ¶ 15.)  Furthermore, elected officials who represent Brentwood, Central Islip, and North Bay Shore at other levels of government often need to intervene on behalf of Latino constituents on Town-related issues because the Town Board is unresponsive. (*See* Montano Decl. ¶¶ 25–28; Ramos Decl. ¶¶ 30–32.)

9.  <u>The Policy Underlying Islip's At-Large Election System Is Tenuous</u>

The final Senate Factor examines whether "the policy underlying the [Town's] use of the challenged . . . practice or procedure is tenuous."  *Goosby*, 180 F.3d at 330 (citing *Gingles*, 478 U.S. at  36–37).  "A policy is 'tenuous' if the reasons behind it appear suspect." *N.A.A.C.P., Inc.* v. *City of Columbia, S.C.*, 850 F. Supp. 404, 425 (D.S.C. 1993).  The prevalence of patronage, self-dealing, and corruption under an at-large structure can be relevant to this analysis.  *See, e.g.*, *McNeil* v. *City of Springfield, Ill.*, 658 F. Supp. 1015, 1032–33 (C.D. Ill. 1987) (finding tenuousness demonstrated because "the real political reason for keeping the [at-large] commission form of government center[ed] on the 1800 jobs over which the commissioners ha[d] power of appointment.").

Support for the at-large structure is driven by Islip's culture of patronage, self-dealing, and corruption, which runs virtually unchecked due to the lack of political accountability under the at-large structure.  Town Board members pay themselves the highest salaries of any town government on Long Island, and regularly raise salaries for their politically-

25

connected appointees.  (Laufer Decl. ¶¶ 2–5.)  Recent Islip history is rife with corruption

scandals, from the misuse of campaign funds by former Islip Supervisor Peter McGowan, to the

conviction of Town officials for their roles in the Roberto Clemente Park dumping.  (*E.g.*,

Ramos Decl. ¶¶ 7–8, 18; Flores ¶ 9; *supra* § I.D.)  The Town Board's 2018 decision to replace

Community Development Agency Board members who were from the minority community with

political allies who are all white and lack experience in community development is yet another

example of political patronage and self-dealing within the Islip Republican Party, and is

emblematic of the culture of corruption in Islip politics.  (*See* Ortiz Decl. ¶ 21–23.)

Republicans involved in Suffolk County politics believe Town council districts

are preferable to at-large Town elections, which supports the tenuousness of the policy reason

underlying Islip's at-large structure.  Notably, Nick LaLota, the Republican Commissioner of the

BOE, believes that districts provide for better government than an at-large structure in a town the

size of Islip.  (LaLota Dep. at 19:5–23, 38:23–39.)  Mr. LaLota also believes that districts

improve the accountability and responsiveness of local elected officials, and enable less

politically connected individuals to become candidates.  (*See id.* at 33:11–34:2, 35:7–39:12; Ex.

4 at FLORES000002633.)

Tenuousness is further exemplified by the fact that numerous prominent and

connected members of Islip's political establishment actually supported districts in the

neighboring town of Babylon as recently as 2016.  In 2016, Islip Republicans were encouraged

to assist in Babylon's "crucial" petitioning efforts to get a referendum in support of districts on

the ballot.  LaLota Dep. Ex. 7.  At least five members of the Islip Republican Committee, and at

least three additional residents of Islip, personally collected hundreds of petition signatures in

support of districts in Babylon between 2016 and 2018.  (LaLota Dep. at 63:21–72:14; 78:20–

90:12; Ex. 10.)  In Islip there is no policy justification:  when Islip Town Supervisor Angie

Carpenter was asked to support districts in Babylon on August 17, 2018, she objected not on the

basis that at-large elections provide better representation, but only because lending her support

would put her in a "very difficult position" in light of this lawsuit.  (LaLota Dep. Ex. 18;

Garbarino Decl. ¶ 16.)

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

As this Court has recognized, the continued abridgment of Plaintiffs' right to vote

in yet another election constitutes irreparable harm.  *See Montano* v. *Suffolk Cty. Legislature*,

268 F. Supp. 2d 243, 260 (E.D.N.Y 2003).  Deprivation of the right to full and effective

participation in the political process "is *in and of itself* irreparable harm."  *Puerto Rican Legal*

*Def. & Educ. Fund, Inc.* v. *New York*, 769 F. Supp. 74, 79 (E.D.N.Y. 1991) (emphasis added);

*see also Rossito-Canty* v. *Cuomo*, 86 F. Supp. 3d 175, 200 (E.D.N.Y. 2015).

Here, time is of the essence.  On January 24, 2019, Governor Andrew Cuomo

signed legislation advancing the primary elections for 2019 from September to June, and

Plaintiffs notified the Court of their intent to file this motion shortly thereafter.  The proximity of

the at-large elections scheduled in June and November weighs heavily in Plaintiffs' favor.

## III.   THIS CASE INVOLVES SERIOUS QUESTIONS ON THE MERITS AND THE BALANCE OF HARDSHIPS DECIDEDLY FAVORS PLAINTIFFS

The balance of hardships favors ensuring that no elections take place under

conditions that violate Section 2 of the VRA.  *See, e.g.*, *Arbor Hill Concerned Citizens*

*Neighborhood Ass'n* v. *Cty. of Albany*, 2003 WL 21524820, at *17 (N.D.N.Y. July 7, 2003),

*report and recommendation adopted sub nom. Arbor Hill Concerned Citizens Neighborhood*

*Ass'n* v. *City of Albany*, 281 F. Supp. 2d 346 (N.D.N.Y. 2003) ("The interests of plaintiffs in

obtaining equal voting rights . . . outweigh the interests of defendants in avoiding disruption of

the ongoing electoral process."). Federal courts routinely hold that administrative burdens do not

outweigh the hardship faced by citizens who are deprived of voting rights. *See, e.g.*, *Arbor Hill*,

281 F. Supp. 2d at 456 ("[T]he deprivation of the rights of blacks and Hispanics to exercise their

vote and participate in the political process outweighed any disruption to the electoral process.").

        Defendants will suffer only minimal hardship, if any, if the injunction is granted.

The Town of Islip and Islip Town Board face almost no hardship at all, as Town government

operations will continue under the current Town Board until an election can be held that does not

dilute the votes of Islip's Latino community.  The BOE meanwhile, faces only the administrative

burden of postponing the June primary for two Town Board seats and informing the public of

this change.  These activities are well within BOE's ordinary course of business, and not

dissimilar to the actions it is likely undertaking in response to the state-wide change in the

primary schedule.  (LaLota Dep. 163:17–22 (BOE has experience administering elections with

districts); 159:8–23 (BOE has significance experience administering special elections); 179:5–

180:18 (BOE can enjoin an election on short notice).)  In contrast, if the injunction is denied,

Plaintiffs and tens of thousands of Latino voters in Islip will once again be significantly and

irreparably harmed when yet another election proceeds under a discriminatory at-large scheme.

        A preliminary injunction will ensure that the Town Board elections, when they

are ultimately held, will be lawful and will respect the VRA.  Any election held under the at-

large structure will be voided if Plaintiffs succeed on the merits, creating substantial confusion

for voters while imposing the same or greater administrative burdens on BOE and forcing

taxpayers to pay for two elections instead of one.  Voiding and redoing an election cannot

possibly be preferable to merely postponing an election.  The irreparable harm that Plaintiffs and

other Latino voters in Islip will suffer in the absence of a preliminary injunction plainly

outweighs the minimal harm to Defendants if the injunction is granted.

## IV.     THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION

The public interest weighs strongly in favor of granting a preliminary injunction

in this case.  Courts in this Circuit have repeatedly held that the public interest is served by

injunctions to speedily remedy violations under the Voting Rights Act.  *See Arbor Hill*, 281

F. Supp. 2d at 457 (granting a preliminary injunction notwithstanding imminent elections,

because procedures to minimize disruptions could be implemented, and the right of minorities to

vote, outweighed any potential disruption); *Puerto Rican Legal Defense*, 769 F. Supp. at 79.  The

Supreme Court has long held that "no right is more precious in a free country than that of having

a voice in the election of those who make the laws under which, as good citizens, we must live."

*Clingman* v. *Beaver*, 544 U.S. 581, 599 (2005) (quoting *Wesberry* v. *Sanders*, 376 U.S. 1, 17

(1964)); *see also Purcell* v. *Gonzalez*, 549 U.S. 1, 4 (2006) ("'[T]he right of suffrage can be

denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by

wholly prohibiting the free exercise of the franchise.'") (quoting *Reynolds* v. *Sims*, 377 U.S. 533,

555 (1964)).  Each election that takes place without addressing the Section 2 violation in Islip is

an election in which thousands of citizens are deprived of the ability to fully exercise their right

to vote.  Therefore, a preliminary injunction in this case is in the public interest.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court

enjoin the Town and the BOE from conducting any election for the Islip Town Board under the

current at-large system.

Dated:   New York, New York
         March 1, 2019

                                    PAUL, WEISS, RIFKIND,
                                       WHARTON & GARRISON LLP


                          By:  _____/s/ Greg Laufer_____

                              Gregory F. Laufer
                              Amy K. Nemetz
                              Michael J. Pernick
                              1285 Avenue of the Americas
                              New York, New York 10019-6064
                              (212) 373-3000
                              glaufer@paulweiss.com
                              anemetz@paulweiss.com
                              mpernick@paulweiss.com

                              THE LAW OFFICES
                              OF FREDERICK K. BREWINGTON
                              Frederick K. Brewington
                              Tricia S. Lindsay
                              556 Peninsula Blvd.
                              Hempstead, New York 11550
                              (516) 489-6959
                              fred@brewingtonlaw.com
                              tricia.lindsay@brewingtonlaw.com

                              NEWMAN FERRARA LLP
                              Randolph M. McLaughlin
                              Debra S. Cohen
                              Danielle B. Sullivan
                              1250 Broadway, 27th Floor
                              New York, New York 10001
                              (212) 619-5400
                              rmclaughlin@nfllp.com
                              dcohen@nfllp.com
                              dsullivan@nfllp.com


                          *Attorneys for Plaintiffs*