**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

ANA FLORES, RENE FLORES, MARIA
MAGDALENA HERNANDEZ, MAGALI
ROMAN, MAKE THE ROAD NEW YORK, AND
NEW YORK COMMUNITIES FOR CHANGE,

                          Plaintiffs,

          v.

TOWN OF ISLIP, ISLIP TOWN BOARD,
SUFFOLK COUNTY BOARD OF ELECTIONS,

                          Defendants.

Case No. 2:18-cv-03549 (ADS) (GRB)

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................. 1

FACTUAL STATEMENT ................................................................................. 6

ARGUMENT ................................................................................................... 8

I.   PLAINTIFFS CANNOT ESTABLISH A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THEIR EVIDENCE PROVES THAT LATINOS HAVE EQUAL OPPORTUNITY TO ELECT IN ISLIP ................................................................ 9

    A.   Plaintiffs Cannot Establish that Race, Rather than Partisanship, Is Responsible for Losses by Latino-Preferred Candidates ................................... 9

    B.   Majority Crossover Voting Is So Substantial that the Latino Minority Already Has an Equal Opportunity to Elect Its Candidates of Choice .................................... 18

    C.   The Totality of the Circumstances Favors Defendants ............................... 20

II.  PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM OR THAT CANCELLING ELECTIONS SUPPORTS THE PUBLIC INTEREST BECAUSE THEIR PLAN WOULD DISENFRANCHISE ALL VOTERS—INCLUDING LATINO VOTERS—AND THROW THE ELECTORAL SCHEDULE INTO CHAOS ........................................................... 26

CONCLUSION ................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. Johnson*,
521 U.S. 74 (1997)..............................................................................................16, 18

*Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*,
281 F. Supp. 2d 436 (N.D.N.Y. 2003)...............................................................29, 30

*Baird v. Consol. City of Indianapolis*,
976 F.2d 357 (7th Cir. 1992) ...........................................................................12, 14

*Bartlett v. Strickland*,
556 U.S. 1 (2009)......................................................................................................18

*Butts v. City of New York*,
779 F.2d 141 (2d Cir. 1985).....................................................................................25

*Cano v. Davis*,
191 F. Supp. 2d 1135 (C.D. Cal. 2001) .....................................................................8

*Chisom v. Roemer*,
853 F 2d 1186 (5th Cir. 1988) .................................................................4, 9, 27, 29

*Clarke v. City of Cincinnati*,
40 F.3d 807 (6th Cir. 1994) ...............................................................................17, 18

*Georgia State Conference of the N.A.A.C.P. v. Fayette Cty. Bd. of Comm'rs*,
118 F. Supp. 3d 1338 (N.D. Ga. 2015) ....................................................................30

*Gonzales v. City of Aurora*,
No. 02-cv-8346, 2006 WL 3227893 (N.D. Ill. Nov. 3, 2006) .................................22

*Goosby v. Town Bd. of Town of Hempstead, N.Y.*,
180 F.3d 476 (2d Cir. 1999)............................................................................. passim

*Goosby v. Town Bd. of the Town of Hempstead, N.Y.*,
956 F. Supp. 326 (E.D.N.Y. 1997) ....................................................................20, 26

*Goosby v. Town Bd. of Town of Hempstead, N.Y.*,
981 F. Supp. 751 (E.D.N.Y. 1997) ......................................................................8, 28

*Jeffers v. Clinton*,
730 F. Supp. 196 (E.D. Ark. 1989).........................................................................12

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
4 F.3d 1103 (3d Cir. 1993).......................................................................................13

*Johnson v. De Grandy*,
512 U.S. 997 (1994).......................................................................................... passim

*Jordan v. Winter*,
604 F. Supp. 807 (N.D. Miss. 1984)...................................................................24, 25

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*League of United Latin Am. Citizens v. Clements*,
   999 F.2d 831 (5th Cir. 1993) ............................................................................14, 15

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006)..............................................................................5, 9, 18, 19

*Mahan v. Howell*,
   410 U.S. 315 (1973).......................................................................................2

*Merced v. Koch*,
   574 F. Supp. 498 (S.D.N.Y. 1983)..................................................................4, 27

*Metro. Taxicab Bd. of Trade v. City of New York*,
   615 F.3d 152 (2d Cir. 2010)...............................................................................8

*Miller v. Bd. of Comm'rs of Miller Cty.*,
   45 F. Supp. 2d 1369 (M.D. Ga. 1998) ................................................................28

*Montano v. Suffolk Cty. Legislature*,
   268 F. Supp. 2d 243 (E.D.N.Y. 2003) .......................................................... *passim*

*Moore v. Brown*,
   448 U.S. 1335 (1980)....................................................................................28

*N.A.A.C.P.-Greensboro Branch v. Guilford Cty. Bd. of Elections*,
   858 F. Supp. 2d 516 (M.D.N.C. 2012) ...............................................................30

*N.A.A.C.P., Inc. v. City of Niagara Falls, N.Y.*,
   65 F.3d 1002 (2d Cir. 1995)....................................................................... *passim*

*Nipper v. Smith*,
   39 F.3d 1494 (11th Cir. 1994) ..........................................................................14

*Ortiz v. City of Philadelphia Office of City Comm'rs Voter Registration Div.*,
   824 F. Supp. 514 (E.D. Pa. 1993) .....................................................................25

*Pope v. Cty. of Albany*,
   687 F.3d 565 (2d Cir. 2012)........................................................................14, 30

*Queens Cty. Republican Comm. ex rel. Maltese v. New York State Bd.
   of Elections*,
   222 F. Supp. 2d 341 (E.D.N.Y. 2002) ..............................................................8, 26

*Reynolds v. Sims*,
   377 U.S. 533 (1964).....................................................................................8, 29

*Rodriguez v. Bexar Cty., Tex.*,
   385 F.3d 853 (5th Cir. 2004) ............................................................................18

*Shelby Cty., Ala. v. Holder*,
   570 U.S. 529 (2013)......................................................................................24

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sw. Voter Registration Educ. Project v. Shelley*,
  344 F.3d 914 (9th Cir. 2003) ................................................................8

*Thornburg v. Gingles*,
  478 U.S. 30 (1986).................................................................... *passim*

*United States v. Charleston Cty.*,
  318 F. Supp. 2d 302 (D.S.C. 2002)..................................................29

*United States v. Upper San Gabriel Valley Mun. Water Dist.*,
  No. CV007903, 2000 WL 33254228 (C.D. Cal. Sept. 8, 2000)........9, 27

*United States v. Vill. of Port Chester*,
  704 F. Supp. 2d 411 (S.D.N.Y. 2010).........................................20, 30

*Uno v. City of Holyoke*,
  72 F.3d 973 (1st Cir. 1995)...........................................13, 14, 19

*Vecinos DeBarrio Uno v. City of Holyoke*,
  880 F. Supp. 911 (D. Mass. 1995) ....................................................25

*Whitcomb v. Chavis*,
  403 U.S. 124 (1971)...............................................................10, 11

*White v. Daniel*,
  909 F.2d 99 (4th Cir. 1990) ...........................................4, 19, 27, 29

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...............................................................................8

*Wright v. Sumter Cty. Bd. of Elections & Registration*,
  301 F. Supp. 3d 1297 (M.D. Ga. 2018) ...........................................30

**STATUTES**

52 U.S.C. § 10301........................................................................9, 17

N.Y. Town Law § 20 (McKinney)........................................................6

N.Y. Town Law § 24 (McKinney)........................................................6

N.Y. Town Law § 60 (McKinney)........................................................6

N.Y. Town Law § 80 (McKinney)........................................................6

N.Y. Town Law § 85 (McKinney)........................................................6

N.Y. Town Law § 20 (McKinney 1932).................................................6

N.Y. Town Law § 24 (McKinney 1932).................................................6

N.Y. Town Law § 80 (McKinney 1932).................................................6

N.Y. Town Law § 85 (McKinney 1932).................................................6

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

OTHER AUTHORITIES

S. Crichton & J. Valenti,
*Republicans take control in Islip*, NEWSDAY (Nov. 9, 2011) ....................................................6

Bernard Fraga,
*The Turnout Gap Between Whites and Minorities Is Larger than You Think
and Hard to Change*, THE WASHINGTON POST (Sept. 25, 2018) ............................................19

S. Rep. No. 97-417, 1982 U.S.C.C.A.N. 177 (1982)........................................................22, 23, 24

## INTRODUCTION

Plaintiffs, purportedly seeking to vindicate Latino voters' ability to elect a candidate of their choice, ask this Court to deny Latinos any ability to even vote for their candidate of choice by cancelling their constitutional right to vote in the 2019 elections, thereby extending the terms of office holders who, according to plaintiffs, were illegally elected under a racist system. Needless to say, one does not vindicate the right to vote by eliminating it and one does not remedy discriminatory electoral schemes by rewarding the beneficiaries of that system by extending their terms of office (in violation of state law). Rather, this simply punishes the putative victims and aids the purported beneficiaries of the illegal scheme.

If an electoral system illegally minimizes minorities' chances of electing their preferred candidates, the solution is not to completely eliminate their chance of doing so by precluding them from even casting ballots. Far from *precluding* irreparable injury, plaintiffs' disenfranchisement scheme would affirmatively inflict injury by denying Latino and other Islip citizens the right to vote, particularly since the loss of the right to vote, "for even minimal periods of time, unquestionably constitutes irreparable injury" to the electorate. *Montano v. Suffolk Cty. Legislature*, 268 F. Supp. 2d 243, 261 (E.D.N.Y. 2003) (citation omitted). Thus, the only rational remedy for illegally discriminatory electoral practices is to replace them with non-discriminatory election practices—not to eliminate elections themselves. If a jurisdiction used unconstitutional literacy tests or poll taxes to suppress minority voting power, the remedy obviously would not be to cancel the elections and thereby completely disenfranchise the disadvantaged minorities—it would be to hold elections under a system without the discriminatory features.

Here, the necessary solution of fixing, rather than cancelling, elections is readily available (if needed) and was the solution plaintiffs themselves were seeking until they recently

decided, for some inexplicable reason, to switch gears and seek a wholly counter-productive cancellation of the 2019 elections.  That is, the only sensible solution here—and the one contemplated by the discovery schedule plaintiffs agreed to prior to their recent about-face—is to determine liability prior to the next regularly scheduled elections in 2021 and, if the at-large system is invalidated, install a new system for those elections.  This normal process is markedly superior to plaintiffs' disenfranchisement effort, not only because it would not eviscerate citizens' right to vote in a democracy, but because it is the only solution that would comport with the Constitution's one-person one-vote requirements without massive voter confusion and disruption to orderly elections.

If the Court were ultimately to replace the at-large system with single-member districts, the districts would obviously have to be of substantially equal population under the Constitution. *Mahan v. Howell*, 410 U.S. 315, 324–25 (1973).  That can easily be done in 2021 since the decennial census will have occurred in 2020, so any districts could be equally populated in that year.  In contrast, any electoral scheme entailing cancelling the 2019 elections would have absurdly counter-productive downstream effects.  While plaintiffs are extraordinarily elusive about what happens in the wake of the 2019 election cancellations, we presume they are contemplating having the two postponed elections in 2020, which would necessitate having an extremely accelerated trial and final remedy in place by then.  But even if that timetable were feasible, those two districts would be extremely malapportioned because of the great population changes that occurred during the past decade and, consequently, would have to be redrawn using the 2020 census data.  And if the plaintiffs are contemplating that the victors in the 2020 elections would serve until 2023, then the Court would have ordered elections in malapportioned districts and would be forced to reduce the tenure in office from four to three years (thus

2

relegating the town's first elected Latino—if one is selected in 2020—to a shorter term than that enjoyed by all prior Anglo incumbents).  If plaintiffs are contemplating *four* single-member elections in 2020, the result would be even more bizarre and disruptive.  All four incumbents would have to run again in 2021 under the constitutionally mandated equally populated districts (and to return elections to odd-numbered years), thus making the 2020 elections good for only one year.  Worse still, to preserve the (unchallenged) staggered-term system, two of the four candidates would be elected for two-year terms (with new elections for them in 2023), while the other two would be elected for four-year terms (with new elections in 2025).  (Alternatively, if the Court finds that the at-large system satisfies Section 2, then the disenfranchisement of Latino and other voters in 2019 would be utterly purposeless and gratuitously disruptive.)

All of this disruption, voter confusion, expense, and federal judicial interference could be completely avoided by the normal process of determining whether an election system is illegal *before* invalidating it and, if found illegal, replacing it with a system that complies with the VRA, not by gratuitously depriving minorities and non-minorities of the right to vote guaranteed by that Act and the Constitution.

In short, on the negative side, plaintiffs' preliminary injunction would disenfranchise all voters in 2019, extend terms (in violation of state law) of officials purportedly elected under a discriminatory system, and require some unknown number of additional confusing elections in districts of grossly unequal population.  All this is to be done merely to accelerate the remedy for an 87-year-old at-large system by *one* year.  Since no rational cost-benefit analysis remotely supports plaintiffs' disenfranchisement request, even assuming that the at-large system is illegal, no court anywhere has ever cancelled elections at the end of the decade on the cusp of a decennial census requiring redrawing single-member districts.  To the contrary, it "makes far

more sense to await the [2020] census figures and the [2021] reapportionment (if required) than for a court to intervene at such a late hour." *White v. Daniel*, 909 F.2d 99, 104 (4th Cir. 1990). Conversely, "den[ying] the entire electorate the right to vote" "offend[s] basic principles," and this "disenfranchisement" could not "conceivably be considered in the best interest of the citizenry." *Chisom v. Roemer*, 853 F 2d 1186, 1191–92 (5th Cir. 1988) (citation omitted). (Indeed, even if plaintiffs could articulate some rational reason for having elections in 2020 in districts that would be unconstitutionally malapportioned within a year—which they cannot— this extreme result does not necessitate disenfranchising voters in 2019, as the Court could add special elections in 2020 after having an opportunity to analyze the at-large system's legality. *See, e.g.*, *Merced v. Koch*, 574 F. Supp. 498, 499 (S.D.N.Y. 1983).)

At an absolute minimum, plaintiffs' disenfranchisement remedy could conceivably be contemplated only upon a showing of extraordinary circumstances; i.e., some extreme exigent event or an extraordinarily strong showing of a clear Section 2 violation. But both of these factors weigh strongly against Plaintiffs' effort to ban voting.

It is entirely plaintiffs' fault that the schedule has become so compressed. Islip's at-large system has been in place since at least 1932, and yet they waited until the eleventh hour of a census cycle to file suit, and then they waited until the eleventh hour *again* to file a motion for a preliminary injunction. Plaintiffs chose to file suit in June 2018, when they could have filed suit months or years before that, and they provide no reason to have tossed their wrench into the election machinery at the last possible moment. Even *after* filing suit, they delayed *nine months* before filing a motion for a preliminary injunction. There is no excuse, and plaintiffs offer none, for these dilatory filings.

The impracticality of plaintiffs' proposal is even more stark for how weak their merits

argument is.  Plaintiffs cannot establish any likelihood of success on the merits—much less a substantial likelihood—because their own evidence shows that it is *partisanship*, not race, that explains voting patterns in Islip.  There has been a Republican hammerlock on the Town Board since time immemorial; the majority of Latinos happen to vote for Democrats, but there is no evidence that this ideological coincidence has anything to do with racial discrimination.  That forecloses plaintiffs' Section 2 claim entirely.  *Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476, 496 (2d Cir. 1999) (where majority voters "support[] [minority] candidates . . . at levels equal to or greater than those of [non-minority] candidates," it is "proper to conclude" that "divergent voting patterns" among minority and majority voters are "best explained by partisan affiliation" (citation omitted)).  There is extensive crossover voting, and voters cross over regardless of the race of the candidate.  And plaintiffs adduced no evidence whatsoever that Latinos have been shut out from the Republican party, denied access to the Republican nomination, or in any way prevented from competing for elections.  Democrats tend to lose, but Latino Democrats are just as successful (if not more so) than white Democrats.

And plaintiffs' remarkably thin allegations regarding racial disparities in Islip are based on isolated incidents, hearsay, and the opinions of activist groups.  Plaintiffs do not even attempt to prove that these supposed deficits arise from racial discrimination, and with good reason.  The real story is of a notably prosperous Latino community that, despite its relative youth and concentration of recent immigrants and non-citizens, has substantially higher per capita income than the nation at large and an increasingly powerful political coalition.  Latinos do not have a "guarantee of electoral success," but they do have an "equality of opportunity" in Islip, which is all that Section 2 requires.  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006) ("*LULAC*").  The Court should deny the motion for a preliminary injunction.

## FACTUAL STATEMENT

Islip is primarily governed by a Supervisor and four Council Members.  N.Y. Town Law § 20(1)(a) (McKinney).  The Supervisor and Council Members constitute the Town Board, which is vested with the powers of the Town.  *Id.* § 60.  New York law further requires that Members have four-year terms, with the terms staggered so that two are elected every other year, in odd-numbered years.  *Id.* §§ 24, 80.  The default rule—and the rule followed by Islip—calls for at-large elections for each of the Council Members and Supervisor.  Towns can vote by referendum to change this rule and instead elect Council Members via single member wards.  *Id.* § 85.  Islip held a referendum on that question in 2006, but it failed, with the "no" votes earning a 54% majority.  McDonald Report Table 2.  Islip's electoral structure has been the same since at least 1932.  *See* N.Y. Town Law §§ 20, 24, 80, 85 (McKinney 1932).

The Islip Town Board has been dominated by Republicans since its inception.  With rare exceptions, every Republican to run for Town-wide office has won, including the Supervisor and Council Member seats.  The only exception to this rule in recent memory was in 2007, when Democrats won both Council seats up for election and the Supervisor position.  But that election was held in the wake of a high-profile scandal involving the previous Town Supervisor, Peter McGowan.  McGowan—a Republican—was convicted of misusing campaign funds, which temporarily soured the electorate as to the Republican Party.  In 2009 and 2011 Republicans swept back into power, and they have held all the seats on the Board since then.  As Phil Nolan, the Democrat who briefly held the Town Supervisor position, explained in the wake of his 2011 defeat, "at the end of day, Islip has been a Republican town for a very long time . . . and apparently voters may have been returning to their Republican roots."  S. Crichton & J. Valenti, *Republicans take control in Islip*, NEWSDAY (Nov. 9, 2011).

Although Republicans are politically dominant, most Latinos vote for Democrats.  And,

with the exception noted above, those Democrats generally lose.  But the Latino population in Islip is young and rapidly growing.  As recently as 2000, the citizen voting age population of Latinos in Islip was only 12.85%—it had doubled by 2017 and is almost certainly higher than 26% in 2019.  Beveridge Report Table 5.  Similarly, the total Latino population—including non-citizens and those too young to vote—has grown from a mere 8.79% of Islip in 1980 to about *35%* as of 2017.  *Id.*, Table 3.  According to plaintiffs' expert, "given the composition of Islip's younger Latino citizens [and] the general increase in Islip's Latino population," the Latino share of the population and voting age population will likely continue to grow.  *Id.* ¶ 60.  Indeed, Islip's (2017) population of citizens under age 18 is 39% Latino and only 46.5% white.  *Id.*

Despite their relative youth, newness to the Town, and recent-immigrant status, Latinos in Islip are thriving by common measures.  The median household income for Latinos is over $86,000 per year, which is *$26,000* higher than the median income for households in the United States as a whole, and *$36,000* higher than Latinos nationwide.  Thernstrom Report Table 1. (Dr. Logan reports similar, but slightly lower, income, as he uses an earlier year in his Table 1.) The Latino unemployment rate is also lower than the national average (5.7% to 7.4%).  Logan Report Table 1; U.S. Census Bureau, 2012–2016 ACS 5-Year Estimates, Table S2301.  To be sure, in some categories—e.g., English language proficiency—the Latino community in Islip lags, but that is hardly surprising given that only one third of Islip's Latino community was born in the United States.  Logan Report Table 1; Beveridge Report Table 2 (showing that, for 2012-2016 ACS data, 68,805 of the 99,740 Latinos in Islip are citizens, of whom 46.5% were born in the U.S., meaning that 31,994, or approximately 32% of the Latinos in Islip, are U.S.-born).

Although the at-large system has been in use in Islip for almost a century, plaintiffs filed suit in June 2018, providing defendants and the Court with very little time to conduct a thorough

review before the 2019 elections—the last elections under the current census figures.  On

March 1, plaintiffs filed a motion for a preliminary injunction to cancel Islip's elections.

## ARGUMENT

Even granting plaintiffs their data and their underlying analysis of that data, they do not

come close to justifying the need for a preliminary injunction.  A preliminary injunction is

*always* "an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 24 (2008).  And particularly extraordinary is "[i]nterference with impending

elections."  *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003).

Federal courts "*almost never*" upset an election "prior to a determination on the merits."  *Cano v.*

*Davis*, 191 F. Supp. 2d 1135, 1137 (C.D. Cal. 2001) (emphasis added).  Indeed, even *after* a

determination on the merits, courts are reluctant to upset impending election schedules.

*Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also, e.g.*, *Goosby v. Town Bd. of Town of*

*Hempstead, N.Y.*, 981 F. Supp. 751, 762–63 (E.D.N.Y. 1997) (declining to cancel elections after

finding liability on the merits).

Plaintiffs utterly fail to establish the need for a preliminary injunction here, as they fail to

establish a likelihood of success on the merits, irreparable harm, or that an injunction would be in

the public interest.  *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir.

2010).  And they certainly fail to prove a "*substantial* likelihood of success," as they must when

attempting to alter the status quo in a suit against the government.  *Queens Cty. Republican*

*Comm. ex rel. Maltese v. New York State Bd. of Elections*, 222 F. Supp. 2d 341, 346 (E.D.N.Y.

2002) (emphasis added).  Instead, plaintiffs' evidence establishes that Islip's voters have strong

partisan preferences and electoral outcomes are not based on race.  Indeed, the Latino

community in Islip already has the potential to elect Latino-preferred candidates, due to strong

non-Latino crossover voting.

But even if the plaintiffs had a case on the merits, they have no hope of showing the equitable factors necessary for this "extraordinary" remedy.  Plaintiffs would cancel the 2019 elections and thus deny Latinos—and everyone else—the *opportunity* to vote out the current Members, thus *guaranteeing* that the voters will be "deprived of their right to replace the allegedly unlawful incumbents."  *United States v. Upper San Gabriel Valley Mun. Water Dist.*, No. CV007903, 2000 WL 33254228, at *3 (C.D. Cal. Sept. 8, 2000).  This makes no sense when the Court's remedial options are in no way reduced if Islip holds elections in 2019.  To deny "'the entire electorate the right to vote'" could not "conceivably be considered in the best interest of the citizenry."  *Chisom*, 853 F.2d at 1191–92 (citation omitted).

I.   **PLAINTIFFS CANNOT ESTABLISH A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THEIR EVIDENCE PROVES THAT LATINOS HAVE EQUAL OPPORTUNITY TO ELECT IN ISLIP.**

A.   **Plaintiffs Cannot Establish that Race, Rather than Partisanship, Is Responsible for Losses by Latino-Preferred Candidates.**

Section 2 requires plaintiffs to prove that there is a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*."  52 U.S.C. § 10301(a) (emphasis added).  Plaintiffs must show that "the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation by members of a class of citizens . . . in that its members have *less* opportunity *than other members of the electorate* to participate in the political process and to elect representatives of their choice."  *Id.* § 10301(b) (emphasis added).  Accordingly, Section 2 guarantees minorities an "*equality of opportunity*" to that enjoyed by the majority, but does not grant preferential treatment or electoral "success."  *LULAC*, 548 U.S. at 428 (emphasis added).  Nor does Section 2 immunize minorities from the same political forces that govern the majority.  *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994).  Accordingly, if minorities suffer political

defeats for reasons unrelated to race—namely, colorblind partisan politics—there can be no Section 2 claim, because that statute reaches only "those communities in our Nation where racial politics do dominate the electoral process." *N.A.A.C.P., Inc. v. City of Niagara Falls, N.Y.*, 65 F.3d 1002, 1023 (2d Cir. 1995) (citation omitted).

**1.** The Supreme Court in *Gingles* was clear that bloc voting must be attributable to *race*, not colorblind partisan politics. A plurality of the Court would have held that differential voting between blacks and whites was sufficient to establish racial bloc voting, even if factors other than race, such as partisan preference, could explain the difference. *Thornburg v. Gingles*, 478 U.S. 30, 63–64 (1986) (plurality op.). But five Justices *rejected* that view. Justice White, who in all other respects joined with the plurality, wrote separately to explain that differences in voting attributable to *partisanship* cannot form the basis of a Section 2 claim. *Id.* at 83 (White, J., concurring). According to Justice White, "if blacks and whites were voting differently simply because they were voting along partisan lines, there would be no unlawful racial polarization, because 'interest group politics,' not 'racial discrimination,' would explain the outcomes." *Niagara Falls*, 65 F.3d at 1016 (quoting *Gingles*, 478 U.S. at 83). Speaking for four Members of the Court, Justice O'Connor likewise explained that a rule ignoring racial causation would "give no effect whatever to the Senate Report's repeated emphasis on 'intensive racial politics,' on 'racial political considerations,' and on whether 'racial politics . . . dominate the electoral process.'" *Gingles*, 478 U.S. at 101 (O'Connor, J., concurring) (citation omitted).

Justice O'Connor explained that a contrary view would fly in the face of *Whitcomb v. Chavis*, the Supreme Court precedent that the "[a]mended § 2 [was] intended to codify." *Gingles*, 478 U.S. at 83. In *Whitcomb*, the Court explained that, although "ghetto" residents in Marion County consistently lost elections, that was because they "vote[d] predominantly

Democratic," and Republicans generally won in the county.  *Whitcomb v. Chavis*, 403 U.S. 124,

153 (1971).  "[H]ad the Democrats won all of the elections or even most of them, the ghetto

would have had no justifiable complaints about representation."  *Id.* at 152.  And the failure of

*Democrats* was insufficient to show illegality.  "[A]re poor Negroes of the ghetto any more

underrepresented than poor ghetto whites who also voted Democratic and lost . . . ?  We think

not."  *Id.* at 154.  Accordingly, in *Gingles*, Justice O'Connor stressed that *Whitcomb* required

courts to differentiate between situations where *race* explains voter behavior from those where

the partisan "interests of racial groups" simply "diverge."  478 U.S. at 100.

Any other rule would provide not *equal* opportunity but *preferential* opportunity enabling

minorities to override colorblind partisan politics and guarantee their political success.  Here, for

instance, Latino Democrats—like white Democrats and black Democrats—frequently fail to

elect their preferred candidates because the voters choose Republicans.  Plaintiffs, however,

claim that *Latinos alone* among that group are entitled to a district in which they are guaranteed

electoral success.  But Section 2 does not grant minorities that special privilege.  That is, Section

2 does not relieve minorities of "the obligation to pull, haul, and trade to find common political

ground."  *De Grandy*, 512 U.S. at 1020.

Indeed, plaintiffs' interpretation of Section 2 would judicially mandate not only an ethnic

preference but a partisan preference, too.  In jurisdictions where Democrats form a majority, at-

large districts would be perfectly legal because minorities' preferred candidates (Democrats) will

be routinely elected.  But in an identical jurisdiction with a Republican majority, an at-large

scheme somehow violates Section 2 just because the majority has different ideological

preferences.  Needless to say, Section 2 cannot be rationally interpreted as prohibiting at-large

election schemes where Republicans are in the majority but blessing jurisdictions where

11

Democrats dominate, just because Latinos tend to affiliate in greater numbers with that party. "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if [minority] voters are likely to favor that party's candidates." *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992).

**2.** The most obvious circumstance where minority defeats are attributable to colorblind partisan affiliation, rather than racial headwinds, is where Democratic candidates of *all races* typically lose with vote tallies that approximate minority candidates' vote tallies. In such cases, race has been eliminated as the variable explaining minority defeats, leaving colorblind partisan politics as the reason. That is, the success or lack of success of white Democrats—inevitably supported by minority voters—does not determine whether there is *racial* bloc voting, as opposed to ordinary partisan voting.

This point can be seen by comparing two scenarios. In jurisdictions where white Democrats (supported by Latinos) consistently win general elections, Latino voters do not have equal opportunity unless *Latino* Democratic candidates achieve success equal to white Democrats. That is, "[i]f [Latino] voter[s] cannot be expected to elect a [Latino] candidate of choice under the current at-large system—then having the opportunity to vote on occasions for winning white candidates doesn't amount to equal opportunity." *Niagara Falls*, 65 F.3d at 1009 (citation omitted); *see also Jeffers v. Clinton*, 730 F. Supp. 196, 209 (E.D. Ark. 1989), *summarily aff'd*, 498 U.S. 1019 (1991) (there is no equal opportunity where "[c]andidates favored by blacks can win, but only if the candidates are white" (citation omitted)). Accordingly, where white Democrats (supported by Latinos) routinely *lose*, this does not show anything about Latinos' equal opportunity if Democrats are defeated thanks to colorblind partisan politics, as minorities, too, must "pull, haul, and trade to find common political ground," *De Grandy*, 512 U.S. at 1020.

Thus, the key determinant of *racial* bloc voting is evidence of how minority candidates fare relative to majority candidates of their own party. That is, where voters "support[] minority candidates . . . at levels equal to or greater than those of [non-minority] candidates," it is "proper to conclude" that "'divergent voting patterns'" among minority and majority voters are "'best explained by partisan affiliation.'" *Goosby*, 180 F.3d at 496 (citing *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 861 (5th Cir. 1993)). For this reason, contests between minority and non-minority candidates are the most probative. *Niagara Falls*, 65 F.3d at 1017; *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1128 (3d Cir. 1993). For example, *Gingles* looked exclusively at elections involving black and white candidates. 478 U.S. at 52–54. And the Senate Report listed the success of *minority* candidates as a factor, not *minority-preferred* candidates, reinforcing that Congress wanted to attack racial discrimination, not colorblind politics. *Montano*, 268 F. Supp. at 266.

Indeed, the Second Circuit has held that a district court committed *clear error* in using white-white elections to override its findings of racial polarization in black-white elections. *Niagara Falls*, 65 F.3d at 1014–19. The Court explained that the evidentiary focus on races involving minority and non-minority candidates allows courts to exclude "partisan politics" and "determine . . . whether the majority is voting against candidates for reasons of race." *Id.* at 1015.

**3.** In light of the foregoing, it is well established in the Second Circuit—and everywhere else—that Section 2 plaintiffs have the burden of showing that race, rather than partisan affiliation, results "in significantly diminished opportunities for minority participation in elective government." *Uno v. City of Holyoke*, 72 F.3d 973, 983–84 (1st Cir. 1995). The Second Circuit so held in *Goosby*, and it favorably cited the approaches of the First, Fifth, and Eleventh Circuits, each of which have explained in detail that plaintiffs must persuade the Court that race, rather

than partisanship, explains the minority's lack of electoral opportunity.  *See* 180 F.3d at 493, 496 (citing *Uno*, 72 F.3d at 983; *Nipper v. Smith*, 39 F.3d 1494, 1524–25 (11th Cir. 1994) (en banc); and *Clements*, 999 F.2d at 861).  *See also, e.g.*, *Baird*, 976 F.2d at 361.

To be sure, there is some disagreement on *when* in the process to locate this burden, but all courts agree that plaintiffs must prove as much at some point.  For instance, the Fifth Circuit requires Section 2 plaintiffs to prove a lack of partisanship as part of their prima facie case.  *Clements*, 999 F.2d at 855, 892.  *Goosby,* following other circuits, did not require this showing at the *prima* facie stage, but it is clear that, at the ultimate liability stage, plaintiffs retain the "ultimate burden of persuading the factfinder that the voting patterns were engendered by race" (at least where there is a "legitimate question in regard to whether nonracial factors adequately explain racial voting patterns").  *Uno*, 72 F.3d at 983; *see also, Goosby*, 180 F.3d at 493; *Nipper*, 39 F.3d at 1524–25.  This simply applies the general rule that plaintiffs have the burden of establishing Section 2 liability: plaintiffs must "satisfy the ultimate Section 2 inquiry by showing from the 'totality of the circumstances,' that members of the identified racial group 'have less opportunity than do other members of the electorate' to elect a candidate of their choice."  *Pope v. Cty. of Albany*, 687 F.3d 565, 571 (2d Cir. 2012) (quoting *LULAC*, 548 U.S. at 425–26); *see also De Grandy*, 512 U.S. at 1011 (it is "clear[]" that *Gingles* factors are not "sufficient" to "prove a § 2 claim").

For instance, the Second Circuit in *Niagara Falls* held that, even though plaintiffs had established the three *Gingles* factors, they "failed to show that the challenged voting structure impairs the plaintiffs' rights to enjoy an equal opportunity to participate in the political process and elect candidates of their choice."  65 F.3d at 1019.  While the "three *Gingles* factors are important and necessary, they are not sufficient to prove a § 2 violation."  *Id.*  The plaintiffs'

further burden "follows from the [Voting Rights] Act itself, which states that a violation of the Act 'is established, if, based on the totality of circumstances, it is shown' that the political process is not equally open to participation." *Id.* (quoting 52 U.S.C. § 10301).

**4.**  As in *Clements*, and unlike *Goosby*, plaintiffs here do "not even attempt[] to establish proof . . . that race, not . . . partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855 (citation omitted).  Their motion concedes that the Republican Party dominates Islip Town elections and that Latinos tend to prefer Democrats, Plaintiffs' Mem. of Law in Support of Motion at 12, 17, but nowhere do plaintiffs explain why the failure of *Democrats* should be understood as a lack of equal opportunity for *Latinos*.

*Goosby* itself is instructive on this point.  In that case, the Second Circuit upheld a finding of vote dilution in the Hempstead, where Republicans dominated Town elections, but the Court did so solely because the evidence proved that the Republican Party slating process was *entirely* unavailable to black-preferred candidates.  "Without access to the Republican slating process, blacks simply [were] unable to have any preferred candidate elected to the Town Board."  180 F.3d at 496.  That is, Democrats never won, and black Republicans were incapable of even *trying* to run.  Despite ample "pressure" from the black community, including marches on town hall, Republicans only once had slated a black candidate, and that candidate was not even the preferred choice of black Republicans.  *Id.*  The *Goosby* Court referred to him as a "black crony."  *Id.*  In that circumstance, race, not politics, explained the lack of minority opportunity.

By contrast, plaintiffs here have not even attempted to disentangle race from politics.  At best, plaintiffs vaguely allude to some practical difficulties for Latinos hoping to slate with the Republican party.  Motion at 16–17.  But plaintiffs put forward no evidence of any Latino who tried and failed to be slated, no evidence of any Latinos who even *hoped* to be slated by the

Republican party yet could not be, and no evidence of any race-based decisions on the part of Republican leaders or voters.

Plaintiffs' failure to prove that racial factors explain the defeats of Latino-preferred candidates—rather than colorblind partisan politics—should end the dispute.  But even if defendants share some portion of the burden to produce evidence as to partisanship, plaintiffs themselves *already* provided that evidence, and then some.  Plaintiffs' expert Dr. McDonald shows that, with the exception of the 2007, scandal-plagued year, Republicans win every election for Council.  McDonald Report Table 1.  But the Latino Democratic candidates (Gonzalez and Ortiz) are just as successful as (or more successful than) the average Democratic candidate; in fact, the Democratic ticket performs significantly better in years where a Latino is running.  *Id.* Moreover, Dr. McDonald estimates that white crossover voting for Latino candidates of choice is "about 30 percent," and the Latino candidates themselves obtained that same amount (e.g., 27.0%–27.4% for Gonzalez in 2017, 29.8%–29.9% for Ortiz in 2011).  *Id.*, Tables 6 & 7.  (Even then, Dr. McDonald incorrectly underestimates crossover voting levels, which are actually over 40%, *see infra* at 19.)  Non-Latino blacks vote for Latino candidates at an equal or higher rate than for other Democratic candidates.  *Id.*  And Latino support for Republican candidates has been fairly consistent for the last decade—even during the scandal-plagued 2007 election.  *Id.*

In other words, the non-Latino majority not only substantially crosses over to vote for Latino candidates of choice, but it does so at equal rates *when the candidate is Latino*.  Majority voters have evinced "a general willingness . . . to vote for [minority] candidates."  *Abrams v. Johnson*, 521 U.S. 74, 93 (1997) (citation omitted).  Indeed, roughly *three times* as many non-Latino voters vote for Democratic candidates as Latino voters do.  For example, about 5,000 Latinos voted for Gonzalez in 2017, but almost *12,000* white voters (and about 2,600 black

voters) voted for him.  Because this pattern shows that it is Democrats who consistently lose, not Latinos, there is no way plaintiffs can prove "that [Latino voters] have *less* opportunity *than other members of the electorate* to participate in the political process and to elect representatives of their choice."  52 U.S.C. §10301(b)*.* (emphasis added).  White and black Democrats have exactly the same hope of electing their candidates of choice as Latino Democrats, and the same holds true for white, black, and Latino Republicans.

And in a coup-de-grace to the notion that Latinos are shut out based on racial bias, plaintiffs' own expert cannot say definitively that Latinos *even support* a single-member district system.  McDonald Report ¶ 54.  In the 2006 referendum, Dr. McDonald estimates the slimmest of a Latino majority voted to switch to a ward system, but it is within the margin of error, and in any event, the clear import of his estimates is that Latinos, whites, and blacks were equally deeply divided, with each group of voters roughly as equal to vote for or against the referendum. *See id.*, Table 9.  These are simply not the results one would find if the Latino minority thought at-large elections had a discriminatory result, or if the majority rushed to impose such a result.

Finally, when one actually *calculates* the effect of partisanship on voting patterns in Islip—which plaintiffs failed to do—the result is unmistakable.  Partisanship accounts for practically the *entire difference* between the preferred candidates of Latinos and non-Latinos. Alford Report at 25–32.  Indeed, when one controls for party membership, Latino voters were slightly *less* likely to support Gonzales in 2017.  *Id.* at 28.

"When, in the competition inherent in the democratic process, a racial group's preferred candidates are defeated despite the ability of its members to participate fully in that process, the Voting Rights Act should not provide that group with a remedy which is unavailable to other supporters of defeated candidates."  *Clarke v. City of Cincinnati*, 40 F.3d 807, 812 (6th Cir.

17

1994).  To find a Section 2 violation here would be a racial gerrymander, not a remedial measure aimed at combatting discrimination.

**B.    Majority Crossover Voting Is So Substantial that the Latino Minority Already Has an Equal Opportunity to Elect Its Candidates of Choice.**

Plaintiffs also fail to prove the type of highly polarized bloc voting that animates a Section 2 claim.  Whether or not plaintiffs can establish the minimal technical requirements of the third *Gingles* factor, the crossover voting in this case is so substantial, and the "willingness of [majority] voters to vote for [minority] candidates" so apparent, *Abrams*, 521 U.S. at 93 (citation omitted), that it is clear Latinos have an "equal opportunity" to elect candidates of their choice. There is no "guarantee" that they will *win*, but that is beside the point.  *LULAC*, 548 U.S. at 428.

"States can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover voting patterns" that are evidence of "equal political opportunity."  *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009).  In *Bartlett*, for example, the Court was "skeptical" that in cases where majority crossover voting was above 20 percent, Section 2 would be implicated.  *Id.* at 16.  And in *Abrams*, the Court held that Section 2 did not apply when the "average percentage of whites voting for black candidates across Georgia ranged from 22% to 38%, and the average percentage of blacks voting for white candidates ranged from 20% to 23%."  *Abrams*, 521 U.S. at 92; *see also, e.g.*, *Rodriguez v. Bexar Cty., Tex.*, 385 F.3d 853, 868 n.22 (5th Cir. 2004) (relying on evidence of 25% to 33% white voter crossover to reject Section 2 claim).  *See generally Niagara Falls*, 65 F.3d at 1012 ("'[B]loc voting [is] a matter of degree, with . . . variable legal significance.'" (quoting *De Grandy*, 512 U.S. at 1011)).

The evidence again betrays plaintiffs.  Even using plaintiffs' (incorrect) numbers, there is white crossover of about 30%, far too substantial to support the notion that race is the great explainer of elections in Islip.  But plaintiffs' expert Dr. McDonald systematically

underestimates crossover, at that.  Non-Latinos vote for Latino-preferred candidates at an average rate of *42%–49.6%*.  Alford Report Tables 1 & 2.  Although plaintiffs repeatedly try to focus on *white* voters as the "majority," the question in Section 2 cases is whether the *entire* set of non-minority voters overwhelms the minority.  *LULAC*, 548 U.S. at 444 (examining whether "Anglos and Latinos" in the majority would defeat black candidates).  And Dr. McDonald's voter preference calculations are also in error because he does not account for differing *turnout* among demographic groups.  Alford Report at 12–13.  When Alford corrects these errors, the non-Latino crossover ends up in the stratosphere, ranging from 37.8% to 55.1%.  *Id.*, Table 2.

Consequently, Latino-preferred Democratic candidates receive over 50% of Islip's town-wide vote in about *50%* of the non-town elections.  McDonald Report Tables 3, 4 & 5.  To be sure, thus far Democrats have usually lost in Town elections, but there is no generalized "pattern" of *Latino* losses.  *Gingles*, 478 U.S. at 57.  Plaintiffs present evidence of only two Latino candidates for Council—and again, each of them did as well or better than most Democrats.  McDonald Report Table 1.  The "[C]ourt must determine whether the challenged electoral structure deprives a racial minority of equal opportunity to participate in the political process *at present*," *Uno*, 72 F.3d at 990, and there is every reason to believe that Latino-preferred candidates are capable of competing for Town Board spots in 2019.

Indeed, given a Latino citizen voting age population north of 26%, the primary reason that Latino-preferred candidates have not *already* won elections is low turnout—a phenomenon hardly unique to Islip, *see, e.g.*, Bernard Fraga, *The Turnout Gap Between Whites and Minorities Is Larger than You Think and Hard to Change*, THE WASHINGTON POST (Sept. 25, 2018), and hardly attributable to any Islip policies.  But "the Court can expect that turnout will likely increase as Hispanics in [Islip] realize their opportunity to elect their preferred representative."

*United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 451 (S.D.N.Y. 2010).

For example, in a hypothetical district covering Legislative District 9 in Islip, with a CVAP of only 45%, Dr. McDonald establishes that Latino candidates of choice would win all of this decade's Town elections in a landslide, with percentages ranging from 68% to 72%. McDonald Report ¶35 & Table 11.  If Latino-preferred candidates, even with low Latino turnout, can obtain 70% of the vote where they make up 45% of CVAP, then they can at least *potentially* win 50% of the vote where they make up 26% of CVAP.  And, as noted above, Latino CVAP is almost certainly higher than 26% in 2019.  There is plenty of reason to believe that, perhaps as early as this year, the increased size of the Latino minority will make *multiple* elections competitive—unless plaintiffs have their way and cancel the elections.

But if the Court intervenes to impose single-member districts now, it will likely guarantee that Latinos elect *one* candidate of their choice, while also guaranteeing that they never elect *more* than one.  Indeed, *Goosby* is a cautionary tale on that front.  *Goosby v. Town Bd. of the Town of Hempstead, N.Y.*, 956 F. Supp. 326, 331 (E.D.N.Y. 1997).  Since 1907, Republicans won every town-wide election in Hempstead.  *Id.* at 332.  But racial minorities were growing in Hempstead, just as in Islip.  *Id.* at 331.  The district court intervened and imposed a ward system on Hempstead.  Two decades later, while the black-majority district in Hempstead has a black representative, Republicans have *all* the other single-member seats on the Town Board, even though a Democrat is Town Supervisor, showing that Democrats have a realistic opportunity to win at-large elections.  Thus, consigning Democrats and minorities to a 5 to 1 minority, rather than an opportunity to control more (or all) Town Board seats under at-large elections, shows the danger of limiting a growing minority and Democratic polity to a "safe," single-member district.

## C.  The Totality of the Circumstances Favors Defendants.

In any event, considering the totality of the circumstances proves that plaintiffs are trying

to transform ideological disputes and the ordinary realities of a young, immigrant community into a federal case.  They rely on hearsay, isolated incidents, hyperbolic "reports" from controversial activist groups, and logical fallacies.  And even then, much of their evidence simply proves the partisanship at work.   At the most general level, Latinos are moving to Islip in ever-growing numbers and increasing their share of the Town's population, at the same time garnering income *43%* above the national average (and 74% above the national average for Latinos), which would not have occurred if Islip was the discriminatory, exclusionary haven plaintiffs seek to portray.  Thernstrom Report Table 1.  Specifically, almost every one of the Section 2 Senate Report factors turns against them.  *See Montano*, 268 F. Supp. 2d at 264.

**1.**  As an initial mater, there is so little "history of official discrimination," *id.*, in Islip that plaintiffs rely entirely on isolated anecdotes (usually involving hearsay), as well as policy disputes in *other* jurisdictions on Long Island.  Motion at 14–15.  The supposedly "discriminatory" activity includes unenacted legislative proposals that have nothing to do with voting or discrimination, like a requirement that contractors verify the legal status of their employees.  *See, e.g.*, Motion at 15.  But even assuming support for such policies is somehow "discriminatory," plaintiffs "may not satisfy [their] burden with general allegations of racial discrimination"; they must show that Islip "has historically restricted the access of minorities to the political process."  *Montano*, 268 F. Supp. 2d at 265.  None of plaintiffs' assertions rise beyond "general allegations of racial discrimination."

**2.**  As shown above, even if several elections in Islip are "racially polarized" in the *Gingles* third-factor sense, the *extent* of that polarization is minimal.  *See Montano*, 268 F. Supp. 2d at 265.  Bloc voting is "a matter of degree," *De Grandy*, 512 U.S. at 1011, and this factor leans toward the plaintiffs "only if the evidence shows that the polarization rate is high,"

*Gonzales v. City of Aurora*, No. 02-cv-8346, 2006 WL 3227893, at *2 (N.D. Ill. Nov. 3, 2006). Of course, with crossover rates in the 40% (or even 30%) range for white voters and in the 80%–90% range among black voters, the "extent" of racially polarized voting is miniscule.

**3.**  The third factor is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."  S. Rep. No. 97-417 at 29, 1982 U.S.C.C.A.N. 177, 206 (1982).  But Islip does *not* ban single-shot voting, has no majority vote requirement, and there is nothing "unusually large" about an at-large district that covers the Town.  Although plaintiffs do not like off-year, staggered term elections, that is a New York State law that has been around for a century, and they provide *no evidence* it operates in a discriminatory fashion.  The best plaintiffs can do is speculate that off-year elections "can" have a discriminatory effect.  Motion at 16.  If anything, plaintiffs' own expert disproves this claim, stating that "[w]hite voter participation also ebbs and flows in similar ways" to the Latino population, "increasing in presidential election years and decreasing in off-year elections."  McDonald Report ¶ 65.

**4.**  The fourth factor is "whether members of the minority group have been denied access to any candidate slating process."  S. Rep. No. 97-417 at 29.  This factor was the reason that the *Goosby* Court upheld a Section 2 violation even where there was otherwise evidence of partisanship in voting.  Here, in stark contrast to *Goosby*, there is no evidence whatsoever of problems in Latino access to Republican slating and nothing but two ambiguous, uncorroborated declarations regarding Democratic slating.  With respect to Democrats, Latinos *have* been slated, and plaintiffs put forward only minimal evidence that it was not "easy"—but easy or not, those candidates were slated.  Motion at 17.  And plaintiffs' "evidence" as to the Republican party is a

single email where one person expressed frustration that Republicans had not done a better job of *recruiting* Latino candidates.  *Id*.  Even if a single person's views were relevant, the email does not imply that Latinos have difficulty accessing Republican nominations, but the opposite. Republicans have had trouble *finding* Latino candidates, which reinforces the partisan nature of the dispute at issue here: most Latinos are not interested in Republican politics.  But Republican slating interviews are open to *everyone*, rejected candidates can decide to nevertheless run in primaries, Garbarino Decl. ¶8, and plaintiffs provide no evidence of a single Latino who was rejected by Republicans, much less rejected on the basis of race.

**5.**  The fifth factor is "the extent to which members of the minority group . . . bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process."  S. Rep. No. 97-417 at 29.  That is, "the plaintiffs must show that *as a result of prior discrimination*, [Latinos] suffer from lower socioeconomic conditions than whites."  *Montano*, 268 F. Supp. 2d at 265 (emphasis added). And plaintiffs must also show that Latinos' "lower socioeconomic condition in [Islip], if such is the case, has deprived them of their right to participate in [Town] elections."  *Id.*

Plaintiffs do not even *attempt* to show that Latinos' diminished outcomes on test scores or English-language proficiency are a result of discrimination, rather than the result of the community being, on the whole, new to the country.  Indeed, plaintiffs do not show that Islip Latinos suffer significant material socioeconomic deficits *at all*.  Two-thirds of the Latino population in Islip was not born in the United States.  *See supra*, at 7.  Moreover, the Latino population is much younger than the non-Latino population: although Latino citizens make up only 20.44% of Islip's voting age population, they make up *36%* of Islip's under-18 population. Beveridge Report Table 1.  And, presumably, because so much of the Latino community is

formed by immigrants, the Islip Latino community likely includes more lower-income, less-established families.  And yet, despite all of that, Latinos in Islip have a median income of $86,572, or $26,000 higher than the nation at large, Thernstrom Report Table 1, as well as a lower unemployment rate.  On the other hand, it is hardly surprising that Islip Latinos' rate of home ownership, English proficiency, or rate of post-secondary education is lower than non-Latinos in Islip, given the immigrant background of the community.  At the very least, plaintiffs fail to prove that Latinos' relatively lower (but still high) achievement in Islip is the "result of prior discrimination" rather than the result of recent immigrant status.

And even if plaintiffs could show they bore the effects of discrimination, they also cannot show that these supposed socioeconomic deficiencies are "correlate[ed]" with "voter participation."  Plaintiffs rely on national studies that purport to show that low socioeconomic status depresses political participation, but these studies clearly have no applicability here.  As an initial matter, Latinos in Islip have *high* socioeconomic indicators, at an absolute level. Moreover, plaintiffs' studies fly in the face of the well-known fact that, at least in modern times, black voter participation is essentially on par with whites *even in the old south.  Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 535 (2013).  If blacks in the south—the minority that bore more "effects of discrimination" than any other in modern history—can participate politically, there is little to be said for decades old studies that would predict otherwise.

**6.**  The sixth factor is "whether political campaigns have been characterized by overt or subtle racial appeals."  S. Rep. No. 97-417 at 29.  The only Islip campaign ad plaintiffs can muster up is a Republican ad using the term "He's one of us!"  Motion at 22–23.  But they cannot point to a single case where that language, devoid of any context suggesting it was a racial appeal, was problematic.  In *Jordan v. Winter*, 604 F. Supp. 807, 813 n.8 (N.D. Miss.

1984), for instance, the ad involved *confederate statues* and narration that implied that black factory workers were "new" to Mississippi culture.  *See also e.g.*, *Vecinos DeBarrio Uno v. City of Holyoke*, 880 F. Supp. 911, 922 (D. Mass. 1995) ("One ad featured a large picture of an Hispanic young man, cigarette dangling from his lips and the caption 'The people who really should read this, can't.'").  Simply put, plaintiffs have put forward no evidence of racial appeals in Islip campaigns, much less a "general pattern of racial appeals."  *Ortiz v. City of Philadelphia Office of City Comm'rs Voter Registration Div.*, 824 F. Supp. 514, 536 (E.D. Pa. 1993) (citation omitted).  "[T]he *absence* of such evidence" tends to disprove plaintiffs' claim, *Butts v. City of New York*, 779 F.2d 141, 150 (2d Cir. 1985), as does the fact that Democratic tickets *with* a Latino candidate outperform tickets without.

**7.**  To be sure, Latinos have not had electoral success—yet—in Islip.  *Montano*, 268 F. Supp. 2d at 266 (seventh factor is extent to which minorities have been elected to public office).  But given that most Latinos support Democrats, that is understandable.  And Latinos have only in the past decade become a substantial minority in Islip—as recently as 2000, the Latino CVAP percentage in Islip was only 12.85%.   Little can be gleaned from a lack electoral success over such a short timeframe, especially when very few Latinos have run for Town-wide office.

**8.**  Plaintiffs' evidence regarding the "responsiveness" of elected officials to the "minority group," *Montano*, 268 F. Supp. 2d at 266, consists of garden variety local government complaints, without any proof of racial tinge.  Their prime example is the Roberto Clemente Park dumping incident.  Motion at 24.  But that incident was the fault of business interests and unelected officials, not the Town Board, which solved the problem by cleaning up the park.  Plaintiffs complain about the length of time it took, but they offer nothing to show the process could have been quicker or was slower than efforts in predominantly white parts of Town.  The

best plaintiffs can do, for comparative purposes, is cite a few individuals who personally believe that street repair, snow removal, and similar services are more effective outside of Latino-heavy neighborhoods.  *Id.*  This is unsubstantiated, untrue, and is far removed from the type of strong evidence that courts generally require.  In *Goosby*, for instance, the Town's "Affirmative Action Officer" took no action when white employees would insult or berate black employees with inflammatory, racist language.  *Goosby*, 956 F. Supp. at 345.  Plaintiffs provide no evidence of such problems, much less an endemic problem, in Islip.

**9.**  Plaintiffs provide no evidence that the policy underlying at-large districts is tenuous. *Montano*, 268 F. Supp. 2d at 266.  For starters, it is a New York State law—and the move to districts was rejected by voters in 2006, including, at the very least, almost a majority of Latinos. Plaintiffs point to isolated alleged corruption in the Town Board, but at-large elections do not foster corruption, they minimize it.

And plaintiffs' last piece of evidence is telling, but not in the way they think.  Plaintiffs point to Republicans in Suffolk County and the Town of Babylon who support single-member districts rather than at-large schemes.  Motion at 26.  *Of course they do*, for entirely partisan reasons.  Democrats control Suffolk County and Babylon, so single-member districts increase *Republican* chances for additional seats.  That Republicans and Democrats support opposite electoral systems in different jurisdictions is yet further evidence that the heart of the dispute here is partisan disagreement, not racial discrimination.

**II. PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM OR THAT CANCELLING ELECTIONS SUPPORTS THE PUBLIC INTEREST BECAUSE THEIR PLAN WOULD DISENFRANCHISE ALL VOTERS—INCLUDING LATINO VOTERS—AND THROW THE ELECTORAL SCHEDULE INTO CHAOS.**

Even if plaintiffs had a strong case on the merits, their request to cancel the 2019 elections should still be denied because they cannot remotely establish the equitable factors that

support entry of a preliminary injunction.  To prove as much takes little more than a description of the two potential paths forward for the Court.  The sensible option is to allow elections to proceed as scheduled, hold a trial, determine liability, and if a remedy is required, implement it for the 2021 elections, which are the first elections under the new census.  Alternatively, there is plaintiffs' plan to cancel elections, which will waste resources, confuse voters, illegally extend incumbents' terms, and deny *all* voters, including Latinos, the opportunity to elect candidates of their choice in 2019.  And *even if* plaintiffs' outlandish plan for post-2019 elections made sense, there is still no reason to cancel the 2019 elections preemptively, because holding the 2019 elections would not limit the Court's ability to implement plaintiffs' remedial plan in 2020.  It makes no sense to cancel an election under these circumstances, and "the principles of equity require a federal court to stay its hand when judicial relief makes no sense."  *White*, 909 F.2d at 104.  It is no surprise, then, that plaintiffs' cut-off-your-nose-to-spite-your-face proposal has been roundly rejected in other cases.

**1.**   There is no irreparable harm here because only "when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief."  *Chisom*, 853 F.2d at 1189 (citation omitted).  And cancelling an election is not required when, under plaintiffs' theory, a special election will be necessary *anyway*.  Instead, there will be irreparable harm if the Court cancels the elections, as the voters, including Latino voters, "would have been deprived of their right to replace the allegedly unlawful incumbents."  *Upper San Gabriel Valley*, 2000 WL 33254228, at *3.  There is no way around this basic point.  Plaintiffs' request is a self-defeating plan that can only harm but provide no benefit.  *See, e.g.*, *Merced*, 574 F. Supp. at 499 ("If it is subsequently determined that the [electoral scheme] [is] consistent with . . . the [Voting Rights] Act, there will be no need for a new election," and otherwise, "the Court

has the power to void the election results and to order a new election."); *Miller v. Bd. of Comm'rs of Miller Cty.*, 45 F. Supp. 2d 1369, 1372 (M.D. Ga. 1998) (same).

The preference for holding elections is so strong that this Court has refused to cancel elections even *after* finding for plaintiffs *on the merits*. In *Goosby*, 981 F. Supp. at 762–63, the District Court ruled for the plaintiffs but stayed its own order pending appeal. As the Court explained, "if plaintiffs prevail on appeal, there is *nothing to prevent a special election to remedy the Section 2 violation*." *Id.* at 763 (emphasis added). Accordingly, plaintiffs "failed to establish that irreparable injury will result if [the Court] decline[d] to grant the relief they request." *Id.*

Plaintiffs correctly assert that "[d]eprivation of the right to full and effective participation in the political process is in and of itself irreparable harm," but that is why *plaintiffs*' effort to deprive Latinos and others of the right to participate in the 2019 political process must be rejected. Motion at 27 (citation and emphasis omitted).

**2.** The "strong public interest" in holding regularly scheduled elections, *Montano*, 268 F. Supp. 2d at 260 (citation omitted), also counsels against cancelling the elections. The right of the public to vote is so essential to democracy that jurists bend over backwards to protect it. For example, in *Moore v. Brown*, 448 U.S. 1335, 1340–41 (1980) (Powell, J., in chambers), the district court blatantly flaunted the mandate of the Supreme Court by reinstalling a remedial electoral plan after the Supreme Court had vacated its ruling. But Justice Powell declined to intervene because there would be no time to organize any other electoral process. Given "the unacceptable alternative of enjoining the fall election and retaining in office incumbents whose terms have expired," Justice Powell "decline[d] to stay the preliminary injunction." *Id.* Of course, Justice Powell's in-chambers opinion echoes the broader statements both the Supreme Court and other courts have repeatedly made, regarding the importance of avoiding electoral

disruption.  *See, e.g.*, *Reynolds*, 377 U.S. at 585 (where "a State's election machinery is already in progress," courts can deny injunctive relief even where liability has been established); *Chisom*, 853 F.2d at 1192 (cancelling elections cannot "conceivably be considered in the best interest of the citizenry"); *United States v. Charleston Cty.*, 318 F. Supp. 2d 302, 327–28 (D.S.C. 2002) (conducting elections, even where liability is likely, would "preserve the right of the public at-large to vote").  Plaintiffs do not overcome the powerful interest in orderly elections.

And there is also the matter of redistricting not *once* but *twice* in the span of a year. "[T]wo reapportionments within a short period of two years would greatly prejudice [Islip] and its citizens by creating instability and dislocation in the electoral system and by imposing great financial and logistical burdens."  *White*, 909 F.2d at 103–04.  Plaintiffs negligently and inexplicably waited until the end of a census cycle to file their complaint.  The law has been on the books since 1932 and plaintiffs could have filed at any time through 2017.  Particularly given plaintiffs' inexcusable lethargy, it "makes far more sense to await the [2020] census figures and the [2021] reapportionment (if required) than for a court to intervene at such a late hour."  *Id.* at 104.  In *White*, for instance, the Fourth Circuit reversed a district court's judgment for plaintiffs solely on the basis of laches, because the plaintiffs had delayed their suit until the end of a census cycle.  *Id.*  Laches would be similarly appropriate here, but at the very least this delay goes to show that the public interest is set firmly against a preliminary injunction.

**3.**  Remarkably, even in the face of such overwhelming authority, plaintiffs boldly (and misleadingly) assert that courts "do not hesitate to grant preliminary injunctions" in Voting Rights Act cases.  Motion at 4.  To the contrary, courts certainly do hesitate to *cancel elections* in the Section 2 context, and the plaintiffs' cited cases have practically nothing to do with the facts here.  In *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 281 F.

Supp. 2d 436 (N.D.N.Y. 2003), the defendants did not even *argue* irreparable harm, *see id.* at 441 n.2. In any event, plaintiffs there challenged a redistricting scheme at the *beginning* of a census cycle, *id.* at 440–41, not the *end*, when any change necessarily causes severe disruption. In *Port Chester*, the Court again *presumed* irreparable harm because the suit was filed by the United States. 06-cv-15173, Doc. 57, Transcript, pp. 6–7 (Mar. 2, 2007). And both of these cases were decided before *Pope*, 687 F.3d 565, which clarified that tainted elections can be remedied after the fact. The remainder of plaintiffs' citations are even further afield. *See Georgia State Conference of the N.A.A.C.P. v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338 (N.D. Ga. 2015) (imposing remedial plan for special election necessitated by incumbent's death); *N.A.A.C.P.-Greensboro Branch v. Guilford Cty. Bd. of Elections*, 858 F. Supp. 2d 516 (M.D.N.C. 2012) (not a Section 2 case); *Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297 (M.D. Ga. 2018) (court *declined* to grant preliminary injunction).

Plaintiffs assert that "'no right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.'" Motion at 29 (quoting *Clingman v. Beaver*, 544 U.S. 581, 599 (2005)). Defendants heartily agree, and for that reason, the Court should deny a preliminary injunction that would eliminate that right for the Latino and non-Latino citizenry of Islip.

## CONCLUSION

For these reasons, the Court should deny plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

Dated:  April 4, 2019

/s/ Michael A. Carvin
Michael A. Carvin, Esq. (MC-9266)
Louis K. Fisher, Esq. (LF-3979)
Stephen J. Petrany, Esq. (*pro hac vice*)
JONES DAY
51 Louisiana Avenue
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: macarvin@jonesday.com
        lkfisher@jonesday.com
        spetrany@jonesday.com

Laura Washington Sawyer, Esq. (LS-4385)
Jennifer L. Del Medico, Esq. (JD-9913)
Michael T. Ferruggia, Esq. (MF-9558)
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Fax: (212) 755-7306
Email: lwsawyer@jonesday.com
        jdelmedico@jonesday.com
        mferruggia@jonesday.com

John R. DiCioccio, Esq.
Town Attorney
655 Main Street
Islip, New York 11751
Telephone: (631) 224-5550

*Counsel for Defendants Town of Islip
and Islip Town Board*