# JONES DAY

51 LOUISIANA AVE NW  •  WASHINGTON, DC  20001-2113

TELEPHONE: +1.202.879.3939  •  FACSIMILE: +1.202.626.1700

DIRECT NUMBER:  (202) 879-7643
MACARVIN@JONESDAY.COM

April 26, 2019

<u>Via ECF</u>

The Honorable Arthur D. Spatt
United States District Court, Eastern District of New York
100 Federal Plaza, P.O. Box 9014
Central Islip, New York 11722-9014

Re: *Flores v. Town of Islip, et al.*, Case No. 2:18-cv-03549

Dear Judge Spatt:

We submit this letter in response to Plaintiffs' letter, filed April 19 (ECF Doc. 117), which attempts to fundamentally alter the scope of this preliminary injunction proceeding.

The Court has two available avenues to resolve the validity of Islip's at-large system, and, if necessary, enter a remedy.  The first option is the normal process universally used in voting rights cases (absent extreme external emergencies), which was contemplated by all parties until Plaintiffs' recent about face: that is, having a trial on liability, then offering the Town an opportunity to craft a remedy for any identified violation, and then a hearing to consider the proposed remedy or other remedies.  All of this can be done in the normal course, including time for any appeal, prior to the 2021 election.  Any remedial plan in this scenario could be used until 2031 because it would be based on 2020 census data and would preserve the staggered-term election system without any need to override state and town law requirements on the terms for Board Members and the schedules and procedures for conducting orderly elections.

Alternatively, solely due to Plaintiffs' inexcusable, unexplained delay, the Court could rush to enter a slap-dash, purportedly "preliminary" injunction that would fundamentally alter the electoral status quo by entering a four-district redistricting plan for the 2019 elections.  This fundamental alteration of the status quo under a "preliminary" injunction could not be unscrambled absent massive disruption, expense and confusion to voters and candidates, should the at-large system be upheld by this Court at the final adjudication stage or by the Second Circuit (given the manifest legal and evidentiary flaws in Plaintiffs' case).  Adoption of this gratuitous "preliminary" injunction would also violate Defendants' due process rights and require adjudication on a necessarily incomplete record by depriving Defendants of any opportunity to litigate, through expert and other testimony, the bona fides of Plaintiffs' proposed single member scheme.  Defendants have had and will have no such opportunity because Plaintiffs affirmatively misled them (and the Court) into believing that their "2 to 3 day" preliminary injunction case would solely concern whether the 2019 election should be postponed, since Plaintiffs floated the prospect of conducting those elections under a single-member seat plan only after the preliminary injunction hearing had begun.  This deprivation is

JONES DAY

The Honorable Arthur D. Spatt
April 26, 2019
Page 2

exacerbated by Plaintiffs' efforts to foreclose any remedial evidentiary hearings on proposed plans. Finally, there is inherently no adequate record to justify massive alteration of the status quo because it is principally based on evidence that all agree is normally unreliable and inadmissible, but was admitted solely because Plaintiffs sought this extreme remedy under the guise of a "preliminary" injunction hearing.

This alternative would also violate the sovereign right of the Town to have an opportunity to devise a remedy for any identified violation. It would further violate the doctrine of laches and reward Plaintiffs for both their egregiously deceptive bait-and-switch tactics on remedy and for artificially creating a "time crunch" by not filing any lawsuit until June 2018, by not requesting a preliminary injunction of any kind until nine months into their extremely delayed litigation, by not mentioning the possibility of a single-member district remedy until opening statements in this hearing, and by not providing any indication of how they would implement any single-member plan until the Court ordered them to provide this basic information nine days after the preliminary injunction hearing commenced.

This slap-dash 2019 alternative would also necessarily exceed the Court's remedial power by invalidating election practices that have not been challenged and go well beyond any liability for an at-large system—such as altering the staggered terms mandated by state law and never challenged here. Worse still, the 2019 remedy would require invalidation and massive disruption of the normal election schedule that is not only legally mandated, but essential to inform the electorate and provide candidates with their First Amendment opportunity to run and communicate with voters. For example, Plaintiffs' proposal would require invalidating the already-secured nominations of candidates, including one Latino, who have already complied with the signature gathering and other ballot access requirements. It would also violate the state law and constitutional rights of Town Board members and their supporters by shortening the terms of two Board Members by two years, although such a gratuitous state law violation is wholly unnecessary to implement a plan to create a single Latino district. Further, it would deprive independent parties of their First Amendment rights for a realistic opportunity for ballot access, *Anderson v. Celebrezze*, 460 U.S. 780 (1983), by denying the minimum 37 days needed *after* the primaries for independent candidates to gather signatures.

Worse still, Plaintiffs' proposal would deny our soldiers stationed in foreign lands the ability to cast their vote because it would create intractable logistical difficulties in transmitting overseas military ballots at least 45 days before an election if there is a September primary. This problem explains why the Justice Department previously forced New York to move its September Federal Congressional primaries to June. *United States v. State of New York*, No. 1:10-cv-1214, 2012 WL 254263 (N.D.N.Y. Jan. 27, 2012). (Plaintiffs' bizarre suggestion that the Court can simply ban primary elections and leave nominations to the party bosses that they have unrelentingly attacked throughout the hearing, is simply another manifestation of their perverse notion that the Court can vindicate voting rights by denying citizens the right to vote.)

Perhaps worst of all, Plaintiffs' 11th-hour interference with the democratic process would necessarily lead to massive voter confusion and extremely depressed turnout. It is not feasible at

JONES DAY

The Honorable Arthur D. Spatt
April 26, 2019
Page 3

this late date for candidates and voters to run and interact in the four entirely new districts that
will be identified only well into the electoral process. Moreover, Plaintiffs' newly hatched
remedial scheme is quite impossible to implement, invalidates a number of unchallenged New
York state election laws absent any remedial justification and facially violates the most basic
traditional districting principles. While there are numerous examples of this burden, one basic
fact suffices to prove the point: there will be either not enough or too many candidates in all of
Plaintiffs' proposed districts for 2019. Under New York law, candidates must both reside, and
collect signatures, in the district for which they are running. Potential candidates cannot even
assess potential signature gathering until the districts are finalized and gathering those signatures
would have to be done in an unrealistic time frame. Much more important, it seems to be quite
impossible to draw a four district plan without placing two incumbents in the same district, a
violation of traditional districting principles so egregious that Justice Brennan said avoiding such
"contests" justifies a departure from the Constitution's one-person-one-vote principles. *Karcher
v. Daggett*, 462 U.S. 725, 740 (1983). Such pairing of incumbents in one district would also
inevitably create districts where no incumbent resides. Indeed, it is quite likely that a qualified
and interested Latino candidate would not be able to run in the majority-minority district because
any Central Islip Latino candidate would likely reside outside a district centered in Brentwood,
like Dr. Beveridge's demonstration map. In the end, of course, all of this would have to be
redone in 2021 (if staggered terms are respected) or in 2023 (if Plaintiffs contemplate all four
candidates serving four-year terms, and running simultaneously in the future).

    Needless to say, there is no rational justification for entering a preliminary injunction for
2019 that is based on a fundamentally flawed record and would require a wholesale invalidation
of unchallenged New York laws designed to conduct orderly elections, thereby burdening
candidates and voters and requiring the Court to judicially monitor and further invalidate state
laws through at least 2023. This is especially true because all that this massive disruption and
wholesale invalidation would accomplish is simply entering a dubious and impossible-to-undo
remedy two years before the next election and census cycle.

    *Goosby v. Town Bd. of Town of Hempstead, N.Y.*, provides valuable instruction here. 981
F. Supp. 751, 762–63 (E.D.N.Y. 1997). Although the district court there faced none of the
unsurmountable obstacles outlined above and had *finally* adjudicated liability, the court
nonetheless postponed implementation of any remedy for the at-large system until the Second
Circuit had the opportunity to rule—which it did two years later, *see Goosby v. Town Bd. of
Town of Hempstead, N.Y.*, 180 F.3d 476 (2d Cir. 1999). Indeed, so far as we can discern, no
court anywhere has entered a single-member remedy for an at-large system pursuant to a
preliminary injunction, much less done so at the end of a decennial census cycle. Thus, this
Court should follow the lead of the *Goosby* court in the far more compelling circumstances
present here and refuse to enter Plaintiffs' last-minute request for imposing a single member plan
for 2019.

JONES DAY

The Honorable Arthur D. Spatt
April 26, 2019
Page 4

## I.  PLAINTIFFS CANNOT ALTER THEIR REQUESTED RELIEF *AFTER* FILING THEIR MOTION FOR A PRELIMINARY INJUNCTION.

Plaintiffs filed a motion asking this Court to *cancel* the 2019 Islip elections.  There is no other way to read their motion or brief in support.  Plaintiffs' motion requested that the Court issue an order "preliminarily enjoining Defendants Town of Islip, Islip Town Board, and Suffolk County Board of Elections from conducting any election for the Islip Town Board under the current at-large system."  Mem. of Law at 29.  They again made that demand, and only that demand, in their motion for a pre-motion conference, (Doc. 31), their notice of motion, (Doc. 35), and their brief.  Mem. of Law at 29 (Doc. 50).  And to dispel any confusion, they made their stated goal even clearer when they explained that, under their remedy, "Town government operations will continue under the current Town Board until an election can be held."  *Id.* at 28. There was no need for Plaintiffs to explain that the "current Town Board" will run the Town unless the remedy they sought was to cancel the elections that would have replaced the Town Board.  And to make everything *even clearer*, Plaintiffs specifically argued that "postponing" (that is, cancelling) "an election" was preferable to any alternatives.  *Id.*

But after Defendants pointed out the absurdity of such a plan, Plaintiffs dramatically changed their position.  They now attempt to argue that the Court should not cancel but *replace* the 2019 at-large elections with *four new* districted elections.  This abrupt change of course flies in the face of their actual request in their motion, and they have forfeited and waived any right to ask for this new remedy.  Moreover, it attempts to convert the preliminary injunction hearing, which has been entirely about the question of *liability*, into an omnibus proceeding reaching liability, remedy, and implementation, without any actual remedial phase of litigation—an absolute must in voting rights cases—or any recognition of the need for the Town to take the lead on any remedy.

Defendants developed their arguments, obtained their evidence, decided what witnesses to call, and what exhibits to introduce, on the basis of the motion that Plaintiffs *actually filed*. Plaintiffs cannot be allowed to make a feinting maneuver with one theory and then roll out a new remedial request after Defendants dismantle their first theory.  Under black-letter law, Plaintiffs plainly cannot seek their new relief after expressly requesting *something else* in their motion. Federal Rule of Civil Procedure 7(b)(C) is clear that Plaintiffs must "state the relief sought" within their motion.  We just completed testimony based on the *actual* motion that Plaintiffs filed, not an imaginary one that they now wish they had filed.

It is a fundamental rule of litigation and due process that courts will not consider requested relief or arguments if not raised *prior* to a hearing, in order to give the opposing party sufficient notice and an opportunity to respond.  "[A]s a matter of procedural fairness, courts decline to consider newly minted arguments raised for the first time" at a hearing or oral argument.  *In re Hackler*, 588 B.R. 394, 400 n.1 (D.N.J. 2018) (citation omitted)).  This rule is so basic it falls into the category of barely needing to be stated, but courts repeatedly state it anyway.  For instance, just a few months ago, the court in *Yunus v. Robinson*, No. 17-cv-5839, 2019 WL 168544, at *7 (S.D.N.Y. Jan. 11, 2019) (slip op.), explained that it would refuse to

JONES DAY

The Honorable Arthur D. Spatt
April 26, 2019
Page 5

allow a party to raise a new argument not raised in the briefs, because "fairness favors providing a prompt determination of [the] motion for a preliminary injunction without allowing Defendants to interpose new arguments." *Id.*  In every United States court, this rule has been applied unswervingly to deny relief or arguments made after a hearing has commenced.  *See, e.g.*, *Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 555 (S.D.N.Y. 2010) (rejecting argument because it was "not made in any of Plaintiff's papers"); *Cataphora Inc. v. Parker*, No. C09-5749 BZ, 2012 WL 13657, *3 n.6 (N.D. Cal. Jan. 4, 2012)  ("Inasmuch as this argument was raised for the first time during the hearing and is not mentioned in Defendants' opposition, I decline to consider it."); *White v. FedEx Corp.*, No. C04-00099 SI, 2006 WL 618591, *2 (N.D. Cal. Mar. 13, 2006) ("The Court will not consider any arguments or evidence raised for the first time at the hearing."); *see also, e.g.*, *Khaldei v. Kaspiev*, No. 10 CIV. 8328 JFK, 2014 WL 3950707, at *2 (S.D.N.Y. Aug. 12, 2014) ("Plaintiff['s] . . . contention [was] improperly raised for the first time after the hearing."); *Eastman Kodak Co. v. Agfa-Gevaert N.V.*, No. 02-CV-6564, 2003 WL 23101783, at *1 n.1 (W.D.N.Y. Dec. 4, 2003) ("Because complete disqualification of Hailstone was not sought in Kodak's initial moving papers and is being raised for the first time in Kodak's post-hearing brief, this Court declines to order such relief.").

Indeed, this unflinching rule implements the constitutional mandate that parties be provided with adequate notice and an opportunity to be heard before the judiciary imposes any burden on them.  *Hansberry v. Lee*, 311 U.S. 32, 40 (1940); *Martin v. Wilks*, 490 U.S. 755, 761–63 (1989).  Thus, the Court may not, consistent with Due Process, consider a remedy that Plaintiffs requested only *after* the hearing convened.

Given the posture of this case, it is even more imperative than usual that the Court refuse to allow Plaintiffs to make up a new remedy on the spot.  "'Federal court review of districting legislation represents a serious intrusion on the most vital of local functions.  It is well settled that reapportionment is primarily the duty and responsibility of the State.'"  *Diaz v. Silver*, 932 F. Supp. 462, 469 (E.D.N.Y. 1996) (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995).  Any attempt to interfere with a State's electoral machinery should be subjected to the most stringent requirements of procedural fairness; it is no time to bend the rules and allow Plaintiffs to change their requested remedy on the fly.  And of course the *real* victims in all of this are the *voters*.  As the Supreme Court has explained, "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls.  As an election draws closer, that risk will increase."  *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).  This is why last-minute changes to elections are highly suspect and regularly rejected.  *See, e.g.*, *id.*; *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018).  Even when courts have already decided the *merits* of a case, the Supreme Court has cautioned against upsetting the "election machinery" of a State.  *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

Plaintiffs' attempt to make their preliminary injunction motion mutate into an entirely different request is particularly unfair because it is the Plaintiffs who have repeatedly dragged their feet and elongated the process at every turn.  They waited to file their complaint until the end of a decade census cycle—even though they had demonstrative maps already drawn by 2017, Tr. 646–47 (Beveridge), and the "justifications underlying the complaint have existed for

JONES DAY

The Honorable Arthur D. Spatt
April 26, 2019
Page 6

several years," Tr. 483 (Altschuler).  Then they waited another nine months to file their motion for a preliminary injunction.  These delays are unjustifiable because it is "well established that in election-related matters, extreme diligence and promptness are required."  *Smith v. Husted*, No. 2:16-cv-212, 2016 WL 10321579, at \*4 (S.D. Ohio Mar. 11, 2016).  To engage in all this delay and then, when the hearing is already substantially completed, to try to fundamentally alter the character of their request, is foul play by any standard.

Even *if* Plaintiffs could raise this new argument at this late date as a matter of litigation procedure—which they cannot—it should be barred as a matter of laches.  "Laches arises when an unwarranted delay in bringing a suit or otherwise pressing a claim produces prejudice."  *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1060–61 (7th Cir. 2016) (citations omitted).  Beyond the massive unwarranted delays Plaintiffs imposed in bringing suit and then filing their motion, they have no justification for now trying to change their requested remedy.  And the prejudice to Defendants and the voting public is immense, both in terms of litigation strategy and fairness, as well as in further creating confusion and depressing turnout in upcoming elections.

## II.  DISTRICTING CHALLENGES REQUIRE A LIABILITY PHASE AND A REMEDIAL PHASE, AND WE HAVE NOT HAD A REMEDIAL PHASE.

Plaintiffs' new request is also improper because it entirely skips a necessary part of litigation before a court imposes a new electoral system: a *remedial phase*.  Districting litigation follows a set pattern.  First, there is a liability phase, at which the parties determine if the electoral system even needs to be changed.  Then, if the court finds liability, the legislative body must be given the opportunity to fix the problem.  Finally, if the legislative body cannot do so or the plaintiffs continue to contest the sufficiency of the government's chosen remedy, there is a remedial stage of the litigation, at which the court must decide what remedy is sufficient to cure the legal problem, while granting all possible deference to the legislative policy choices.  At an earlier stage of the litigation, Plaintiffs agreed that "*after* the liability phase has been determined, whether on a preliminary injunction or a permanent injunction after that, then the court would traditional[ly] give the jurisdiction the first opportunity to propose their remedy."  ECF Doc. 21 p. 27 (Transcript of Initial Conference, Dec. 11, 2018).  But again, Plaintiffs have simply abandoned this fundamental principle.

Regardless of Plaintiffs' infinitely malleable legal perspectives, "[t]he Court must give the defendant jurisdiction the first opportunity to suggest a legally acceptable remedial plan," because "the judiciary should not intrude on legislative policy any more than necessary."  *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 447 (S.D.N.Y. 2010).  And the "Court must . . . defer to the choice of the governing legislative body so long as the choice is consistent with federal statutes and the Constitution."  *Id.* at 447–48 (citing *Whitcomb v. Chavis*, 403 U.S. 124, 160–61 (1971)).  That is because, again, "'[f]ederal court review of districting legislation represents a serious intrusion on the most vital of local functions'" and "'reapportionment is primarily the duty and responsibility of the State.'"  *Diaz*, 932 F. Supp. at 469 (quoting *Miller*, 515 U.S. at 915).  "A district court *may not* substitute its own remedial plan for defendant's legally acceptable one, even if it believes another plan would be better."  *Port Chester*, 704

JONES DAY

The Honorable Arthur D. Spatt
April 26, 2019
Page 7

F. Supp. 2d at 448 (emphasis added).  The Supreme Court has emphasized this principle repeatedly.  *See, e.g.*, *Perry v. Perez*, 565 U.S. 388, 396 (2012) (reversing district court because it "exceeded its mission to draw interim maps that do not violate the Constitution or the Voting Rights Act, and substituted its own" judgment for that of the Legislature); *Upham v. Seamon*, 456 U.S. 37, 39 (1982) ("[A] court must defer to legislative judgments on reapportionment as much as possible.").

For that reason, districting challenges are bifurcated into "liability and remedial phase[s]," *Port Chester*, 704 F. Supp. 2d at 416, and those phases have different evidentiary issues.  In *Pope v. Cty. of Albany*, 687 F.3d 565, 575 (2d Cir. 2012), the Second Circuit noted that the factors to be considered at "'liability stage'" are "distinct" from factors to be considered at "remedial stage." (quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991)).  For instance, even after liability is established, "the fine-tuning of the alternative" electoral system is "left to the remedial stage of the litigation." *Barnett v. City of Chicago*, 141 F.3d 699, 702 (7th Cir. 1998).  *See also, e.g.*, *Nipper v. Smith*, 39 F.3d 1494, 1533 (11th Cir. 1994) (distinguishing between remedial and liability phases of districting litigation).

After the liability phase, but before any court-ordered remedy may be entered, the "Legislature must be afforded an opportunity to repair the defects the court discloses." *Chisom v. Roemer*, 853 F.2d 1186, 1191–92 (5th Cir. 1988).  But the preliminary injunction hearing in this case is, at best, a poor substitute for a full liability phase.  It certainly does not encompass a remedial phase.  And Plaintiffs cannot transform it into a remedial phase by snapping their figures when they realize that their proposed injunction was unwarranted.

## III.  PLAINTIFFS' REQUESTED RELIEF IS IMPOSSIBLE.

Even if the Court were to consider Plaintiffs' unwarranted, unjustified new request, it would create a logistical nightmare that would confuse voters, confound election officials, and be incapable of producing a new electoral scheme in time for the 2019 elections, anyway.  Plaintiffs are still remarkably vague about several points, but even the details they have proposed are outlandish and wholly unsupported by precedent.

The Court, at best, would have to rule on liability, grant Defendants a reasonable opportunity to craft a remedy, and then hold a remedial phase when Plaintiffs inevitably dissent from Defendants' chosen plan.  Defendants act as if this could be done in a matter of weeks, which is plainly wrong.  Plaintiffs cite *Arbor Hill Concerned Citizens v. Cty. of Albany*, 357 F.3d 260 (2d Cir. 2004), for support.  But, in fact, that litigation proves that Plaintiffs' schedule is infeasible.  The court in that case *did* grant a preliminary injunction purporting to cancel elections—after Plaintiffs filed their motion in April—but in October the court had to dissolve its injunction because there was *no time* to implement any remedies in time for the November elections.  *Id.* at 261–62.

Nor is there any basis for removing incumbents from office, in violation of state law and in derogation of the incumbents' and their supporters' rights to serve a term of office awarded to

JONES DAY

The Honorable Arthur D. Spatt
April 26, 2019
Page 8

them in an honest election that had not even been challenged at that time.  *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 820 (1995) (rejecting additional requirements on candidates because "an aspect of sovereignty is the right of the people to vote for whom they wish"); *Powell v. McCormack*, 395 U.S. 486, 507 (1969) (elected congressional representative has right to be seated unless removed by constitutional procedures).  Plaintiffs want to draw four new districts, which they admit would kick out two incumbents, two years early.  Plaintiffs' support for this anti-democratic request is two cases that had already reached *final judgement*.  *Neal v. Harris*, 837 F.2d 632 (4th Cir. 1987); *Williams v. City of Texarkana, Arkansas*, 861 F. Supp. 756 (W.D. Ark. 1992).  And even then, the cases do not support Plaintiffs' anti-democratic relief.  *Neal* involved a *consent decree*—and it does not even appear to have involved shortening incumbents' terms of office.  In *Williams*, the court specifically *stayed* all aspects of its order until an appropriate remedy could be approved.  We are not aware of a single instance—and Plaintiffs have not pointed to any—where a Court removed current office-holders on the basis of a *preliminary proceeding*.

But the problems with Plaintiffs' plan have only begun, as the logistical problems are nearly unending.  In New York, the elected officials must live in their electoral district.  N.Y. Pub. Off. Law § 3 (McKinney).  So new districts would have to be drawn around incumbents and the existing candidates' current residences.  And that creates numerous problems, even beyond the contortionist act it would require to draw such lines.  None of the incumbents even live in Plaintiffs' proposed Latino-majority district—which is not likely the district that would be used, in any event.  (Again, the Town must be given the opportunity to draw the lines first.)  And there is little guarantee that the district lines would even include Latino candidates in the majority-minority district because most of Central Islip is outside the district. Moreover, placing two incumbents of the same party in one district would almost be inevitable because, as Plaintiffs themselves point out in their Complaint, two of the incumbents live practically next door to each other.  ECF Doc. 1 at 53.  But pairing incumbents is completely unacceptable, as "avoiding contests between incumbent[s]" is one of the most fundamental districting principles courts must respect—so central that it even justifies otherwise unconstitutional population deviations. *Karcher*, 462 U.S. at 740.  Pairing incumbents of the same party in the same district forces Republican voters  to choose *between* the two incumbents in the Republican primary, rather than nominating *both* candidates for the general election, thus impermissibly burdening Republican voters' ability to nominate their desired candidates, both of whom have a proven track record of success.  Similar issues will undoubtedly arise with the respect to the two Democratic and two Republican candidates already nominated by their respective parties—either because *no* candidate or *two* candidates will reside in a particular district—thus requiring further judicial interference with the voters' ability to select and elect their chosen candidates, and skewing election results.

Moreover, candidates have already gathered signatures to gain access to the ballot for the 2019 elections.  New York law requires that those signatures be gathered from *within* the electoral district at issue.  N.Y. Elec. Law § 6-136 (2), (4) (McKinney).  With at-large elections, that means the candidates can gather them from anywhere in Islip.  But if broken into districts,

JONES DAY

The Honorable Arthur D. Spatt
April 26, 2019
Page 9

candidates would have to *re-gather* signatures, this time from the new districts in which they are running.

And even if this were all somehow feasible for the general election, there is the *primary* election problem.  Plaintiffs want to hold a special election primary, which will almost certainly have extremely reduced turnout, even *if* the Town and County could feasibly implement such an election.  Tr. 1205–08 (LaLota).  And if the Court limited the candidates who can run to the candidates already slated to run, it would, at best, disenfranchise the electorate by providing voters with no choices, and, at worst, provide *no candidates* where the district lines do not encompass any currently-running nominees.  (Plus, there are not sufficient candidates for four different elections.)

Moreover, there should be time *post* primary to gather signatures for independent candidates, as Plaintiffs' own witness, Sam Gonzalez, attests.  Tr. 537–39 (Gonzalez).  And that requires a 37-day window, unless the Court intends to make it essentially impossible for independent candidates to gather sufficient support.  Tr. 1193–94 (LaLota).  Any such shortening of the time available to independent parties and their voters to gain access to the ballot would violate "ballot access" rights under the Constitution.  *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) ("The right to vote is heavily burdened if that vote may be cast only for major-party candidates at a time when other parties or other candidates are clamoring for a place on the ballot." (citations omitted)); *see also id.* at 787–88 ("The exclusion of candidates also burdens voters' freedom of association.").  Similarly, Plaintiffs completely ignore that the military ballots must be sent out at least forty-five days in advance of any election, a time period that this Court cannot compress.  Tr. 1212–13, 1243–44 (LaLota).  This would be logistically disastrous with a September primary, which is why New York previously had to abandon its Federal Congressional September primaries.  *United States v. State of New York*, 2012 WL 254263 at *1 ("It is unconscionable to send men and women overseas to preserve our democracy while simultaneously disenfranchising them while they are gone.").

On top of all that, Plaintiffs' plan would require the Court to violate New York law by moving to non-staggered elections.  And the Court *cannot* violate such a law because no one is challenging it and it is not illegal.  It is "well-settled . . . that the nature and scope of the remedy are to be determined by the violation," which "means simply that federal-court decrees must directly address and relate to the [legal] violation itself."  *Milliken v. Bradley*, 433 U.S. 267, 281–82 (1977).  *See also Upham*, 456 U.S. at 43 ("[W]hether a remedy is required must be determined on the basis of the substantive legal standards applicable.").

There is no feasible way for the Court to compress all of these schedules, allow the Town to devise a new plan, hold a remedial phase, hold elections, and do so without violating New York law.  At *best*, there would be massive voter confusion and extremely low turnout.  Adding to the absurdity, the Court would have to *re-do* all of its work in 2021, because the new census numbers will make obsolete the malapportioned districts devised in 2019.  Plaintiffs are mute as to the difficulties this would create.

JONES DAY

The Honorable Arthur D. Spatt
April 26, 2019
Page 10

And even the foregoing does not encompass all the problems with Plaintiffs' plan to cavalierly override state law. For example, current Board Member Trish Bergin-Weichbrodt is limited by Town law to three terms in office—she is in her third term, so if allowed to serve through 2021, she would no longer be eligible to run for Town Council. Code of the Town of Islip § 49A-2. But if she is not allowed to serve her full third term, she would presumably be allowed to run again in 2019 and presumably serve until 2023, two years longer than contemplated by town law (and extending the tenure of a Board Member criticized by Plaintiffs). This is but one illustrative example of the thorny, constitutionally inflected state law questions the Court will be forced to decide on the fly under Plaintiffs' plan to unnecessarily rush to judgment.

Simply listing these myriad problems vividly demonstrates that "two reapportionments within a short period of two years would greatly prejudice [Islip] and its citizens by creating instability and dislocation in the electoral system and by imposing great financial and logistical burdens." *White v. Daniel*, 909 F.2d 99, 103–04 (4th Cir. 1990). It "makes far more sense to await the [2020] census figures and the [2021] reapportionment (if required) than for a court to intervene at such a late hour." *Id.* at 104.

\*     \*     \*

Finally, it bears repeating that *all* of this is based on preliminary facts and argument. Plaintiffs have introduced an unending stream of inadmissible hearsay, lay opinion, improper expert testimony, and other evidence that the Court admitted precisely and only because this was a preliminary injunction hearing. Moreover, Defendants have not had time to complete discovery or provide all of the counter-evidence they will be able to provide at a full hearing. To throw Islip's electoral system into chaos for *years*, potentially remove duly-elected officials before the end of their terms, *and* depress voter turnout, on the basis of preliminary evidence and a forfeited argument, is the furthest thing from equitable.

Respectfully submitted,

   */s/ Michael Carvin*
Michael Carvin
Louis K. Fisher
Laura Washington Sawyer
Jennifer L. Del Medico

*Attorneys for the Town of Islip and the Islip Town Board*

cc: All Counsel (via ECF)