**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANA FLORES, RENE FLORES, MARIA MAGDALENA HERNANDEZ, MAGALI ROMAN, MAKE THE ROAD NEW YORK, AND NEW YORK COMMUNITIES FOR CHANGE, <br><br> Plaintiffs, <br><br> v. <br><br> TOWN OF ISLIP, ISLIP TOWN BOARD, SUFFOLK COUNTY BOARD OF ELECTIONS, <br><br> Defendants. | Case No. 2:18-cv-03549 (ADS) (GRB) |

## TOWN OF ISLIP AND ISLIP TOWN BOARD'S POST-HEARING BRIEF

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................ 1

I. PLAINTIFFS HAVE NOT SHOWN THAT RACE, RATHER THAN COLORBLIND PARTISAN POLITICS, EXPLAINS THEIR ELECTORAL DEFEATS ............................. 3

II. THE NON-LATINO MAJORITY VOTES FOR LATINO-PREFERRED CANDIDATES AT RATES FAR TOO HIGH FOR PLAINTIFFS TO CLAIM THEY ARE DENIED AN EQUAL OPPORTUNITY TO PARTICIPATE IN THE POLITICAL PROCESS .................................. 9

III. THE TOTALITY OF THE CIRCUMSTANCES FAVORS DEFENDANTS ......................... 13

    A. Plaintiffs Failed to Establish that Latinos in Islip Suffer from Discriminatory Treatment That Hinders Their Ability to Participate in the Political Process ............. 13

    B. Plaintiffs Spent an Inordinate Amount of Time Trying to Prove a Lack of Responsiveness—the Least Important Senate Factor—and They Failed, Anyway ................................................................................................... 19

    C. The Remaining Factors Favor Defendants ................................................. 23

CONCLUSION ........................................................................................................ 25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. Johnson*,
  521 U.S. 74 (1997)................................................................11

*Baird v. Consol. City of Indianapolis*,
  976 F.2d 357 (7th Cir. 1992) ...............................................6

*Bartlett v. Strickland*,
  556 U.S. 1 (2009) ...............................................................11

*Butts v. City of New York*,
  779 F.2d 141 (2d Cir. 1985)................................................24

*City of Mobile v. Bolden*,
  446 U.S. 55 (1980) ..............................................................6

*Goosby v. Town Bd. of Town of Hempstead, N.Y.*,
  180 F.3d 476 (2d Cir. 1999)........................................ *passim*

*Jones v. City of Lubbock*,
  727 F.2d 364 (5th Cir. 1984) ...............................................19

*League of United Latin Am. Citizens v. Clements*,
  999 F.2d 831 (5th Cir. 1993) ..........................................6, 17

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006)...........................................................12

*Montano v. Suffolk Cty. Legislature*,
  268 F. Supp. 2d 243 (E.D.N.Y. 2003) ...............................13

*NAACP, Inc. v. City of Niagara Falls*,
  65 F.3d 1002 (2d Cir. 1995)..........................................4, 5, 7

*Nipper v. Smith*,
  39 F.3d 1494 (11th Cir. 1994) ............................................6

*Solomon v. Liberty Cty., Fla.*,
  957 F. Supp. 1522 (N.D. Fla. 1997)...................................19

*Thornburg v. Gingles*,
  478 U.S. 30 (1986).......................................................... *passim*

*Uno v. City of Holyoke*,
  72 F.3d 973 (1st Cir. 1995).............................................5, 6

STATUTES

52 U.S.C. § 10301 ..............................................................3, 5

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**OTHER AUTHORITIES**

*Brentwood Union Free School District*,
   Board Members ..........................................................................................................15

New York State Legislative Task Force,
   *Demographic Research and Reapportionment*, Senate District 3 ....................................12, 13

Ramakrishnan & Espenshade,
   *Immigrant Incorporation and Political Participation in the United States*,
   35 Int'l Migration Rev. 870 (2001) ..........................................................................19

S. Rep. No. 97-417 ...........................................................................................6, 7, 13, 24

## INTRODUCTION

Even if Plaintiffs' proposed remedies—cancelling elections or four single-member district elections in 2019—did not *exacerbate* irreparable injury and *violate* the public interest by grossly interfering with orderly election processes and depressing turnout (which they assuredly do), Plaintiffs have utterly failed to establish the extraordinary likelihood of success required to even contemplate entering their eleventh-hour request to alter the status quo in an extremely disruptive manner.

Prior to the hearing, the Town of Islip and the Islip Town Board ("Defendants") told the Court that Plaintiffs would not be able to prove that Latinos in Islip lack an equal opportunity to participate in the political process on account of race or color. The evidence fully established this failure. Not only is there *no evidence whatsoever* that race, as opposed to colorblind partisan politics, explains the electoral outcomes in Islip, there is irrefutable empirical evidence that Latino candidates are just as successful as non-Latino candidates. Latino candidates have no difficulty in slating. In *non*-partisan elections, Plaintiffs' expert found that elections are *not racially polarized*. When controlling for partisanship, Latinos are slightly *less* likely to vote for Democratic candidates. The only reason Latino-preferred candidates tend to lose is that they are *always* Democrats in a Republican-leaning town.

Recognizing the weakness of their case, Plaintiffs attack a straw man by arguing that any consideration of partisanship would reimport the rejected "intent" test under Section 2, but that is simply wrong. A majority of the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986), *rejected* the notion that Section 2 could be violated where only partisanship is the cause. And all of the *unanimous* Circuit Courts—including the Second Circuit—to examine this issue have rejected Plaintiffs' scare tactic that examining partisanship somehow involves analyzing whether voters are motivated by racial intent. The question is whether, as an objective matter, *race*

explains the voting patterns or *partisanship* does. And on that score, the evidence is unequivocal: Latino-preferred candidates lose precisely and only because they are Democrats. When controlling for party, a voter's race tells you *nothing* about their voting patterns.

Moreover, the evidence has proven that the non-Latino majority also votes in *waves* for Latino-preferred candidates, to the tune of 42%–47.5%. This degree of crossover voting is completely inconsistent with the notion that there is majority bloc voting that crushes Latino political opportunity. Latino-preferred candidates win *all kinds* of elections in Islip, and they do so because of the massive majority crossover. The only reason Latinos have yet to win in Town Board elections is bad turnout luck. But if historical turnout averages hold true, Latino-preferred candidates *will win* Town Board elections.

Finally, Plaintiffs' evidence as to the totality of the circumstances is anecdotal, irrelevant, and unpersuasive. They have not provided *any* systemic, non-anecdotal evidence of racial discrimination in Islip. When one looks to empirical *facts*, it is clear that Latinos in Islip are doing extremely well, with incomes well above national averages and barely below Islip's average. Plaintiffs do not even *attempt* to show that the minimal socioeconomic disparities are the result of discrimination. And that is because doing so would be impossible: whatever disparities exist are almost certainly the result of Latinos' recent migrant status, their youth, and their lack of facility with English, as Plaintiffs' own expert, Dr. Logan, admitted. Nor do they offer any evidence that any alleged discrimination hinders their ability to vote.

Plaintiffs' run-of-the-mill town government complaints, like snow removal and road repair, are wholly pointless because the witnesses do not even know which roads are governed by which jurisdiction—meaning that differences in caretaking are wholly irrelevant. Many of the incidents they emphasize—like alleged police misconduct by the Suffolk County Police

Department—did not even occur in Islip.  And although they repeatedly refer to evidence of Suffolk County's alleged misdeeds, Suffolk County *has* districts *and* a Latino representative from the Brentwood/Central Islip area, showing that even if Plaintiffs had legitimate complaints, a Latino representative hardly solves the problem.

The actual evidence here has shown a hard-working Town Board that cleaned up Roberto Clemente Park, was praised by the New York Attorney General and Plaintiff Make The Road New York, has worked hard to provide Spanish-language information and services, and has provided a comfortable environment in which Latinos thrive.  Changing to a ward system will do nothing to help anyone.  Throwing the 2019 elections into chaos will do even less.  Plaintiffs' motion for a preliminary injunction should be denied.

## I.   PLAINTIFFS HAVE NOT SHOWN THAT RACE, RATHER THAN COLORBLIND PARTISAN POLITICS, EXPLAINS THEIR ELECTORAL DEFEATS.

In pre-trial briefing, Defendants explained that Plaintiffs would not be able to show that Latinos are denied an equal opportunity to participate in the political process "on account of race or color."  52 U.S.C. § 10301(a).  The evidence has shown this to be incontrovertible.  Latino-preferred candidates tend to lose only because they are always Democrats in a Republican-leaning Town.

**1.**  As our pre-trial brief explained at length, although the plurality in *Gingles* expressly opined both that vote dilution and racial bloc voting is established simply because minority and non-minorities vote differently, and that the race of the candidates in analyzed elections is "irrelevant," five justices in *Gingles* expressly *rejected* this view.  *See Gingles*, 478 U.S. at 83 (White, J., concurring); *id*. at 101 (O'Connor, J., concurring).  In light of this, the Second Circuit in *Goosby* squarely held, citing with approval four Circuit Court decisions establishing the same rule, that there is no cognizable vote dilution under Section 2, even if the candidates preferred by

minorities frequently lose, if the "'divergent voting patterns'" among white and minority voters are "'best explained by partisan affiliation.'" *Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476, 496 (2d Cir. 1999) (quoting *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 861 (5th Cir. 1993)).  It upheld the finding that the at-large system there violated Section 2 precisely and only because it found that "such is not the case here" since it agreed with the district court's express finding that "black citizens' failure to elect representatives of their choice to the Town Board is *not* best explained by partisan politics."  *Id.* at 496–97 (citation omitted) (emphasis added).

To be sure, as the pre-trial brief also explained, under *Goosby*, Plaintiffs do not need to negate the partisan explanation for voting patterns as part of a threshold *Gingles*' preconditions showing but, instead, must prove this as part of the "totality of circumstances" showing needed to establish a violation.  *See id.* at 493 ("non-racial reasons for divergent voting patterns to be considered under [the] totality of circumstances test") (citing *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995)).  Thus, under binding, unambiguous Second Circuit precedent, in order to meet their burden of establishing a Section 2 violation, Plaintiffs must show that minority-preferred candidates' losses are not best explained by normal partisan politics.

For essentially the same reason, the Second Circuit has also rejected the *Gingles* plurality view that the race of the candidate in the examined elections is irrelevant in assessing racial bloc voting.  To the contrary, *Niagara* squarely held that elections between minority and white candidates are most probative and, indeed, that it would be clearly erroneous to base a racial bloc voting finding on white vs. white elections if the minority vs. white races yield different results. *NAACP, Inc. v. City of Niagara Falls*, 65 F.3d 1002, 1014–19 (2d Cir. 1995).  Again, the reason the *Gingles* plurality said that the race of candidates was irrelevant was because of its general

view that any difference in minority and white voting patterns, even if explainable for reasons wholly unrelated to race, constitutes impermissible racial vote dilution. *Gingles*, 478 U.S. at 67–70. But the Second Circuit took a different view, explaining that the focus on minority vs. white elections is a straight-forward means of "determin[ing] whether the majority is voting against candidates for reasons of race," or is simply due to normal "partisan politics." *Niagara Falls*, 65 F.3d at 1015.

Plaintiffs nonetheless brazenly ask the Court to defy these precedents by affirmatively asserting that they need not even examine whether normal partisan politics best explains divergent voting patterns and that the race of the candidates in the elections examined is irrelevant to the racial bloc voting analysis. Tr. 759 (McDonald); 16–17 (Brewington). Apparently recognizing that their evidence is legally deficient under Second Circuit case law, Plaintiffs seek to overturn this precedent by attacking a straw man. Specifically, Plaintiffs contend that Defendants' interpretation of *Goosby* and *Niagara* somehow requires analysis of voters' *intent*, in which the Court is to determine whether white opposition to minority-preferred candidates stems from racial animus, which Plaintiffs maintain is inconsistent with the Section 2 results test. *Id.* This argument misstates Defendants' position and the precedent it relies on.

*Goosby* and similar precedents do not require psycho-analyzing voters for impermissible racial intent; they require *objective* examination of voting *patterns* to determine whether they "result" in some disadvantage to Latinos or, alternatively, whether Latinos play on the same level playing field as all others, such that they do not suffer "less opportunity" on "account of race or color" in electing their preferred candidates. 52 U.S.C. § 10301. "Properly conceived, the results test protects racial minorities against a stacked deck but does not guarantee that they will be dealt a winning hand." *Uno*, 72 F.3d at 982. That is, courts simply ask whether the elections

analyzed reflect an objective pattern of "*racial* bloc" voting or simply partisan voting.

This merely reflects the obvious point long ago made by Justice Marshall that an at-large system has no racially discriminatory effect if "the Negro community's lack of success at the polls was the result of partisan politics, not racial vote dilution."  *City of Mobile v. Bolden*, 446 U.S. 55, 109 (1980) (Marshall, J., dissenting).  The mere fact that white Democratic candidates usually lose to Republican candidates in a particular jurisdiction would not suggest to anyone that this reflects a *racially discriminatory* "result," simply because minority voters align themselves with the less popular party.  The same is true if Latino Democratic candidates are treated the same as white Democratic candidates, because this reflects even-handed political opportunities and participation, not any racially discriminatory results.

Moreover, as numerous courts have explained, Plaintiffs' specific "contention that an inquiry into the explanations underlying racially divergent voting patterns somehow conflicts with Congress' abandonment of the intent requirement [in Section 2] . . . completely ignores the fact that the Senate Report *expressly* adopted [such a] standard . . . in codifying the 'results' test." *Clements*, 999 F.2d at 862 (citing S. Rep. No. 97-417 at 21, 1982 U.S.C.C.A.N. 177, 206 (1982)).  *See also, e.g.*, *Uno*, 72 F.3d at 982 ("[T]he 1982 amendment" does not "lend[] itself to this restrictive conclusion"); *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 360 (7th Cir. 1992); *Nipper v. Smith*, 39 F.3d 1494, 1520 (11th Cir. 1994) (en banc).  For example, the 1982 Senate Report emphasized that Section 2 embodied *Whitcomb*'s teaching that minorities' inability to elect their preferred candidates was not proscribed unless it reflected a "built-in bias against poor Negroes" because otherwise the notion that minority "voting power . . . ha[s] been 'canceled out,'" would be a "'mere euphemism for political defeat at the polls.'"  S. Rep. No. 97-417 at 21 (quoting *Whitcomb* v. *Chavis*, 403 U.S. 124, 153 (1971)).  Accordingly, the Senate

Report emphasizes that the proper inquiry into "racial bloc voting" is whether "race is the predominant determinant of political preference." *Id.* at 33.  And, as *Niagara* noted, the Senate Report was quite clear that Section 2 requires courts to distinguish between situations where "'racial politics do dominate the electoral process'" and those where it does not.  65 F.3d at 1023 (quoting S. Rep. 97-417 at 33).  Accordingly, it is Plaintiffs who are advocating a rule that is at war with Section 2's language and legislative history.

**2**.  Applying the correct legal standard, it is clear that Plaintiffs did not satisfy—indeed disavowed any attempt to satisfy—their obligation to show that election results are not best explained by partisan politics.  Dr. McDonald acknowledged that he did not examine this issue, did not find lesser white support for Latino Democrats than white Democrats, and Latino Democrats were actually *advantaged* relative to white Democratic candidates because of their high Latino support.  Tr. 1424–25.  Moreover, in the *only* non-partisan elections Dr. McDonald analyzed, there *was no racial polarization*.  Tr. 1425–27.  There is no more obvious case of partisan politics than one where the *non-partisan* elections are the elections without polarization.

Thus, the only unrebutted testimony on this dispositive "partisan politics" issue is offered by Dr. Alford, who showed that there is overwhelming evidence that party, *not* race, predicts voter behavior and explains why Democrats (the Latino-preferred candidates) usually lose.  As Dr. Alford explained, the partisan percentage of an electoral district accounts for virtually the *entire* difference in voting behavior: 99.4%.  So if you increase the percentage of Democrats in a district by 10%, the percentage of votes for a Latino-preferred candidate will increase by almost exactly 10%.  Tr. 1618–22 (Alford).  Conversely, the *Latino* percentage of an electoral district has *no* predictive power when controlling for party.  Tr. 1624 (Alford).

As Dr. Alford explained, "once we establish what percentage of registered voters . . . are

Democrats, knowing what proportion of them are Hispanic gives us *no additional information*." Tr. 1624–25 (emphasis added).  That is, Democrats give well over 90% of their votes to Democrats, and non-Democrats give less than 6% of their votes to Democrats, and race has *nothing to do with it*.  Tr. 1622–25 (Alford).  (Dr. Alford did not consider "motivation" or "intent"—only results.  Tr. 1749–50.)  The reason for Latinos' lack of success is that they always prefer Democrats—in *51 of 51* races analyzed by the experts—and Democrats have tended to lose Council elections.  Tr. 1575.

Finally, Republicans routinely won in Islip since before there *were* many Latinos in Islip. This demonstrates that the majority votes based on *party*, not as a bloc to defeat Latino-preferred candidates.  It is not as if Islip elected Democrats *until* Latinos started voting.

**3.**  Plaintiffs similarly failed to prove any discrimination in slating—the issue that convinced the *Goosby* Court that race, rather than politics, explained voting patterns.  There is no evidence (let alone the overwhelming evidence in *Goosby*) that Latinos have trouble accessing party slates, much less suffer "exclusion," *Gingles*, 478 U.S. at 45.  Every Latino candidate that has tried to slate has done so successfully, including the current Democratic candidate for Town Board, Jorge Guadron.  Tr. 337 (Ramos).  And the heads of both the Islip Democratic Party and the Suffolk County Republican Party are Latino.  Tr. 539–40 (Gonzalez); Tr. 1821 (Carpenter).

Tellingly, the Latino candidates received the same level of support as non-Latino candidates, even where the other candidates were *incumbents*.  Renee Ortiz admitted that, even though she was running on a Democratic ticket with two incumbents—by contrast, she was a newcomer—she received the same amount of money as her white running-mates, was on the same number of mailers, and everybody got their "fair share" of resources.  Tr. 1314–16.

## II. THE NON-LATINO MAJORITY VOTES FOR LATINO-PREFERRED CANDIDATES AT RATES FAR TOO HIGH FOR PLAINTIFFS TO CLAIM THEY ARE DENIED AN EQUAL OPPORTUNITY TO PARTICIPATE IN THE POLITICAL PROCESS.

As explained in our pre-trial brief, Latinos frequently win elections town-wide in Islip (including 15 of 28 non-Town elections, Tr. 1403–05 (McDonald)), and there is no reason to think that Town Board elections will remain an exception to that rule.  Before even looking to expert statistical analysis, very simple numbers prove that Latinos in Islip have a very realistic opportunity to win elections for Town Board.

**1.**  If Latinos and non-white Latinos turn out at the *usual rates* in which they have turned out in the past, Latino-preferred candidates will *win* the Town Board seats.  For example, in 2017, Gonzalez and Fenley, the Democratic, Latino-preferred candidates, obtained 23,302 and 22,820 votes respectively.  As Dr. McDonald admitted, those vote totals would have been sufficient to win *every* prior election he analyzed, except for 2011.  The *only* reason that these Latino-preferred candidates did not win in 2017 is that there was an unexpected jump in non-Latino white turnout, up to 31.9% from the ordinary rate of around 20%.  Latinos, by contrast, voted at their typical rate of 10.6%.  With that disparity in turnout, the Latino-preferred candidates lost.  But in 2007, we have another example of Latinos voting at the same rate— 10.6%—and in *that* election, Latino-preferred candidates *won*, because non-Latino white turnout was in line with its historical average at 21.6%.  Tr. 1359–61 (McDonald).  Accordingly, if in 2019, Latinos turn out at a rate around 10%, and non-Latino whites turn out at a rate around 20% (the norm for each), Latino-preferred candidates will almost certainly win.  And Dr. McDonald admitted that he had no reason to expect white turnout to spike that high again.  Tr. 1367.  (The reason for that turnout was likely an uncommon event that will not affect 2019—the inclusion of a constitutional convention ballot question.  Tr. 2150–51 (Carpenter).)

Fenley's performance in 2017 makes this even clearer.  Fenley is a white Democrat who

obtained only *52.7%* of the Latino vote, far lower than what Latino candidates obtain.  Tr. 1365 (McDonald).  And using McDonald's own numbers again, Fenley received 30.3% white crossover.  Tr. 1366.  Nevertheless, despite receiving only *50%* of the Latino vote and only *30%* of the white vote, Fenley obtained 22,820 votes, enough to win the election in *every year* except for 2011.  *Id.*  If a white Democratic candidate with performance that poor among Latinos can be that successful, a *Latino* Democratic candidate in 2019 will almost certainly win, assuming that Latinos give such a candidate 80%–90% of their votes, as they have done for both Latino candidates previously.  PX–118 Table 7.

Finally, the winning results in 2007 significantly underestimate 2019 Latino voting strength, because Latinos' share of the Islip population has significantly increased since 2007 and will continue to rapidly grow in the near future.  While the Latino CVAP share was only 15% in 2007, it had grown to 25.9% in 2017.  PX-108 ¶50.  Although Dr. Beveridge quibbled with these numbers based on "confidence intervals" he could not deny that the Latino trend-line is markedly upward, particularly in recent years, and has "substantially" increased.  Tr. 656–663, 730.  Moreover, it will continue to grow since, as Dr. Beveridge notes in his report (without confidence intervals), the 2017 census data shows that 39% of Islip's under-18 citizen population is Latino, compared to only 46.5% for whites.  PX-108 ¶60.

**2.**  Latino-preferred candidates also *dominate* County elections held on the very same day as Town elections.  Latino-preferred candidates won the Islip portion of 4 out of 6 County elections held in odd-numbered years, and in a fifth, their preferred candidate lost by 178 votes out of 55,000 cast.  Tr. 1372–73 (McDonald).  These elections show that all Latinos need to do is mark the Town Board ballot once they have already turned out to vote, and they will win elections.  Again, these County elections are odd-year elections held on the *same day* as Town

Board elections, meaning voters are already there.  Dr. McDonald performed no analysis to show that Latinos cannot replicate their County success at the Town level.  Tr. 1397–98.  If anything, Latinos have a better chance of success for Town Board elections because their turnout gap is much smaller in Town elections than county elections.  Tr. 1380 (McDonald).

**3.**  The majority crossover here is huge, enough to defeat white bloc voting under the relevant Supreme Court precedents.  As previously discussed, the Supreme Court is "skeptical" that Section 2 claims can survive where crossover voting is as high as *20%*, *Bartlett v. Strickland*, 556 U.S. 1, 16 (2009), and it has rejected claims where the crossover ranged from 20% to 38%.  *Abrams v. Johnson*, 521 U.S. 74, 92 (1997).

More importantly, the crossover voting here *has led* to Latinos winning elections. Federal elections illustrate the point.  Under Dr. McDonald's own numbers, there is average non-Latino white crossover of 41.3% in federal elections.  DX-B Table 1.  And Latino-preferred candidates won *seven out of eleven* federal elections in Islip despite racially polarized voting and the fact that the turnout gap between Latinos and whites in federal elections is larger than the gap in Town elections.  Tr. 1405 (McDonald); PX-118 Tables 8, 22.

The important point here is that majority crossover in Islip *is* greater than the 41.3% needed for Latinos to consistently win.  As Dr. Alford showed, majority crossover in Town Board elections averages *42%*.  Tr. 1782; DX-B Table 2.  Dr. McDonald reports a lower figure, but his estimation is clearly inaccurate for three reasons, as Dr. Alford explained (and Dr. McDonald admitted).

*First*, Dr. McDonald understates white crossover in Town Board elections because he calculated the crossover percentage as the number of votes divided by the number of *voters*.  But there will always be more voters than votes because not all voters cast every possible vote.  So,

11

as Dr. McDonald admitted, the crossover "percentages will be lower" under his method of comparing apples (voters at the polls) with oranges (votes cast for a particular candidate). Dr. McDonald further admitted that he could not calculate what part of the different crossover percentage is attributable to this different calculation method, meaning that *all* of the difference in crossover percentages may be attributable to his apple-to-oranges calculation. Tr. 1392–95.

*Second*, Dr. McDonald did *not* account for differing rates of turnout between racial groups in estimating crossover. Dr. McDonald was *aware* of this flaw—in fact he tested some of the elections using the correct method—but he decided *not to report* those results. Tr. 1428–30.

*Third*, Dr. McDonald did not compute *majority* crossover voting, he computed non-Latino white crossover voting. But the relevant question is majority crossover, not a cherry-picked racial group's crossover. Tr. 1591–93 (Alford); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 444 (2006) (examining whether "Anglos and Latinos" in the majority would defeat black candidates).

In short, Dr. McDonald found that where crossover rates are 41.3%, Latinos *usually* win elections in Islip. And Dr. Alford proved that crossover rates in Town Board elections *average* 42%. Latinos, then, can and will elect their preferred candidates for Town Board because the bizarre 2017 turnout will not likely recur.

Finally, the meritless nature of Plaintiffs' analysis is illustrated by the recent election in Senate District Three (covering parts of Islip). Under Plaintiffs' myopic view, because Latino-preferred Democratic candidates had not won this office for over five decades, Latinos did not have a realistic opportunity to elect their candidate of choice. As recently as 2010, the Latino voting age population in District Three was only 23.91% (less than the *CVAP* in Islip). New York State Legislative Task Force, *Demographic Research and Reapportionment*, Senate

District 3, https://www.latfor.state.ny.us/maps/2012s/SD_map_rep_03.pdf (last visited Apr. 26, 2019).  But Democrat Monica Martinez was elected in District Three in 2018, showing that the growing Latino population and increased political awareness *are* leading to results Plaintiffs claim are impossible.

## III. THE TOTALITY OF THE CIRCUMSTANCES FAVORS DEFENDANTS.

Before the hearing, Defendants showed that Plaintiffs' proposed evidence regarding the Senate Factors was weak, anecdotal, and based on highly non-credible hearsay.  Two weeks of evidence have disproven nearly every inference Plaintiffs hope the Court would make.  Plaintiffs have not pointed to a *scintilla* of non-anecdotal evidence of discriminatory treatment in Islip.

### A. Plaintiffs Failed to Establish that Latinos in Islip Suffer from Discriminatory Treatment That Hinders Their Ability to Participate in the Political Process.

Exemplary of the weakness of Plaintiffs' case is that they cannot even remotely satisfy Senate Factor Five, which was the only factor they attempted to demonstrate with systemic, non-anecdotal evidence.  That factor looks at "the extent to which members of the minority group . . . bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process."  S. Rep. No. 97-417 at 29. Under this factor, "plaintiffs must show that *as a result of prior discrimination*, [Latinos] suffer from lower socioeconomic conditions than whites."  *Montano v. Suffolk Cty. Legislature*, 268 F. Supp. 2d 243, 265 (E.D.N.Y. 2003) (emphasis added).  And Plaintiffs must show that Latinos' "lower socioeconomic condition in [Islip], if such is the case, has deprived them of their right to participate in [Town] elections."  *Id.*  Plaintiffs not only failed to make either of these showings, the evidence disproves the entire theory of Plaintiffs' case.  Islip is nothing like the caricature Plaintiffs have alleged; it is a haven for Latinos who continue to move there in large numbers to achieve a degree of success that is unparalleled for such a young, migrant community.

*First*, Plaintiffs failed to show discriminatory effects among Latinos in Islip.  Stunningly, *they did not even try*.  Their own expert did not analyze discrimination; Dr. Logan did not even use the term "discrimination" to mean anything other than "disparity."  Tr. 933–34.  And what few disparities Dr. Logan found are easily explained by non-discriminatory factors.  An astounding *30%* of Latinos in Islip are not citizens.  PX-108, Table 1.  About 40% of the Latino community in Islip was not born in the United States.  Tr. 1944–47 (Thernstrom).  Over 40% of the Latinos in Islip do not speak English well.  PX-115 Table 1.  The Latino community is *much* younger than the non-Latino community.  PX-108 Table 1.  Thus, there is no reason at all to attribute disparities to discrimination when they are simply the disparities that would exist for any recent immigrant group with limited English skills and a large subset of non-citizens.

Indeed, Dr. Logan admitted that citizens likely had higher socioeconomic indicators than non-citizens *across the board*.  Tr. 927–31.  Moreover, Dr. Logan admitted that U.S.-born citizens likely have higher socioeconomic indicators than non-U.S.-born (naturalized) citizens; that the English language fluency disparity between Latinos in Islip and others is "very large" and that English language proficiency leads to better jobs, higher incomes, higher education, and more home ownership; and that youth is associated with lower socioeconomic status.  Tr. 930–33.  Thus, Dr. Logan not only failed to examine discrimination, he admitted that whatever disparities he found are attributable to nondiscriminatory causes.  And Dr. Thernstrom was able to explain that, entirely unsurprisingly, immigrant groups tend to have lower socioeconomic status, not because of discrimination, but because they start out that way (and that is in part why they migrate in the first place).  Tr. 1948–49.

Plaintiffs offer no evidence of a discriminatory cause for *any* of the alleged disparities they put forward.  On employment, they do not offer any evidence of discrimination.  Dr. Logan

considered but *decided not to address* discrimination in employment.  Tr. 923.

With respect to discrimination in education, Dr. Logan did not even examine the issue. He simply offered the tautological observation that, because Latinos on average are poorer and lag behind in academic achievement, schools with more Latino students tend to have poorer students who lag behind in academic achievement.  Tr. 965–72.  Dr. Logan did not examine or opine that Latino students were treated less well in terms of, for instance, per capita spending, quality of teachers, or the condition of the schools.  Tr. 966–68.  Indeed, he emphasized that he made "no effort to explain why Latinos have lower achievement" in school.  Tr. 905.  And it would be quite astonishing if discrimination explained the relatively lower performance of schools in Brentwood, Central Islip, and North Bay Shore, since the school boards that control those schools are *local*, and they have no input from Islip.  Tr. 1818 (Carpenter).  Brentwood's school board, for instance, is run almost entirely by Latinos and African-Americans.  *Brentwood Union Free School District*, Board Members, https://www.bufsd.org/district/board_of_education/board_members (last visited Apr. 26, 2019).  Would Plaintiffs have us believe that Brentwood's local, Latino school board members are discriminating against Latino students?  Plaintiffs' entire case is based on the notion that a Brentwood or Central Islip official would respond to local needs.  (Dr. Logan did not examine this, nor did he even know that he left out numerous school districts from his report.  Tr. 956–57.)

Dr. Logan tried to suggest that the schools were "segregated," but he meant only that they differ in their racial and ethnic composition.  Tr. 864–67.  As the Court pointed out, people attending school based on where they live is *not* segregation.  Tr. 866.  And the greater presence of Latinos in Brentwood and elsewhere is not attributable to residential discrimination.  Dr. Logan, departing from his standard practice, did not examine housing patterns here.  Tr. 867–68.

15

As to health, again, Dr. Logan made no effort to examine the cause of any health disparities, nor have the Plaintiffs.  His "sole[]" conclusion as to health was that there were disparities between Latinos and whites.  Tr. 955–56.  (And even as to disparities, Dr. Logan cherry-picked his results.  In some important metrics, like suicide rate or low birthweight rate, Latinos are actually *advantaged* in Islip, Tr. 948–49, 953–55 (Logan).)

As to policing and public safety, Dr. Logan again made no attempt to determine whether there was discriminatory activity.  He performed no analysis of assault records, harassment records, discrimination complaint records, hate crime frequency, or anything of the sort.  Tr. 986.

With respect to the environment, Dr. Logan suggests that Latinos suffer from disparities in terms of their placement near industrial sites, but he again provides no evidence of discrimination, and his overall analysis is fatally flawed.  He made no effort to confirm that his list of industrial sites was complete or representative, and even then, *eight* of those fourteen sites are in census tracts or hamlets with *less than 10% Latino population*, and disproportionately *few* sites are located in Brentwood, Central Islip, and North Bay Shore.  Tr. 993–94, 997.  On top of that, he provided no relevant historical data to explain what the population of Latinos was when these industrial sites were *placed*, which means we *cannot* know whether they were even theoretically placed there for discriminatory reasons, as there might not have even *been* Latinos at the time.  Tr. 1010–12.  Finally, the list of 14 sites includes at least four *dry cleaners*.  PX-115 ¶81.  Nuclear waste dumps, these are not.

Of course, it is no surprise that Plaintiffs could barely even make an attempt at showing discrimination in Islip.  Contrary to the absurd claims of Plaintiffs and their witnesses that the Latino community in Islip is "poor," Tr. 283 (Ramos), the socioeconomic status of Latinos in Islip is remarkably advanced.  Latino households earn about $86,000 per year, which *dwarfs*

16

households of all races in the rest of the nation (~$60,000).  Tr. 1940 (Thernstrom).  Similarly, their poverty rate is substantially lower than the nation at large.  Tr. 1941–42 (Thernstrom). (Even using Plaintiffs' older numbers, Latinos in Islip vastly out-earn households around the country and are not far below Islip averages.)  This is hardly a community that is scraping by.

*Second*, there is no linkage *whatsoever* between Latinos' socioeconomic status in Islip and their political participation.  For one thing, Latinos *do* turn out to vote in presidential election years in great numbers.  Dr. McDonald reports that they turned out at rates of approximately 45% in each of the last three presidential elections.  PX-118 Table 22.  (That is even higher than non-Latino black turnout, including in the two elections President Obama ran for office.  *Id.*)  As Dr. McDonald admitted, all the alleged socioeconomic barriers to Latino voting in Town Council elections are still present for presidential elections, yet somehow they turn out to vote in huge numbers.  Tr. 1406–07.  Thus, nothing hinders Latinos' ability to turn out.  If they truly share Plaintiffs' dissatisfaction with Town governance, they can and will elect their preferred representatives, just as they do in County elections on the same day.

Another basic point destroying any linkage between socioeconomic factors and political participation is that there is no evidence about the socioeconomic factors of Latino *citizens* in Islip, the only Latinos *eligible* to vote.  Again, Dr. Logan could have, but chose not to, analyze that data.  Tr. 925–27.  But without it, we have no frame of reference to determine whether Latinos' voting rates are affected by depressed socioeconomic status.  If Latino *citizens* have average or above socioeconomic status (which is likely, given how successful the entire Latino population is), then low turnout rates cannot be caused by low socioeconomic status.  But we cannot make that comparison because Plaintiffs introduced no such evidence.  Instead, we know only the socioeconomic status of a group where at least 30% are not citizens and cannot vote.

Even if we *had* the data for the relevant (citizen) population, Dr. Logan's analysis is flawed because the studies he relies on are out-of-date and irrelevant.  Dr. Logan relies on a "foundational" study from 1993 to support the hypothesis that lower income leads to lower participation.  PX-115 ¶17.  But that study is 26 years old; relying on it to prove facts about 2019 is like relying on 1967 data to prove facts about black political participation in the 1990s.  And none of the studies that Dr. Logan relies on examined a community *anything like* Islip.  The "foundational study" looked at Latinos with median incomes of $28,000, nowhere near the high incomes in Islip—a fact of which Dr. Logan was unaware.  Tr. 924–25.  None of Dr. Logan's cited studies purports to find a relationship between voting and socioeconomic status where the incomes are as high as they are in Islip.  And Dr. Logan admitted that very high incomes, even where there is a disparity with whites, would not lead to changes in political participation.  *Id.*

Moreover, data on New York and Islip refute the notion that socioeconomic status is affecting voter participation.  Racial groups in New York simply *do not* follow that pattern.  Asian-Americans have the best socioeconomic indicators but they barely vote; blacks have the worst indicators but they vote almost as much as whites.  Tr. 1955–59 (Thernstrom).

Finally, and dispositive for most of the socioeconomic factors he analyzed, Dr. Logan does not even claim that they affect voter participation.  On the one hand, all of the factors he lists that purportedly affect turnout are not effects of any prior discrimination.  PX-115 ¶¶17–19.  Conversely, he makes no showing that police activity or environmental factors affect voting (indeed, his cited studies make no such claim either, *id.*).  He speculates that police misconduct can lead to higher levels of "stress"—though he performed no analysis to determine the "stress" levels of Latinos in Islip—but he admittedly did nothing to assess any potential relationship between "stress" and political participation.  Tr. 951–52.  And there is no reason to assume that

something like police misconduct would decrease voter participation.  Often, as Dr. Logan himself noted, *disliked* policies induce greater political participation.  Tr. 895.  For instance, anti-immigration legislation tends to *increase* Latino political participation, according to research that Dr. Logan relies on.  Ramakrishnan & Espenshade, *Immigrant Incorporation and Political Participation in the United States*, 35 Int'l Migration Rev. 870, 870, 892–93 (2001).

Furthermore, almost all of the incidents and evidence that Dr. Logan relies on with respect to police happened *outside of Islip*, and so are completely irrelevant.  Even insofar as the Suffolk County Police Department has some effect *in* Islip, the Town Board has no control over the SCPD, so there is no feasible way in which SCPD is relevant to political participation of Islip voters in Islip elections—or if there is, no one has shown it.

## B. Plaintiffs Spent an Inordinate Amount of Time Trying to Prove a Lack of Responsiveness—the Least Important Senate Factor—and They Failed, Anyway.

Plaintiffs used almost all of their non-expert witness case to make claims that Islip is not "responsive" to the Latino community (the eighth Senate Report factor).  This is remarkable, as the "responsiveness" factor is one of the two least important factors.  As *Goosby* noted, the Senate Report itself set it apart and stated that only "some cases" might find this factor probative.  180 F.3d at 491–92 (citation omitted).  And courts have repeatedly noted that it is "less important than other factors."  *Solomon v. Liberty Cty., Fla.*, 957 F. Supp. 1522, 1566 (N.D. Fla. 1997). *See also, e.g.*, *Jones v. City of Lubbock*, 727 F.2d 364, 382 (5th Cir. 1984).

Yet for all the time Plaintiffs spent on it, they established *no* disparate treatment in responsiveness.  Even if their exaggerated, hearsay anecdotes were credible evidence, Plaintiffs have *nothing* to compare them to and did not provide a scintilla of *evidence* (as opposed to subjective speculation) that treatment of Latinos in Islip is different from non-Latinos.

Most relevant to a voting rights case, Plaintiffs claim that there are problems in voting

19

access, but they could not point to a single example of someone being unable to vote.  *See, e.g.*, Tr. 477–81 (Altschuler); 224–25 (Barrientos); 1309–10 (Ortiz).  Nor could they identify any incidents of voters lacking Spanish-language ballots or poll workers, Tr. 227 (Barrientos); Tr. 355–56 (Ramos); Tr. 1547–48 (Flores).  Plaintiffs complain that 3,000 voters' online registrations were denied in 2012 (a technical glitch, at worst), but they do not even know who those voters were, whether they were Latinos, or if they even lived in Islip.  Tr. 490 (Altschuler). Nor do they deny that the glitch—the fault of the County, not the Town—was promptly remedied seven years ago.  Instead of providing facts, Plaintiffs' witnesses offered only tales of what they "felt," Tr. 1262 (Ortiz), or "recall[ed] hearing," Tr. 445 (Altschuler).

Plaintiffs made cumulative and overlapping claims that snow removal, road repair, and similar services are performed inequitably, but every time Plaintiffs' witnesses were asked for *specifics* about their claims, they fell mute.  Plaintiffs' witnesses cannot remember which streets they saw, they do not know who had responsibility for those streets (many are not the responsibility of Islip, which means that any differential treatment is irrelevant), and they cannot point to similarly situated governmental services that are performed better in white neighborhoods.  Tr. 221–25 (Barrientos); Tr. 344 (Ramos); Tr. 1544–48 (Flores).

Instead, the unrebutted evidence is that there is *no* distinction in how the Town reacts to complaints in different areas.  Pot hole repair and snow removal, like most services in the Town, are largely operated on the basis of resident *complaints*, as the Commissioner for Public Works explained.  Tr. 2050–60 (Owens).  They go into the same system and the only priority system is for hospitals, bus stops, and similar high importance areas.  Tr. 2050–52 (Owens).  Indeed, the director of constituent services—a Latina—has *never* received a complaint about differential treatment in the *six years* she has held that position.  Tr. 2295, 2303 (Barrios-Reyes).

A few witnesses have the subjective *perception* of disparate treatment, but their anecdotal claims are wholly unpersuasive, as they are contradicted by the evidence at every turn.  For instance, numerous witnesses claimed that Islip does not keep Latinos "informed"—but then had to admit that they were simply unaware of the information that was made available.  *E.g.*, Tr. 190–92; (Barrientos unaware of email alert regarding park cleanup); Tr. 474 (Altschuler unaware of Town setting up office to address concerns about park or placing Spanish-speaking representative in Brentwood senior center).  Although Plaintiffs' witnesses claim they never received action on anything, they never contacted the Town to seek such action.  Tr. 223–25 (Barrientos); Tr. 1545 (Flores).  When the Town received requests to produce flyers in Spanish, the Town did so, and it produced numerous Spanish-language updates. Tr. 190–92 (Barrientos), 2306–09 (Barrios-Reyes).  A scrap metal facility was not built in Brentwood after protests from residents.  Tr. 342 (Ramos).  The Town improved Noble Street park after a community advocate brought it to Commissioner Owens' attention.  Tr. 2068 (Owens).  Thus, the Town is quite responsive to requests, but individuals who never contacted the Town would not know this.

A particularly revealing example of the gap between Plaintiffs' perceptions and reality is the Heartland Development.  That development is a proposal to create 9,000 housing units in a Latino neighborhood, refuting any notion that the Town is indifferent to and not investing in the Latino community.  Incredibly, that  economic investment was decried by Assemblyman Ramos because it would "change the demographic"—that is, make the community *more* diverse—and because it would *"change the political persuasion"* of the district.  Tr. 245–46 (emphasis added).  That is, Assemblyman Ramos does not *want* the Town to develop or provide resources to "[his] district," because it might *change political outcomes*. *Id.*  Not only does his refreshingly candid testimony reveal what this litigation is *actually* about (the advancement of Democratic political

power), it shows that Plaintiffs' witnesses are able to complain against the Town about *anything*, even when any reasonable observer would think that economic development in Brentwood shows solicitude, not a lack of responsiveness or discrimination.

Exemplary of Plaintiffs' flawed attempt to create non-responsiveness where there is none, they complain incessantly about the clean-up of the Roberto Clemente park. They devoted an extraordinary portion of the hearing to repeating the same allegations about the Town's response, but the evidence defeats them at every turn. The Town Board did not cause that problem, a criminally-convicted developer did. The Town Board *fixed* the problem and was congratulated by the State Attorney General and Plaintiff Make the Road New York for its efforts. DX-Z (23:45–26:01). And the criminal dumping itself was hardly discriminatory—the dumping happened in other places as well. (Plaintiffs declined to investigate those other dumping incidents. *E.g.*, Tr. 991–92 (Logan).) The park incident was unfortunate, but it shows no disparate treatment and proves that the Town Board *is* responsive to Latino concerns.

Plaintiffs' witnesses complained of the number of years it took to clean up Roberto Clemente park, but they provided no evidence on how it could have been done more quickly and admitted that they had no idea how much of that time was taken up with legitimate, State-mandated procedures (creation of a plan, approval by the State, public and agency comment, testing results, certification of results, etc.). *E.g.*, Tr. 193–94 (Barrientos); Tr. 352–53 (Ramos); Tr. 467–69 (Altschuler). The Town moved as expeditiously as it could. The New York Department of Environmental Conservation did not approve a plan until January 2015. The Town had to find a reputable contractor to do the hazardous cleanup work. The Town worked to minimize disruption by, for instance, alternating truck routes into and out of the park. The Town hired an environmental consultant "immediately." The Town kept people informed via mailings,

its website, updates at Town Board meetings, a representative installed at the Brentwood Senior Center, and information posted at the Brentwood library.  Tr. 2121–28 (Carpenter).

Moreover, the Town has worked to make the park better than it was, and the community was impressed at the grand re-opening.  Tr. 2138–40 (Carpenter).  Nor is the Town finished, as it is adding a spray park and a skate park as well.  *Id.* 2134–35, 2141–42.  In short, Plaintiffs have *literally no evidence* that the Town's response to the dumping—which it did not cause—was even slow, much less slower than the Town would have made in parks elsewhere in Islip.

Finally, Plaintiffs' central thesis—that a Latino majority district in a single-member system will enhance responsiveness—is flatly contradicted by their own evidence.  A large portion of their "non-responsiveness" and "marginalization" evidence is focused on Suffolk County, which *has* districts, including a majority-Latino district within Islip.  So although Plaintiffs' witnesses repeatedly complain about the SCPD, Steve Levy's anti-immigration policies, and similar Suffolk County material, all of their allegations occurred with a Latino incumbent from Islip in the Suffolk County Legislature.  Tr. 349–51 (Ramos); Tr. 1538–39 (Flores).  So it is clear that a Latino majority district is not a cure for Plaintiffs' complaints, even if they were valid.

## C.   The Remaining Factors Favor Defendants.

Nearly every remaining factor works against Plaintiffs.

**Factor One.**  The first Senate factor asks whether there is a "history of voting-related discrimination in the State or political subdivision."  *Gingles*, 478 U.S. at 44. Plaintiffs produced no evidence of such a history.  *None* of Plaintiffs' witnesses could point to a single incident of a Latino being kept from voting.  The best Plaintiffs can point to is unenacted legislation in *Suffolk County* that was, supposedly, anti-immigration.  But even setting aside that "anti-immigration" and "anti-Latino" are not the same thing, anti-immigration legislation tends to *increase* Latino

23

political participation, as noted above.  Even if Plaintiffs *had* proven something, it does not relate to *voting*.  Anyway, Dr. Thernstrom explained that New York State has a sterling record of anti-discrimination laws and policy. Tr. 1931–37.

**Factor Two.**  As explained above, and in our opening brief, there is minimal racial polarization in Islip elections, if any at all.

**Factor Three.**  There are no anti-single shot provisions, majority vote provisions, or any other devices that might depress minority voting power.  The only evidence of this sort that Plaintiffs even waved at was the notion that Islip is large.  But Islip did not create an "unusually large" election district.  S. Rep. No. 97-417 at 29.  It is coterminous with the Town.

**Factor Six.**  With respect to racial appeals in political campaigns, advertisements stating that Jim O'Connor is "one of us," as noted in our pre-trial brief, are hardly racist; they were well understood to mean that Jim O'Connor was a Republican, conservative, businessman.  Tr. 2150 (Carpenter).  (Similarly, Board Member Bergin-Weichbrodt's statement, ripped from context, that her electoral opponent, Gonzalez, was not "from" some part of Islip, was merely a routine, factually accurate political statement.)  And although Plaintiffs want to reach outside of Islip for more racial appeals, virtually all they can find are references opposing illegal immigration.  And if the Court is going to examine Suffolk County as a whole, the relevant point is that in the entire County, with a population of roughly 1.5 million—larger than ten *states*—Plaintiffs can find only a few ambiguous statements.  That is a remarkably clean climate, one where the "*absence*" of racial appeals should lean heavily in Defendants' favor.  *Butts v. City of New York*, 779 F.2d 141, 150 (2d Cir. 1985).  (And, again, Suffolk County *has districts* and a Latino representative.)

**Factor Seven.**  As mentioned previously, no Latinos have been elected to Town Council, but only two have ever run—as Democrats in a Republican-leaning Town.

**Factor Nine.**  Along with responsiveness, this factor is least important.  *Goosby*, 180 F.3d at 491–92.  Anyway, there is nothing tenuous about the at-large system.  As Dr. Thernstrom testified, at-large systems are the most common systems in the country for municipal elections, and they have long been seen as an *anti*-corruption measure.  Tr. 1959–60.

Indeed, Plaintiffs' witnesses repeatedly testified that they *do* have access to and support from current Town Board members.  Jim Cochrane intervened on behalf of Sam Gonzalez and responded to Renee Ortiz's concerns regarding Roberto Clemente park.  Tr. 534–35 (Gonzalez); 1303 (Ortiz).  Although Ms. Ortiz was an electoral opponent, she was retained (by a Republican Board) on the Community Development Agency for years after her term expired (along with two other Latinos out of five) and, as Ms. Ortiz testified, the CDA is an "amazing" resource for affordable housing and community work, especially in Central Islip.  Tr. 1321–1330.  Board Member Cochrane attended CDA meetings and both he and Supervisor Carpenter voted against (eventually) replacing Ms. Ortiz on the CDA.  Tr. 1324–25 (Ortiz).  Further still, Supervisor Carpenter has shown a "commitment" to Central Islip through, among other things, obtaining a $10 million revitalization grant.  Tr. 1326–27 (Ortiz).  Supervisor Carpenter has delivered her State of the Town address to the Brentwood Chamber of Commerce and was awarded the 2015 Presidential Award at the Puerto Rican Day parade.  Tr. 549–50 (Gonzalez); 1805 (Carpenter).

Plaintiffs provide *no rationale whatsoever* for why replacing Cochrane or Carpenter with a Latino from Brentwood would change anything.  The Town Board *has* members who go to bat for the Latino community.  Plaintiffs are unsatisfied, but wrenching apart Islip's almost century-old voting scheme will do nothing to change any of that; if anything, districted elections will balkanize the Town and create the very segregation that Plaintiffs claim to oppose.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

25

Respectfully submitted,

Dated:  April 30, 2019

_____/s/ Michael A. Carvin_____
Michael A. Carvin, Esq. (MC-9266)
Louis K. Fisher, Esq. (LF-3979)
Stephen J. Petrany, Esq. (*pro hac vice*)
JONES DAY
51 Louisiana Avenue
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: macarvin@jonesday.com
        lkfisher@jonesday.com
        spetrany@jonesday.com

Laura Washington Sawyer, Esq. (LS-4385)
Jennifer L. Del Medico, Esq. (JD-9913)
Michael T. Ferruggia, Esq. (MF-9558)
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Fax: (212) 755-7306
Email: lwsawyer@jonesday.com
        jdelmedico@jonesday.com
        mferruggia@jonesday.com

John R. DiCioccio, Esq.
Town Attorney
655 Main Street
Islip, New York 11751
Telephone: (631) 224-5550

*Counsel for Defendants Town of Islip
and Islip Town Board*