## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

ANA FLORES, RENE FLORES, MARIA
MAGDALENA HERNANDEZ, MAGALI
ROMAN, MAKE THE ROAD NEW YORK, AND
NEW YORK COMMUNITIES FOR CHANGE,

Case No. 2:18-cv-03549

Plaintiffs,

v.

TOWN OF ISLIP, ISLIP TOWN BOARD,
SUFFOLK COUNTY BOARD OF ELECTIONS,

Defendants.

## DECLARATION OF DEFENDANTS' EXPERT DR. JOHN ALFORD

### Scope of Inquiry

I have been retained by counsel for the Town of Islip, New York, as an expert to provide

analysis related to *Flores et. al. v. Town of Islip.* For this report, I have examined the expert reports

provided by plaintiffs' experts Dr. Michael McDonald and Dr. Andrew Beveridge. I have provided

both Ecological Regression analysis and Ecological Inference analysis for various elections

covered in Dr. McDonald's report in the geography of the Town of Islip, using Election District

demographics information provided by Dr. Beveridge. In addition, I have utilized the Spanish

Surname coding of voters that participated in the 2017 Township elections, as provided by Dr.

Beveridge. Because of the time limits imposed by the need to have a preliminary analysis for the

upcoming injunction hearing, this is only a first effort to respond to several of the key issues raised

in the plaintiffs' expert report. I expect to conduct a more complete analysis of the issues covered

here as well as other issues that time would not allow for here. My rate of compensation in this

matter is $350 per hour.



Defs' Ex. B

## **Qualifications**

I am a tenured full professor of political science at Rice University. In my over thirty years at Rice I have taught courses on redistricting, elections, political representation, voting behavior, and statistical methods at both the undergraduate and graduate level. Over the last thirty years, I have worked with numerous local governments on districting plans and on Voting Rights Act issues. I have previously provided expert reports and/or testified as an expert witness in voting rights and statistical issues in a variety of court cases, working for the U.S. Attorney in Houston, the Texas Attorney General, a U.S. Congressman and various cities and school districts.

In the 2000 round of redistricting, I was retained as an expert to provide advice to the Texas Attorney General in his role as Chair of the Legislative Redistricting Board. I subsequently served as the expert for the State of Texas in the state and federal litigation involving the 2001 redistricting for U.S. Congress, the Texas Senate, the Texas House of Representatives, and the Texas State Board of Education.

In the 2010 round of redistricting in Texas, I was again retained as an expert by the State of Texas to assist in defending various state election maps and systems including the district maps for the U.S. Congress, the Texas Senate, the Texas House of Representatives, and the current at large system for electing Justices to the State Supreme Court and Court of Appeals, as well as the winner-take-all system for allocating Electoral College votes. I have also worked as an expert on redistricting and voting rights cases at the state and/or local level in Michigan, Washington, Louisiana, New Mexico, Mississippi, Wisconsin, Florida, New York, Georgia, and Alabama. The details of my academic background, including all publications in the last ten years, and work as an expert, including all cases in which I have testified by deposition or at trial in the last four years, are included in my curriculum vitae, which is attached to this declaration as Exhibit 1.

2

**Summary of Conclusions**

In assessing Dr. McDonald's analysis, I conclude that he makes significant errors in estimating "crossover" voting for Hispanic voters' preferred candidates. In addition to those methodological errors, he completely fails to analyze the effect of partisanship, which, as I show below, is the main driver of election outcomes in Islip.

As to his methodological errors, Dr. McDonald's report assesses racial/ethnic polarization by estimating the degree to which Democratic candidates in the geography of Islip draw support from Hispanic, non-Hispanic Black and non-Hispanic white voters. But he fails to account for variations in voter turnout rates for different racial/ethnic groups. Dr. McDonald also fails to assess the degree of crossover voting by the *entire* non-Hispanic majority. My analysis here replicates his methodology while incorporating turnout differences in the estimation and providing parallel estimates for Hispanic and *all* non-Hispanic voters combined. Together these refinements of Dr. McDonald's estimates suggest little difference in the typical level of Hispanic cohesion, but they do indicate that crossover voting among non-Hispanics runs about 6 percentage points higher than Dr. McDonald's estimates would suggest. Given that his estimates already suggested considerable crossover voting among non-Hispanics, the refined figures are very high, with crossover in the range of 40-45 percent among non-Hispanics.

Additionally, Dr. McDonald fails to use comparable terms when he analyzes the "vote for two" Town Council elections. Because voters can choose to vote for two, one, or no candidates in these elections, one should ensure that the methodology used to calculate voter support allows for comparisons to the standard election formats where voters can only vote for one candidate. Dr. McDonald fails to do this, and I correct the error. Again, correcting this error helps establish

3

that majority crossover is about 6 percent higher than Dr. McDonald estimates in the Town Council elections.

My findings are consistent with the observed election results. In 19 of the 51 elections, the candidate preferred by Hispanic voters wins the most votes within Islip. These victories for Hispanic preferred Democratic candidates are more common in the exogenous elections at the County, State, and Federal level, where Hispanic candidates of choice (Democrats) win more often than they lose. However, these elections draw from the same voter population and share the same partisan character as the Township elections. The combination of the continuing growth in the Hispanic percentage of eligible voters in Islip, together with crossover rates among non-Hispanic voters that exceed 40 percent, provide clear opportunity for the election of candidates of choice of Hispanic voters in the Town Council elections including the upcoming 2019 elections.

Finally, there is nothing in Dr. McDonald's analysis, or in the analysis provided here, that suggests that either the cohesion shown by Hispanic voters for Democratic candidates, or the much more modest tendency of non-Hispanic voters to slightly favor Republican candidates, is the result of anything beyond partisan voting. Dr. McDonald's assertion in his conclusions that "elections at all levels show persistent patterns of ethnically/racially polarized voting among voters in Islip, in which white candidates and Latino candidates vote as distinct blocs," is not consistent with what is shown here to be the high level of non-Hispanic crossover voting, the levels of success for Democratic candidates, and the fact the polarization found in these elections appears to be partisan polarization rather than racial/ethnic polarization.

**Data and Sources**

In preparing my report, I have reviewed the reports and the underlying data provided by plaintiffs' experts Dr. Michael McDonald, and Dr. Andrew Beveridge, in this case. I have relied

4

on Election District level data, including publicly available election results and demographic data including estimates of voter racial and ethnic characteristics provided by the plaintiffs' experts in response to a request for the data used to produce the election analysis estimates in their reports in this case. I have also relied on the list of voters in the 2017 elections in Islip that Dr. Beveridge provided with his coding of the individual voters that had Spanish surnames according to a Census Bureau list.

## *Gingles* **Prongs Two and Three**

My analysis focuses on the empirical issues related to the assessment of racially polarized voting. This assessment begins with a focus on the second and third of the so-called '*Gingles*' factors. My analysis focuses first on *Gingles* 2 (minority cohesion) and *Gingles* 3 (majority bloc voting). The two techniques commonly used in Voting Rights Act lawsuits to assess voter cohesion and polarization—Ecological Regression (ER) and Ecological Inference (EI)—are both utilized in this case in both my report and in Dr. McDonald's report.

Ecological Regression analysis is the original statistical estimation technique used in VRA lawsuits to assess voter cohesion and polarization. Ordinary Least Squares Regression (OLS or regression) is a mathematical technique for estimating the single best-fitting straight line that can be drawn to describe the relationship between two variables in a scatter plot. Ecological regression (also called Goodman's regression) is distinct from simple regression in that it relies on a data set made up of precinct level aggregations of voters and election results, rather than a data set of individual voter characteristics and vote choices. This is necessary for the sort of analysis we wish to do here because while we have election results for groups of voters at the polling-place level, and also have racial characteristics for the voters in the precinct, we do not have access to the actual vote choice of individual voters. In effect, this limits us to looking at the tendency of the

5

precinct level total votes for a candidate to rise or fall as we move across precincts with increasing proportions of residents or voters that fall within a racial or ethnic group of interest.

Applied to voting rights cases, the logic of regression analysis is to determine to what degree, if any, the vote for a candidate increases in a linear fashion as the concentration of voters of a given ethnicity in the precincts increases. This is done by finding the equation for the line that best fits the scatterplot of precinct-level demographics (e.g., percent Hispanic as a proportion of voters in a precinct) and precinct-level support for a given candidate (e.g. percent of votes cast for candidate A). The intercept of this equation is an estimate of non-Hispanic voting cohesion for the candidate, and the sum of the intercept and the slope estimates in the same equation is an estimate of Hispanic voting cohesion.

Gary King's Ecological Inference (EI) procedure differs from Ecological Regression by recognizing that at least some of the statistical assumptions underlying regression analysis do not hold when one has aggregate data rather than individual data (as we do here). Specifically, the assumptions underlying the regression technique do not recognize that the data are bounded—that is, no more than 100% and no less than 0% of a given racial group can vote for a given candidate. As a consequence, regression can sometimes lead to unsatisfying conclusions, e.g., a model that predicts -10% of Hispanics supported a candidate, or relatedly that 130% of Hispanics supported another candidate. In addition, the regression technique does not utilize the information that is inherent in these bounds at the precinct level. For example, if we know that a precinct has 100 voters, of whom 90 are Hispanic and 95 people voted for the Hispanic candidate, then our estimate for both Hispanic and non-Hispanic voters are bounded. Given the 95 votes for the Hispanic candidate, the 10 non-Hispanic voters could not have cast fewer than 5 votes for the Hispanic candidate. And if they did cast all five of the votes against the Hispanic candidate, then all 90 of

6

the Hispanic voters must have cast their votes for the Hispanic candidate. At the other extreme, all 10 of the non-Hispanic voters could have voted for the Hispanic candidate, in which case 85 of the 90 Hispanic voters would have voted for the Hispanic candidate and 5 would have had to vote for the non-Hispanic candidate. Ecological Regression fails to utilize this deterministic information and so, in some circumstances, does not use all the available data optimally. In contrast, Ecological Inference methods incorporate this information about the bounds for each precinct into the statistical analysis.

A second distinction of Ecological Inference is that it does not force the relationship to be linear across the precincts. As mentioned above, Ecological Regression assumes a linear relationship between the racial composition of precincts and the precinct vote returns. Ecological Inference, in contrast, allows the relationship between the size of the demographic group and support for a candidate to be non-linear. The other major difference is in the mechanism of the actual estimation of the parameters of the model. Ecological Regression uses a mathematical formula that produces a single specific estimated equation given a set of election data. Ecological Inference estimates the model parameters by an iterative procedure that, over a large number of repeated trials, yields an estimated model that may vary to some degree in repeated estimations, even given the exact same input data. While the details of this estimation procedure are mathematically complex, the key point is that Ecological Inference techniques use the available data in a potentially more efficient and less biased way than previous methods.

A limitation of the initial version of King's Ecological Inference was that it was limited to direct estimation of only a 2x2 table of election data. That is, it could be utilized directly only for elections with two candidates and two racial/ethnic groups. In practice, this was often sufficient, as many elections feature two major-party candidates, and the focus of the litigation was on Blacks

7

versus non-Black voters, or Hispanics versus non-Hispanic voters. This 2x2 limitation has since been overcome with the introduction of publically available software to perform what is called RxC Ecological Inference. This approach can be used when there are more than two candidates and/or more than two voter groups.

Whichever version of EI is used to generate estimates of voter support for candidates by racial group, a researcher must input two types of data into the EI procedure. First is the election data from the jurisdiction showing how many voters voted at each precinct and how many votes were cast for each of the candidates in each election. Second, the researcher must provide demographic information about the relevant racial and/or ethnic characteristics of the voters in each precinct in the jurisdiction. In states like Georgia that include questions regarding race and ethnicity on their voter registration forms, the resulting self-classification of voters can be used to provide precinct level demographic data based on registered voters or actual voters that received ballots in a given precinct in a given election. Where the focus is on Hispanic voters, a Spanish surname list produced by the Census Bureau can be used as an alternative to voter self-reporting, in order to code registered or turned-out voters as Hispanic or non-Hispanic.

When information on the race or ethnicity of voters is not available, the precinct-level summary of the racial breakdown of the eligible voter population can be used instead. In most cases, the standard input of demographic information is in the form of the "voting age population" (VAP) or more recently the "citizen voting age population" or "CVAP" data provided by the United States census at the Census block or block group level and aggregated to the election precinct level. The disadvantage of using something like CVAP is that while it tells you about racial and ethnic breakdown of the eligible population, the resulting proportions are accurate for

8

the actual voters in a given election only if turnout is equal across the racial and ethnic groups of interest. In most cases, and this is true in Islip, this assumption is clearly not appropriate.

Two alternatives have been developed to deal with the need to adjust for this problem of systematic turnout variation when performing ecological estimations. For Ecological Regression, the alternative of what is called "double regression" has been proposed, but it is limited by the issue of the lack of agreement on suitable indicators of statistical significance (or confidence intervals) for the resulting estimates of minority and majority cohesion.[1] For Ecological Inference this was also an early limitation, but the move to RxC methods of estimation provided a solution. Adding a category to the vote options that allowed for eligible voters (CVAP) to be characterized as voting for one of the candidates or choosing not to vote at all (for example candidate A, candidate B, and *no vote*), allowed both vote direction and voter turnout information to be incorporated into the EI estimation.

**Election Analysis**

Dr. McDonald provides a series of tables in his report that detail the election results in the Islip geography for elections from 2005 to 2017, including Town Council (Table 1, page 10, Town-wide offices (Table 2, page 11), County elections (Table 3, page 12), Statewide offices (Table 4, page 13), and National offices (Table 5, page 14). In total, there are 44 separate contests and a total of 51 positions elected (each of the seven Town Council elections are vote-for-two contests electing two persons). In all 51 cases, Dr. McDonald's ER and EI analysis shows that the

---

[1] *See* B. Grofman and M. A. Barreto, *A reply to Zax's (2002) critique of Grofman and Migalski (1988): double-equation approaches to ecological inference when the independent variable is misspecified*, 37 Sociological Methods & Research, 599, 602 (2009) ("However, although data on [the proportion of votes cast by each race] are available in a few data sets, these data are quite rare in real voting and most other applications. Thus, almost any practical use of aggregate data in race and voting studies to make inferences about individuals should include the insights from the double regression procedure." (quoting Gary King, Princeton University Press, *A Solution to the Ecological Inference Problem* (1997))).

Democrat in each contest is the preferred candidate of Hispanic voters, and therefore any Democratic loss counts as a defeat for the Hispanic candidate of choice. It is notable that the party of the candidate is the defining characteristic here, not the race or ethnicity of the candidate, an issue that will be addressed in more detail below.

With regard to wins and losses, the tables suggest that Democrats can and do win majority support from the Islip voters. In the national office contests, the Democrat, and hence the preferred candidate of Hispanic voters, won in 7 of the 11 contests in Dr. McDonald's Table 5 when we total the votes cast within Islip, a 64% success rate, including at least one win in five of the six election years he included. In the Statewide office contests, the Democrat, and hence the preferred candidate of Hispanic voters, won in 4 of the 9 contests in Dr. McDonald's Table 4 when we total the votes cast within Islip, a 44% success rate, including at least one win in every election year he included. In the County office contests, the Democrat, and hence the preferred candidate of Hispanic voters, won in 4 of the 8 contests in Dr. McDonald's Table 3 when we total the votes cast within Islip, a 50% success rate, and in a fifth contest the Democrat lost by fewer than 200 votes. In the Town-wide office contests other than the vote-for-two Town Council elections, the Democrat, and hence the preferred candidate of Hispanic voters, won in 2 of the 9 contests in Dr. McDonald's Table 2, a 22% success rate, and in a third contest the Democrat lost by fewer than 400 votes. In the vote-for-two Town Council contests, the Democrat, and hence the preferred candidate of Hispanic voters, won in 2 of the 14 contests in Dr. McDonald's Table 1, a 14% success rate. Overall, the Democrat, and hence the preferred candidate of Hispanic voters, won, based on vote totals within Islip, in 19 of the 51 contests, a 37% success rate.

The same pattern of mixed party results can be seen by looking at individual odd-year elections in which there were contests above the township level. In the November 2017 contest,

10

the two Democratic Town Council candidates lost, but a Democrat won the County DA election,
and the Democratic candidate for County Sheriff almost won as well (48.9% to 49.2%). In the
November 2015 and November 2011 contests, the Democrats lost in the Township elections, but
a Democrat won in the election for County Executive. In the November 2007 contest, the
Democrats won both of the Town Council seats, and also Town Supervisor. In the November
2005 contest, the two Democratic Town Council candidates lost, but a Democrat won the County
Sherriff election.

All of this indicates that the Democratic candidates preferred by the majority of Hispanic
voters in Islip have won a majority of the total vote in Islip at every level of elections. This fact,
together with the rapid increase in Hispanic CVAP evident in the report of Dr. Beveridge, suggests
that the upcoming 2019 elections could result in the election of one or two Hispanic candidates of
choice. On the topic of Hispanic CVAP growth, and the potential for continued growth, Dr.
Beveridge notes on pages 20-21 that:

> *When one compares the 2005–2009 five-year ACS with the 2013–2017 five-year ACS, the
> Latino CVAP proportion in Islip has increased as these younger Latino citizens reach
> voting age and the number of Latinos in Islip increases. In fact, Islip's Latino CVAP has
> continued to increase since the 2013–2017 five-year ACS (which is centered on 2015),
> because Islip's total Latino CVAP was 25.9% according to the 2017 one-year ACS.
> Because the proportion of Latino non-voting age citizens in Islip (about 36%) is greater
> than the Latino CVAP proportion (about 20%) according to the 2013–2017 five-year
> ACS, even without any migration of Latinos into Islip, the proportion of Latino CVAP
> will continue to grow. In addition, the non-Latino white population and CVAP have
> steadily declined in Islip, thus further increasing Latino proportions. Given these trends,
> it is reasonable to expect that Islip's Latino CVAP proportion has continued to increase
> since the 2013–2017 five-year ACS and the 2017 one-year ACS, and will continue to do
> so.*

As Dr. Beveridge's Table 2 on page 22 of his report shows, non-Hispanic whites made up
over 66% of the citizens of voting age in Islip in the 2013-2017 ACS. In contrast, only 50% of
the under 18 citizens in Islip were non-Hispanic whites. The continued replacement of the

older, less Hispanic population by the younger, more Hispanic population, increases the potential

for the election of a Hispanic candidate of choice in the 2019 Township elections.

## Polarized Voting Analysis

In this section, I report EI estimates for the voting cohesion of Hispanic and non-Hispanic

voters, for the same races that McDonald reports in his tables 7 (Town Council), 9 (other Township

offices), 17 (county), 18 (statewide), and 19 (national). In my analysis, I correct for two flaws in

Dr. McDonald's analysis, and in addition, in the vote-for-two Council elections, I produce my EI

estimates in a manner that makes them more directly comparable to the EI estimates for the other

vote-for-one contests. All of these areas of difference in the technique used here are explained in

more detail below in the respective sections.

### Vote-For-One Elections

Dr. McDonald makes two significant errors in calculating the vote percentages in Town-

wide, vote-for-one, non-Council elections. First, he fails to account for varying degrees of voter

turnout in his Ecological Inference estimates. Second, he fails to compare Hispanic voting

behavior with non-Hispanic voting behavior, even though the relevant question is whether the

majority (i.e., non-Hispanics) are voting as a bloc to defeat Hispanics.

Analysis that depends on CVAP data for estimates of racial and ethnic proportions needs

to account for turnout unless there is clear evidence that turnout does not vary systematically across

these categories. Here it is clear from Dr. McDonald's report that he believes that there are

differences in turnout between these groups, and in fact, on pages 22-23 of his report Dr.

McDonald describes how EI might go about testing combinations of turnout and cohesion

estimates to see if they were possible given actual bounds.[2] He describes the process as follows:

---

[2] The accuracy of Ecological Regression is also affected by variation in turnout across ethnic or racial groups. The technique of 'double regression' was developed to deal with this problem, but there is evidence that there are issues

12

> *To illustrate, I will use an example of how EI works as it hones in on its best estimate of candidate support and turnout. The process might start by assuming 25 percent of white CVAP cast ballots and gave 80 percent of their support to Weik in the Town Receiver of Taxes election. That result turns out to be impossible because it would mean that whites cast 38,922 votes (0.25 x 155,687 = 38,922 (where 155,687 is the estimated white CVAP in 2015) when in fact only 33,359 total votes were cast in the election. A revised estimate could assume that whites cast 20 percent of the total vote with 80 percent going to Weik.*

Note that this illustration places equal emphasis on varying the level of white turnout and the level of white cohesion in order to arrive at a cohesion estimate. However, the EI scripts that Dr. McDonald provided, which reveal how he obtains his EI estimates, indicate that his procedure did not allow for variations in turnout. As explained above, the way to allow for variations in turnout under EI is to add an input for eligible voters who chose not to vote at all. Dr. McDonald confirmed in his deposition that he was aware of the method for including turnout estimation when relying on CVAP data, and indeed indicated that he had used this method to produce estimates for these elections, but decided not to report them.

My estimates include the appropriate non-voting category to allow the EI estimation process to account for turnout variation in the fashion Dr. McDonald describes, but did not implement. The second modification to the estimates provided in Dr. McDonald's report is to estimate the models as Hispanic versus all non-Hispanic voters. This case concerns the ability of Hispanic voters to elect candidates of choice, and the appropriate *Gingles* three focus is potential bloc voting by non-Hispanic voters. Dr. McDonald explains his separation of Blacks from all other non-Hispanics in reference to his concern for accurately estimating Hispanic voter cohesion. As he states in his report: "The reason for deriving separate vote support estimates for the three groups is to ensure that the direct relationship between the rise in Castro support and EDs with

---

with this approach, particularly as regards the confidence intervals provided. Dr. McDonald mentions this in his discussion of turnout on page 17 of his report, where he concludes that the discontinuity he observes in the relationship between turnout and percent Hispanic renders double regression estimation unreliable.

increased Latino CVAP is not actually because non-Hispanic blacks residing in EDs with Latinos are, by themselves, the reason support for Castro increases." McDonald Report at 18. It may indeed be useful to include an initial estimate breaking out Black support as a diagnostic to ensure that Hispanic cohesion was not being over-estimated. But beyond that, it is not appropriate to treat non-Hispanic Blacks differently than any other non-Hispanic voters when it comes to assessing *Gingles* three. When Hispanics are the minority group challenging an at-large election system, the majority group for *Gingles* three purposes is all non-Hispanics. Collectively, it is the non-Hispanic voters that have the potential to vote as a bloc to defeat Hispanic candidates of choice. Dr. McDonald states that "the degree of racially polarized voting, if any, is the difference between Latino and *white* voter support for the Latino preferred candidate when the groups prefer different candidates." McDonald Report at 18-19. This is not the case. Here it is the difference between Latino and non-*Latino* support that is at issue. In a case where the minority group is Hispanic it is appropriate to include Hispanic Blacks with Hispanics, but by the same reasoning it is not appropriate to separate out non-Hispanic Blacks from other non-Hispanics, including whites, Asians, Native Americans, and Hawaiian/Pacific Islanders.

Table 1 below provides the results of three distinct EI estimation procedures. It includes only Democratic candidates because, as noted above, those candidates are the Latino-preferred candidates. Each percentage in the table reflects the estimated percentage of the votes in a particular racial or ethnic group who voted for that candidate. Working from right to left, columns 8, 9, and 10 simply copy Dr. McDonald's EI results from his various tables for ease of comparison to the estimates that I have reported here. Those estimates retain the two errors described above. So in column 10, for instance, Dr. McDonald reported that 30% of non-Latino white votes in the 2015 Town Supervisor election were cast for Licari. Continuing, columns 5, 6, and 7 correct for

14

Dr. McDonald's failure to take turnout into account. So in column 7, for instance, one can now see that 33% of white votes were cast for Licari in 2015. Finally, columns 3 and 4 report the percentages after correcting Dr. McDonald's failure to analyze the entire non-Latino majority. So column 4 shows that the non-Latino votes were cast for Licari at a rate of 35%.

The table shows that Dr. McDonald's estimates include erroneous results. Looking first at columns 7 and 10, we can see that the general impact of accounting for turnout alone is to increase the estimate of non-Hispanic white/other crossover for Democratic candidates by an average of about 3 percentage points (from 41.7% to 44.5%). The increase varies slightly across the contests, but mostly stays in the 2 to 4 percentage point range. Looking next to the estimates of Hispanic cohesion for Democratic candidates in columns 5 and 8, we can see that these estimates, while they do vary up or down in individual contests, are nonetheless largely unchanged overall, declining by an average of only one-tenth of one percent (from 87.3% to 87.2%) when all the contests are averaged together. Similarly, the estimates of non-Hispanic Black cohesion for Democratic candidates in columns 6 and 9, though they vary up and down from contest to contest, are largely unchanged overall, declining by an average of only seven-tenths of one percent (from 86.1% to 85.4%). Overall these changes show that accounting for turnout in the estimation procedure has little impact on Hispanic or non-Hispanic Black cohesion, but this change does indicate that non-Hispanic white crossover is about 3 percentage points higher than suggested by Dr. McDonald's estimates.

The results of an analysis performed with turnout in the model (as above), and the majority group correctly specified as all non-Hispanics, is provided in column 3 of Table 1 for non-Hispanic voters and in column 4 for Hispanic voters. When these results are compared to the estimates for the three-way race/ethnicity model (with turnout in the estimation), the results show that non-

15

Hispanic crossover for Democratic candidates increases by an average of three percentage points, from the 44.5% shown in column 7, to the 47.5% in column 3. This change to a more appropriate model of Hispanic versus non-Hispanic voter cohesion does not seem to have any general effect of inflating the estimates of Hispanic cohesion in the EI models, and in fact the average estimate of Hispanic cohesion declines from 87.2 (in column 5) to 84.3% (in column 3).

Taken together, the effect of properly allowing for differences in Hispanic and non-Hispanic turnout and correctly contrasting Hispanic voter cohesion with all non-Hispanic voter cohesion, suggests a different picture of the voting patterns in these elections. For Hispanic cohesion the impact of these changes is modest, lowering the average estimate of Hispanic cohesion from 87.3% in Dr. McDonald's estimates to 84.3% in the estimates here. The impact on non-Hispanic crossover is about twice that large, increasing average non-Hispanic crossover from 41.7% in Dr. McDonald's estimates to 47.5% in the estimates here. Looking only at the vote-for -one township elections, average Hispanic voter cohesion moves down slightly from 80.2% to 78.6%, while average non-Hispanic crossover rises from 38.8% to 44.4%. These are not substantive differences in the level of Hispanic cohesion, as it remains around 80%, but the larger shift upward in non-Hispanic crossover is notable. Crossover that is typically over 40%, and averages in the mid to high 40 percent range, seems at odds with the notion that non-Hispanic voters are voting in a cohesive bloc in opposition to the candidate of choice of Hispanic voters.

16

## Table 1: EI Estimates for All Vote-For-One Elections

| | | Alford EI Estimates with Turnout Included in the Estimation | | | | | McDonald EI Estimates | | |
| | | Hispanic/non-Hispanic | | Non-Hispanic Blacks Separate | | | Non-Hispanic Blacks Separate | | |
| **Column Number** | | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| **Contest/Year** | **Candidate** | %Hispanic | %Non-Hispanic | %Hispanic | %Non-Hispanic Black | %Non-Hispanic white | %Hispanic | %Non-Hispanic Black | %Non-Hispanic white |
| SMD Prop. 2006 | Yes Vote | 54% | 46% | 55% | 57% | 45% | 55% | 56% | 44% |
| Town Supervisor 2015 | Licari (d) | 77% | 35% | 78% | 75% | 33% | 70% | 71% | 30% |
| Town Receiver 2015 | Castro (D) | 85% | 29% | 84% | 76% | 27% | 74% | 79% | 24% |
| Town Clerk 2015 | Fidelia (D) | 82% | 36% | 85% | 75% | 33% | 83% | 73% | 30% |
| Town Supervisor 2011 | Nolan (D) | 83% | 48% | 85% | 85% | 45% | 91% | 75% | 41% |
| Town Receiver 2011 | Rossifontana (D) | 82% | 40% | 87% | 82% | 38% | 86% | 80% | 34% |
| Town Clerk 2011 | Fields (D) | 80% | 46% | 84% | 83% | 43% | 88% | 79% | 39% |
| Town Supervisor 2007 | Nolan (D) | 66% | 69% | 77% | 83% | 68% | 84% | 88% | 65% |
| Town Receiver 2007 | Slinkosky (D) | 71% | 44% | 69% | 76% | 42% | 69% | 82% | 40% |
| Town Supervisor 2006 | Nolan (D) | 81% | 53% | 83% | 80% | 50% | 77% | 87% | 48% |
| **Town Office Election Average** | | 78.6% | 44.4% | 81.3% | 79.4% | 42.1% | 80.2% | 79.4% | 38.8% |
| County DA 2017 | Siri (D) | 65% | 64% | 86% | 86% | 61% | 93% | 92% | 57% |
| County Sheriff 2017 | Toulon (D) | 81% | 48% | 87% | 86% | 46% | 92% | 90% | 41% |
| County Exec 2015 | Bellone (D) | 77% | 54% | 82% | 82% | 51% | 88% | 84% | 48% |
| County Comptroller 2014 | Gaughran (D) | 91% | 42% | 91% | 88% | 39% | 95% | 88% | 43% |
| County Exec 2011 | Bellone (D) | 74% | 53% | 84% | 82% | 50% | 89% | 73% | 46% |
| County Clerk 2006 | Viloriafisher (D) | 80% | 45% | 81% | 83% | 42% | 76% | 87% | 40% |
| County Sheriff 2005 | Demarco (D) | 71% | 49% | 75% | 75% | 47% | 74% | 76% | 45% |
| County Treasurer 2005 | Crespo (D) | 72% | 32% | 68% | 73% | 30% | 67% | 61% | 28% |
| **County Election Average** | | 76.4% | 48.4% | 81.8% | 81.9% | 45.8% | 84.4% | 81.3% | 43.5% |
| Governor 2014 | Cuomo (D) | 91% | 44% | 94% | 88% | 41% | 93% | 91% | 37% |
| Atty Gen 2014 | Schneiderman (D) | 89% | 45% | 92% | 86% | 41% | 90% | 91% | 38% |
| Comptroller 2014 | Dinapoli (D) | 89% | 50% | 92% | 88% | 46% | 95% | 88% | 43% |
| Governor 2010 | Cuomo (D) | 91% | 58% | 93% | 90% | 55% | 92% | 95% | 52% |
| Atty Gen 2010 | Schneiderman (D) | 90% | 42% | 91% | 89% | 39% | 91% | 88% | 35% |
| Comptroller 2010 | Dinapoli (D) | 91% | 43% | 91% | 89% | 40% | 90% | 86% | 36% |
| Governor 2006 | Spitzer (D) | 80% | 64% | 86% | 88% | 62% | 90% | 91% | 59% |
| Atty Gen 2006 | Cuomo (D) | 81% | 48% | 83% | 83% | 45% | 76% | 89% | 43% |
| Comptroller 2006 | Hevasi (D) | 81% | 52% | 87% | 87% | 50% | 88% | 88% | 50% |
| **State Election Average** | | 87.0% | 49.6% | 89.9% | 87.6% | 46.6% | 89.5% | 89.6% | 43.5% |
| President 2016 | Clinton (D) | 96% | 41% | 97% | 91% | 36% | 94% | 94% | 34% |
| US House 2016 | Duwayne (D) | 95% | 33% | 96% | 90% | 29% | 94% | 90% | 25% |
| US Senate 2016 | Schumer (D) | 94% | 60% | 96% | 92% | 56% | 96% | 93% | 54% |
| US House 2014 | Mather (D) | 91% | 26% | 91% | 88% | 24% | 83% | 86% | 20% |
| President 2012 | Obama (D) | 95% | 48% | 96% | 94% | 44% | 96% | 95% | 42% |
| US House 2012 | Falcone (D) | 96% | 37% | 96% | 92% | 33% | 95% | 92% | 30% |
| US Senate 2012 | Gillibrand (D) | 94% | 62% | 96% | 92% | 59% | 96% | 94% | 57% |
| US Senate 2010 Schumer | Schumer (D) | 89% | 57% | 92% | 92% | 54% | 93% | 92% | 51% |
| US Senate 2010 Gillibrand | Gillibrand (D) | 90% | 51% | 90% | 92% | 48% | 91% | 91% | 45% |
| President 2008 | Obama (D) | 94% | 49% | 94% | 90% | 45% | 96% | 93% | 43% |
| US Senate 2006 | Clinton (D) | 85% | 59% | 89% | 90% | 56% | 91% | 93% | 54% |
| **National Election Average** | | 92.6% | 47.5% | 93.9% | 91.2% | 44.0% | 93.3% | 92.2% | 41.3% |
| **All Office Election Average** | | 84.3% | 47.5% | 87.2% | 85.4% | 44.5% | 87.3% | 86.1% | 41.7% |

**Vote-For-Two Town Council Elections**

As mentioned above, the EI estimates for ethnic/racial voting patterns for the vote-for-two

Council elections are not directly comparable to the estimates discussed above for the vote-for-

one contests. This is true even if the comparisons are solely to results within Dr. McDonald's

report. At the beginning of his discussion of the vote-for-two Council elections Dr. McDonald

cautions that "it is proper to keep in mind that all candidate support percentages in both tables are

votes received as percentages of *voters at the polls*, regardless of whether a voter cast a ballot in

the Town Board election." McDonald Report at 33 n.18 (emphasis added). In contrast, Dr.

McDonald's estimates in all of the vote-for-one elections are votes received as percentages *of votes

cast.*[3]

Similarly, Dr. McDonald acknowledges that this difference between vote-for-two elections

and vote-for-one elections means that the estimates for each are not directly comparable. In his

footnote 22 on page 38, he states that, "some part of" the difference between his estimates in vote-

for-one Township contests and vote-for-two Council contests "can be attributed to calculating

candidate support as a percentage of voters at the polls (Council) versus as a percentage of votes

cast for a particular office."

This lack of comparability between votes as a percentage of voters at the polls and votes

as a percentage of votes cast is seen even in the reports of the election results that Dr. McDonald

provides at the beginning of his report. In Dr. McDonald's Table 1 and 2 on pages 10-11, he

provides percentages for all racial/ethnic groups together. In the vote-for-one Township elections

---

[3] Based on Dr. McDonald's backup information, it appears that he estimated votes received as a percentage of voters at the polls by treating each of the four candidates in the vote-for-two elections as if they had run in a separate contest. For example, to estimate the racial/ethnic voting for Gonzalez, Dr. McDonald counted votes for Gonzalez as one category and votes for everyone else, as well as non-votes, as the other category. He then performed an EI analysis to estimate the proportion of Hispanic, non-Hispanic Black, and other non-Hispanic voters at the polls that voted for Gonzalez. This same approach was repeated for each of the three remaining candidates.

18

on Table 1, the figures are votes received by each candidate as a percentage of votes cast. Accordingly, the figures for the candidate pairs, like Democrat Licari (37.8%) and Republican Carpenter (62.2%) in the 2015 Supervisor contest, have vote percentages that add to 100%.[4] In the same 2015 election in the vote-for-two contests reported in McDonald's Table 1 on page 10, the figures are votes received by each candidate as a percentage of voters at the polls. The Republicans are at 53.6% and 52.7% of the vote while the Democrats are at 37.1% and 36.3%— clearly not comparable to the vote-for-one proportions, because the numbers do not add up to 100%. Indeed, in vote-for-two elections the total number of potential votes is 200% of the voters at the polls, and Dr. McDonald's numbers add up to less than 200% because some voters at the polls cast zero or only one of their two potential votes. As Dr. McDonald notes "the vote percentages reported in Table 1 (above) across all four candidates (Bergin Weichbrodt, O'Connor, Gonzalez, and Fenley) would have a sum of 200% if every Islip voter at the polls cast two ballots. The sum of the four percentages, however, is 172.6% (51.3 + 47.9 + 37.1 + 36.3 = 172.6)." McDonald Report at 26.

In addition to the issue of comparability, Dr. McDonald repeats the same estimation flaws that were discussed above for his vote-for-one elections. Namely, he fails to allow for turnout differences across racial/ethnic groups, and he improperly fails to include non-Hispanic Blacks with other non-Hispanic voters when estimating majority bloc voting.

Table 2 below provides the results of three distinct EI estimation procedures. In columns 1 and 2, under the heading "Alford EI Estimates with Turnout in the Estimation," and the sub-headings "%Hispanic and Non-Hispanic%" are the estimates from what I believe to be the most appropriate model, with turnout included in the estimation and the contrast being between the

---

[4] The one exception is the 2006 contest for Supervisor, in which there was a third-party candidate not listed in Table 2. With inclusion of that candidate, the percentages would add up to 100%.

voting behavior of Hispanics and non-Hispanics. The next three columns (3, 4, and 5) in the middle of Table 2 provide the results from a replication of Dr. McDonald's three-way breakout of Hispanic, non-Hispanic Black, and non-Hispanic white voters. Here, however, unlike in Dr. McDonald's results, the estimation procedure includes turnout in the estimation, thereby correcting one of the two flaws in Dr. McDonald's analysis. Finally, the last three columns (6, 7, and 8) on the far right of Table 2 re-present Dr. McDonald's EI results from his Table 7, transformed to be roughly equivalent as described below.

The results for my EI estimations in Table 2, like those reported above in Table 1, are from a single EI estimation run for each contest, but here they include vote totals for each of the four candidates (in Table 1 the vote-for-one contests had two candidates in the estimation) and an additional category for any form of non-voting. The estimates reported here are the proportion of the votes cast by a racial/ethnic group for each candidate. For example, in the 2017 election, the estimates in column 2 of Table 2 indicate that non-Hispanics cast an estimated 30.7% of their votes for Bergin-Weichbrodt, 28.6% of their votes for O'Connor, 20.1% of their votes for Gonzalez, and 20.6% of their votes for Fenley. To put the results in a form more comparable to the one-for-one contests, we can sum the proportions for the two Republican candidates, and do the same for the two Democratic candidates. In this form, the results are more comparable to the two-party vote that is reported in all the vote-for-one contests in Table 1. Here in the 2017 election, for example, non-Hispanics voters gave 59.3% of their votes to the Republican candidates and 40.7% of their votes to the Democratic candidates.

For the reasons mentioned above, these results, unlike the ones reported in Table 1, cannot be directly compared to Dr. McDonald's results for the same elections. It nonetheless is possible to put Dr. McDonald's results from his Table 1 into a form that at least allows approximate

20

comparison. As noted earlier, Dr. McDonald's figures for each candidate's votes, as a percentage

of voters at the polls, add up to 172.6% in the 2017 Council elections because there were 172.6

votes cast (rather than all 200 potential votes) for every 100 voters at the polls. He stated that the

four percentages "would have a sum of 200% if every Islip voter at the polls cast two ballots. The

sum of the four percentages, however, is $172.6\% \ (51.3 + 47.9 + 37.1 + 36.3 = 172.6)$." McDonald

Report at 26. His estimates can be roughly adjusted by simply calculating the proportions that

each of these four individual vote shares make up as a of proportion of the actual total of 172.6%.

Dividing each of the candidate percentages by 172.6 yields new percentages of $29.7 + 27.8 + 21.5$

$+ 21.0 = 100\%$.

The results of this adjustment for each of the sets of cohesion estimates in Dr. McDonald's

Table 7 are produced here in columns 6, 7, and 8 of Table 2 below. Using these proportions,

adapted to vote cast rather than voters at the polls, allows us to make at least the rough comparison

of Dr. McDonald's results for his fixed-turnout three-way analysis to my three-way analysis that

properly accounts for differences in turnout (columns 3, 4 and 5). Thus, we can make this

comparison to first assess the impact of accounting for turnout, and then to assess the impact of

combining non-Hispanic Blacks with all other non-Hispanic voters, just as we did above for the

vote-for-one elections in Table 1.

Looking first at columns 5 and 8, we can see that the general impact of accounting for

turnout (correcting only one of Dr. McDonald's two errors) is to increase the estimate of non-

Hispanic white/other crossover for Democratic candidates by an average of almost 4 percentage

points (from 35.9% to 39.6%). The increase varies slightly across the contests, but mostly stays

in the 3 to 5 percentage point range. Looking next to the estimates of Hispanic cohesion for

Democratic candidates in columns 3 and 6, we can see that these estimates, while they do vary up

or down in individual contests, decline generally by an average of 2 percentage points (from 83.1% to 80.8%) when all the contests are averaged together. Similarly, the estimates of non-Hispanic Black cohesion for Democratic candidates in columns 7 and 4, though they vary up and down from contest to contest, are largely unchanged overall, declining by an average of only seven-tenths of one percent (from 81.4% to 80.7%). Overall these changes show that accounting for turnout in the estimation procedure suggests that non-Hispanic white crossover is about 4 percentage points higher than suggested by Dr. McDonald's estimates.

The results of an analysis performed with turnout in the model (as above), and the majority group correctly specified as all non-Hispanics, is provided in columns 1 and 2 of Table 2. When these results are compared to the estimates for the three-way race/ethnicity model (with turnout in the estimation), the results show that non-Hispanic crossover for Democratic candidates increases by an average of about 2 percentage points, from the 39.6 % shown in column 5, to the 42.0% in column 2. This change to a more appropriate model of Hispanic versus non-Hispanic voter cohesion does not seem to have any general effect of inflating the estimates of Hispanic cohesion in the EI models, and in fact the average estimate of Hispanic cohesion declines from 80.8% (in column 3) to 76.8% (in column 1).

Taken together, the effect of (1) properly allowing for differences in Hispanic and non-Hispanic turnout and (2) correctly contrasting Hispanic voter cohesion with all non-Hispanic voter cohesion, suggests patterns similar to that reported above for the various vote-for-one elections in Table 1. For Hispanic cohesion, the impact of these changes lowers the average estimate of Hispanic cohesion from 83.1% in Dr. McDonald's estimates to 76.8% in the estimates here. The impact on non-Hispanic crossover is to increase average non-Hispanic crossover from 35.9% in Dr. McDonald's estimates to 42.0% in the estimates here.

22

Properly estimated, the overall average of the results for the vote-for-two township elections reported in columns 1 and 2 of Table 2 are similar to the overall average of those reported in columns 3 and 4 of Table 1 for the vote-for-one township elections. In the vote-for-one elections average Hispanic voter cohesion was 78.6%, and in the vote-for-two elections it is 76.8%. Average non-Hispanic crossover in the vote-for-one elections was 44.4%, and in the vote-for-two elections it is 42.0%. In both types of Township elections Hispanic are moderately cohesive at near 80%. Non-Hispanic crossover in both types of elections is over 40%. This is at odds with the notion that non-Hispanic voters are voting in a cohesive bloc in opposition to the candidate of choice of Hispanic voters.

23

Table 2: Islip Council Vote-for-two Elections EI Estimates for Hispanic/non-Hispanic

| | | Alford EI Estimates with Turnout Included in the Estimation | | | | | McDonald EI Estimates as % of Votes | | |
| | | Hispanic/non-Hispanic | | Non-Hispanic Blacks Separate | | | Non-Hispanic Blacks Separate | | |
| | Column Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Year | Candidate | %Hispanic | %Non-Hispanic | %Hispanic | %Non-Hispanic Black | %Non-Hispanic white | %Hispanic | %Non-Hispanic Black | %Non-Hispanic white |
|---|---|---|---|---|---|---|---|---|---|
| 2017 | Bergin-Weichbrodt (R) | 9.1% | 30.7% | 6.9% | 7.0% | 32.1% | 6.9% | 6.5% | 34.7% |
| | O'Connor (R) | 9.3% | 28.6% | 7.4% | 7.5% | 29.9% | 4.8% | 10.0% | 32.4% |
| | **Republicans** | **18.4%** | **59.3%** | **14.3%** | **14.5%** | **62.0%** | **11.7%** | **16.5%** | **67.1%** |
| | Gonzalez (D) | 50.2% | 20.1% | 52.5% | 45.3% | 18.5% | 52.8% | 41.9% | 15.5% |
| | Fenley (D) | 31.4% | 20.6% | 33.1% | 40.3% | 19.5% | 35.5% | 41.6% | 17.4% |
| | **Democrats** | **81.6%** | **40.7%** | **85.7%** | **85.5%** | **38.0%** | **88.3%** | **83.5%** | **32.9%** |
| 2015 | Cochrane (R) | 9.4% | 31.4% | 8.9% | 10.7% | 32.6% | 9.7% | 9.0% | 34.4% |
| | Mullen (R) | 9.9% | 30.9% | 9.4% | 9.6% | 32.1% | 6.8% | 11.6% | 34.1% |
| | **Republicans** | **19.2%** | **62.2%** | **18.3%** | **20.3%** | **64.7%** | **16.5%** | **20.6%** | **68.5%** |
| | McDermott (D) | 42.4% | 19.3% | 42.8% | 41.8% | 17.9% | 42.0% | 42.4% | 16.1% |
| | Pulitano (D) | 38.4% | 18.5% | 38.9% | 37.9% | 17.3% | 41.5% | 36.9% | 15.4% |
| | **Democrats** | **80.8%** | **37.8%** | **81.7%** | **79.7%** | **35.3%** | **83.5%** | **79.4%** | **31.5%** |
| 2013 | Flotteron (R) | 9.2% | 31.3% | 8.6% | 8.8% | 32.6% | 8.1% | 9.3% | 34.8% |
| | Bergin-Weichbrodt (R) | 8.9% | 30.8% | 6.8% | 8.4% | 32.2% | 8.1% | 10.2% | 34.1% |
| | **Republicans** | **18.1%** | **62.1%** | **15.4%** | **17.3%** | **64.8%** | **16.2%** | **19.5%** | **68.9%** |
| | Fidelia (D) | 44.9% | 18.7% | 43.7% | 46.2% | 17.3% | 42.1% | 43.8% | 15.3% |
| | Hafele (D) | 36.9% | 19.2% | 40.9% | 36.6% | 17.9% | 41.7% | 36.7% | 15.8% |
| | **Democrats** | **81.9%** | **37.9%** | **84.6%** | **82.7%** | **35.2%** | **83.8%** | **80.5%** | **31.1%** |
| 2011 | Cochrane (R) | 8.5% | 29.6% | 5.5% | 9.2% | 31.0% | 6.4% | 10.5% | 32.7% |
| | Senft (R) | 7.0% | 29.5% | 7.1% | 6.2% | 30.8% | 4.3% | 6.4% | 33.2% |
| | **Republicans** | **15.5%** | **59.1%** | **12.6%** | **15.5%** | **61.8%** | **10.8%** | **16.9%** | **66.0%** |
| | Parrington (D) | 34.5% | 21.1% | 36.8% | 39.3% | 19.9% | 39.1% | 39.7% | 18.0% |
| | Ortiz (D) | 50.0% | 19.8% | 50.6% | 45.2% | 18.3% | 50.1% | 43.4% | 16.1% |
| | **Democrats** | **84.5%** | **40.9%** | **87.4%** | **84.5%** | **38.2%** | **89.2%** | **83.1%** | **34.0%** |
| 2009 | Bergen (R) | 19.2% | 30.7% | 14.5% | 12.4% | 31.9% | 13.7% | 12.5% | 33.6% |
| | Flotteron (R) | 18.0% | 28.2% | 15.5% | 12.9% | 29.1% | 8.9% | 12.5% | 31.3% |
| | **Republicans** | **37.2%** | **59.0%** | **29.9%** | **25.3%** | **61.0%** | **22.6%** | **25.0%** | **64.9%** |
| | Bodkin (D) | 30.9% | 22.0% | 34.0% | 38.5% | 21.0% | 40.3% | 37.8% | 18.9% |
| | Morgo (D) | 31.9% | 19.1% | 36.1% | 36.2% | 18.0% | 37.1% | 37.2% | 16.2% |
| | **Democrats** | **62.8%** | **41.0%** | **70.1%** | **74.7%** | **39.0%** | **77.4%** | **75.0%** | **35.1%** |
| 2007 | Finley (R) | 15.9% | 23.6% | 12.4% | 10.3% | 24.6% | 12.0% | 7.9% | 25.8% |
| | Schettino (R) | 15.8% | 21.3% | 10.4% | 9.1% | 22.3% | 10.2% | 6.0% | 23.6% |
| | **Republicans** | **31.7%** | **44.9%** | **22.7%** | **19.4%** | **46.9%** | **22.2%** | **13.9%** | **49.5%** |
| | Edwards (D) | 27.5% | 29.8% | 37.9% | 41.4% | 28.6% | 40.1% | 45.7% | 27.1% |
| | Parrington (D) | 40.8% | 25.3% | 39.4% | 39.2% | 24.5% | 37.7% | 40.3% | 23.4% |
| | **Democrats** | **68.3%** | **55.1%** | **77.3%** | **80.6%** | **53.1%** | **77.8%** | **86.1%** | **50.5%** |
| 2005 | Bodkin (R) | 10.6% | 32.6% | 10.3% | 12.5% | 33.7% | 9.6% | 10.2% | 34.8% |
| | Flotteron (R) | 11.2% | 27.2% | 11.1% | 10.7% | 28.1% | 8.7% | 7.6% | 29.3% |
| | **Republicans** | **21.8%** | **59.8%** | **21.4%** | **23.2%** | **61.8%** | **18.3%** | **17.8%** | **64.1%** |
| | Parrington (D) | 29.1% | 23.7% | 37.9% | 32.9% | 22.6% | 41.9% | 40.0% | 21.3% |
| | Alvarez (D) | 49.1% | 16.5% | 40.8% | 43.8% | 15.5% | 39.9% | 42.1% | 14.6% |
| | **Democrats** | **78.2%** | **40.2%** | **78.6%** | **76.8%** | **38.2%** | **81.7%** | **82.2%** | **35.9%** |
| | **Average for Democrats** | **76.8%** | **42.0%** | **80.8%** | **80.7%** | **39.6%** | **83.1%** | **81.4%** | **35.9%** |
| | **Average for Republicans** | **23.2%** | **58.0%** | **19.2%** | **19.3%** | **60.4%** | **16.9%** | **18.6%** | **64.1%** |

**Party Polarization versus Racial Polarization**

Dr. McDonald does not address or analyze the impact of partisan voting in his report. This is surprising, given that partisan patterns are so clear and that all of the elections in his report are partisan elections, except for the 2006 proposition election and a pair of party primaries that he mentions briefly. Specifically, Dr. McDonald does not analyze whether ethnicity, as opposed to normal partisan politics, plays any role in the defeat of Hispanic-preferred candidates. In all 51 cases, Dr. McDonald's ER and EI analysis shows that the Democrat in each contest is the preferred candidate of Hispanic voters. This pattern is clearly partisan, with Hispanics uniformly giving majority support (typically around 70-80 percent) to the Democratic candidates. Non-Hispanic voters tilt Republican, but less solidly, with crossover support for the Democratic candidate typically in the range of 40-50 percent, and with a majority of non-Hispanic whites supporting the Democratic candidate in 9 of the 51 contests.

The importance of partisan polarization in these elections can also be seen by looking at the non-partisan elections included in Dr. McDonald's report. In the non-partisan elections that he analyzes, he concludes that the voting is not racially polarized. In the 2006 referendum on moving from at-large to single-member districts in Town elections, Dr. McDonald did not conclude that the voting was racially polarized. The point estimate of 54 or 55 percent Hispanic support for single-member districts is well below the 70-80% Hispanic cohesion reported in the partisan elections, as discussed above. In addition, given the confidence intervals, Dr. McDonald is not able to conclude with 95% certainty that a majority of Hispanic voters supported single-member districts in that election. Even if we were to rely on the point estimates, 54 percent support among Hispanic voters does not suggest that they are politically cohesive on this issue, and indeed

25

they seem heavily divided. Similarly, 44 percent support of single-member districts among non-Hispanic voters does not suggest cohesive opposition to single-member districts.

The only other election contests that lack a party signal are the two primary elections in LD9 that Dr. McDonald discusses on page 43 of his report, and as he notes in footnote 25 on that page neither of these primary contests were racially or ethnically polarized. Thus, Dr. McDonald characterizes the polarization he observes in the partisan elections as racial/ethnic polarization, but he provides no evidence that it is anything more than partisan polarization.

We can look at this question of partisan versus ethnic polarization more directly in the 2017 Council elections. This is because Dr. Beveridge provided information from the individual voter records for the November 2017 election that show the party registration of the voters who participated in each election district. As it happens, the 2017 elections also featured one Hispanic Democratic candidate, Mr. Gonzalez, so voters had both a party cue and an ethnic cue.

Appendix 1 below includes Ecological Regression estimates for the 2017 Gonzalez Town Council contest that replicate those reported by Dr. McDonald (in his Table 6, on page 35 of his report). The replication of that analysis was performed using the same single equation regression approach that Dr. McDonald utilized.[5] As we would expect, I was able to closely replicate Dr. McDonald's analysis (see appendix 1 for details), and the results are essentially the same, with the estimated vote for Gonzalez among non-Hispanic whites at 27.4% (Dr. McDonald 27.4%), among Hispanics at 74.0% (Dr. McDonald 74.0%), and among non-Hispanic Blacks at 84.7% (Dr.

---

[5] Note that, as discussed above, this regression analysis does not incorporate turnout, and so it bears one of the same errors that I identified in Dr. McDonald's estimates above. But there is not an acceptable method for making that incorporation using Ecological Regression, as opposed to Ecological Inference. In turn, Ecological Inference cannot be used to estimate the simultaneous effect of party and racial/ethnic variation. This regression analysis also separates non-Hispanic Black voters from other non-Hispanic voter—the other error that I identified in Dr. McDonald's estimates. Nevertheless, separating non-Hispanic Black voters here allows me to compare my analysis directly to Dr. McDonald's analysis for illustrative purposes, just as I did in Tables 1 and 2 above.

26

McDonald 84.7%). The actual regression estimation is reported as the equation for a line in the
form of :

*Vote for Gonzalez = 27.4 + .466 \* Hispanic% + .573 \* non-Hispanic Black%*

This is translated into the estimates above by recognizing that the constant (27.4) represents
the expected percent of the vote for Gonzalez in an election district where both Hispanic% and
non-Hispanic Black% are zero, and therefore drop out of the equation. To compute the estimate
of Hispanic cohesion, holding the proportion non-Hispanic Black constant, we evaluate the
equation for an election district where the Hispanic proportion is 100% (and the non-Hispanic
Black proportion is 0%). That would give us the constant (27.4) plus 46.6 (100 \* .466) plus 0 (0
\* .573) for an estimated share of the Hispanic vote of 74.0%. Likewise, to compute the estimate
of non-Hispanic Black cohesion, we evaluate the equation for an election district where the non-
Hispanic Black proportion is 100% (and the Hispanic proportion is 0%). That would give us the
constant (27.4) plus 0 (0 \* .466) plus 57.3 (100 \* .573) for an estimated share of the non-Hispanic
Black vote of 84.7%. Put another way, the Hispanic coefficient of .466 tells us that on average an
increase of 10 percent in the proportion Hispanic in an election district would yield an expected
increase in the vote for Gonzalez of 4.66 percent.

When we add a variable for the proportion of the voters in each Election District that were
registered as Democrats, the role of party versus race/ethnicity is clear. The new regression
estimation (see appendix 1 for details) that includes the variable for percent Democratic among
voters is reported as the equation for a line in the form of:

*Vote for Gonzalez = 5.9 - .057 \* Hispanic% - .004 \* non-Hispanic Black% + .994 \* Dem%*

In this equation we can see that the effect of the proportion Democratic is very clear.
Holding the other variables constant, an increase of 10 percent in the proportion Democratic yields

27

a nearly identical expected increase in the vote for Gonzalez of 9.94 percent. In contrast, holding the other variables (including percent Democratic) constant, an increase of 10 percent in the proportion Hispanic yields a slight *decrease* in the vote for Gonzalez of .57 percent. Thus, if an election district had a Hispanic% of 50, a Black% of 0, and a Dem% of 50, its estimated vote for Gonzalez would be 52.7% (5.9 – (.57 * 50) – (.004 * 0) + (.994 *50) = 52.7). Increasing the Dem% to 60 and holding other factors constant would increase the estimated vote for Gonzales to 62.7%, but increasing the Hispanic% to 60 and holding other factors constant would slightly *decrease* the vote for Gonzalez to 52.1%. Since by definition the non-Hispanic white CVAP proportion is simply one minus the sum of the proportion Hispanic and the proportion non-Hispanic Black, it is also true that the impact of changes in the proportion of non-Hispanic whites is similarly minimal.

We can see this graphically in the scatterplot below in Figure 1. Each point on the scatterplot represents one election district, or voting precinct, in the Town of Islip. The scatterplot shows the pattern of the relationship between the percentage of voters in the election who are registered Democrats and the percentage of votes for Gonzalez as a proportion of voters. The regression line shows visually what the equation above suggests as well—that the vote for Gonzalez closely tracks the proportion of Democrats among the voters in the election district. The points representing each election district are all close to the line and the relationship is clearly linear. In contrast, Figure 2 shows the same sort of scatterplot, but the relationship is between the percentage of votes for Gonzalez and the proportion Hispanic CVAP in the election district. Here the scatter of election districts around the line is much larger.

Figure 1: Scatterplot of Support for Gonzalez by Proportion Democrat



Figure 2: Scatterplot of Support for Gonzalez by Proportion Hispanic CVAP



**Percent Hispanic CVAP**

As an example, in Figure 2 the election districts where Gonzalez got votes from more than 60% of the voters range across most of the width of the graph, from below 20% Hispanic CVAP to above 60% Hispanic CVAP. Only 5 of the over 40 election districts where Gonzalez received votes from more than 60% of the voters are in the range of over 60% Hispanic CVAP. In contrast, in Figure 1 the election districts where Gonzalez got votes from more than 60% of the voters are mostly also in the range of more than 60% Democratic. None are below 50% Democratic. Similarly, in the election districts between 20% and 40% Democrat, the share of voters casting votes for Gonzalez is also mostly between 20% and 40%. In contrast, in the election districts

30

Case 2:18-cv-03549-GRB-ST Document 129-19 Filed 04/30/19 Page 31 of 49 PageID #:
Case 2:18-cv-03549-ADS-GRB Document 84-5 Filed 04/04/19 Page 31 of 35 PageID #: 2004
3352

between 20% and 40% Hispanic CVAP, the share of voters casting votes for Gonzalez is almost never between 20% and 40%.

Figure 3 below provides another way to visualize this relationship. The scatterplot again shows the pattern of the relationship between percent Democrat and percent vote for Gonzalez, with a reference line showing what we would expect if percent Democrat and percent vote for Gonzalez were exactly equal in every Election district. In addition, the election districts are coded to indicate whether each has a Hispanic CVAP of less than 20%, 20% to 49%, or 50% and above. The actual percent Gonzalez typically falls above the reference line, indicating that Gonzalez does slightly better in most election districts than what we would expect from him getting only the votes of all of the Democrats (consistent with the positive 5.9% constant in the regression equation) . This pattern is the same regardless of the CVAP proportion Hispanic in the election district.

Figure 3: Scatterplot of Support for Gonzalez by Proportion Democrat with Hispanic CVAP categories



Both the regression equations and the scatterplots support the importance of party in accounting for the patterns of election support that we see in these elections. Once we control for party, the influence of the race/ethnicity of voters is weak, if present at all. All of this is consistent with the pattern discussed above for the election analysis where the candidate of choice of Hispanic voters is the Democrat.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 2, 2019.

JOHN R. ALFORD

32

**APPENDIX 1**

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .860[a] | .740 | .737 | 121.044701717496570 |

a. Predictors: (Constant), pernhblack, perhisp

**ANOVA[a,b]**

| Model | | Sum of Squares | df | Mean Square | F | Sig. |
|---|---|---|---|---|---|---|
| 1 | Regression | 9079003.815 | 2 | 4539501.908 | 309.825 | .000[c] |
| | Residual | 3194096.719 | 218 | 14651.820 | | |
| | Total | 12273100.535 | 220 | | | |

a. Dependent Variable: gonzalez_vpct

b. Weighted Least Squares Regression - Weighted by voters

c. Predictors: (Constant), pernhblack, perhisp

**Coefficients[a,b]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | | |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | t | Sig. |
| 1 | (Constant) | 27.407 | .642 | | 42.682 | .000 |
| | perhisp | .466 | .044 | .493 | 10.663 | .000 |
| | pernhblack | .573 | .059 | .449 | 9.707 | .000 |

**Coefficients[a,b]**

| Model | | 95.0% Confidence Interval for B | |
|---|---|---|---|
| | | Lower Bound | Upper Bound |
| 1 | (Constant) | 26.141 | 28.672 |
| | perhisp | .380 | .552 |
| | pernhblack | .457 | .689 |

a. Dependent Variable: gonzalez_vpct

b. Weighted Least Squares Regression - Weighted by voters

## Model Summary

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .944[a] | .890 | .889 | 78.72569127927 8350 |

a. Predictors: (Constant), PcDem, pernhblack, perhisp

## ANOVA[a,b]

| Model | | Sum of Squares | df | Mean Square | F | Sig. |
|---|---|---|---|---|---|---|
| 1 | Regression | 10928192.155 | 3 | 3642730.718 | 587.752 | .000[c] |
| | Residual | 1344908.379 | 217 | 6197.734 | | |
| | Total | 12273100.535 | 220 | | | |

a. Dependent Variable: gonzalez_vpct

b. Weighted Least Squares Regression - Weighted by voters

c. Predictors: (Constant), PcDem, pernhblack, perhisp

## Coefficients[a,b]

| Model | | Unstandardized Coefficients | | Standardized Coefficients | | |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | t | Sig. |
| 1 | (Constant) | 5.916 | 1.312 | | 4.508 | .000 |
| | perhisp | -.057 | .042 | -.060 | -1.370 | .172 |
| | pernhblack | -.004 | .051 | -.003 | -.077 | .939 |
| | PcDem | 99.433 | 5.756 | .997 | 17.273 | .000 |

## Coefficients[a,b]

| Model | | 95.0% Confidence Interval for B | |
|---|---|---|---|
| | | Lower Bound | Upper Bound |
| 1 | (Constant) | 3.330 | 8.503 |
| | perhisp | -.139 | .025 |
| | pernhblack | -.104 | .096 |
| | PcDem | 88.087 | 110.779 |

a. Dependent Variable: gonzalez_vpct

b. Weighted Least Squares Regression - Weighted by voters

# EXHIBIT 1

Case 2:18-cv-03549-GRB-ST Document 129-19 Filed 04/30/19 Page 37 of 49 PageID #:
Case 2:18-cv-03549-ADS-GRB Document 84-58 Filed 04/04/19 Page 2 of 14 PageID #: 2010
3358

**John R. Alford**
Curriculum Vitae
March, 2019

Dept. of Political Science
Rice University - MS-24
P.O. Box 1892
Houston, Texas 77251-1892
713-348-3364
jra@rice.edu

## Employment:
Full Professor, Rice University, 2015 to present.
Associate Professor, Rice University, 1985-2015.
Assistant Professor, University of Georgia, 1981-1985.
Instructor, Oakland University, 1980-1981.
Teaching-Research Fellow, University of Iowa, 1977-1980.
Research Associate, Institute for Urban Studies, Houston, Texas, 1976-1977.

## Education:
Ph.D., University of Iowa, Political Science, 1981.
M.A., University of Iowa, Political Science, 1980.
M.P.A., University of Houston, Public Administration, 1977.
B.S., University of Houston, Political Science, 1975.

## Books:
*Predisposed: Liberals, Conservatives, and the Biology of Political Differences.* New York: Routledge, 2013. Co-authors, John R. Hibbing and Kevin B. Smith.

## Articles:
"Intuitive ethics and political orientations: Testing moral foundations as a theory of political ideology." with Kevin Smith, John Hibbing, Nicholas Martin, and Peter Hatemi. **American Journal of Political Science**. (April, 2017).

"The Genetic and Environmental Foundations of Political, Psychological, Social, and Economic Behaviors: A Panel Study of Twins and Families." with Peter Hatemi, Kevin Smith, and John Hibbing. **Twin Research and Human Genetics**. (May, 2015.)

"Liberals and conservatives: Non-convertible currencies." with John R. Hibbing and Kevin B. Smith. **Behavioral and Brain Sciences** (January, 2015).

"Non-Political Images Evoke Neural Predictors Of Political Ideology." with Woo-Young Ahn, Kenneth T. Kishida, Xiaosi Gu, Terry Lohrenz, Ann Harvey, Kevin Smith, Gideon Yaffe, John Hibbing, Peter Dayan, P. Read Montague. **Current Biology**. (November, 2014).

"Cortisol and Politics: Variance in Voting Behavior is Predicted by Baseline Cortisol Levels." with Jeffrey French, Kevin Smith, Adam Guck, Andrew Birnie, and John Hibbing. **Physiology & Behavior**. (June, 2014).

"Differences in Negativity Bias Underlie Variations in Political Ideology." with Kevin B. Smith and John R. Hibbing. **Behavioral and Brain Sciences**. (June, 2014).

"Negativity bias and political preferences: A response to commentators Response." with Kevin B. Smith and John R. Hibbing. **Behavioral and Brain Sciences**. (June, 2014).

"Genetic and Environmental Transmission of Political Orientations." with Carolyn L. Funk, Matthew Hibbing, Kevin B. Smith, Nicholas R. Eaton, Robert F. Krueger, Lindon J. Eaves, John R. Hibbing. **Political Psychology**, (December, 2013).

"Biology, Ideology, and Epistemology: How Do We Know Political Attitudes Are Inherited and Why Should We Care?" with Kevin Smith, Peter K. Hatemi, Lindon J. Eaves, Carolyn Funk, and John R. Hibbing. **American Journal of Political Science**. (January, 2012)

"Disgust Sensitivity and the Neurophysiology of Left-Right Political Orientations." with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **PlosONE**, (October, 2011).

"Linking Genetics and Political Attitudes: Re-Conceptualizing Political Ideology." with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **Political Psychology**, (June, 2011).

"The Politics of Mate Choice." with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Journal of Politics**, (March, 2011).

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" with Peter Hatemi, John Hibbing, Sarah Medland, Matthew Keller, Kevin Smith, Nicholas Martin, and Lindon Eaves, **American Journal of Political Science**, (July, 2010).

"The Ultimate Source of Political Opinions: Genes and the Environment" with John R. Hibbing in **Understanding Public Opinion**, 3rd Edition eds. Barbara Norrander and Clyde Wilcox, Washington D.C.: CQ Press, (2010).

"Is There a 'Party' in your Genes" with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Political Research Quarterly**, (September, 2009).

"Twin Studies, Molecular Genetics, Politics, and Tolerance: A Response to Beckwith and Morris" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (December, 2008). This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

"Political Attitudes Vary with Physiological Traits" with Douglas R. Oxley, Kevin B. Smith, Matthew V. Hibbing, Jennifer L. Miller, Mario Scalora, Peter K. Hatemi, and John R. Hibbing, **Science**, (September 19, 2008).

"The New Empirical Biopolitics" with John R. Hibbing, **Annual Review of Political Science**, (June, 2008).

"Beyond Liberals and Conservatives to Political Genotypes and Phenotypes" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (June, 2008). This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

"Personal, Interpersonal, and Political Temperaments" with John R. Hibbing, **Annals of the American Academy of Political and Social Science**, (November, 2007).

"Is Politics in our Genes?" with John R. Hibbing, **Tidsskriftet Politik**, (February, 2007).

"Biology and Rational Choice" with John R. Hibbing, **The Political Economist**, (Fall, 2005)

"Are Political Orientations Genetically Transmitted?" with John R. Hibbing and Carolyn Funk, **American Political Science Review**, (May, 2005). (The main findings table from this article has been reprinted in two college level text books - Psychology, 9th ed. and Invitation to Psychology 4th ed. both by Wade and Tavris, Prentice Hall, 2007).

"The Origin of Politics: An Evolutionary Theory of Political Behavior" with John R. Hibbing, **Perspectives on Politics**, (December, 2004).

"Accepting Authoritative Decisions: Humans as Wary Cooperators" with John R. Hibbing, **American Journal of Political Science**, (January, 2004).

"Electoral Convergence of the Two Houses of Congress" with John R. Hibbing, in **The Exceptional Senate**, ed. Bruce Oppenheimer, Columbus: Ohio State University Press, (2002).

"We're All in this Together: The Decline of Trust in Government, 1958-1996." in **What is it About Government that Americans Dislike?**, eds. John Hibbing and Beth Theiss-Morse, Cambridge: Cambridge University Press, (2001).

"The 2000 Census and the New Redistricting," **Texas State Bar Association School Law Section Newsletter**, (July, 2000).

"Overdraft: The Political Cost of Congressional Malfeasance" with Holly Teeters, Dan Ward, and Rick Wilson, **Journal of Politics** (August, 1994).

"Personal and Partisan Advantage in U.S. Congressional Elections, 1846-1990" with David W. Brady, in **Congress Reconsidered** 5th edition, eds. Larry Dodd and Bruce Oppenheimer, CQ Press, (1993).

"The 1990 Congressional Election Results and the Fallacy that They Embodied an Anti-Incumbent Mood" with John R. Hibbing, **PS** 25 (June, 1992).

"Constituency Population and Representation in the United States Senate" with John R. Hibbing. **Legislative Studies Quarterly**, (November, 1990).

"Editors' Introduction: Electing the U.S. Senate" with Bruce I. Oppenheimer. **Legislative Studies Quarterly**, (November, 1990).

"Personal and Partisan Advantage in U.S. Congressional Elections, 1846-1990" with David W. Brady, in **Congress Reconsidered** 4th edition, eds. Larry Dodd and Bruce Oppenheimer, CQ Press, (1988). Reprinted in The Congress of the United States, 1789-1989, ed. Joel Silby, Carlson Publishing Inc., (1991), and in The Quest for Office, eds. Wayne and Wilcox, St. Martins Press, (1991).

"Can Government Regulate Fertility? An Assessment of Pro-natalist Policy in Eastern Europe" with Jerome Legge. **The Western Political Quarterly** (December, 1986).

"Partisanship and Voting" with James Campbell, Mary Munro, and Bruce Campbell, in **Research in Micropolitics. Volume 1 - Voting Behavior**. Samuel Long, ed. JAI Press, (1986).

"Economic Conditions and Individual Vote in the Federal Republic of Germany" with Jerome S. Legge. **Journal of Politics** (November, 1984).

"Television Markets and Congressional Elections" with James Campbell and Keith Henry. **Legislative Studies Quarterly** (November, 1984).

"Economic Conditions and the Forgotten Side of Congress: A Foray into U.S. Senate Elections" with John R. Hibbing, **British Journal of Political Science** (October, 1982).

"Increased Incumbency Advantage in the House" with John R. Hibbing, **Journal of Politics** (November, 1981). Reprinted in The Congress of the United States, 1789-1989, Carlson Publishing Inc., (1991).

"The Electoral Impact of Economic Conditions: Who is Held Responsible?" with John R. Hibbing, **American Journal of Political Science** (August, 1981).

"Comment on Increased Incumbency Advantage" with John R. Hibbing, Refereed communication: **American Political Science Review** (March, 1981).

"Can Government Regulate Safety? The Coal Mine Example" with Michael Lewis-Beck, **American Political Science Review** (September, 1980).

## Awards and Honors:

CQ Press Award - 1988, honoring the outstanding paper in legislative politics presented at the 1987 Annual Meeting of the American Political Science Association. Awarded for "The Demise of the Upper House and the Rise of the Senate: Electoral Responsiveness in the United States Senate" with John Hibbing.

## Research Grants:

National Science Foundation, 2009-2011, "Identifying the Biological Influences on Political Temperaments", with John Hibbing, Kevin Smith, Kim Espy, Nicolas Martin and Read Montague. This is a collaborative project involving Rice, University of Nebraska, Baylor College of Medicine, and Queensland Institute for Medical Research.

National Science Foundation, 2007-2010, "Genes and Politics: Providing the Necessary Data", with John Hibbing, Kevin Smith, and Lindon Eaves. This is a collaborative project involving Rice, University of Nebraska, Virginia Commonwealth University, and the University of Minnesota.

National Science Foundation, 2007-2010, "Investigating the Genetic Basis of Economic Behavior", with John Hibbing and Kevin Smith. This is a collaborative project involving Rice, University of Nebraska, Virginia Commonwealth University, and the Queensland Institute of Medical Research.

Rice University Faculty Initiatives Fund, 2007-2009, "The Biological Substrates of Political Behavior". This is in assistance of a collaborative project involving Rice, Baylor College of Medicine, Queensland Institute of Medical Research, University of Nebraska, Virginia Commonwealth University, and the University of Minnesota.

National Science Foundation, 2004-2006, "Decision-Making on Behalf of Others", with John Hibbing. This is a collaborative project involving Rice and the University of Nebraska.

National Science Foundation, 2001-2002, dissertation grant for Kevin Arceneaux, "Doctoral Dissertation Research in Political Science: Voting Behavior in the Context of U.S. Federalism."

National Science Foundation, 2000-2001, dissertation grant for Stacy Ulbig, "Doctoral Dissertation Research in Political Science: Sub-national Contextual Influences on Political Trust."

National Science Foundation, 1999-2000, dissertation grant for Richard Engstrom, "Doctoral Dissertation Research in Political Science: Electoral District Structure and Political Behavior."

Rice University Research Grant, 1985, Recent Trends in British Parliamentary Elections.

Faculty Research Grants Program, University of Georgia, Summer, 1982. Impact of Media Structure on Congressional Elections, with James Campbell.


## Papers Presented:

"The Physiological Basis of Political Temperaments" 6th European Consortium for Political Research General Conference, Reykjavik, Iceland (2011), with Kevin Smith, and John Hibbing.

"Identifying the Biological Influences on Political Temperaments" National Science Foundation Annual Human Social Dynamics Meeting (2010), with John Hibbing, Kimberly Espy, Nicholas Martin, Read Montague, and Kevin B. Smith.

"Political Orientations May Be Related to Detection of the Odor of Androstenone" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, Amanda Balzer, Michael Gruszczynski, Carly M. Jacobs, and John Hibbing.

"Toward a Modern View of Political Man: Genetic and Environmental Transmission of Political Orientations from Attitude Intensity to Political Participation" Annual meeting of the American Political Science Association, Washington, DC (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Genetic and Environmental Transmission of Political Involvement from Attitude Intensity to Political Participation" Annual meeting of the International Society for Political Psychology, San Francisco, CA (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Are Violations of the EEA Relevant to Political Attitudes and Behaviors?" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, and John Hibbing.

"The Neural Basis of Representation" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with John Hibbing.

"Genetic and Environmental Transmission of Value Orientations" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with Carolyn Funk, Kevin Smith, Matthew Hibbing, Pete Hatemi, Robert Krueger, Lindon Eaves, and John Hibbing.

"The Genetic Heritability of Political Orientations: A New Twin Study of Political Attitudes" Annual Meeting of the International Society for Political Psychology, Dublin, Ireland (2009), with John Hibbing, Cary Funk, Kevin Smith, and Peter K Hatemi.

"The Heritability of Value Orientations" Annual meeting of the Behavior Genetics Association, Minneapolis, MN (2009), with Kevin Smith, John Hibbing, Carolyn Funk, Robert Krueger, Peter Hatemi, and Lindon Eaves.

"The Ick Factor: Disgust Sensitivity as a Predictor of Political Attitudes" Annual meeting of the Midwest Political Science Association, Chicago, IL (2009), with Kevin Smith, Douglas Oxley Matthew Hibbing, and John Hibbing.

"The Ideological Animal: The Origins and Implications of Ideology" Annual meeting of the American Political Science Association, Boston, MA (2008), with Kevin Smith, Matthew Hibbing, Douglas Oxley, and John Hibbing.

"The Physiological Differences of Liberals and Conservatives" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Kevin Smith, Douglas Oxley, and John Hibbing.

"Looking for Political Genes: The Influence of Serotonin on Political and Social Values" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Peter Hatemi, Sarah Medland, John Hibbing, and Nicholas Martin.

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the American Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Matthew Keller, Nicholas Martin, Sarah Medland, and Lindon Eaves.

"Factorial Association: A generalization of the Fulker between-within model to the multivariate case" Annual meeting of the Behavior Genetics Association, Amsterdam, The Netherlands (2007), with Sarah Medland, Peter Hatemi, John Hibbing, William Coventry, Nicholas Martin, and Michael Neale.

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the Midwest Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Nicholas Martin, and Lindon Eaves.

"Getting from Genes to Politics: The Connecting Role of Emotion-Reading Capability" Annual Meeting of the International Society for Political Psychology, Portland, OR, (2007.), with John Hibbing.

"The Neurological Basis of Representative Democracy." Hendricks Conference on Political Behavior, Lincoln, NE (2006), with John Hibbing.

"The Neural Basis of Representative Democracy" Annual meeting of the American Political Science Association, Philadelphia, PA (2006), with John Hibbing.

"How are Political Orientations Genetically Transmitted? A Research Agenda" Annual meeting of the Midwest Political Science Association, Chicago Illinois (2006), with John Hibbing.

"The Politics of Mate Choice" Annual meeting of the Southern Political Science Association, Atlanta, GA (2006), with John Hibbing.

"The Challenge Evolutionary Biology Poses for Rational Choice" Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing and Kevin Smith.

"Decision Making on Behalf of Others" Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions" Annual meeting of the Midwest Political Science Association, Chicago Illinois (2005), with John Hibbing and Carolyn Funk.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions" Annual meeting of the American Political Science Association, Chicago Illinois (2004), with John Hibbing and Carolyn Funk.

"Accepting Authoritative Decisions: Humans as Wary Cooperators" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2002), with John Hibbing

"Can We Trust the NES Trust Measure?" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2001), with Stacy Ulbig.

"The Impact of Organizational Structure on the Production of Social Capital Among Group Members" Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (2000), with Allison Rinden.

"Isolating the Origins of Incumbency Advantage: An Analysis of House Primaries, 1956-1998" Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (2000), with Kevin Arceneaux.

"The Electorally Indistinct Senate," Norman Thomas Conference on Senate Exceptionalism, Vanderbilt University; Nashville, Tennessee; October (1999), with John R. Hibbing.

"Interest Group Participation and Social Capital" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (1999), with Allison Rinden.

"We're All in this Together: The Decline of Trust in Government, 1958-1996." The Hendricks Symposium, University of Nebraska, Lincoln. (1998)

"Constituency Population and Representation in the United States Senate," Electing the Senate; Houston, Texas; December (1989), with John R. Hibbing.

"The Disparate Electoral Security of House and Senate Incumbents," American Political Science Association Annual Meetings; Atlanta, Georgia; September (1989), with John R. Hibbing.

"Partisan and Incumbent Advantage in House Elections," Annual Meeting of the Southern Political Science Association (1987), with David W. Brady.

"Personal and Party Advantage in U.S. House Elections, 1846-1986" with David W. Brady, 1987 Social Science History Association Meetings.

"The Demise of the Upper House and the Rise of the Senate: Electoral Responsiveness in the United States Senate" with John Hibbing, 1987 Annual Meeting of the American Political Science Association.

"A Comparative Analysis of Economic Voting" with Jerome Legge, 1985 Annual Meeting of the American Political Science Association.

"An Analysis of Economic Conditions and the Individual Vote in Great Britain, 1964-1979" with Jerome Legge, 1985 Annual Meeting of the Western Political Science Association.

"Can Government Regulate Fertility? An Assessment of Pro-natalist Policy in Eastern Europe" with Jerome Legge, 1985 Annual Meeting of the Southwestern Social Science Association.

"Economic Conditions and the Individual Vote in the Federal Republic of Germany" with Jerome S. Legge, 1984 Annual Meeting of the Southern Political Science Association.

"The Conditions Required for Economic Issue Voting" with John R. Hibbing, 1984 Annual Meeting of the Midwest Political Science Association.

"Incumbency Advantage in Senate Elections," 1983 Annual Meeting of the Midwest Political Science Association.

"Television Markets and Congressional Elections: The Impact of Market/District Congruence" with James Campbell and Keith Henry, 1982 Annual Meeting of the Southern Political Science Association.

"Economic Conditions and Senate Elections" with John R. Hibbing, 1982 Annual Meeting of the Midwest Political Science Association. "Pocketbook Voting: Economic Conditions and Individual Level Voting," 1982 Annual Meeting of the American Political Science Association.

"Increased Incumbency Advantage in the House," with John R. Hibbing, 1981 Annual Meeting of the Midwest Political Science Association.

## Other Conference Participation:

Roundtable Participant – Closing Round-table on Biopolitics; 2016 UC Merced Conference on Bio-Politics and Political Psychology, Merced, CA.

Roundtable Participant "Genes, Brains, and Core Political Orientations" 2008 Annual Meeting of the Southwestern Political Science Association, Las Vegas.

Roundtable Participant "Politics in the Laboratory" 2007 Annual Meeting of the Southern Political Science Association, New Orleans.

Short Course Lecturer, "What Neuroscience has to Offer Political Science" 2006 Annual Meeting of the American Political Science Association.

Panel chair and discussant, "Neuro-scientific Advances in the Study of Political Science" 2006 Annual Meeting of the American Political Science Association.

Presentation, "The Twin Study Approach to Assessing Genetic Influences on Political Behavior" Rice Conference on New Methods for Understanding Political Behavior, 2005.

Panel discussant, "The Political Consequences of Redistricting," 2002 Annual Meeting of the American Political Science Association.

Panel discussant, "Race and Redistricting," 1999 Annual Meeting of the Midwest Political Science Association.

Invited participant, "Roundtable on Public Dissatisfaction with American Political Institutions", 1998 Annual Meeting of the Southwestern Social Science Association.

Presentation, "Redistricting in the '90s," Texas Economic and Demographic Association, 1997.

Panel chair, "Congressional Elections," 1992 Annual Meeting of the Southern Political Science Association.

Panel discussant, "Incumbency and Congressional Elections," 1992 Annual Meeting of the American Political Science Association.

Panel chair, "Issues in Legislative Elections," 1991 Annual Meeting of the Midwest Political Science Association.

Panel chair, "Economic Attitudes and Public Policy in Europe," 1990 Annual Meeting of the Southern Political Science Association

Panel discussant, "Retrospective Voting in U.S. Elections," 1990 Annual Meeting of the Midwest Political Science Association.

Co-convener, with Bruce Oppenheimer, of Electing the Senate, a national conference on the NES 1988 Senate Election Study. Funded by the Rice Institute for Policy Analysis, the University of Houston Center for Public Policy, and the National Science Foundation, Houston, Texas, December, 1989.

Invited participant, Understanding Congress: A Bicentennial Research Conference, Washington, D.C., February, 1989.

Invited participant--Hendricks Symposium on the United States Senate, University of Nebraska, Lincoln, Nebraska, October, 1988

Invited participant--Conference on the History of Congress, Stanford University, Stanford, California, June, 1988.

Invited participant, "Roundtable on Partisan Realignment in the 1980's", 1987 Annual Meeting of the Southern Political Science Association.

## Professional Activities:

### Other Universities:

Invited Speaker, Annual Lecture, Psi Kappa -the Psychology Club at Houston Community College, 2018.

Invited Speaker, Annual Allman Family Lecture, Dedman College Interdisciplinary Institute, Southern Methodist University, 2016.

Invited Speaker, Annual Lecture, Psi Sigma Alpha – Political Science Dept., Oklahoma State University, 2015.

Invited Lecturer, Department of Political Science, Vanderbilt University, 2014.

Invited Speaker, Annual Lecture, Psi Kappa -the Psychology Club at Houston Community College, 2014.

Invited Speaker, Graduate Student Colloquium, Department of Political Science, University of New Mexico, 2013.

Invited Keynote Speaker, Political Science Alumni Evening, University of Houston, 2013.

Invited Lecturer, Biology and Politics Masters Seminar (John Geer and David Bader), Department of Political Science and Biology Department, Vanderbilt University, 2010.

Invited Lecturer, Biology and Politics Senior Seminar (John Geer and David Bader), Department of Political Science and Biology Department, Vanderbilt University, 2008.

Visiting Fellow, the Hoover Institution, Stanford University, 2007.

Invited Speaker, Joint Political Psychology Graduate Seminar, University of Minnesota, 2007.

Invited Speaker, Department of Political Science, Vanderbilt University, 2006.

### Member:

Editorial Board, Journal of Politics, 2007-2008.

Planning Committee for the National Election Studies' Senate Election Study, 1990-92.

Nominations Committee, Social Science History Association, 1988

### Reviewer for:

American Journal of Political Science
American Political Science Review
American Politics Research
American Politics Quarterly
American Psychologist
American Sociological Review
Canadian Journal of Political Science
Comparative Politics
Electoral Studies
Evolution and Human Behavior
International Studies Quarterly
Journal of Politics
Journal of Urban Affairs
Legislative Studies Quarterly
National Science Foundation
PLoS ONE
Policy Studies Review
Political Behavior
Political Communication
Political Psychology
Political Research Quarterly
Public Opinion Quarterly
Science
Security Studies
Social Forces
Social Science Quarterly
Western Political Quarterly

## University Service:

Member, University Parking Committee, 2016-2018.

Member, University Benefits Committee, 2013-2016.

*Internship Director for the Department of Political Science, 2004-2018.*

Member, University Council, 2012-2013.

Invited Speaker, Rice Classroom Connect, 2016.

Invited Speaker, Glasscock School, 2016.

Invited Speaker, Rice Alumni Association, Austin, 2016.

Invited Speaker, Rice Alumni Association, New York City, 2016.

Invited Speaker, Rice TEDxRiceU , 2013.

*Invited Speaker, Rice Alumni Association, Atlanta, 2011.*

Lecturer, Advanced Topics in AP Psychology, Rice University AP Summer Institute, 2009.

Scientia Lecture Series: "Politics in Our Genes: The Biology of Ideology" 2008

Invited Speaker, Rice Alumni Association, Seattle, San Francisco and Los Angeles, 2008.

Invited Speaker, Rice Alumni Association, Austin, Chicago and Washington, DC, 2006.

Invited Speaker, Rice Alumni Association, Dallas and New York, 2005.

Director: Rice University Behavioral Research Lab and Social Science Computing Lab, 2005-2006.

*University Official Representative to the Inter-university Consortium for Political and Social Research, 1989-2012.*

Director: Rice University Social Science Computing Lab, 1989-2004.

*Member, Rice University Information Technology Access and Security Committee, 2001-2002*

Rice University Committee on Computers, Member, 1988-1992, 1995-1996; Chair, 1996-1998, Co-chair, 1999.

Acting Chairman, Rice Institute for Policy Analysis, 1991-1992.

Divisional Member of the John W. Gardner Dissertation Award Selection Committee, 1998

Social Science Representative to the Educational Sub-committee of the Computer Planning Committee, 1989-1990.

Director of Graduate Admissions, Department of Political Science, Rice University, 1986-1988.

Co-director, Mellon Workshop: Southern Politics, May, 1988.

*Guest Lecturer, Mellon Workshop: The U.S. Congress in Historical Perspective, May, 1987 and 1988.*

Faculty Associate, Hanszen College, Rice University, 1987-1990.

Director, Political Data Analysis Center, University of Georgia, 1982-1985.

## External Consulting:

Expert Witness, Flores et al. v. Town of Islip, NY, racially polarized voting analysis, 2018.

Expert Witness, Tyson v. Richardson ISD, racially polarized voting analysis, 2018.

Expert Witness, Dwight v. State of Georgia, racially polarized voting analysis, 2018.

Expert Witness, NAACP v. East Ramapo Central School District, racially polarized voting analysis, 2018.

Expert Witness, Georgia NAACP v. State of Georgia, racially polarized voting analysis, 2018.

Expert Witness, Arismendez v. Coastal Bend College, racially polarized voting analysis, 2017.

Expert Witness, United States v. City of Eastpoint, racially polarized voting analysis, 2017.

Expert Witness, Georgia NAACP v. Gwinnett County, racially polarized voting analysis, 2017.

Expert Witness for the State of Texas, Lopez, et al v. Abbott, a challenge to the current system of statewide at-large elections for the Texas Supreme Court and the Texas Court of Criminal Appeals, including election analysis, and racially polarized voting analysis, 2017.

Expert witness for the State of Texas, Perez, et al v State of Texas (and consolidated cases), challenge to adopted Texas election districts for the US Congress and the Texas House of Representatives, 2011-2017.

Expert Witness for Coppell ISD, Jain v. Coppell ISD, racially polarized voting analysis, 2016.

Consultant, City of Clute, Texas – Demographic analysis and redrawing of election districts, 2015.

Expert Witness for Carrollton-Farmers Branch ISD, Ramos v. Carrollton-Farmers Branch ISD, racially polarized voting analysis, 2015.

Expert Witness for Coahoma County, Columbus Partee, et al. v. Coahoma County, Mississippi, racially polarized voting analysis, 2015.

Expert Witness for the State of Lousianna, Terrebonne Parish NAACP v. Jindal, racially polarized voting analysis, 2015.

Expert Witness for the City of Pasadena, Patino v. City of Pasadena, racially polarized voting analysis, 2015.

Expert Witness for the City of St. Gabriel, York v. City of St. Gabriel, racially polarized voting analysis, 2014.

Consultant, Houston ISD – Incorporation of North Forest ISD, and the consequent redrawing of all nine board member election districts including demographic analysis, board and public hearing presentations and support for pre-clearance submission, 2014.

Expert Witness for Grand Prairie ISD, Rodriguez v. Grand Prairie ISD, racially polarized voting analysis, 2014.

Expert Witness for Irving ISD, Benevides, v Irving ISD, racially polarized voting analysis, 2014.

Expert Witness for Pasadena ISD, Garcia-Sonnier et al v., racially polarized voting analysis, 2013.

Case 2:18-cv-03549-GRB-ST   Document 129-19   Filed 04/30/19   Page 49 of 49 PageID #:
Case 2:18-cv-03549-ADS-GRB   Document 83-70   Filed 04/04/19   Page 14 of 14 PageID #: 2022
3370

Expert witness for the City of Yakima, Montes v. City of Yakima, challenge to Yakima, Washington At-Large City Council Elections, 2012.

Consultant, Lamar ISD – redrawing of all board member election districts including demographic analysis and redrawing of election districts, board and public hearing presentations, and support for pre-clearance submission, 2012.

Expert witness for Harris Co, Rodriguez, et. al. v., challenge to adopted Harris County Commissioners' Court precincts, 2011.

Consultant, City of Baytown – redrawing of all board member election districts including demographic analysis and redrawing of election districts, board and public hearing presentations, and support for pre-clearance submission, 2011.

Consultant, Goose Creek ISD – redrawing of all board member election districts including demographic analysis and redrawing of election districts, board and public hearing presentations, and support for pre-clearance submission, 2011.

Consultant, San Antonio Water System – Analysis of preclearance issues related to merger with BexarMet Water Authority, 2011.

Expert witness for the State of Texas, Texas v US, preclearance suit for Texas statewide districts, 2011.*

Expert witness for the State of Texas, Davis v Perry (and consolidated cases), challenge to adopted Texas Senate districts, 2011.

Expert witness for the State of Texas, Perez, et al v State of Texas (and consolidated cases), challenge to adopted Texas statewide districts, 2011-2017.

Expert witness, Fabela, et al. v City of Farmers Branch, Farmers Branch city council at large district challenge, 2011.

Expert Witness, El Paso Apartment Owners Assoc. v City of El Paso, analysis of racial patterns in housing occupancy, 2009.

Expert Witness, Benevides, v Irving ISD, racially polarized voting analysis, 2008-2009.

Expert Witness, Benevides, v City of Irving, racially polarized voting analysis, 2008-2009