**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
ANA FLORES, RENE FLORES, MARIA
MAGDALENA HERNANDEZ, MAGALI
ROMAN, MAKE THE ROAD NEW YORK,
and NEW YORK COMMUNITIES FOR
CHANGE,

                             Plaintiffs,

                 -against-

TOWN OF ISLIP, ISLIP TOWN BOARD,
SUFFOLK COUNTY BOARD OF
ELECTIONS,

                           Defendants.

-------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
2:18-cv-3549 (ADS)(GRB)

**SPATT, District Judge.**

      This is an action brought under Section Two of the Voting Rights Act of 1965, 52 U.S.C. § 10301 *et seq* ("VRA"). The plaintiffs, Hispanic residents of the Town of Islip (the "Town" or "Islip") as well as two community advocacy organizations, contest the at-large voting procedure used in the Town to elect the four councilpersons of the Town Board of the Town of Islip (the "Town Board") (together with the Town, the "Islip Defendants"). The Plaintiffs complain that the at-large system dilutes the voting strength of the Hispanic minority, in violation of the VRA. They seek a preliminary injunction that enjoins the Islip Defendants and the Suffolk County Board of Elections ("BOE") from holding elections for the Town Board under the current system and establishes a transition to single-member districts for all future elections. The BOE has not taken a position in this litigation but objects to the issuance of a preliminary injunction. In response to

1

this motion, the Court conducted an evidentiary hearing at which 16 witnesses testified over a period of 12 days. The hearing concluded with closing arguments on May 2, 2019 and the Court reserved its decision.

In deciding the instant motion, the Court notes that "enjoining an election is an 'extraordinary remedy' involving far-reaching power, which is almost never exercised by federal courts prior to a determination on the merits[.]" *Cano v. Davis*, 191 F. Supp. 2d 1135, 1137 (C.D. Cal. 2001) (quoting *Oden v. Brittain*, 396 U.S. 1210, 1211, 90 S. Ct. 4, 24 L. Ed. 2d 32 (1969)).

## I. LEGAL STANDARDS

### A. Preliminary Injunction

In general, a preliminary injunction may be granted when the party seeking the injunction shows that (1) absent injunctive relief, she will suffer irreparable injury and (2) either (a) a likelihood of success on the merits, or (b) that there are sufficiently serious questions going to the merits of the claims to make them a fair ground for litigation, and a balance of hardships tips decidedly in her favor. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018); *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir. 2000); *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). If, on the other hand, "the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction will be granted only if the moving party meets the more rigorous likelihood-of-success standard." *No Spray Coal., Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001) (per curiam) (internal citations and quotation marks omitted).

As here, when the movant seeks an injunction against the government that "will alter rather than maintain the status quo, the movant must show … [a] substantial likelihood of success." *Id.* (internal citations and quotation marks omitted); *Torres v. New York State Bd. of Elections*, 462

F.3d 161, 183 (2d Cir. 2006) ("[w]here ... the relief that plaintiffs seek either (1) stays governmental action taken in the public interest pursuant to a statutory scheme, or (2) mandates an affirmative action, plaintiffs must demonstrate a 'clear' or 'substantial' likelihood of success on the merits of their claim"), *rev'd on other grounds*, 552 U.S. 196, 128 S. Ct. 791, 169 L. Ed. 2d 665 (2008); *see, e.g.*, *Pankos Diner Corp. v. Nassau Cty. Leg.*, 321 F. Supp. 2d 520, 523 (E.D.N.Y. 2003) (requiring a clear or substantial likelihood of success on the merits where the plaintiffs sought "to enjoin enforcement of and, ultimately, void a statute that was already in effect at the time that the Complaint was filed").

An injunction in this case will alter the status quo by not only enjoining the Town and the BOE from holding elections under the current at-large structure, but requiring a transition to single-member districts on a preliminary basis. As a result, the Plaintiffs are required to establish a substantial likelihood of success on the merits. *See Queens Cty. Republican Comm. ex rel. Maltese v. New York State Bd. of Elections*, 222 F. Supp. 2d 341, 345-46 (E.D.N.Y. 2002) (Spatt, J.). In addition, the Plaintiffs must also demonstrate that they will suffer irreparable harm in the absence of an injunction and that it is in the public interest "to grant injunctive relief [when] faced with an impending election." *Montano v. Suffolk Cty. Legislature*, 268 F. Supp. 2d 243, 260 (E.D.N.Y. 2003) (Spatt, J.).

## B. Voting Rights Act

Section Two of the VRA, as amended, establishes the following:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C.A. § 10301 (emphasis in original). A plaintiff is not required to prove discriminatory intent in order to prove a violation under Section Two. *See Chisom v. Roemer*, 501 U.S. 380, 394, 111 S. Ct. 2354, 115 L. Ed. 2d 348 (1991).

In *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986), the Supreme Court established a framework to establish a Section Two cause of action. First, a plaintiff is required to satisfy three "preconditions": (1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it must be politically cohesive; and (3) the white majority must vote sufficiently as a bloc to enable it, in the absence of special circumstances, to defeat the minority's preferred candidate. *Id*. at 50-51. Regarding the third prong, the Supreme Court instructed that "in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *N.A.A.C.P. v. City of Niagara Falls*, 65 F.3d 1002, 1007 (2d Cir. 1995) (quoting *Gingles*, 478 U.S. at 56).

While the satisfaction of the *Gingles* preconditions is required to prove a Section Two violation, a court's inquiry at that stage is far from complete. Next, a district court must consider whether, under the totality of the circumstances, "(1) the political processes for nomination and election (2) are not equally open to participation by members of the protected class (3) because the

class members have less opportunity than others to participate and elect their representatives of choice." *Goosby v. Town Bd. of Town of Hempstead*, 180 F.3d 476, 491 (2d Cir. 1999). In other words, a court must determine whether the minority group's political power is actually diluted. *Johnson v. De Grandy*, 512 U.S. 997, 1013, 114 S. Ct. 2647, 2658, 129 L. Ed. 2d 775 (1994). To do that, the Supreme Court identified nine factors, which are listed in the Senate Report accompanying the 1982 amendments to Section Two of the VRA, as relevant to such an inquiry. Those factors are as follows:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction;

(8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

(9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S. Rep. No. 97-417, at 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07.  As noted in *Gingles*, "[t]he Report stresses, however, that this list of typical factors is neither comprehensive nor exclusive.  Though the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered."  *Gingles*, 478 U.S. at 45 (citing S. Rep. at 29-30).  In its inquiry, the Court must utilize "a 'functional' view of the political process."  *Id*.

## II.  FINDINGS OF FACT

### A. The Parties

The plaintiffs are Ana Flores ("Ana"), Rene Flores ("Rene"), Maria Magdalena Hernandez ("Hernandez"), Magali Roman ("Roman"), Make the Road New York ("MRNY"), and New York Communities for Change ("NYCC") (together, the "Plaintiffs").  Ana, Rene, Hernandez and Roman are registered voters and Hispanic residents of Brentwood, a census designated place ("CDP") in the Town.  Ana is a member of NYCC and Hernandez is a member of MRNY.  NYCC is an organization registered under 26 U.S.C. § 504(c)(4).  Its mission is to use "direct action to defend and uplift its members' communities and fight back against racist structures and economic policies that continue to extract wealth from its members' communities and neighborhoods."  Docket Entry ("Dkt.") 1, ¶ 20.  MRNY is an organization registered under 26 U.S.C. § 501(c)(3).  Its mission is to "build the power of Latino and working class communities to achieve dignity and justice through organizing, policy innovation, transformative education, and survival services."  *Id*. ¶ 19.  A majority of the members of MRNY are undocumented immigrants.  Although the term "Hispanic" focuses on individuals of Spanish-speaking origin and "Latino" refers to people of Latin American origin, the Court will use these terms interchangeably for the purposes of deciding this motion.

The defendants are Islip, the Town Board, and the BOE (together, the "Defendants"). Islip is a town in the County of Suffolk, which is organized and operated under the laws of the State of New York. Town Hall is located at 655 Main Street, Islip, New York 11751. The Town Board is the legislative body which governs the Town. The BOE is the agency charged with the implementation of elections within the County of Suffolk.

**B. The Town of Islip**

Islip is the third most populous town in the State of New York. It encompasses approximately 100 square miles of land and 59 square miles of water. Located in Suffolk County, the Town includes four incorporated villages and all or part of 23 CDPs. The four villages, Ocean Beach, Saltaire, Bright Waters, and Islandia all perform certain local government functions. The responsibilities of Suffolk County, the Town and the villages are distinct, and vary by location. According to the 2010 decennial census, the total population in the Town is 335,543. According to the 2017 one-year American Community Survey ("ACS"), Islip has a population of 333,701, of which 34.5% is Hispanic. The majority of Islip's Latino community is located in Brentwood, Central Islip and North Bay Shore. The below table shows the racial/ethnic composition of the Town:

| Population Category | ACS 2005–2009 | | ACS 2013–2017 | |
|---|---|---|---|---|
| Citizens of Voting Age | 218,645 | 100.00% | 221,830 | 100.00% |
| Non-Latino White | 160,100 | 73.22% | 146,975 | 66.26% |
| Latino | 32,785 | 14.99% | 45,340 | 20.44% |
| Non-Latino Black | 20,430 | 9.34% | 22,795 | 10.28% |
| Non-Latino Asian | 4,350 | 1.99% | 5,535 | 2.50% |
| Non-Latino All Other | 980 | 0.45% | 1,185 | 0.53% |
| | | | | |
| Citizens | 303,515 | 100.00% | 297,870 | 100.00% |
| Non-Latino White | 207,290 | 68.30% | 185,120 | 62.15% |
| Latino | 57,520 | 18.95% | 72,665 | 24.39% |
| Non-Latino Black | 30,575 | 10.07% | 30,380 | 10.20% |

| | | | | |
|---|---|---|---|---|
| Non-Latino Asian | 6,650 | 2.19% | 7,880 | 2.65% |
| Non-Latino All Other | 1,480 | 0.49% | 1,825 | 0.61% |
| | | | | |
| Citizens Under 18 | 84,870 | 100.00% | 76040 | 100.00% |
| Non-Latino White | 47,190 | 55.60% | 38,145 | 50.16% |
| Latino | 24,735 | 29.14% | 27,325 | 35.94% |
| Non-Latino Black | 10,145 | 11.95% | 7,585 | 9.98% |
| Non-Latino Asian | 2,300 | 2.71% | 2,345 | 3.08% |
| Non-Latino All Other | 500 | 0.59% | 640 | 0.84% |
| | | | | |
| Total Population | 336,755 | 100.00% | 335,310 | 100.00% |
| Non-Latino White | 210,795 | 62.60% | 187,230 | 55.84% |
| Latino | 81,635 | 24.24% | 103,245 | 30.79% |
| Non-Latino Black | 33,355 | 9.90% | 33,020 | 9.85% |
| Non-Latino Asian | 9,490 | 2.82% | 9,930 | 2.96% |
| Non-Latino All Other | 1,480 | 0.44% | 1,885 | 0.56% |

Exhibit ("Ex.") 108 at 22. There is substantial diversity within Islip's Latino community. Approximately 33% are Salvadorian, 15% are Columbian, 15% are Ecuadorian, 15% are Peruvian, and 11% are Dominican.

Islip is governed by a Supervisor, Town Clerk, Receiver of Taxes, and four Councilpersons. The Town Board is composed of the four councilpersons and the Supervisor. All are elected to four-year terms, and the elections for councilperson are staggered. Two councilpersons are up for election every odd year. The Supervisor, Town Clerk, Receiver of Taxes and four Councilpersons are all elected by the voters in Islip in an arrangement commonly referred to as an at-large system. Each voter in Islip is able to vote for one person for each vacant seat on the Town Board as well as one candidate for Supervisor, Town Clerk, and Receiver of Taxes. Voters may choose to vote for one or two candidates for the Town Board or decline to vote for any of them. The Town Board candidates who receive the most and second most votes are elected. For the other three town-wide positions, the candidate who receives the most votes are elected. A

referendum to change the electoral system in the Town to single-member districts was rejected by the Town's voters in 2006.

The four councilpersons are part-time employees who earn $77,000 per year. The Town Supervisor is a full-time employee, the chief executive of the Town and a voting member of the Town Board. The current Supervisor is Angie M. Carpenter ("Carpenter"). None of the current members of the Town Board live in predominantly Hispanic neighborhoods.

Carpenter supervises the following departments: Assessor, Comptroller, Environmental Control, Municipal Parking, Parks Recreation and Cultural Affairs, Planning and Development, Public Safety, Public Works, Receiver of Taxes, Senior Citizen Services, the Town Attorney, and the Town Clerk, among others. Thomas Owens is currently the commissioner of the Department of Public Works and the Department of Parks Recreation and Cultural Affairs. The Suffolk County Police Department ("SCPD") patrols the Town and investigates criminal activity. The SCPD is operated by Suffolk County.

Although the Republican, Democrat, Conservative, Independence, Women's Equality and Working Families parties are all active in Islip elections, the Republican Party has largely dominated town-wide elections. Currently, all town-wide elected positions are held by Republicans.

## C. The *Gingles* Preconditions

### 1. Precondition One

The Plaintiffs introduced Dr. Andrew Beveridge, an expert in the field of districting to determine if the Latino citizens of voting age population ("CVAP") are sufficiently numerous and geographically compact to create one majority-Latino CVAP district in a four-district plan that is drawn in accordance with traditional districting principles. Dr. Beveridge is a Professor of

Sociology at Queens College and the Graduate Center of the City University of New York and has provided expert opinions and testimony regarding proposed districting plans in several cases.

Dr. Beveridge used the decennial census, one-year ACS files, and five-year ACS files to draw his conclusions. The decennial census is the most accurate data, but it is only collected once every 10 years. The ACS survey uses a "rolling sample" method, collecting data continually through monthly surveys based on a random selection of households. Excluding the census, the one-year ACS files provide the most up to date information and the five-year ACS files provide the most accurate data. The most recent one-year ACS survey was conducted in 2017 and the most recent five-year ACS survey was conducted from 2013 through 2017. The total aggregate sample size for the five-year ACS file is similar to that of the long-form decennial census, which was discontinued in 2005.

Dr. Beveridge drew two demonstrative districting plans to illustrate that the Latino CVAP is sufficiently numerous and geographically compact. In doing so, he reviewed the following traditional districting principles: population equality, contiguity, compactness, and preserving existing political and geographic subdivisions. Both plans were created using the 2013-2017 five-year ACS redistricting files.

The first plan was based upon preserving census blocks ("Census Block Plan"). Census blocks are the smallest geographic units delineated by the Census Bureau. They are not based on population but serve as the building components to create larger geographic units. There are more than 11 million census blocks in the United States. Dr. Beveridge split Islip up into four districts, with District One consisting of 54.4% of the total CVAP of that district. District One was made up of Brentwood, North Bay Shore, and two portions of Central Islip. The total population deviation was 1.55%, significantly less than the maximum deviation for local districting plans.

Other than the island areas, all four districts were contiguous and considered compact. To measure compactness, Dr. Beveridge used the Roeck measure, which compares the area of each district to the area of a circumscribing circle. Using the Roeck test, District One scored 0.61, which is considered very compact. Three CDPs, Central Islip, Ronkonkoma and Islip, were split to preserve population equality and some districts split election district boundaries. Below is a map that illustrates Dr. Beveridge's Census Block Plan:



Ex. 105 at 36.

The second plan was based upon preserving election districts ("ED Plan"). Once again, Dr. Beveridge split the Town into four districts. In District One, Hispanics constituted 54.4% of the total CVAP of the district. District One was composed of Brentwood, North Bay Shore, and two portions of Central Islip. The total population deviation was 1.01%, all four districts were contiguous and considered very compact. Using the Roeck test, District One scored 0.61, which is considered very compact. Central Islip, Ronkonkoma and Islip were also split to preserve population equality and some of the boundaries of election districts were breached to preserve census blocks. Below is a map that illustrates Dr. Beveridge's ED Plan:



Ex. 105 at 39.

While both plans split certain communities that one would expect to be preserved, i.e. Central Islip, these examples are limited and do not drastically impact compactness. Both plans are considered very compact; however, District Three, which includes the barrier islands, is naturally less compact than the remaining districts.

Both of these plans demonstrate that it is possible to create a district that has a majority Hispanic CVAP in Islip based upon a four-district plan that complies with traditional districting principles.

**2. Precondition Two**

The Plaintiffs' expert, Dr. Michael D. McDonald, is a Professor of Political Science and the Director of the Center on Democratic Performance at the State University of New York at Binghamton. He examined seven Town Board general elections from 2005 to 2017 using both bivariate regression analysis ("regression analysis") and ecological inference. Regression analysis applies a regression to derive a best fitting line in order to determine if a correlation exists between the racial makeup of an election district and the racial breakdown of votes cast. Ecological inference is "the statistical process of drawing inferences about individuals from aggregate data." Bruce M. Clarke & Robert Timothy Reagan, Fed. Judicial Ctr., Redistricting Litigation: An Overview of Legal, Statistical, and Case-Management Issues 53 (2002). In the context of a VRA case, it produces estimates of voting patterns by race by analyzing the bounds of the data to produce maximum likelihood statistics. In all seven elections, the candidates of choice for the Hispanic community were the two nominees of the Democratic Party. In three of those elections, one of the two Hispanic-preferred candidates were Latino. The point estimate measured by regression analysis for the Hispanic candidate of choice ranged from 52.7% to 77.7% of Hispanic voters, and

13

from 53.9% to 88.8% using ecological inference. The three Latino candidates for Town Board received between 58.3% and 77.7% of Hispanic voters using regression analysis and from 56.1% to 88.8% using ecological inference.

The Islip Defendants' expert in this area is Dr. John Alford, a Professor of Political Science at Rice University. In an effort to normalize the vote-for-two Town Board Elections so as to better compare it with vote-for-one elections, Dr. Alford converted Dr. McDonald's ecological inference results from the number of votes to the number of voters. In this analysis, each Hispanic candidate of choice received between 35.5% and 52.8% of the votes, a combined average of 83.1% of the Latino vote for both candidates.

With the exception of 2007, all Town Board elections examined by Dr. McDonald resulted in the Hispanic candidates of choice losing to the Republican slate of candidates. Further, the only election examined where the Latino candidate of choice received greater than 50.4% of white votes was 2007.

The 2007 Town Board election results are properly considered a special circumstance. A special circumstance is defined as an extraordinary situation that impacts election results. In 2006, Peter McGowan, Islip's supervisor at the time, pled guilty to three criminal charges relating to kickbacks and misappropriation of campaign funds and resigned from his position with the Town. *See* Julia C. Mead, *Ex-Supervisor of Islip Gets 3 Months, a Light Term*, N.Y. Times (May 5, 2006), https://www.nytimes.com/2006/05/05/nyregion/05suffolk.html. The Court accepts the Plaintiffs' contention that this astonishing turn of events at least partially impacted town-wide elections in 2006 and 2007.

Dr. McDonald also analyzed town-wide, county, state, and federal elections for political cohesiveness. In the nine town-wide elections examined, the Hispanic candidate of choice

received between 64.1% and 78.6% of the Latino vote using regression analysis and 68.5% and 90.7% using ecological inference. A review of Suffolk County elections reveals that in the eight elections analyzed since 2005, the Hispanic candidate of choice received between 63.0% and 91.0% of the Latino vote using regression analysis and between 67.4% and 94.6% using ecological inference. In the nine New York State elections examined since 2005, the Hispanic candidate of choice garnered between 73.4% and 86.5% of the Latino vote using regression analysis and 76.0% and 94.6% using ecological inference. Finally, Dr. McDonald analyzed eight federal elections since 2005 and found that Hispanic candidates of choice received between 83.3% and 95.5% of Latino votes using regression analysis and 91.0% and 96.1% of votes using ecological inference. The Court does not credit the results of elections for the Second Congressional District from either expert. These elections did not include approximately a dozen electoral districts within the Town. Without knowing more about which election districts were excluded, these results cannot be compared to results that include the entire town.

### 3. Precondition Three

The parties each presented expert testimony during the hearing regarding the voting patterns of Hispanics and whites in Islip. Dr. McDonald analyzed the same 14 Town Board elections as described in Section II.C.2. In 12 of the 14 elections, the Hispanic candidate of choice lost to the two candidates preferred by whites. In those 12 elections, between 51.2% and 65.6% of white voters did not vote for the Hispanic-preferred candidate using regression analysis and between 50.1% and 66.0% using ecological inference. Further, Dr. McDonald estimated that white crossover voting, that is the number of white voters who voted for the Hispanic candidate of choice, ranged from 23.8% to 35.9% using regression analysis and 25.0% to 36.5% using ecological inference. In the elections that featured Latino candidates for Town Board, white crossover voting

was between 23.8% and 29.8% using regression analysis and between 25.0% and 29.9% using ecological inference. The two remaining elections occurred during 2007, which, as explained in Section II.C.2., were the result of special circumstances.

Dr. Alford also analyzed all 14 Town Board elections since 2005 using ecological inference. He determined that, after correcting for certain errors, the winning candidates in the 12 elections that resulted in a victory for white candidates of choice received combined support from whites of between 61.0% and 64.8% of votes. White crossover voting for the two Hispanic candidates of choice in each election was measured between 35.2% and 39.0% of votes. The three Latino candidates since 2005 received 18.5%, 18.3% and 15.5% of white votes. The most recent Latino candidate, Samuel Gonzalez, received the second highest percentage of white votes of any Democratic Town Board candidate since 2012.

Both Dr. McDonald and Dr. Alford evaluated nine town-wide elections since 2005. Since then, the Hispanic candidate of choice was unsuccessful in seven of the nine elections. For those seven races, Dr. McDonald calculated white crossover voting at between 22.7% and 41.0% of voters using regression analysis and 23.5% and 40.9% using ecological inference. Dr. Alford calculated that white crossover at between 27% and 45% of voters using ecological inference. The remaining elections, the 2006 and 2007 supervisor races, are considered special circumstances. Both experts found similar levels of racial polarization in the Town Board races they reviewed.

A review of exogenous elections at the county, state, and federal levels yields more significant white crossover voting patterns than endogenous elections. Dr. McDonald estimates that since 2005, white crossover voting ranged from 27.0% to 55.9% using regression analysis and 28.4% and 57.3% using ecological inference in county elections, 34.5% to 58.4% using regression

analysis and 35.1% to 58.8% using ecological inference in statewide elections, and 30.8% to 55.1% using regression analysis and 33.7% to 57.1% using ecological inference in federal elections. Using ecological inference, Dr. Alford contends that white crossover voting for the same elections was between 30% and 61% for county elections, 39% and 62% for statewide elections, and 36% and 59% for federal elections.

Dr. McDonald also conducted a projection analysis that examined the election results for Suffolk County Legislature District Nine to determine what would happen in a Town Board election under a single-member district with a majority of Hispanic voters. From this analysis, Dr. McDonald concluded that the Hispanic candidates of choice would have been more successful in Town-wide elections if the relevant elections had been held in a majority-Latino district.

Using the data described in this section, Dr. McDonald concluded that white bloc voting consistently precludes the Hispanic candidates of choice from being elected to the Town Board. Dr. Alford believes that the levels of white bloc voting observed are explained by partisan polarization rather than racial polarization.

The Islip Defendants contend that Dr. McDonald's results were impacted by three major errors: (1) Dr. McDonald analyzed the number of voters that submitted a ballot in Town Board elections; (2) Dr. McDonald did not account for varying degrees of voter turnout in his ecological inference analysis; and (3) Dr. McDonald analyzed white bloc voting rather than non-Hispanic bloc voting. The Court addresses these arguments in Section III.B.1.c.

## D. The Senate Report Factors

### 1. History of Official Discrimination

There has been no evidence of any official policy of discrimination against Hispanics in New York State or Islip. The Islip Defendants offered the testimony of Dr. Stephan Thernstrom,

the Winthrop Professor of History Emeritus at Harvard University to discuss the history of discrimination in New York State.  Dr. Thernstrom explained:

> The starting point of any assessment of an alleged Voting Rights Act violation must be an examination of the history of the jurisdiction in which the complaint has been filed. If a state or any of its political subdivisions had demonstrably had such a history, it would be plausible to think that any current racial disparities (the focus of the fifth Senate Report factor) are at least in part attributable to that history. … New York has been a pioneer in combatting discrimination.
>
> …
>
> Not much has been written about the history of Islip, and what little I was able to locate offered nothing relevant to the issues in the present case. But there is an abundance of scholarly literature on the history of racial and ethnic groups in the state of New York, and on the long story of the state's efforts to combat discrimination against such groups. Even a brief glance at this literature would have shown the plaintiffs that over the course of more than a century the people of New York have demonstrated a strong commitment to minority rights by supporting the development of a rich body legislation designed to prevent discrimination based on race, religion, or national origins.
>
> …
>
> Throughout the twentieth century, New York more often than not led the nation in enacting laws to attack discriminatory practices.
>
> …
>
> Most directly relevant to the issues in this case are the efforts of New York in recent decades to guarantee the voting rights of its minority citizens. Eligible voters no longer need to show up at the office of the local board of election. These voters may mail in forms obtainable by mail or phone request (registration by mail was authorized by the legislature in 1975). Voter registration also is available while applying for a driver's license, or appearing at public assistance or disability services offices.

Ex. A, ¶¶ 13-15, 19.

In 2012, the New York State Department of Motor Vehicles ("DMV") developed an online registration process that allowed voters to complete the voter registration process online.  This used a signature drawn from the DMV's existing records to complete the registration.  During the

2012 general election, the BOE refused to accept certain voter registrations obtained using the DMV's online system due to a software error that rendered signatures unreadable. It is unclear how many registered voters were impacted by the glitch. The 2012 general election is the only election impacted by the BOE's refusal to accept DMV online registrants. Since then, the DMV has maintained a policy of accepting online registrations through the DMV and Nicholas LaLota, the BOE's Republican Chairman has personally encouraged residents to register via the DMV's website. There is no evidence that this issue disproportionately impacted communities of color in general or the Hispanic community in particular.

Dr. Daniel Altschuler, the Director of Civic Engagement and Research at MRNY and an Adjunct Assistant Professor of Public Service at New York University testified on behalf of the Plaintiffs. During the 2012 election, he supervised a non-partisan election protection operation in collaboration with the New York Civil Liberties Union and Common Cause New York. Dr. Altschuler testified regarding a handful of isolated incidents in Islip during the 2012 general election. In one notable episode, a female Latino voter complained that a white male poll worker instructed her to vote for Mitt Romney, the Republican candidate for President of the United States. This incident purportedly occurred at 8:00am at a polling place in Brentwood. The BOE was notified and the police were dispatched to the polling place. The call log only identified the complainant as "Jessica H." Dr. Altschuler also recalled at least one incident of a poll worker inappropriately requesting identification from a voter. There was nothing in the record to indicate that any registered voters were prevented from voting in recent elections in Islip. While the Court credits Dr. Altschuler's testimony, the incidents he recalled lacked sufficient detail to conclude that that Hispanic voters experienced unfair or discriminatory treatment. His ambiguous testimony

of isolated incidents may demonstrate that certain poll workers need additional education, but it did not establish that they engaged in discriminatory behavior.

The BOE has hired two Hispanic Outreach coordinators, who ensure proper translation of all materials into Spanish. Spanish BOE materials and ballots are available to all Hispanic voters. The BOE also hired Spanish-speaking poll workers who can answer any questions at polling locations. The website of the BOE is also able to be translated into Spanish. The BOE trains approximately 6,000 poll inspectors and utilizes 10% of its employees to staff a call center on election day. SCPD is responsible for responding to any incidents that arise throughout Election Day.

### 2. Degree of Racially Polarized Voting

The Court has already reviewed much of the factual record associated with racially polarized voting and incorporates Sections II.C.2. and II.C.3. into the findings of fact on this Senate factor. The Islip Defendants contend that partisan affiliation rather than race better explains voting patterns in Islip.

The Plaintiffs' expert, Dr. McDonald, only examined two non-partisan elections: the 2013 and 2015 Democratic primary elections for Suffolk County Legislative District 9. As Dr. McDonald acknowledged in his expert report, these elections were not racially polarized. Hispanics and whites each supported the winning candidate in both contests. These elections are particularly noteworthy even though they do not represent all of Islip because they are the only two elections where ethnicity is eliminated as a variable. Moreover, these elections take place in a majority Latino district and are illustrative of a majority minority single-member district. *See* Ex.118, ¶¶ 55-62. Dr. McDonald did not examine the influence of partisan politics in Town Board elections.

Dr. Alford reviewed the elections-at-issue in this case for evidence of partisan voting. In all 51 elections examined by Dr. McDonald, the Hispanic candidates of choice ran as Democrats in the general election. These candidates received substantial support from white voters. In Town Board elections, the Hispanic candidates of choice averaged over 37% of white votes, even after removing the 2007 election. These numbers increased to over 40% when examining town-wide and exogenous elections. Dr. Alford calculated that an average of 42.1% of white voters supported Hispanic-preferred candidates in town-wide races. That number became 45.8% for county elections, 46.6% for state elections, and 49.75% for federal elections. In 12 of 34 town-wide and exogenous elections (35.3%), the Hispanic candidate of choice received at least 50% of white votes.

In the only analysis that reviews the impact of both race and political affiliation, Dr. Alford examines the 2017 Town Board election using Dr. Beveridge's individual voter records. Here, Trish Bergin Weichbrodt and James O'Connor, both white Republicans, ran against Samuel Gonzalez and Jason Fenley. Gonzalez is Latino and Fenley is white. First, Dr. Alford replicated Dr. McDonald's regression analysis estimates for the election and found similar results. He then added a variable for the proportion of the voters in each election district that were registered as Democrats. That equation reveals that when holding all other variables constant, an increase of 10% in the proportion of registered Democrats yields an expected increase in the vote for Gonzalez of 9.94%. If the same equation is used to illustrate an increase of 10% of the Hispanic CVAP proportion and all other variables are held constant, the change yields a slight decrease in the vote for Gonzalez of 0.57%. This regression reveals that in only five of the over 40 election districts where Gonzalez received more than 60% of the votes, the election district also had greater than 60% Hispanic CVAP. The proportion of Hispanic CVAP in an election district had no predictive

power when controlling for all other variables, while the percentage of registered Democrats did have predictive power.

### 3. Electoral Mechanisms that Enhance Vote Dilution

There are no anti-single shot provisions or majority vote requirements in Islip Town Board elections. Elections for the Town Board occur on the primary and general election dates in odd years. In each Town Board election, two of the four council seats are open. The two candidates with the most votes are elected. Voters may vote for two, one or none of the candidates.

The Plaintiffs contend that Islip is an unusually large election district. To support this argument, they introduced the testimony of Renee Ortiz, who ran for the Town Board in 2011 and Gonzalez, who is now the current Suffolk County Legislator for the Ninth District. The Ninth District comprises a large portion of Islip's Latino community, including Central Islip and parts of Brentwood. As stated *supra*, Gonzalez ran for the Town Board in 2017. Both individuals testified that the size of Islip posed a challenge during their Town Board campaigns. Specifically, they believed that they did not receive enough funds to run a town-wide campaign. Yet, Gonzalez did not exclusively campaign in the predominantly Hispanic portions of Islip. He canvassed and attended events throughout the Town, including events in Sayville and Bay Shore. The fruits of these efforts are demonstrated in the election results. Gonzalez received more votes than any other Latino candidate for Town Board and collected more votes than the four winners of the last two Town Board elections.

The Plaintiffs have not introduced any evidence that the Town is *unusually* large compared to other districts in New York State. Carpenter testified that the size of Islip did not pose any particular challenges to her campaign. An examination of Suffolk County reveals that Islip is smaller than many districts in county or state races. In the Suffolk County Legislature, there are

multiple districts that are considerably larger than Islip. The Second Legislative District is comprised of the entire South Fork of Long Island and encompasses approximately 250 square miles of land. The First Legislative District is even larger, stretching the over 70 miles from Brookhaven to Fisher's Island. Further, there are numerous large towns on Long Island that feature at-large election systems.

### 4. Access to Candidate Slating Process

The Republican Party is the dominant political party in Islip's town-wide elections. All current Islip elected positions are filled by Republicans and since 2009, no Democrat has been elected to the Town Board.

The Islip Republican Committee has an open screening process that allows any interested person to apply to run for elected office. All candidates that apply are screened for all available positions. An open interview is then conducted, which allows any registered Republican to attend and ask questions of the candidate. During that process, the candidates may make opening and closing statements and attendees have the opportunity to rate each candidate. An executive committee of approximately 18 committee members selects the candidates who receive the party's nomination. If candidates who are not nominated still wish to run, the party holds a primary election to determine the nominee. In 2017, 17 candidates were screened for the two available Town Board positions and approximately 80 voters attended the screening event. Since 2005, the Islip Republican Committee has not slated a Hispanic candidate. Neither party has produced information regarding party nominations prior to 2005. There is no evidence that anyone from the Islip Latino community ever sought the Republican Party's nomination for the Town Board or that there are any structural impediments that preclude a Hispanic Republican from seeking or

obtaining the nomination.  The Suffolk County Republican Committee is composed of the 10 town committees, including Islip.  The current chairman is Jesse Garcia.

Since 2005, the Islip Democratic Committee has nominated three Hispanics for the Town Board: Gonzalez in 2017, Ortiz in 2011 and Kellie Alvarez in 2005.  This represents approximately 21% of all nominations for the Town Board during that timeframe, which is substantially similar to Islip's Hispanic CVAP.  There is no evidence regarding how many Latino residents sought the Democratic Party's nomination for Islip Town Board or how many Latino candidates were slated prior to 2005.  In 2015, Maxima Castro was nominated by the Democratic Party for the position of Town Receiver of Taxes.

Neither party in this case has introduced evidence of the nominating process for exogenous elections outside Islip nor how many Hispanic residents sought their political party's nomination for the various local, state, and federal elected positions.  The record does reflect, however, that in 2012, Gonzalez and Philip Ramos competed in the Democratic Party primary for the nomination for New York State Assembly District 6.  Further, in 2013 Monica Martinez and Ricardo Montano both sought the Democratic Party's nomination for Suffolk County Legislative District Nine and in 2015, Montano ran against Tom Licari for the Democratic Party's nomination for Islip Town Supervisor.

### 5. Discrimination in Other Areas Which Hinders Hispanics' Ability to Participate in Political Process

The Plaintiffs offered  the expert testimony of Dr. John Logan regarding the socioeconomic status of Hispanics in Islip.  Dr. Logan is a Professor of Sociology at Brown University and has provided expert reports in a series of housing related cases.  In his expert report and testimony, he

focused on socioeconomic characteristics, public health, public education, policing and environmental hazards.

There are significant differences between Hispanics and whites in Islip. The median household income of Hispanics is $75,543 as compared to $93,766 for whites. However, Latinos have a slightly lower unemployment rate than whites in Islip. 84.9% of whites are employed in professional or managerial roles compared to 62.1% of Hispanics. There are two times as many white residents than Latinos in Islip with some college experience. Whites are also 20% more likely to be homeowners than Hispanics in Islip.

Yet, the Latino community also exhibits telltale signs of an immigrant community on the rise. More than 53.5% of Latino citizens were naturalized compared to 2.9% of white citizens. In other words, over 97% of white citizens were born in the United States as opposed to 46.5% of Latino citizens. More than 40% of whites have lived at their residence for over 20 years compared to 15.5% of Hispanics in Islip. Greater than 30% of Latinos have lived at their current residence for less than five years. The Hispanic community's English language adoption also falls far behind their white counterparts. 98.3% of whites in Islip either speak only English or speak English very well. Only 57.5% of Hispanics can say the same. That leaves 42.5% of Latinos with a significant gap in language ability, which is a limiting factor for upward mobility. Dr. Logan obtained the above information from the 2012-2016 five-year ACS survey. He acknowledged during his testimony that Hispanic citizens in the Town likely exhibit higher socioeconomic characteristics than non-citizens.

Dr. Thernstrom contends that examining Islip in a nationwide context reveals that Islip's Latino community is a successful immigrant community on the rise. Using the 2017 ACS one-year survey, the median household issue of Hispanics rose to $86,572 as compared to 98,400 for

25

whites and $92,955 for all of Islip.  The nationwide median household income was $60,336 for all

households and $49,793 for Hispanic households.  When examining poverty levels, Dr.

Thernstrom found that 10.5% of Hispanics in Islip were below the poverty level compared to 4.9%

of whites and 7.3% of the entire town.  Nationwide, 19.4% of Hispanics, 9.6% of whites, and

13.4% of all Americans were below the poverty level.

> In an effort to explain these numbers, Dr. Thernstrom notes the following:

> The continuing flow of Latino newcomers into Islip, both from abroad and from other parts of the United States, inevitably means that the group will lag behind the local average in its socioeconomic characteristics, because migration streams tend to be selective of the young, the less educated, those who are not qualified for professional or managerial jobs, and the like.

> …

> As a historian of American immigration, I am not in the least surprised to see such a pattern in any community that has recently experienced a large influx of newcomers from abroad. Exactly the same generalizations apply to the Irish of New York, Philadelphia, and Boston in the 1840s and 1850s, and the Italians, Poles, and East European Jews who settled in New York, Philadelphia, and Pittsburgh in the late-nineteenth century. It also appeared in the northern communities—Detroit, Cleveland, and Chicago—that were the destinations of southern blacks in their original Great Migration northward (1915–1929) and their Second Great Migration to northern cities that began at outbreak of World War II and petered out in the 1970s. In each case, the migration stream was selective of the socioeconomically disadvantaged.

Ex. A, ¶¶ 28-29.

> Turning to educational achievement and public health, Dr. Logan opines that there are

significant disparities in health and education outcomes.  The proportion of Latinos with no health

insurance is four times higher than whites.  Latinos are also more likely to be covered by Medicaid

than whites.  Approximately 44.7% of Latinos either have no health insurance or are insured

through Medicaid.  Yet, as Dr. Logan acknowledges, "[individuals] who speak a primary language

other than English and have limited English proficiency were more likely to be uninsured."  Ex.

115, ¶ 33 (internal citations omitted). Dr. Logan also examined birth and mortality figures and concludes that Latinos in New York State are more likely than whites to experience issues related to insufficient prenatal care and primary care. Although the Court credits this testimony, these statewide statistics have limited persuasive value in this application. The Economic Opportunity Council of Suffolk's Community Needs Assessment, cited in Dr. Logan's report, describes significant differences between Suffolk County and New York State health-related statistics.

Dr. Logan uses data from the New York State Education Department to examine public education disparities. He cites statistics from six school districts in Islip: Brentwood, Central Islip, Bay Shore, Islip, East Islip, and West Islip. The data shows that Brentwood and Central Islip, which are predominantly Latino districts, score lower on average in Mathematics and English than East Islip and West Islip, which are largely white districts. Brentwood and Central Islip also have the highest English as a second language students of the six districts examined. All six of these schools have independent boards that are run by elected members of the community. The Town has no control over school taxes and does not make policy-based decisions.

There are several potential problems with Dr. Logan's data. In his expert report, Dr. Logan only examines six school districts in the Town, even though there are 12 school districts that enroll students in Islip. Dr. Logan also failed to provide evidence on per person spending, the quality or quantity of teachers, the conditions of the schools, the sizes of classrooms, or anything else that contributes to overall performance. The comparative information regarding the six schools he chose for analysis is therefore less compelling.

Dr. Logan next turns to disparate treatment in Islip regarding policing and public safety. Ten of his 21 citations in this section are to a 2009 report by the Southern Poverty Law Center ("SPLC") entitled Climate of Fear: Latino Immigrants in Suffolk County. While the Court is well

aware of the excellent work done by the SPLC in advancing civil rights in this country, it also recognizes that at its core, SPLC is an advocacy organization. The Court does not credit any portion of the report or testimony that is sourced from the SPLC report.

Dr. Logan also cites a series of reports from the U.S. Department of Justice ("DOJ") to conclude that the SCPD has not established enough trust within the Latino community, which leads to public safety issues. In January 2014, the DOJ entered into a settlement agreement with the SCPD "to ensure that police services are provided to all members of the Suffolk County community, including the Latino community, in a manner that complies with the Constitution and laws of the United States." Ex. 310 at 2. The DOJ investigation, which commenced in 2009 and culminated with the signing of the agreement, focused on allegations that the SCPD discouraged Latinos from filing complaints and failed to investigate criminal incidents involving Latinos. Over the last five years, the DOJ has issued seven reports assessing compliance with the agreement. By October 11, 2018, the DOJ certified that the SCPD was in substantial compliance in three categories (Hate Crimes and Hate Incidents, Allegations of Police Misconduct, and Policies and Training Generally) and in partial compliance in three categories (Bias-Free Policing, Language Assistance, and Community Engagement). The DOJ also stated that in those categories rated in partial compliance, the SCPD had made significant progress. Except as detailed above, the Court credits Dr. Logan's testimony regarding policing and public safety, but also notes the noteworthy progress over the years in improving the relationship between the SCPD and Suffolk County's Hispanic community.

In the final section of his expert report, Dr. Logan concludes that Islip's Latino community has been disproportionately subjected to significant environmental hazards. In this effort, he examines 14 hazardous waste sites in Islip, which he obtained from the New York State

Department of Environmental Conservation.  Only six of the 14 sites are located in census tracts that have greater than 10% Latinos.  Two of the six are dry cleaners.  Of the remaining four, one is located in a mostly non-residential, industrial area.  Many of these sites were constructed and operated decades ago, long before the census tracts became predominantly Hispanic.  Two of the sites that are in a majority-Hispanic census tract, MacKenzie Chemical Company and Sonia Road Landfill were in operation by 1948 and 1965 respectively.  Based on this data, the Court does not credit Dr. Logan's conclusion that a disproportionately large share of hazardous waste sites are located in predominantly Hispanic areas.

Dr. Logan also examines the dumping at Roberto Clemente Park and its impact on the Brentwood community.  In early 2014, it became public that a firm contracted by the Town to create two soccer fields at Roberto Clemente Park had dumped 40,000 tons of toxic debris from other construction sites in the construction area.  The park remained closed until August 2017.  Neighbors of the park were rightly concerned with the long-term health impacts of the dumping.  Yet, this tragic incident does not imply a broader pattern of neglect, or that Brentwood has been disproportionately subjected to environmental hazards.

### 6. Racial Appeals in Political Campaigns

Over the past 20 years, the Hispanic community has continued to expand in Brentwood, Central Islip, and North Bay Shore (along with other neighborhoods in Nassau and Suffolk County).  This has caused some well-documented racial tensions in communities across Long Island.

The Plaintiffs have introduced evidence regarding five instances that they contend are examples of overt or subtle racial appeals in local political campaigns.  During O'Connor's 2017 campaign for Town Board, the New York State Republican State Committee paid for a town-wide

mailer for O'Connor. Garbarino, the Chairman of the Islip Republican Committee, was shown the mailer but did not have substantive comments. On the front of the mailer, it read "WHY JIM O'CONNOR? BECAUSE HE'S ONE OF US!" and on the back read "Jim O'Connor is one of us who is experienced in both business and government. … I hope to earn your trust and vote because I will fight for you to preserve our quality of life in Islip." Ex. 10 (emphasis in original). Gonzalez believes that "us" refers to white residents of Islip rather than the Town as a whole. He found this mailer to be discriminatory. Carpenter did not find it discriminatory and contends that O'Connor is referring to all residents of Islip. There is no evidence that O'Connor's mailer was only sent to the predominantly white parts of the Town.

One of the current members of the Town Board, Bergin Weichbrodt, came under fire in 2009 for purportedly writing a post on her Facebook page that references El Salvador. This Facebook post was not admitted into evidence as it was not properly authenticated. It is not manifestly clear whether or not Bergin Weichbrodt authored this post. However, this post was authored after the 2017 Town Board elections and, therefore, was not connected to any election.

During the 2017 Town Board elections, Bergin Weichbrodt attended a "meet the candidates" campaign event in Sayville, along with the other three candidates. At some point in the night, when Gonzalez had left the room, she remarked the following about Gonzalez, "He lives in Central Islip. He's not from here. He doesn't understand what our concerns are in this part of the Town." Ex. 11. The video admitted into evidence does not provide any context for the comment and does not show any footage of before or after the quote. Gonzalez testified that he found the comments "very discriminatory." While Gonzalez's opinion is understandable, the Court does not credit this portion of his testimony. Gonzalez was not in the room at the time and was unable to provide any context for the remark. None of the other witnesses were present in the

room for the remark and could comment on its context. Without more, the Court could only speculate as to the meaning of Bergin Weichbrodt's comments.

The Plaintiffs also point to a campaign mailer for Steve Flotterton's 2017 campaign for Suffolk County Legislature. On one side of the mailer, it lists three elements of his campaign platform: (1) "Federal Task Force actions to fight MS-13 and other Gangs throughout Suffolk County"; (2) "[t]ougher sentences for drug dealers to combat the Heroin epidemic and protect our families"; and (3) "[t]ighter control of our borders to stop the flow of Heroin and Gang members (MS-13) into our neighborhoods." Ex. 12. The other side features a picture of a Hispanic male with the letters "MS" tattooed on his forehead, and a picture of drug paraphernalia. Under the pictures, it states, "Under the Democrats Control, Suffolk County has been a 'Sanctuary County' and suffered the most MS-13 Gang Killings and highest Opioid Death Rate in New York State!" *Id*. This mailer was sent to residents of the 11th Legislative District, which includes all of West Islip, Brightwaters, most of Bay Shore and portions of Islip, Islip Terrace, and Deer Park.

Gonzalez testified that although each side of the mailer is not offensive when viewed in isolation, when read together it can be read to infer that all Hispanics are murderers, gang members or drug addicts. Ana testified that she was offended by the picture of the Hispanic male depicted in the flyer. She explained, "I fear … that other people who are not … familiar with my community would … see this picture, as well as see my father, who is brown, and then put those two together and think that my father is a gang member by just the color of his skin." Transcript of Evidentiary Hearing ("Tr.") at 1519:12-20.

Carpenter also testified regarding this mailer. When asked on cross examination if she thought this mailer was "a good invitation to Latino people to join the Republican Party?", Carpenter replied, "I think if they're concerned about gangs, and this person is saying they're going

to fight gangs, they probably would be happy to see that." Tr. at 2241:5-13. She also mentioned that the image of drug paraphernalia was offensive to her but did not indicate that her offense was connected to any purported portrayal of the Hispanic community. The Court credits the testimony of these three witnesses.

### 7. Minorities Elected to Public Office

Since 2005, Hispanics have not been elected to the Town Board. In that period, only three Latino candidates have attempted to do so and all three ran as Democrats. In 2005, Alvarez received 12,680 out of 41,459 votes. In 2011, Ortiz received 20,617 of 51,247 votes. Most recently, in 2017, Gonzalez received 23,302 of 62,893 votes, the highest number for any Hispanic candidate. It is unknown if a Latino candidate has ever been elected to the Town Board prior to 2005.

Hispanics have been appointed or elected to other local and state government positions with Islip constituents. Suffolk County's Legislative District Nine encompasses Central Islip, the eastern portion of Brentwood and a section of the Village of Islandia. It consists of 44 election districts and approximately 32,000 registered voters. The district was created in 2004 by Resolution 402-2003. Gonzalez is the current legislator. He was recently elected in 2018. From 2014 to 2018, the position was held by Martinez and Montano was the district's legislator from 2004 to 2013. All three are Hispanic.

New York Senate District Three encompasses portions of Brentwood, Bellport, Blue Point and Bayport. The district is currently represented by Monica R. Martinez, who was elected in 2018. New York State Assembly District Six is currently represented by Ramos, who was elected in 2012. Ramos's district encompasses Brentwood, Central Islip, and parts of North Bay Shore, Bay Shore and the Village of Islandia. Martinez and Ramos are both Hispanic.

**8. Responsiveness by Elected Officials to Minority Needs**

The Plaintiffs contention that the Town Board has been unresponsive to the needs of the Latino community is based on three general categories of evidence: (1) the dumping at Roberto Clemente Park; (2) inequities in municipal services; and (3) inadequate translation services.

Officials discovered in early 2014 that a firm contracted by the Town to create two soccer fields at Roberto Clemente Park had dumped 40,000 tons of toxic debris in the park. This resulted in a 32-count indictment against six individuals involved in the dumping, including Joseph Montuori, the Parks Commissioner at the time, and Brett Robinson, his secretary. Both were fired by the Town and ultimately pled guilty to criminal charges. The park was shut down on May 5, 2014.

In the aftermath of the dumping, the Town took a series of steps to alleviate the problem and communicate with the Brentwood community. Within 24 hours of learning of the dumping, Islip retained an environmental consultant. Later that week, the two Town employees who were criminally charged were removed from their positions with the Town. On May 13, 2014, the Town issued its third written update, which was available in both English and Spanish. The first two updates, if they exist, are not part of this Court's record. Among other things, the update informed the community of the results from air samples, and detailed methods of future communication. Additional updates were issued in both English and Spanish. To further communicate with residents, the Town mailed thousands of letters to residents in Brentwood; established a toll-free, 24-hour, bilingual hotline; held an information session attended by over 100 residents at the Brentwood Recreation Center; relocated a Spanish speaking employee to the Brentwood Recreation Center to field concerns; and distributed handouts to residents' homes. These actions were enough to keep the Brentwood community informed as to continued progress. *See* Ex. 67 at

2 (explaining the recommended methods of informing the community). Though the park was supposed to reopen in 2015, it did not ultimately reopen until August 2017. The evidence does not demonstrate that this delay was the result of the Islip Defendants.

The Plaintiffs argue that the Town's overall response was deficient. Specifically, they contend that "Town officials did not promptly communicate to residents that the dumping had occurred or that the toxic waste posed health risks. … When the Town did attempt to communicate information, it was months after the park had closed and not all of the communication was translated." Dkt. 130 at 21-22. Yet, the documentary evidence in the record refutes much of this claim. *See* Exs. O (May 13, 2014 Spanish translated update); P (June 13, 2014 Spanish translated update); R (bilingual flyer for May 20, 2014 meeting); T (website section in Spanish). Most of the evidence put forth by the Plaintiffs on this matter was in the form of opinions.

The Plaintiffs' contend that municipal services such as snow removal, road repair, and similar services are performed inequitably. To support this argument, numerous witnesses testified that these services were conducted in a faster and more diligent manner in predominantly white areas than the predominantly Latino areas of the Town. This testimony was generally vague and bereft of specifics. *See, e.g.*, Tr. 343-44. In the few instances where particular streets or areas were mentioned, most of these did not fall within the Town's jurisdiction. *See, e.g.*, Tr. 344-45; 2302. Accordingly, the Court does not credit this testimony.

There is no distinction in how the Town handles complaints in different areas within Islip. Generally, there are two ways the Department of Public Works ("DPW") is made aware of road maintenance issues: it is either discovered by one of the area foremen who are encouraged to canvas their territory in search of projects, or citizen complaints. The DPW also employs a paving inspector who looks for roads in disrepair. Islip is only responsible for those roads that are Town

roads, not county, state, or undedicated roads. The Town prioritizes issues that are in front of schools, hospitals, bus stops, fire houses, and other significant locations. The DPW strives to fill all potholes within 24 hours. In 2018, the DPW filled approximately 2,000 potholes. Last year, the Town spent around $4 million to pave Washington Avenue, one of the major roadways in Brentwood. For snow removal, the DPW contracts with approximately 350 vendors who conduct the overwhelming majority of snow removal operations. There are three DPW yards: Sayville, Bay Shore, and Central Islip. Each of these yards is assigned roughly one third of the vendors. The Town uses GPS technology to track their movements in real time. A 2018 report authored by the Town revealed that of 1,938 potholes filled that year, the DPW filled 396 in Bay Shore, 376 in Brentwood, 170 in Ronkonkoma, 145 in Central Islip and 118 in West Islip. This report does not reveal that potholes were prioritized based on CDPs.

The Islip Defendants have introduced substantial evidence of the Town's investment of significant resources within the Hispanic community. In August 2018, the Town completed an extensive renovation on the pool at Roberto Clemente Park. Owens testified that although the project took longer than anticipated, residents now enjoy a brand-new pool. With the pool open, the focus shifted to installing a water spray facility at Roberto Clemente Park. This complex is presently under construction. Since Owens became commissioner, the Parks Department has also renovated many of the Town's "pocket parks." One notable example is Noble Street Park. The Town received a series of complaints from the SCPD and the community that there was drug activity in the park. To combat this, the Town installed a new walking path, raised the tree line, added a large floodlight, and installed a new playground and basketball court. These improvements were designed to discourage drug activity in the park and promote a more constructive use of the space.

Carpenter also testified extensively about the financial resources devoted to improving predominantly Latino areas of the Town. Recently, Islip applied for and received an approximately $10 million grant from the Regional Economic Development Council to revitalize the Central Islip downtown area. Islip also was awarded a $15 million grant by New York State to renovate the Brentwood Recreation Center as well as funding to address vacant housing.

Finally, the Plaintiffs contend that the Town's efforts to communicate in Spanish are insufficient to meet the needs of the Hispanic community. Translation services at Town Board meetings are provided by Lissette Barrios-Reyes, who is employed by the Constituent Services group in the Office of the Town Supervisor. She also provides translation and interpretation services for other departments and answers telephone complaints. Barrios-Reyes testified that she is not formally trained in interpretation services and is unable to provide simultaneous translation. Although the record does not show that this has resulted in any Spanish-speaking residents being unable to participate in Town Board meetings for want of translation services, the evidence reflects that translation services at these meetings can be improved. There are also Spanish speaking employees in other departments, including the Town Clerk, Registrar, and Environmental Control. There is no record of Spanish-speaking employees working for the DPW or the Parks Department.

While the Town has not ignored the need for access to translation services, there is room for improvement. With such a large Latino community, it is imperative that residents have quick and competent access to translation and interpretation services. Barrios-Reyes is a competent and dedicated public servant whose devotion to serving the Hispanic community is commendable. However, to adequately serve the needs of approximately one third of residents, more is needed.

### 9. Tenuousness of the Policy Underlying At-large Elections

The at-large system is currently the dominant electoral system employed by American cities and towns and used to select their governing body. Throughout the twentieth century, progressive electoral reformers considered at-large elections to combat the pervasive corruption in many urban political machines. The Plaintiffs have failed to note any academic studies that support their claim that at-large elections foster corruption.

In 2006, the Town held a referendum on whether to keep the at-large system in place for the Town Board. The referendum asked Islip voters, "[s]hall the local law adopted by the Islip Town Board on March 07, 2006, entitled 'a local law providing for the establishment of a ward system for the election of councilpersons in the Town of Islip' be approved?" Residents voted to keep the current system by a margin of 53.98% to 46.02%. Approximately 45% of Hispanics and 55% of whites voted to keep it.

Carpenter, the current Town Supervisor, explained her thoughts on the advantages of at-large election systems as follows:

> [T]he representation of all of the residents of the town, as far as I'm concerned and as far as I've seen and with our departments and with the sharing of resources and everything that's done, it's done equitably across the town.
>
> …
>
> When I was in the legislature, I routinely would get phone calls from the neighboring district saying, I know she's not my legislator, but I understand that she's willing to help. Could she help me with, whatever the issue was. And that's, you know, a difficult road to travel because legislators are very parochial. You know, when there are events and a legislator shows up that isn't from that district, you can see the stares, like why are they here. They're so protective of their own district. And, again, I really believe that all of the residents of the town are so much better served if they're there as one body unified working together for all of the residents.

Tr. 1834:16-1835:3.

In August 2018, Anthony Pancella, the Vice Chairman of the Suffolk County Republican Committee and the Chairman of the Babylon Town Republican Committee, emailed Carpenter to ask for her support to add a referendum on the November ballot that would create single-member districts for the Babylon Town Council. Carpenter replied, "[y]ou know I am always there for you and the Babylon GOP, but this puts me in a very difficult position. This is a very sensitive issue and we are smack in the middle of a very expensive lawsuit[.]" Ex. 36. In context, it is clear that Carpenter is referring to the instant case in her email. Carpenter does not take a position as to the Babylon referendum. She expresses general support for Pancella and the Babylon Republican Committee, but chooses not to take a public position, given the current lawsuit. The Plaintiffs would have this Court conclude that Carpenter only withheld her support because of the lawsuit, not because of any personal beliefs on the issue. The Court is not willing to jump to that conclusion. The Court credits Carpenter's testimony on her justification for the at-large system.

Numerous other witnesses testified as to the benefits and drawbacks of both the at-large system and the single-member district system. Although the Court credits this testimony, it does not advance the argument that the policy underlying the at-large system is tenuous. The reasons provided by the witnesses are helpful if the Court were asked to render a decision on which system is *best*; but, the Court is only required to decide if the current system has *tenuous policy justifications*. Both systems have numerous benefits and disadvantages, but those witnesses that testified as to the weaknesses of the at-large system fall short of alleging that the policy justification rests on unsteady ground.

The Town of Islip Community Development Agency ("CDA") is a public benefit corporation that assists low- and moderate-income residents by implementing housing and community development programs for the Town. It is funded by a series of federal grants and is

38

largely independent from the Town.  The Town Board appoints all members of the CDA Board of Directors.  There are five members of the Board of Directors, which chooses the Executive Director.  From 2011 to 2018, Ortiz was a member of the Board of Directors.  In 2018, there were three Hispanic board members: Ortiz, Ramon Colon and Manuel Troche.  Steve Raccuglia and Debra Cavanagh also served on the Board of Directors.  By 2018, the terms of Ortiz, Colon, and Raccuglia had expired.  At that time, the Board of Directors was searching for a new Executive Director and had engaged in a national search.  They had narrowed their search to several candidates but had yet to conduct interviews.

In May 2018, the Town Board voted to remove the three board members with expired terms.  The two Hispanic and one white members were replaced with three white members, leaving Troche as the only Hispanic left on the Board of Directors.  The vote to remove the holdover board members was contentious and only passed by a three to two margin.  Carpenter voted against the measure.  Soon after, the Board of Directors voted to confirm a well-connected Republican to the position.

### E. The Relief Requested

The Plaintiffs' motion for a preliminary injunction, filed on March 1, 2019, sought an injunction "preliminar[ily] enjoining Defendants Town of Islip, Islip Town Board, and Suffolk County Board of Elections from conducting any election for the Islip Town Board under the current at-large system."  Dkt. 35; *see also* Dkt. 50 at 1 ("Plaintiffs seek to enjoin the Town of Islip … and the Suffolk County Board of Elections … from holding any elections for the Islip Town Board … under the current at-large system because that system violates Section 2 of the [VRA]." (citing 52 U.S.C. § 10301)).  The primary election is scheduled for June 25, 2019 and the

general election will occur on November 5, 2019. Both parties' briefing papers reflected this request. Prior to the hearing, the parties conducted significant discovery.

On the first day of the hearing, the Plaintiffs represented that rather than seeking to "cancel the 2019 elections," they "want the 2019 elections to proceed, but with councilmatic districts." Tr. at 26:2-7. This prompted the Court to issue a short order requesting clarification regarding the Plaintiffs' requested relief. *See* Dkt. 116. The Plaintiffs responded that they "ask[] the Court (1) to enjoin elections for the Islip Town Board under the current at-large structure because it violates Section 2 of the [VRA] and (2) to exercise its broad discretion to order a preliminary remedy before another unlawful election proceeds." Dkt. 117 at 1.

The Defendants vigorously objected to the requested relief, arguing that the Plaintiffs altered their requested relief after the motion was filed and the hearing had already begun. The Court agrees that the Plaintiffs had modified their request for relief by the start of the hearing. The Plaintiffs' briefing papers to this Court on that point are self-evident. After reviewing both parties' submissions on this matter, *see* Dkt. 123; 128, the Court will permit the Plaintiffs to amend their request for relief. Contrary to their contention, the Defendants have had enough time to be heard on the altered relief. They submitted a 10-page, single-spaced letter on the topic, questioned witnesses on it, and incorporated it into their closing argument. The Plaintiffs are advised that the Court will not permit their proposed remedy to continue to evolve and urge them to be more careful in their representations to this Court in the future.

### III. THE PRELIMINARY INJUNCTION

For the reasons set forth below, the Court concludes that the Plaintiffs have not shown that they are substantially likely to succeed on the merits and that an injunction is in the public's interest.

40

## A. Irreparable Harm

The Plaintiffs seek to enjoin all future elections under the current at-large system and institute single-member districts for all future elections prior to this case's ultimate disposition. They contend that the continuation of the present system irreparably harms the Hispanic population in Islip. Irreparable harm is "injury for which a monetary award cannot be adequate compensation." *Diaz v. Silver*, 932 F. Supp. 462, 466 (E.D.N.Y. 1996) (citing *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966)); *Brennan Ctr. for Justice v. U.S. Dep't of Justice*, No. 17-CV-6335 (KBF), 2018 WL 637424, at *2 (S.D.N.Y. Jan. 31, 2018) ("Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." (internal citations and quotation marks omitted)).

As this Court ruled in *Montano*, "[a]n abridgement or dilution of the right to vote constitutes irreparable harm." 268 F. Supp. 2d at 260-61 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690, 49 L. Ed. 2d 547 (1976); *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S. Ct. 1362, 1381, 12 L. Ed. 2d 506 (1964); *Puerto Rican Legal Def. & Educ. Fund v. City of New York*, 769 F. Supp. 74, 79 (E.D.N.Y. 1991)); *Arbor Hill Concerned Citizens Neighborhood Ass'n. v. Cty. of Albany*, No. 03-CV-502, 2003 WL 21524820, at *3 (N.D.N.Y. July 7, 2003) (same), *report and recommendation adopted sub nom.*, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 281 F. Supp. 2d 436 (N.D.N.Y. 2003). This includes the continued deprivation of the right to effective participation in the political process. *Puerto Rican Legal Def. & Educ. Fund*, 769 F. Supp. at 79.

Here, the Court finds that there would be irreparable harm if the upcoming elections were permitted to proceed under a framework that violated the VRA.

## B. Substantial Likelihood of Success on the Merits

**1.** *Gingles* **Preconditions**

**a. Precondition One**

The first precondition requires the Plaintiffs to demonstrate that the minority group at issue, in this case the Hispanic community in Islip, is sufficiently large and geographically compact to constitute a majority in a hypothetical single-member district. *Gingles*, 478 U.S. at 50. To do so, the Plaintiffs must show that "a remedy could be fashioned which would enhance the ability of the minority group to elect its preferred candidates. *Montano*, 268 F. Supp. 2d at 260-61. If they fail to do so, "the … form of government cannot be responsible for its inability to elect its candidates of choice, and in any event a court could not fashion a remedy for a demonstrated dilution of its voting strength. In short, unless minority voters are sufficiently numerous and compact that they have the potential to elect representatives in a single-member system, they cannot claim that their voting rights have been infringed by [an at-large] system." *Goosby v. Town Bd. of the Town of Hempstead*, 956 F. Supp. 326, 328 (E.D.N.Y. 1997) (citing *Gingles*, 478 U.S. at 50), *aff'd*, 180 F.3d 476 (2d Cir. 1999).

In the instant case, the Plaintiffs have demonstrated that Latinos in the Town of Islip would constitute a majority of the CVAP in one of four hypothetical single-member districts. Under Dr. Beveridge's ED Plan, Hispanics constitute 54.4% of the total CVAP in District One, which is primarily composed of Brentwood and North Bay Shore. In Dr. Beveridge's Census Block Plan, Hispanics also makeup 54.4% of the total CVAP in District One. Like the ED Plan, District One in the Census Block Plan is primarily composed of Brentwood and North Bay Shore. Under either plan, the Plaintiffs have demonstrated that under a single-district plan, it is possible for Latino voters in one of the four districts to elect their preferred candidate. *Goosby*, 956 F. Supp. at 348

(holding proposed district by Dr. Beveridge of VAP of 52.57% black as sufficient to satisfy first precondition).

Dr. Beveridge's plans also sufficiently establish that the Hispanic population complies with major traditional districting principles. First, the plans are sufficiently compact geographically. Under the Roeck measure, both plans score 0.61, which is considered very compact. The district that includes Fire Island is somewhat less compact; yet, this is understandable given the geographic makeup of Islip. Both plans are also contiguous, with the exception of the district that includes Fire Island, and have maximum population deviations of 1.55% and 1.01% respectively. This is well below the typical 10% threshold. While both plans split political and geographic subdivisions, there is no evidence that any common interests within these areas would be unfavorably impacted. *See Goosby*, 956 F. Supp. at 349 (finding that a district that splits one village and two CDPs is sufficiently compact).

The Islip Defendants appear to abandon any potential effort to contest Dr. Beveridge's findings related to the first *Gingles* precondition. Regardless, "the proposed districts are not 'cast in stone.'" *Goosby*, 956 F. Supp. at 349 (quoting *Clark v. Calhoun Cty.*, 21 F.3d 92, 95 (5th Cir. 1994)). Their purpose is to validate the viability of a single-member, majority-minority district that complies with traditional districting principles. If the Plaintiffs ultimately prevail in a trial on the merits, the Town will have the opportunity to develop their own remedial plan and can seek to rectify any potential issues it may have at that time.

Accordingly, the Plaintiffs have adequately demonstrated by a substantial likelihood of success that a majority-minority district can be constructed without violating traditional districting principles. The Latino population of Islip is sufficiently large and geographically compact to constitute a majority in a single-member district.

### b. Precondition Two

The second precondition requires the Plaintiffs to show that the minority group at-issue is political cohesive. *Montano*, 268 F. Supp. 2d at 264 (citing *Gingles*, 478 U.S. at 51). To demonstrate political cohesion, a plaintiff typically establishes that a significant percentage of the group usually votes for the same candidates. "Unlike the first [*Gingles*] prong, which has an established bright-line test of 50%+, there is no cutoff for political cohesion. [T]he degree of bloc voting which constitutes the threshold of legal significance will vary from district to district." *Pope v. Cty. of Albany*, 94 F. Supp. 3d 302, 333 (N.D.N.Y. 2015) (internal citations and quotation marks omitted). To demonstrate this, a plaintiff may use statistical and non-statistical evidence. *Id.* (citing *Gingles*, 478 U.S. at 52-58; *Goosby*, 180 F.3d at 482, 498; *Brewer v. Ham*, 876 F.2d 448, 454 (5th Cir. 1989); *Sanchez v. Bond*, 875 F.2d 1488, 1493-94 (10th Cir. 1989)).

Using both regression analysis and ecological inference, Dr. McDonald analyzed seven Town Board general elections, which took place from 2005 to 2017. Both regression analysis and ecological inference are acceptable methodologies in VRA cases. *United States v. Vill. of Port Chester*, No. 06 CIV. 15173 (SCR), 2008 WL 190502, at *25 (S.D.N.Y. Jan. 17, 2008) (finding that regression analysis and ecological inference "have been accepted by numerous courts in voting rights cases"). In all seven elections, the Hispanic candidate of choice received the support of greater than 50% of Latino voters who submitted ballots. Dr. McDonald testified that in all Town Board general elections, Hispanics in the Town vote in a politically cohesive manner. The Court believes this is sufficient to establish political cohesion. *Goosby*, 956 F. Supp. 326, 350: (holding black voters are politically cohesive in support for Democratic candidates when in all but one Town Board election, a majority of blacks voted for a democratic candidate); *accord Pope*, 94 F.

Supp. at 334 ("Black voters need not vote cohesively in every election in order for the Court to find that they are cohesive.").

Dr. McDonald also analyzed a series of town-wide and exogenous elections, which are probative for determining political cohesion. *See Goosby*, 180 F.3d at 497. These included Suffolk County general elections, New York State general elections, and federal elections and concluded that in all analyzed elections, Islip Hispanics voted in a politically cohesive manner. The Islip Defendants did not contest these results in their briefing papers. Dr. Alford, the Town's expert, conceded that the Plaintiffs had succeeded in establishing political cohesion. *See* Tr. 1651:1-10.

The Plaintiffs also introduced anecdotal evidence to reveal political cohesion among the Hispanic community. Multiple witnesses for the Plaintiffs testified that the Latino community was unified in support of Hispanic candidates. Further, there is evidence that Hispanic candidates are chosen to secure the Latino vote for the Democratic Party's slate of candidates.

Accordingly, the Plaintiffs have adequately demonstrated by a substantial likelihood of success that the Hispanic community in Islip is politically cohesive.

### c. Precondition Three

The third precondition requires the Plaintiffs to show that white bloc voting generally defeats the minority-preferred candidate. *See Gingles*, 478 U.S. at 51.

> In assessing which elections should be afforded the greatest probative value, we were guided by two Second Circuit pronouncements on this question. First, it is clear that, in this Circuit, at least, district courts must consider "white versus white" elections as part of a Section 2 analysis. In addition, "exogenous elections-those not involving the particular office at issue-are less probative than elections involving the specific office that is the subject of the litigation."

*Vill. of Port Chester*, 2008 WL 190502, at *25 (citing *Goosby*, 180 F.3d at 497: *City of Niagara Falls*, 65 F.3d at 1015-17). The primary focus in this inquiry is the presence of white bloc voting

with respect to the elections implicated in the Plaintiffs' claims. *Montano*, 268 F. Supp. 2d at 264 (citing *City of Niagara Falls*, 65 F.3d at 1015 n. 16; *France v. Pataki*, 71 F. Supp. 2d 317, 327 (S.D.N.Y. 1999)).

The Plaintiffs must present evidence that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority-preferred candidate. *Goosby*, 956 F. Supp. at 250; *Gingles*, 478 U.S. at 50-51. "[I]n general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles*, 478 U.S. at 56; *Arbor Hill*, 281 F. Supp. 2d at 436 ("[P]laintiffs are not required to show that minority candidates *always* lose to white candidates, only that they *usually* do" (citing *Gingles*, 478 U.S. at 75) (emphasis in original)).

This determination is largely a fact-driven inquiry. As a result, courts have deviated from a bright-line rule. *See Pope*, 94 F. Supp. 3d at 335 (collecting cases). The Second Circuit has emphasized the need for flexibility in this inquiry. *Id.* (citing *Pope v. Cty. of Albany*, 687 F.3d 565, 578 (2d Cir. 2012)). "[D]epending on the features of a particular electoral system, such as the presence or absence of other dilutive practices (e.g., majority vote requirements or prohibitions on single-shot voting), the size of the jurisdiction, the number of seats open, and the number of candidates in the field, the degree of white bloc voting that will generally preclude the [minority] voters from electing their preferred candidate will vary from case to case." *Goosby*, 956 F. Supp. at 350 (citing *Gingles*, 478 U.S. at 56).

> For purposes of analyzing the third prong of *Gingles*, in § 2 cases in which the plaintiffs seek to replace an at-large, multimember electoral system with a series of single-member districts of which one or more would be a so-called majority-minority district, a candidate cannot be "minority-preferred" if that candidate receives support from fewer than 50% of minority voters. When a candidate receives support from 50% or more of minority voters in a general election, a court need not treat the candidate as minority-preferred when another candidate receiving

46

> greater support in the primary failed to reach the general election. Finally, even if a candidate receives 50% or more of the minority vote, a court need not treat the candidate as minority-preferred if another candidate receives significantly higher support. … This rule means that, in any given election in a multimember scheme—where more than one contestant is elected to office in one election—a court may treat more than one candidate as the "minority's preferred candidate," or none at all.

*City of Niagara Falls*, 65 F.3d at 1019.

Dr. McDonald analyzed 14 Town Board elections and nine Town-wide positions since 2005. With the exception of 2007, the Hispanic-preferred candidates lost every Town Board election. In all 12 of those unsuccessful elections, Islip's white majority voted against the Hispanic-preferred candidate, with support ranging from 50.1% to 66.0% of voters. Dr. Alford contends that, after correcting for certain errors, the two winning candidates for each election received combined support of between 61% and 65% of white votes. White crossover voting is between 25% and 37% of voters according to Dr. McDonald's method and between 35% and 39% of votes using Dr. Alford's method. In the three elections with Latino candidates, 2017, 2011, and 2005, white crossover voting for the Hispanic challenger was approximately 23.8% to 30.3% of voters or roughly 15% of votes, depending on the statistical technique used. The 2007 Town Board election, which resulted in a victory for the Hispanic-preferred candidate, showed white support for the winning candidates at between 43.1% and 50.4% of voters according to Dr. McDonald and between 24.5% and 28.6% of votes according to Dr. Alford. Using either expert's measure, there is sufficient white bloc voting to usually defeat the minority-preferred candidate for Town Board. While whites in the Town may not be voting as cohesively as in other VRA cases, the particular percentage of bloc voting is significantly less important than whether the white bloc regularly defeats the minority-preferred candidate. *See United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 442 (S.D.N.Y. 2010). In Town Board elections, only two of the 14 elections resulted in

victories for the Hispanic-preferred candidate. Without a significant number of victories by Hispanic candidates of choice, which would indicate that whites are not voting in sufficient numbers to usually defeat the minority-preferred candidate, white bloc voting is legally significant and white crossover voting is not legally significant.

In the nine town-wide elections analyzed in this matter, seven of those races saw a loss for Hispanic-preferred candidates. The other two elections, the 2006 and 2007 Town Supervisor races, resulted in white crossover voting of between 43.6% and 65.6% of votes according to Dr. McDonald and 50% and 68% of votes according to Dr. Alford. These elections, like the 2007 Town Board Elections, are special circumstances as they occurred immediately after Supervisor McGowan resigned, embroiled in corruption charges. For the seven cases where the Hispanic candidate of choice was unsuccessful, white crossover voting ranged from 27% to 45% according to Dr. Alford and between 23% to 45% using Dr. McDonald's methodology. This level of white crossover voting was not sufficient to yield any significant victories for the minority-preferred candidate in Town-wide elections.

Finally, both experts examined a series of exogenous elections outside of Islip, including county, state, and federal races. These elections "are less probative than elections involving the specific office that is the subject of the litigation." *Goosby*, 180 F.3d at 497. All elections outside of the Town Board race, are therefore less probative than those for the Town Board. Although county, state, and federal elections indicate substantial white crossover voting that resulted in regular victories for Hispanic-preferred candidates, given the overwhelming evidence in endogenous elections, these exogenous results are insufficient to sway the results in an analysis of the third *Gingles* precondition.

The Islip Defendants contend that Dr. McDonald's analysis contains three errors that impacted his results. Even if these criticisms are correctly noted errors, they are insufficient to change the conclusion for precondition three. Yet, the Court believes they are worth addressing for the remainder of the analysis. Dr. Alford's first criticism is that in Town Board elections, Dr. McDonald analyzed the number of voters that submitted a ballot rather than the number of votes cast. This understates the white crossover votes because it divides the number of votes by the number of voters as opposed to the number of votes. Dr. McDonald's method also precludes an apples-to-apples analysis as all vote-for-one elections are analyzed using the number of votes. However, this analysis is not an error in the traditional sense: there is nothing inherently wrong about calculating vote-for-two elections in this manner. Yet, as Dr. Alford points out, this precludes a comparative analysis using multiple types of elections. Although the Court declines to award less weight to Dr. McDonald's approach, Dr. Alford's method has increased utility and will be used in any comparative analysis.

Next, Dr. Alford argues that Dr. McDonald does not account for varying degrees of voter turnout in his ecological inference analysis. Although Dr. McDonald did implicitly account for certain turnout differences, he did not adjust the racial and ethnic composition of precincts based on turnout. Yet, this error had limited impact on his results. Dr. Alford notes that this increases white crossover voting by less than 3% in vote-for-one elections and less than 4% in vote-for-two elections. As Dr. Alford professes, taking this error into account yields in very similar results.

Finally, Dr. Alford insists that Dr. McDonald's analysis of white bloc voting is improper. Rather, he maintains that the Court should review bloc voting in terms of the majority, not just whites. This would presumably include Asians, Pacific Islanders, Blacks, and other non-Hispanic groups. The Islip Defendants argue that by choosing to analyze only white voters, the Plaintiffs

are cherry-picking their results. This contention has no legal basis. As the Plaintiffs correctly note, the Second Circuit requires that district courts analyze white bloc voting, not majority bloc voting. *See Gingles*, 478 U.S. at 51; *Goosby*, 180 F.3d at 492 ("every minority-preferred candidate for the Town Board lost to the majority-preferred candidate as a result of white voters voting for candidates not supported by black voters."); *City of Niagara Falls*, 65 F.3d at 1017-18 (examining white crossover voting). The only case the Islip Defendants cite, *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 126 S. Ct. 2594, 165 L. Ed. 2d 609 (2006) was addressing the first *Gingles* precondition when it examined the number of "Anglos and Latinos" who voted in the general election. The question answered in *Perry* of whether Blacks could elect their candidate of choice in the primary to satisfy the first precondition is separate and distinct from the question presented here, whether there is legally significant white crossover voting in analyzing the third precondition. *Perry* is inapposite.

Dr. Alford maintains that at least 80% of the white majority in Islip must vote against the Hispanic-preferred candidate for the white bloc vote to be sufficient. *See* Tr. 1594:12-17. This theory has no foundation in the applicable caselaw. In this Circuit, "the critical point is whether white voters are voting for other candidates to such a degree that Hispanic-preferred candidates are consistently defeated." *Vill. of Port Chester*, 2008 WL 190502, at *26. This was established by the Supreme Court in *Gingles* and has been expanded to the fact-specific analysis presently conducted by district courts. *See Gingles*, 478 U.S. at 56, 59. The Islip Defendants cite three cases to argue that white crossover voting of 20% to 38% is sufficient to negate a Section Two claim.

In *Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009), Justice Kennedy, in a plurality opinion, expressed skepticism that the third precondition could be satisfied "where minority voters … cannot elect their candidate of choice without support from almost 20

percent of white voters." *Id*. at 16. This comment is made in dicta and did not receive the support of a majority of justices.

In *Abrams v. Johnson*, 521 U.S. 74, 117 S. Ct. 1925, 138 L. Ed. 2d 285 (1997), the Supreme Court did hold that the third precondition was not met. There, "the average percentage of whites voting for black candidates across Georgia ranged from 22% to 38%." *Id*. at 92. However, in *Abrams*, "[b]lack and black-preferred candidates in Georgia ha[d] achieved many electoral victories in local and statewide elections and ha[d] received significant—occasionally overwhelming—support from both black and white voters within the [applicable] district." *Id*. (internal citation omitted). In Islip, Hispanic candidates have rarely achieved any electoral victory, with Suffolk County Legislative District Nine being an exception rather than the rule. Moreover, Hispanic-preferred candidates have only achieved victories in Islip in elections with special circumstances. The Second Circuit's focus on a factual-based inquiry precludes this Court from adopting a bright-line rule. After analyzing the facts in *Abrams*, the Supreme Court's finding that the trial court's assessment of precondition three was not clearly erroneous, is inapplicable to the facts at-bar.

Finally, the Town cites *Rodriguez v. Bexar County*, 385 F.3d 853 (5th Cir. 2004), which noted that the conclusion of the plaintiff's expert was "undercut … [by] his admission at trial that roughly between 25 and 33 percent of [white] voters would cross over to support the Hispanic candidate of choice." *Id*. at 868 n.22. However, the *Rodriguez* court acknowledges that the district court "ignore[d] the consistent electoral victories of Hispanic candidates." *Id*. at 860. Thus, in *Rodriguez*, the relatively low crossover rate of between 25% and 33% was sufficient for minority candidates of choice to consistently win elections.

Here, despite higher white crossover rates, Hispanic candidates of choice consistently lose in Islip elections. Regardless of the percentage of white bloc voting, the third precondition is satisfied when whites are voting in numbers sufficient to usually defeat the minority-preferred candidate. *Goosby*, 956 F. Supp. at 250.

Accordingly, the Plaintiffs have demonstrated substantial likelihood of success that the third *Gingles* precondition is satisfied.

## 2. The Totality of the Circumstances

Although meeting the *Gingles* preconditions are necessary to prove a Section Two VRA claim, this alone is insufficient. *De Grandy*, 512 U.S. at 1013. The Court must conduct a broader inquiry to determine if, based on the totality of the circumstances, the Plaintiffs can demonstrate "that the political process is not equally open to participation." *City of Niagara Falls*, 65 F.3d at 1019; *accord Montano*, 268 F. Supp. 2d at 264 (noting that "the plaintiffs must show that 'its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." (quoting 52 U.S.C. § 10301)). To do so, district courts examine the nine Senate Report factors, as detailed in *Gingles*. 478 U.S. at 45. Although the factors are considered by many to be comprehensive, the Supreme Court found that the list is neither exhaustive nor comprehensive. There is "no specified number of factors [that] need to be proved, and … it is not necessary for a majority of the factors to favor one position or another." *Goosby*, 180 F.3d at 492 (citing *Gingles*, 478 U.S. at 45).

> The "totality of the circumstances" test prescribed by the statute must also be applied to the evidence, since "the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *Id*. at 1011. The Supreme Court has made it clear that resolution of the question of vote dilution is a fact intensive enterprise to be undertaken by the district court.

*Id.* (citing *De Grandy*, 512 U.S. at 1011).

### a. The History of Official Discrimination

The first factor is "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." S. Rep. at 28. General allegations of racial discrimination are insufficient. *See Reed v. Town of Babylon*, 914 F. Supp. 843, 885 (E.D.N.Y. 1996). To satisfy their burden, the Plaintiffs must show that the Town has historically restricted access of Hispanics to the political process. *Id.*

The Plaintiffs put forth lay testimony of numerous plaintiffs as well as third party witnesses. Dr. Stephan Thernstrom, the Winthrop Professor of History Emeritus at Harvard University testified on behalf of the Islip Defendants.

Dr. Thernstrom explained:

[O]ver the course of more than a century the people of New York have demonstrated a strong commitment to minority rights by supporting the development of a rich body legislation designed to prevent discrimination based on race, religion, or national origins.

…

Throughout the twentieth century, New York more often than not led the nation in enacting laws to attack discriminatory practices.

…

Most directly relevant to the issues in this case are the efforts of New York in recent decades to guarantee the voting rights of its minority citizens. Eligible voters no longer need to show up at the office of the local board of election. These voters may mail in forms obtainable by mail or phone request (registration by mail was authorized by the legislature in 1975). Voter registration also is available while applying for a driver's license, or appearing at public assistance or disability services offices.

Ex. A, ¶¶ 13-15.  He further discussed New York State's efforts to guarantee the voting rights of minorities.  Eligible voters are now able to register to vote in a myriad of ways in an effort to decrease potential barriers and spur increased turnout of various minority groups.

As Judge Joanna Seybert noted in *Reed v. Town of Babylon*, "[t]he Court cannot infer that [Islip's] history is unlike that of New York State generally."  914 F. Supp. at 886.  The Plaintiffs have not produced evidence that registration and voting procedures are different for Hispanics than the rest of the Town, or that Latinos in Islip have been unable to register to vote, vote in elections, run for office or otherwise participate in local politics.  One notable exception is an isolated incident in 2012 with validating the signature of voters who registered online through the DMV.  Yet, this issue applied to all those who registered using that method, and there was no evidence introduced that it impacted Hispanic voters more than others.  The Court finds that this issue did not have a discriminatory impact on Islip's Hispanic community.

Although the Plaintiffs introduced anecdotal evidence that there were isolated incidents of voter intimidation or improper requests for photo identification, this testimony was primarily based on hearsay or double-hearsay.  For example, in 2012, Dr. Altschuler testified that he recalled multiple examples of inappropriate requests for voter identification and voter intimidation while he was answering calls at an Election Day telephone hotline.  He could not recall the names of the complainants or anything but the most basic details of the purported incidents.  Such evidence is insufficient, even at this stage, to conclude that this type of discrimination ever occurred in the Town.  Even if it did, the Plaintiffs failed to demonstrate that these isolated events frequently occurred or adversely impacted the Hispanic community.

None of these witnesses testified that a single Latino voter in Islip was prevented from voting.  Hispanic voters in the Town have access to Spanish BOE materials, a Spanish ballot, poll

workers who speak Spanish, and the BOE website translated into Spanish. The BOE hires two Hispanic Outreach Coordinators that ensure the proper translation for all of the above services. This stands in stark contrast to *Village of Port Chester*, a case that was heavily cited by the Plaintiffs. In *Village of Port Chester,* there were only a handful of Spanish speaking poll inspectors and testimony from multiple witnesses that had observed Latino voters being treated differently from white voters. A new election had to be ordered for School Commissioner after it was alleged that over 40 Hispanic voters were turned away from the polls. 704 F. Supp. 2d at 432-33. There are no similar accusations alleged in the instant case, where the record reflects that the BOE adequately accommodates Islip's Hispanic community.

Accordingly, this factor favors the Defendants.

### b. The Extent of Racially Polarized Voting

The second factor is "the extent to which voting in the elections of the state or political subdivision is racially polarized." S. Rep. at 29. "Under the functional view of the political process mandated by Section 2, the most important factors bearing on a challenge to a multimember system are the extent of racial polarization and the extent to which minority group members have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 48 n. 15 (citing S. Rep. at 28-29). Although precondition three and this factor both require evidence of racially polarized voting, precondition three focuses on whether polarized voting *exists* and this factor focuses on the *extent* of racial polarization. In order for the Plaintiffs to prove this factor, they must introduce evidence that demonstrates that the rate of polarization is high. *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 749 (5th Cir. 1993) ("Under the totality of the circumstances inquiry, the focus is on the degree of racially polarized voting.").

As discussed in Sections III.B.1.b. and III.B.1.c., racially polarized voting is present in Islip. As Dr. McDonald explained in his expert report, successful candidates in every Town Board election since 2009 consistently received between 14% and 25% of the Latino vote and between 56% and 65% of the white vote, using regression analysis. Dr. Alford found that successful candidates in every Town Board election since 2009 \received between 5.5% and 15.5% of the Latino vote and between 29% and 33% of the white vote, using ecological inference.

Under either analysis, although racially polarized voting is present, its extent is limited. Using ecological inference, Dr. Alford estimates that white crossover at between 35% and 39% of the total votes for both Latino candidates of choice, though Dr. McDonald approximates that white crossover is between 27% and 36.5% of the voters. Although this is not legally significant white crossover voting, as explained in Section III.B.1.c., the extent of the crossover voting is noteworthy.

Exogenous elections provide a different picture. The only two primary elections examined by Dr. McDonald, both for Legislative District 9, were not racially polarized. Further, legally significant white crossover voting at approximately 45% was sufficient to defeat the Latino candidate of choice on numerous occasions.

As the Islip Defendants have argued, it is also relevant to examine voting patterns to determine whether they are better explained by partisan affiliation rather than racial bias. *See Uno v. City of Holyoke*, 72 F.3d 973, 982 (1st Cir. 1995) ("Properly conceived, the results test protects racial minorities against a stacked deck but does not guarantee that they will be dealt a winning hand."). This is properly examined when reviewing the totality of the circumstances, not in the analysis of the *Gingles* preconditions. *See Goosby*, 180 F.3d at 492-93 ("We therefore ratify the approach taken by the district court to consider the political partisanship argument under the

'totality of circumstances' analysis rather than as part of the third *Gingles* precondition."); *Goosby*, 956 F. Supp. at 355 ("Thus, 'even if [proof of a race-neutral cause of divergent voting patterns] is forthcoming, the defendant does not automatically triumph. Instead, the court must determine whether, based on the totality of the circumstances ..., the plaintiffs have proven that the minority group was denied meaningful access to the political system on account of race.'" (quoting *Uno*, 72 F.3d at 983)).

Dr. McDonald acknowledged that in the only non-partisan elections he examined, two Democratic primaries, there was no racial polarization. The Plaintiffs did not introduce an expert to discuss the influence of partisan politics in the elections at issue and Dr. McDonald admitted during his testimony that he did not examine the question. The Islip Defendants presented evidence that Democratic candidates received similar levels of support, yet always lost, regardless of race. As Dr. Alford explained, Dr. McDonald examined 51 contests and in each one, the Democrat was the preferred candidate of Latino voters. Although Hispanics uniformly and overwhelmingly support Democratic candidates at all levels, white crossover voting was typically at or above 40% for town-wide and exogenous elections. A majority of white voters supported the Democratic candidate approximately 23% of the time in such elections.

An examination of the 2017 Town Board general election reveals the influence of partisan politics in the most recent endogenous election. As noted above, this election featured one Latino Democratic candidate, one white Democratic candidate, and two white Republican candidates. As a result, voters had both a party cue and an ethnic cue. In this election, Dr. Alford found that, when holding all other variables constant, an increase in the proportion of Hispanic voters in an election district of 10% yielded an expected decrease in support for Gonzalez of 0.57%, while an increase in the proportion of Democratic voters in an election district of 10% produced a 9.94%

increase in the vote for Gonzalez. The proportion of Hispanics in an electoral district had no predictive power when controlling for political party. Dr. Alford's regression equations support the prominent role of political parties in accounting for the results of elections in the Town of Islip. *See Reed*, 914 F. Supp. at 886 ("Even if a majority of white voters vote so as usually to defeat the minority community's candidate of choice, this divergent voting pattern is driven, at least in the white community, by partisanship, not race.").

Accordingly, this factor favors the Defendants.

### c. The Use of Voting Practices that Enhance Discrimination

The third factor is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." S. Rep. at 29. The Islip Town Board elections do not contain majority vote requirements or anti-single shot provisions. They coincide with the primary and general election schedules and do not occur "off-cycle" as in *Village of Port Chester*. 704 F. Supp. 2d at 444.

To demonstrate that Islip is "unusually large," the Plaintiffs introduced evidence that Gonzalez and Ortiz found the size of Islip challenging when campaigning for the Town Board. The individual complaints of prior candidates are relevant, but it does not necessarily follow that the area is *unusually* large. There is no evidence that the Town is particularly large compared to other at-large districts in the State of New York or the rest of the country. Rather, there are other at-large districts within Suffolk County that cover significantly more area than that of Islip. There are numerous examples of geographically larger districts nationwide that are not considered unusually large by the trial court. *See, e.g.*, *Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1320 (M.D. Ga. 2018) (400+ square mile county not unusually large);

*N.A.A.C.P., Inc. v. City of Columbia*, 850 F. Supp. 404, 423 (D.S.C. 1993) (130+ square mile city not unusually large), *aff'd as modified*, 33 F.3d 52 (4th Cir. 1994).

The only voting practice in the Islip Town Board elections with potentially discriminatory effects is staggered elections. "The Supreme Court has recognized that staggered elections may enhance the discriminatory effect of certain voting systems." *Vill. of Port Chester*, 704 F. Supp. 2d at 444. Nevertheless, the Plaintiffs "did not demonstrate the effect of [staggered elections] in [Islip Town Board] elections." *City of Niagara Falls*, 65 F.3d at 1020. Without evidence as to the impact of this voting practice, the Court cannot determine that it suppresses voter turnout in Town Board elections.

Accordingly, this factor favors the Defendants.

### d. Access to the Slating Process

The fourth factor is "whether members of the minority group have been denied access" to any candidate slating process. S. Rep. at 29. This centers on whether Hispanics have been able to get on the ballot in Town Board elections. *See Clements*, 986 F.2d at 750. There is no evidence that Latino candidates have been unable to get on the ballot for either of the two major political parties.

It is undisputed that the Republican Party dominates local Town politics. The screening process for the Islip Republican Committee is an open process that allows anyone to apply. Candidates are screened and attend an interview opened to any registered party member. Ultimately, an executive committee of approximately 18 members selects the candidates that are nominated. If a candidate is not selected, he or she may choose to run in a primary election. No Latino has ever been slated to run for the Islip Town Board as a Republican. The Plaintiffs cite *Goosby v. Town of Hempstead* in support of their argument that this failure satisfies its burden

59

regarding this factor.  There, a number of African-Americans challenged the Town of Hempstead's use of the at-large system in town board elections.  A three-week bench trial was held in 1996 before Judge John Gleeson, who found that the plaintiffs had established a Section Two violation, noting that "the at-large scheme employed for [t]own [b]oard elections in Hempstead has operated to invidiously exclude blacks from effective participation in political life[.]"  956 F. Supp. at 356. In *Goosby*, the county chairman selected a potential candidate for each office and, although the nominations were voted on, the county chairman's recommendation had never been rejected.  The trial court in *Goosby* noted that the Black community engaged in a lobbying effort to attempt to procure more Black nominations.  *See Id*. at 341 ("There is no dispute that, as noted above, black Republicans fervently wanted representation on the Town Board, and their frustration at the party's failure to provide it in 1989 had bubbled over to produce the march on Town Hall.").  *Goosby* featured multiple Black Republicans that tried and failed to get on the ballot.

Here, unlike in *Goosby*, there is no evidence that a Hispanic Republican ever *attempted* to get on the ballot for Islip Town Board or that the Islip Republicans ever denied *access* to Latino hopefuls.  The Plaintiffs have not put forth evidence that any Hispanics sought a nomination for an Islip town-wide office or that, in reality, the Chairman controls the nomination process.  In this situation, *Goosby* is apposite.

The Democratic Party has selected Hispanics to run in Town Board elections on multiple occasions.  In the seven Town Board elections since 2005, the Democrats have nominated three Latinos for Town Board slots: Gonzalez in 2017, Ortiz in 2011 and Alvarez in 2005.  Moreover, the current chairperson of the Islip Democratic Committee is Hispanic.  This track record of consistently nominating Hispanic candidates demonstrates that the community does have sufficient access to the Town Board ballot.

The Plaintiffs have not introduced evidence that there are impediments to ballot access for any exogenous elections examined in this case.  Rather, the record reflects that numerous Hispanic candidates have been slated for town, county, and state elected offices.  In multiple instances, two Latinos have faced off in a Democratic primary election to determine the nominee.  Suffolk's robust history of Latino candidates running for office weighs heavily against the Plaintiffs' contentions.

Accordingly, this factor favors the Defendants.

### e. Discrimination Which Hinders Hispanics' Ability to Participate in the Political Process

The fifth factor is "the extent to which members of the minority group in the state or political subdivisions bear the effects of discrimination in such areas as education, employment, and health."  S. Rep. at 29.

The socioeconomic characteristics detailed in Dr. Logan's expert report have demonstrated that certain disparities exist within the Town.  Islip Hispanics are less likely to be citizens, speak English, go to college, own a home, and work in a professional or managerial capacity.  Hispanics also have a lower median household income.  The most glaring discrepancy between the two groups is their ability to speak the English language.  98.3% of whites in Islip either only speak English or speak English very well.  This stands in stark contrast to the Latino community, of which only 57.5% only speak English or speak English very well.  Put another way, 40% more whites in Islip have the ability to comprehensively communicate in English.  Though the Court will not speculate as to degree, it is exceedingly clear that language ability impacts the rest of these characteristics.

Dr. Logan also observed disparities in academic achievement between the Hispanic community and the rest of the Town. This portion of his testimony was incomplete and unpersuasive. Dr. Logan only provided a partial picture of the Town's public school districts. He did not discuss per capita spending, classroom sizes, teacher quality, or other factors that contribute to the quality of an education and only examined six of the 12 public school districts in Islip. This provides an incomplete, potentially curated set of results. Dr. Logan's testimony only provides evidence that, in general, Latino students attend lower performing schools than their white counterparts in certain neighborhoods in Islip.

Dr. Logan discussed public safety and environmental issues as examples of local injustice and discrimination. These sections lacked any convincing analysis of disparate treatment. In regard to public safety, Dr. Logan heavily relied on a 10-year-old report from the SPLC. This report does not meet the evidentiary standards required to draw factual conclusions from the isolated, anecdotal incidents contained therein. *See* Ex. A, ¶ 39 ("This report is not serious social science; it is investigative journalism carried out by researchers with an axe to grind[.]"); *United States v. Prado*, No. 10-CR-74 JFB, 2011 WL 3472509, at *13-14 (E.D.N.Y. Aug. 5, 2011) ("The Court finds that these isolated, anecdotal examples of violence or harassment over a nine-year period [listed in the SPLC study] involving unrelated Hispanic immigrants who have no connection to this case are not sufficient to demonstrate that widespread ethnic prejudice has saturated the community[.]"). Dr. Logan also reviewed a series of reports by the DOJ that involve the settlement agreement between the SCPD and the DOJ. These materials were selectively cited by Dr. Logan to highlight the shortcomings of the SCPD. Dr. Logan did not report on the progress made by the SCPD in its implementation of the settlement agreement and provided no quantitative

analysis on any public safety related metric. This section provides very little evidence of systematic discrimination of Latinos in Islip by the SCPD.

The portion of Dr. Logan's report related to environmental factors is similarly deficient. His report does not show that there are a disproportionate number of hazardous waste sites in Latino neighborhoods and many of the sites mentioned in his report were established long before the area became predominantly Hispanic.

When examined in broader context, the story of the Hispanic community in Islip is largely one of an American success story, at least when examining socioeconomic characteristics. The median Latino household in Islip earns approximately $86,572 per year, which is 43.48% higher than the median household income nationwide, and 73.86% higher than the median Latino household income. Latinos in Islip only earn 6.87% less than the median household income for the Town. This difference between Hispanics and the rest of the community is significantly larger when compared on a national scale (17.47%). Only 10.5% of Hispanics in Islip are below the poverty level. This is only 3% above that of the entire town and almost half of the national rate. While the Hispanic community in Islip may have slightly lower socioeconomic status than whites, these differences are mild and substantially below the national numbers.

The Plaintiffs have not established that the mild socioeconomic differences in status between Hispanics and whites impair their ability to participate in the political process. *See Goosby*, 956 F. Supp. at 342 (holding that minor differences in socioeconomic characteristics do not significantly impair blacks in the Town of Hempstead from participating in the political process).

Accordingly, this factor favors the Defendants.

### f. Racial Appeals in Political Campaigns

The sixth factor is "whether political campaigns have been characterized by overt or subtle racial appeals." S. Rep. at 29. Plaintiffs have presented a handful of potential incidents of subtle racial appeals in local political campaigns.

The only campaign literature used in an election for the Islip Town Board is O'Connor's mailer from the 2017 campaign that uses the term "He's one of us!" This statement, which stands on its own, is bereft of any context that suggests it was a subtle racial appeal referring to the Hispanic community. Although a handful of witnesses testified that they believe the statement to be a racial appeal, they offered no reasons for such a belief other than their "gut." There is nothing to indicate that this mailer was only sent to predominantly white areas of the Town and, in context, the comment likely referred to the candidate's prior experience or his campaign platform. The Court finds that this mailer cannot reasonably be perceived as a reference to the Hispanic community.

The Plaintiffs also reference a Facebook post that certain witnesses attribute to Bergin Weichbrodt. Yet, the record does not demonstrate that the Councilwoman conclusively authored the comment. There is no evidence that this statement was connected to any election. If Bergin Weichbrodt authored it and it was connected to her campaign, the comment can reasonably be perceived as a subtle racial appeal.

Bergin Weichbrodt also made a statement at a campaign event in 2017 about Gonzalez, who at the time was running for Town Board. She commented, "He lives in Central Islip. He's not from here. He doesn't understand what our concerns are in this part of the Town." This statement is not provided in context, which makes it hard for the Court to properly assess its meaning. The video that contains the statement only lasts for the duration of the quote; it does not

show anything said or done before or after the comment.  Given the lack of context, the Court is unable to reach a conclusion regarding the statement.

The only other written material introduced is a mailer for Steve Flotterton's 2017 campaign for Suffolk County Legislature.  It was not intended solely for white residents of Islip, but rather all of Suffolk County.  The picture on the mailer depicts a young Hispanic male with the letters "MS" tattooed to his forehead, a tattoo commonly associated with the notorious street gang MS-13.  In the last five years, MS-13 and other street gangs have increased in prominence in several parts of Suffolk County. In addition to its prolific drug trafficking, MS-13 has committed a series of high-profile gang murders, inducing fear and anxiety throughout the communities affected by their presence.  Liz Robbins & Nadia Rodriguez, *The Gang Murders in the Long Island Suburbs*, N.Y. Times (July 12, 2017), https://www.nytimes.com/2017/07/12/nyregion/ms-13-murders-long-island.html.  As much of the victims of their crimes are Hispanic, the Latino Community has particularly suffered from the gang's activities.  The Court therefore cannot conclude that the flyer's direct reference to MS-13's criminal activity, without more, intended to convey racial stereotypes regarding Suffolk County's Hispanic community, which is indisputably and overwhelmingly law-abiding.

The Court recognizes that statements on issues like illegal immigration or gang violence can go from a legitimate position to race-baiting with only minor changes.  Politicians must walk a fine line when discussing such emotionally-charged campaign issues.  However, simply discussing those issues does not, in and of itself, cross that line. Regardless of the Plaintiffs' disagreements with Mr. Flotterton's political stance, the flyer touched on a matter of importance impacting not only Islip's Hispanic community but all Long Islanders. The content of the flyer

stuck to the issues and addressed reasonable concerns in the County. In this context, this material cannot reasonably be perceived as discriminatory.

Finally, the Plaintiffs contend that Steve Levy, the Suffolk County Executive engaged in public rhetoric against immigrant communities. However, only hearsay evidence is used to support this claim and there is no indication that it is connected to an election.

The Court finds that there is little to no evidence that overt or subtle racial appeals have been used in Islip elections. Accordingly, this factor favors the Defendants.

### g. Success of Hispanics in Public Office Elections

The seventh factor is "the extent to which members of the minority group have been elected to public office in the jurisdiction." S. Rep. at 29. As stated *supra*, "[u]nder the functional view of the political process mandated by Section 2, the most important factors bearing on a challenge to a multimember system are the extent of racial polarization and the extent to which minority group members have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 48 n.15 (citing Senate Report at 28-29). From 2005 to the present, no Hispanic has ever been elected to the Islip Town Board. Although several Hispanics have been elected to other positions that represent the community, including the New York State Senate, the New York State Assembly and the Suffolk County Legislature, this limited evidence is insufficient to overcome the dearth of successful Hispanic candidates for endogenous elections. "In short, there cannot be any more compelling case in support of Senate factor seven." *Vill. of Port Chester*, 704 F. Supp. 2d at 446 (citing *Goosby*, 956 F. Supp. at 343-44).

Accordingly, this factor favors the Plaintiffs.

### h. Government's Responsiveness to the Particularized Needs of the Hispanic Community

66

The eighth factor asks "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." S. Rep. at 29. In the Second Circuit, courts have "pursue[d] this inquiry with some reluctance, as it entails our deciphering what policy steps qualify as responses to the 'needs of members of the minority community.'" *City of Niagara Falls*, 65 F.3d at 1023 n. 24 (quoting S. Rep. at 29). With this in mind, the Second Circuit limits the inquiry to a "review of tangible efforts of elected officials and the impact of these efforts on particular members of the community." *Id.*; *Solomon v. Liberty Cty.*, 957 F. Supp. 1522, 1566 (N.D. Fla. 1997) ("Lack of responsiveness of elected officials to the particularized needs of members of the minority community, although less important than other factors, may also be considered in evaluating a claim under section 2." (citing S. Rep. at 29)), *rev'd sub nom.*, *Solomon v. Liberty Cty. Comm'rs*, 166 F.3d 1135 (11th Cir. 1999), *reh'g en banc granted, opinion vacated*, 206 F.3d 1054 (11th Cir. 2000), *and on reh'g aff'd sub nom.*, *Solomon v. Liberty Cty. Comm'rs*, 221 F.3d 1218 (11th Cir. 2000). In this effort, evidence of both responsiveness and unresponsiveness will be considered. *See City of Niagara Falls*, 65 F.3d at 1023 ("We cannot accept the plaintiffs' argument that only unresponsiveness—and not responsiveness—is relevant to a § 2 inquiry. The district court cited numerous efforts made by the City to address the needs of members of the minority community.").

Islip has spent significant resources investing in predominantly Hispanic areas of the Town. Most notably, it renovated the pool at Roberto Clemente Park and refurbished Noble Street Park with a new walking path, playground, basketball courts and floodlights. A water spray park is currently being constructed in Roberto Clemente Park. This stands in stark contrast to the picture painted by Judge Gleeson in *Goosby*, where the Town of Hempstead denied or disregarded a series

of requests for community centers and redevelopment in black communities.  *See Goosby*, 956 F. Supp. at 345-46.

There is significant evidence that maintenance issues such as snow removal and street paving are accomplished in the same manner as other areas of the Town.  The limited, hearsay evidence introduced by the Plaintiffs to argue that the Town somehow prioritizes the predominantly white areas for projects is speculative and unconvincing.  Much of this consists of subjective complaints of pot hole repairs, snow removal or street maintenance without any supporting detail.  As Owens explained, the above issues are prioritized based on high importance areas and resident complaints, which are tracked electronically.  The issues cited by the Plaintiffs are more akin to run-of-the-mill local government gripes rather than evidence of non-responsiveness to the needs of the Hispanic community.

Notably, one of the Plaintiffs' central illustrations of purported disparate treatment, which is proffered entirely by hearsay, turns out to be a fundamental lesson in the dangers of speculation and hearsay.  On the morning of the 2016 general election, witnesses noticed that there were a number of construction vehicles preparing to perform maintenance work on Suffolk Avenue, one of the major arteries in Brentwood.  One of the Plaintiffs' witnesses testified that it was the Town of Islip that was responsible for this work.  Others even suggested that this was done to thwart residents' efforts to vote that day in an attempt to suppress the Hispanic vote.  The evidence demonstrates that Suffolk Avenue is not a road owned or maintained by the Town and that the Town had no part of any of the work performed that day.  After receiving complaints, Carpenter contacted Owens who assured her that the work was being performed by Suffolk County.

The Court recognizes that the Town's record is imperfect in this regard.  Most notably, its involvement in the dumping of 40,000 tons of toxic debris in Roberto Clemente Park in 2014.

Two unelected Town officials were involved in the incident and pled guilty to related criminal charges. This unfortunate occurrence caused significant harm to the local community. However, there is no evidence that the dumping was connected to any form of discrimination. The Town Board reacted swiftly, unanimously approving a $6 million bond to cleanup the park and working with state environmental officials to expedite the process. Although the community was without Roberto Clemente Park for far too long, this was not for want of action on the Town's part. Throughout the process, the Town continued to communicate with the Brentwood community by mailings, its website, door-to-door canvasing, updates at Town Board meetings, information posted at the local library, and a Spanish-speaking representative who relocated to the Brentwood Senior Center. Most of the communications were conveyed in both English and Spanish. The evidence in this case is clear: the Town properly responded to this crisis with sufficient care and commitment.

Spanish interpretation and translation services can be improved, but these deficiencies are not so severe as to outweigh the wide-ranging efforts by the Town to improve predominantly Hispanic neighborhoods. The Plaintiffs' evidence falls far short of establishing that the Town is not responsive to the needs of the Hispanic community. *See Solomon*, 957 F. Supp. at 1567 ("There was some testimony that many of the streets in black communities in Liberty County are unnamed and unpaved. On the other hand, blacks have access to the same municipal and county services that are available to whites. … Blacks have received other benefits, including the bulk of grant money which was spent on a water project and housing upgrades. … This evidence satisfactorily establishes that the [Defendant] has been responsive to the black community." (internal citations omitted)).

Accordingly, this factor favors the Defendants.

69

### i. Policy Underlying the State's Voting Practice

The ninth and final factor is "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. Rep. at 29. Evidence supporting a tenuous policy "may … indicate that the practice or procedure produces a discriminatory result." *Clements*, 986 F.2d at 753. The Plaintiffs present two theories as to why the policy underlying the at-large system is tenuous: (1) political corruption; and (2) there is no dedicated individual who represents the Hispanic-minority community.

There is no evidence that the at-large voting structure has contributed to any alleged corruption in the Town's politics. 65% of all cities and towns in this country currently use the system and, as Dr. Thernstrom points out, at-large elections were a cornerstone of the twentieth century reforms in urban governments. The Plaintiffs have not even attempted to link any perceived corruption to the current system. Moreover, in a 2006 town-wide referendum, the Town residents voted to keep its at-large elections. Approximately 45% of Hispanics and 55% of whites voted in support of the system. There is insufficient evidence that such a popular form of government that is pervasive throughout this country fosters corruption.

Plaintiffs point to the Town Board's salaries and alleged cronyism in support of their political corruption argument. In 2018, the Town Board voted to replace certain members of the CDA board with board members who purportedly supported the appointment of a politically connected individual to the position of Executive Director. However, this vote was highly contested, with two of the five board members voting against it. There is no indication that this vote is connected in any way to the at-large system. Without further incidents of potential political

corruption, the Court is unable to conclude that a handful of isolated incidents indicate any pervasive corruption, let alone corruption connected to the at-large system.

The Plaintiffs also contend that the Hispanic community has no access to or support from current councilpersons. This is contradicted by the record. Both parties noted the benefits and drawbacks of the at-large system and the single member system. Yet, the question at hand is not which system better serves the Hispanic community; it inquires into whether the policy behind the practice is tenuous. There are numerous instances of dialogue between the Town Board and the Hispanic community, as well as the Town's commitment to improve the lives of its residents. The Plaintiffs have fallen short of proving that the near century-old system is based on a tenuous rationale. *See City of Niagara Falls*, 913 F. Supp. at 749 ("Although plaintiffs testified that they would prefer representatives who would represent their particular neighborhoods, there are obvious advantages to having a City Council comprised of representatives who at least ostensibly represent all the residents of the City."). *Large v. Fremont Cty*, 709 F. Supp. 2d 1176, 1228 (D. Wyo. 2010) ("In combination with the fact that the at-large system carries with it its own set of benefits, it cannot be said that the policy underlying the system is tenuous. In its limited analysis of this particular factor, the Court is not making a judgment call regarding which system is preferable. It need only say that the policy underlying the at-large system is not tenuous.").

Accordingly, this factor favors the Defendants.

After conducting a systematic and exhaustive analysis, as required by the VRA, the Plaintiffs have not shown that, under the totality of circumstances, that they are substantially likely to succeed in their claim that the at-large election system for electing members of the Town Board precludes Hispanics from equal participation in the electoral process.

## C. Public Interest

Even assuming *arguendo* that the Plaintiffs are able to establish substantial likelihood of success on the merits, the issuance of an injunction is not in the public interest. *See Montano*, 268 F. Supp. 2d at 270 ("Even if a plaintiff demonstrates a likelihood of success on the merits and irreparable harm, a court may deny injunctive relief when it weighs against the public interest as a result of an impending election." (citing *Diaz*, 932 F. Supp. at 468-69)). Regardless of a plaintiff's ability to demonstrate irreparable harm and substantial likelihood of success on the merits, a district court may deny injunctive relief if it is against the public interest. *Id.*; *Goosby v. Town Bd. of the Town of Hempstead*, 981 F. Supp. 751, 763 (E.D.N.Y. 1997), *aff'd*, 180 F.3d 476 (2d Cir. 1999).

> The public interest factor is particularly important in cases in which a party seeks to enjoin an election. The Supreme Court has repeatedly held that "redistricting and reapportioning legislative bodies is a legislative task which the courts should make every effort not to preempt." Because the conduct of elections is so essential to a state's political self-determination, the strong public interest in having elections go forward generally weighs heavily against an injunction that would postpone an upcoming election.

*Cano,* 191 F. Supp. 2d at 1139 (quoting *McDaniel v. Sanchez*, 452 U.S. 130, 150 n.30, 101 S. Ct. 2224, 68 L. Ed. 2d 724 (1981)).

As discussed in Section II.E., the Plaintiffs seek an injunction that enjoins under the current at-large structure and asks the Court to use its remedial power to install a district system on a preliminary basis. *See* Dkt. 117 at 1 ("Plaintiffs' motion asks the Court (i) to enjoin elections for the Islip Town Board under the current at-large structure because it violates Section 2 of the Voting Rights Act and (ii) to exercise its broad discretion to order a preliminary remedy before another unlawful election proceeds."). As such, Plaintiffs not only want to suspend any future election using the current system but want the Court to craft its own temporary system, one that is remarkably similar to the ultimate relief they seek. "[G]iven that the plaintiffs' requested

injunction goes well beyond merely preserving the status quo while the litigation is pending, the very nature of their request demand that the court proceed with caution." *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1362 (M.D. Ala. 1986). As Judge Gleeson cautioned in *Goosby*, "intervention by the federal courts in state elections has always been a serious business, not to be lightly engaged in." *Goosby*, 981 F. Supp. at 763 (quoting *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988)); *accord Reynolds*, 377 U.S. at 585 ("[U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid.").

### 1. Nature of Relief/Current Procedural Posture

The Court finds that enjoining elections from continuing under the current structure is not in the public's interest. This Court recognizes that there is a strong public interest in proceeding with regularly scheduled elections and this weighs heavily against granting an injunction that would delay or disrupt an upcoming election. "[T]he decision to enjoin an impending election is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisputed constitutional violation." *Sw. Voter Registration Education Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (internal citations omitted).

In *Goosby*, Judge Gleeson concluded in February 1997, after a three-week bench trial, that the at-large system used for electing members of the Town Board of the Town of Hempstead violated Section Two of the VRA. To remedy this constitutional violation, he ordered the town board to submit a remedial plan that divided the town into six single-member voting districts. *See Goosby*, 956 F. Supp. at 356. In May 1997, the town submitted two proposals. Five months later,

73

Judge Gleeson ordered that one of the two plans be adopted and issued an injunction that, among other things, enjoined Hempstead from using the current at-large system for any future elections. *See Goosby*, 981 F. Supp. at 763. However, he denied the attempt to enjoin the upcoming general election under the at-large system, explaining that "if plaintiffs prevail on appeal, there is nothing to prevent a special election to remedy the Section 2 violation." *Id*. Even after a full trial on the merits and a final order declaring the system in breach of Section Two, the *Goosby* court refused to enjoin the upcoming election until after the appeal.

Here, the Plaintiffs ask for the same relief before any final determination that the current scheme is unconstitutional. The parties have not had the opportunity for the remainder of the discovery process, dispositive motion practice, a trial and an ultimate adjudication on the merits. *Dillard*, 640 F. Supp. at 1362 ("[T]he court refuses to order the five counties to implement new election plans, including possibly single-member district plans, until after this lawsuit has been finally heard on the merits."). Though a preliminary injunction hearing is similar to a trial in many ways, there are also substantial differences. "[W]here, as here, the possibility of corrective relief at a later date exists, even an established VRA violation does not in and of itself merit a preliminary injunction." *Watkins v. Mabus*, 771 F. Supp. 789, 805 n.16 (S.D. Miss. 1991), *aff'd in part and vacated in part as moot*, 502 U.S. 954, 112 S. Ct. 412, 116 L. Ed. 2d 433 (1991). In short, the Plaintiffs are only just past the start line while the *Goosby* plaintiffs were in sight of the finish. At this stage in the proceedings, the public interest does not favor disrupting the right to vote, a right once referred to by Robert Kennedy as "fundamental to all the other rights of citizenship." Robert F. Kennedy, Letter to President Kennedy on Civil Rights (Jan. 24, 1963); *accord Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 534-535, 11 L. Ed. 2d 481 (1964) ("No right is more

precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.").

### 2. Inadequate Time & Administrative Burden

The 2019 elections are rapidly approaching, and the citizens of Islip have a significant interest in those elections proceeding without delay. With election day less than six months away, any attempt to institute a new, comprehensive remedial plan would be reckless. It took the *Goosby* court approximately nine months to develop and evaluate the final remedial plan. It took three months for Hempstead to submit proposals and five months for the district court to approve it. In addition, when accounting for the time for the appellate process to conclude, the order did not go into effect until almost two and a half years after the initial order. The BOE can likely administer an election in approximately six weeks once the candidates are identified, the district maps drawn, and the voters are properly coded. However, the BOE must certify its general election ballot with the New York State Board of Elections by September 12, 2019. This leaves approximately three and a half months to develop and implement the remedy and for the parties to select their candidates in this new system. While many of these time frames are only guideposts and can be condensed, it would be irresponsible to rush to develop a new system of town governance in a few short months. *See Dillard*, 640 F. Supp. at 1362 (explaining that "[n]umerous unforeseen events could delay the implementation of alternative plans"). There is simply not enough time to do this properly in time for the upcoming elections.

This new system would require the parties to re-nominate a new slate of candidates. With the primary elections approximately one month away, the Court would have to remove the current set of candidates from the ballot and postpone the primary election until after the new system is established and able to be implemented. This consequence alone is sufficient to tilt the public

interest against issuing an injunction. *See, e.g.*, *Cardona v. Oakland Unified Sch. Dist.*, 785 F. Supp. 837, 842-43 (N.D. Cal. 1992) (preliminary injunction denied four months prior to primary election).

In the Court's view, the Plaintiffs' proposed relief would pose enormous burdens on the relevant stakeholders sufficient to cause significant disruption to the electoral process. As LaLota explained, the election machinery is already running. February 26, 2019 was the first day to sign designating petitions. Since then, the petitions have been filed, designations authorized, primary ballots certified, and ballot petitions filed. Invalidating all of these steps and implementing a new, truncated schedule for them would pose an administrative challenge that could create a multitude of issues. *See Mac Govern v. Connolly*, 637 F. Supp. 111, 115-16 (D. Mass. 1986) ("Equity demands that a federal court stay its hand when judicial relief makes no sense. This action, in which the remedy sought would come at great cost and yield results that are at best uncertain and, at worst, perverse, is plainly such a case. When the massive disruption to the political process of the Commonwealth is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that we deny relief.").

Most notably, it risks undermining confidence in the integrity of the electoral process. *See Davis v. Commonwealth Election Comm'n*, No. 1-14-CV-00002, 2014 WL 12767673, at *6 (D. N. Mar. I. Oct. 27, 2014). It would also likely cause significant logistical problems for any new candidates looking to collect signatures to get on the ballot. New York requires that signatures be gathered from within the electoral district at issue. New candidates would no longer be permitted to gather signatures from the entire town. Rather, they would be limited to those residents of their newly created district. This would undoubtedly cause confusion for voters as well as candidates and ensures additional judicial challenges to signatures. *See Diaz*, 932 F. Supp. at 466 ("Thus,

even where an existing districting scheme was found invalid, the Supreme Court maintained that the state need not interfere with election machinery which was already 'in gear.'" (citing *Roman v. Sincock*, 377 U.S. 695, 709-710, 84 S. Ct. 1449, 12 L. Ed. 2d 620 (1964)).

The Defendants further argue that the preliminary relief requested would require another redistricting once the decennial census is released, in early 2021. "[T]wo reapportionments within a short period of two years would greatly prejudice [the Town] and its citizens by creating instability and dislocation in the electoral system and by imposing great financial and logistical burdens." *White v. Daniel*, 909 F.2d 99, 103-04 (4th Cir. 1990). As Dr. Beveridge explained, after the decennial census is complete and the required data is released, election lines are redrawn to ensure population equality. This safeguards the "one person, one vote" concept that is integral to American democracy.

If the Court were to issue a preliminary injunction and institute a single-member district system, Islip would have to re-draw the district boundaries after the 2020 census. This would cause additional confusion and preclude the continuity required in local elections. *See In re Below*, 151 N.H. 135, 148, 855 A.2d 459 (2004) ("Permitting the legislature to redistrict nine years after one federal decennial census, when it must redistrict again in only one or two years following the next census, would impair 'the need for stability and continuity in the organization of the legislative system.'" (quoting *Reynolds*, 377 U.S. at 583)).

With Town Board elections occurring every two years, it is likely that any districts established will have to be redrawn before the next elections. The Plaintiffs propose that all councilmember terms would be terminated and four new councilmembers would take office beginning in 2020. If the new district maps are redrawn within two years, any councilperson elected under the current system would be unable to serve their full four-year term. Another

election would need to be held once the decennial census redrawing is complete. The impending decennial reapportionment following the census weighs profoundly against granting preliminary relief that will require almost instant modification. *See Mac Govern*, 637 F. Supp. at 115-16 ("The timing of this action with respect to the normal decennial reapportionment also weighs heavily against granting relief. … Court intervention at this point, then, would not only cause the dislocation that accompanies any reapportionment, it might well cause it twice.").

### 3. Harm to Candidates & Current Councilpersons

The Plaintiffs propose that all current council members' terms would be terminated on December 31, 2019. Although two councilpersons are set to expire at the end of the year, two are in the middle of their four-year term. This Court would have to remove two councilpersons from office, which would undoubtedly cause harm to duly elected town representatives. Such an act is not to be taken lightly. If the Defendants are ultimately successful at trial, two duly-elected councilpersons would have been unnecessarily and unjustly removed from office. The Court is unwilling to take such a drastic step. *See generally Dillard*, 640 F. Supp. at 1362 ("The court does not wish to be left in the position of having either to extend the terms of incumbents or to appoint temporary replacements to serve until the new plans are in place. Both alternatives would effectively deny the entire electorate the right to vote and thus seem to offend basic principles of representative government.").

In addition, there are currently four candidates for the Town Board, including two incumbents who currently serve as councilpersons. The Plaintiffs request that the Court remove these candidates from the ballot. By now, they have participated in party screenings and collected petitions. Candidates have put in a considerable amount of work to get on the ballot. Removing them now, without having established ultimate liability, would be unjust.

### 4. Harm to Voters

The Plaintiffs' proposition would come at the expense of the Town's voters, who would be required to accept a new, temporary political system established by court order. Shortening or otherwise altering the normal election process has the potential to cause significant voter confusion. At the present time, thousands of voters have been made aware of the upcoming election for Town Board. Candidates have collected thousands of voter petitions and have interacted with a significant number of additional voters. These voters expect those candidates to be on the ballot in the primary and potentially the general election. Removing the current slate of candidates and requiring parties to re-nominate additional candidates would cause significant voter confusion.

This confusion is likely to be magnified by the implementation of the new district system. Voters who are used to voting for all vacancies on the Town Board will now have to be made aware of their proper district. This will require a substantial reeducation effort by the BOE to educate the Town's residents on the new system and how it impacts them on election day. All of this effort must be expended with the possibility hanging over the Town's head that either this system will have to once again be amended after the decennial census or that it will be removed entirely if the Defendants are successful at trial. This is likely to decrease turnout on Election Day for all voters. These changes will likely particularly impact Islip's military servicemembers, who are serving our country around the world. As LaLota explained, the nature of the military's communication system makes it difficult for individuals serving abroad to be made aware of any changes in local elections, even if the alterations were made weeks before the election. These men and women are risking their lives to preserve our democracy and protect our right to vote. It would be entirely unfair if even a handful are unable to vote on Election Day. This compresses the

required timetable even further. Introducing these additional variables into the election system will decrease the turnout on election day, promote confusion, and increase the cost.

### 5. Plaintiffs' Delay

The Court also must consider the Plaintiffs' months-long delay in requesting injunctive relief. The Plaintiffs filed their complaint on June 18, 2018 and didn't inform this Court of their desire to seek a preliminary injunction until February 13, 2019. They contend that their motion was precipitated by New York State Assembly Bill A. 229, which was passed on January 24, 2019, and advanced all primary elections in New York from September 10, 2019 to June 25, 2019. This explanation is unconvincing. If the Court accepts the Plaintiffs' representation that their motion not only intended to postpone the election under the current system but also replace it until the merits of this case could be adjudicated, there is no excuse for the months-long delay. The Plaintiffs were aware of the time it takes to fashion a remedy, even a preliminary one, in a VRA case. *See Goosby*, 981 F. Supp. at 754. In the original scheduling order issued by Magistrate Judge Gary R. Brown, the parties' joint pretrial order would not be filed until August 22, 2019, a mere 19 days before the original primary election date. Had they filed their motion contemporaneous with their complaint, much of the issues discussed in this section would never have developed. This harm to their case is entirely self-inflicted. *See Dillard*, 640 F. Supp. at 1362 ("[E]ven if it were clear that all of the counties should be required to adopt single-member districts, it would be unfair … to require them to do so by June. The plaintiffs did not even seek preliminary injunctive relief until February 1986[.]").

The parties' February 13, 2019 joint letter to the Court proposed a two-month period for briefing the motion and requested that the evidentiary hearing be held after May 10, 2019, approximately three months after the letter was filed. If this Court had not amended the briefing

schedule *sua sponte* and ordered an expedited briefing schedule based on a scheduling conflict, the evidentiary hearing would likely be ongoing at the time this decision is published. This longer-than-usual proposed schedule is perplexing, given the immensity and complexity of the Plaintiffs' requested relief.

Accordingly, the Court finds that the issuance of an injunction is not in the public interest.

### IV. CONCLUSION

For the reasons stated above, the Plaintiffs' motion for preliminary injunction is denied in its entirety.

**SO ORDERED**

Dated: Central Islip, New York
May 28, 2019

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge