EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANA FLORES, RENE FLORES, MARIA MAGDALENA HERNANDEZ, MAGALI ROMAN, MAKE THE ROAD NEW YORK, AND NEW YORK COMMUNITIES FOR CHANGE, <br><br> Plaintiffs, <br><br> v. <br><br> TOWN OF ISLIP, ISLIP TOWN BOARD, SUFFOLK COUNTY BOARD OF ELECTIONS, <br><br> Defendants. | Case No. 2:18-cv-03549-GRB-ST |

## DECLARATION OF DEFENDANTS' EXPERT DR. JOHN ALFORD

**Scope of Inquiry**

I have been retained by counsel for the Town of Islip, New York, as an expert to provide analysis related to *Flores et. al. v. Town of Islip.* For this report, I have examined the expert reports provided by plaintiffs' experts Dr. Michael McDonald, Dr. Andrew Beveridge, and Dr. Rene Rocha. I have provided both Ecological Regression analysis and Ecological Inference analysis for various elections covered in Dr. McDonald's report in the geography of the Town of Islip, using Election District demographics information provided by Dr. Beveridge and Dr. McDonald. In addition, I have utilized the Spanish Surname coding of voters that participated in the 2017 Township elections, as provided to Dr. McDonald by Dr. Beveridge, and election vote data at the Election District level provided by the Suffolk County Board of Elections including the voter file for the 2019 Islip election. My rate of compensation in this matter is $350 per hour.

**Qualifications**

I am a tenured full professor of political science at Rice University. In my over thirty years at Rice I have taught courses on redistricting, elections, political representation, voting behavior, and statistical methods at both the undergraduate and graduate level. Over the last thirty years, I have worked with numerous local governments on districting plans and on Voting Rights Act issues. I have previously provided expert reports and/or testified as an expert witness in voting rights and statistical issues in a variety of court cases, working for the U.S. Attorney in Houston, the Texas Attorney General, a U.S. Congressman and various cities and school districts.

In the 2000 round of redistricting, I was retained as an expert to provide advice to the Texas Attorney General in his role as Chair of the Legislative Redistricting Board. I subsequently served as the expert for the State of Texas in the state and federal litigation involving the 2001 redistricting for U.S. Congress, the Texas Senate, the Texas House of Representatives, and the Texas State Board of Education.

In the 2010 round of redistricting in Texas, I was again retained as an expert by the State of Texas to assist in defending various state election maps and systems including the district maps for the U.S. Congress, the Texas Senate, the Texas House of Representatives, and the current at large system for electing Justices to the State Supreme Court and Court of Appeals, as well as the winner-take-all system for allocating Electoral College votes. I have also worked as an expert on redistricting and voting rights cases at the state and/or local level in Michigan, Washington, Louisiana, New Mexico, Mississippi, Wisconsin, Florida, New York, Georgia, and Alabama. The details of my academic background, including all publications in the last ten years, and work as an expert, including all cases in which I have testified by deposition or at trial in the last four years, are included in my curriculum vitae, which is attached to this declaration as Exhibit 1.

**Summary of Conclusions**

The Islip Town Council elections at issue here are partisan elections, and the behavior of voters in these elections reflects a high level of partisan polarization.  It is no accident that in this case Dr. McDonald forgoes the traditional practice of focusing on racially contested elections, and focuses instead on all Democratic party candidates without regard to the ethnicity of the candidates.  As will be extensively documented below, the voters in Islip respond in clear and predictable ways to the party of the candidates, not to the ethnicity of the candidates.  In each of the two most recent Islip Town Council elections two Democratic candidates, one Hispanic and one non-Hispanic, faced two Republican candidates, both non-Hispanic.  Despite the fact that in both elections both of the Democrats were defeated, and despite the fact that in both elections the Hispanic Democrat received  more votes than his fellow non-Hispanic Democratic candidate, Dr. McDonald treats these elections as evidence of  racially polarized voting rather than partisan polarized voting.  This is simply incorrect.

It is also important to recognize that the levels of partisan polarization found in Islip do not bar Hispanic voters' candidates of choice from winning the support of a majority of Islip voters.  Overall, the Democrat, and hence the preferred candidate of Hispanic voters, won the vote within Islip in 27 of the 60 contests, a 45% success rate.   These victories for Hispanic-preferred Democratic candidates are more common in the exogenous elections at the County, State, and Federal level, where Hispanic candidates of choice (Democrats) win more than 70 percent of the time.  However, all of these elections draw from the same voter population and share the same partisan character as the Township elections, and the County elections are on the same ballots as the Township elections.  The potential to elect candidates of choice is clearly present today, and the combination of the continuing growth in the Hispanic population eligible to vote in Islip,

3

together with crossover rates among non-Hispanic voters that exceed 40 percent, provide increasing opportunity for the election of candidates of choice of Hispanic voters to the Town Council.

While the broad characterization of Islip elections discussed above is mostly consistent whether based on my reported estimates or those of Dr. McDonald, there are nonetheless significant methodological errors in Dr. McDonald's estimations. Dr. McDonald's report assesses racial/ethnic polarization by assessing the degree to which Democratic candidates in the geography of Islip draw support from Hispanic, non-Hispanic Black and non-Hispanic white voters. But he fails to account for varying voter turnout rates in different Election Districts, and he also fails to assess the degree of crossover voting by the *entire* non-Hispanic majority. My analysis here replicates his findings while incorporating turnout differences in the estimation and providing parallel estimates for Hispanic voters and for *all* non-Hispanic voters combined. Together these refinements of Dr. McDonald's estimates suggest little difference between our estimates of the typical level of Hispanic cohesion in general elections, but they do indicate that crossover voting among non-Hispanics runs about 6 percentage points higher than Dr. McDonald's estimates would suggest. Given that his estimates already suggested considerable crossover voting among non-Hispanics, the refined figures are very high, with crossover in the range of 40-45 percent among non-Hispanics (and nearly 40 percent even when one erroneously focuses just on non-Hispanic whites). Dr. McDonald's failure to account for turnout differences also has a significant impact on his estimates for the one set of primary contests that he analyzes, but that election involved highly unusual circumstances and therefore is of little probative value anyway.

Additionally, Dr. McDonald fails to use comparable terms when he analyzes the "vote for two" Town Council elections. Because voters can choose to vote for two, one, or no candidates

4

in these elections, one should ensure that the methodology used to calculate voter support allows for comparisons to the standard election formats where voters can only vote for one candidate. Dr. McDonald fails to do this, and I correct the error.  Again, correcting this error helps establish that majority crossover is about 6 percent higher than Dr. McDonald estimates in the Town Council elections.

In sum, there is nothing in Dr. McDonald's analysis, or in my analysis provided here, that suggests that either the cohesion shown by Hispanic voters for Democratic candidates, or the much more modest tendency of non-Hispanic voters to slightly favor Republican candidates, reflects anything beyond partisan voting patterns.  Dr. McDonald's assertion in his conclusions that "[v]oting in Islip shows persistent patterns of ethnically/racially polarized voting" in which "white voters typically bloc vote in opposition to Latino voters' preferred candidates," McDonald Report at 57, is not consistent with what is shown here to be the high level of non-Hispanic crossover voting, the levels of success for Democratic candidates, and the fact that the polarization found in these elections appears to be partisan polarization rather than racial/ethnic polarization.

**Data and Sources**

In preparing my report, I have reviewed the reports and the underlying data provided by plaintiffs' experts Dr. Michael McDonald, Dr. Andrew Beveridge, and Dr. Rene Rocha in this case.  I have relied on Election District level data, including publicly available election results and demographic data including estimates of voter racial and ethnic characteristics provided by the plaintiffs' experts in response to a request for the data used to produce the election analysis estimates in their reports in this case.  In addition, I have utilized the Spanish Surname coding of voters that participated in the 2017 Township elections, as provided to Dr. McDonald by Dr.

Beveridge, and election vote data at the Election District level provided by the Suffolk County Board of Elections including the voter file for the 2019 Islip election.

***Gingles* Prongs Two and Three**

My analysis focuses on the empirical issues related to the assessment of racially polarized voting. This assessment begins with a focus on the second and third of the so-called '*Gingles*' factors. My analysis focuses first on *Gingles* 2 (minority cohesion) and *Gingles* 3 (majority bloc voting). The two techniques commonly used in Voting Rights Act lawsuits to assess voter cohesion and polarization—Ecological Regression (ER) and Ecological Inference (EI)—are both utilized in this case in both my report and in Dr. McDonald's report.

Ecological Regression analysis is the original statistical estimation technique used in Voting Rights Act lawsuits to assess voter cohesion and polarization. Ordinary Least Squares Regression (OLS or regression) is a mathematical technique for estimating the single best-fitting straight line that can be drawn to describe the relationship between two variables in a scatterplot. Ecological regression (also called Goodman's regression) is distinct from simple regression in that it relies on a data set made up of precinct level aggregations of voters and election results, rather than a data set of individual voter characteristics and vote choices. This is necessary for the sort of analysis we wish to do here because while we have election results for groups of voters at the polling-place level, and also have racial characteristics for the voters in the precinct, we do not have access to the actual vote choice of individual voters. In effect, this limits us to looking at the tendency of the precinct-level total votes for a candidate to rise or fall as we move across precincts with increasing proportions of residents or voters that fall within a racial or ethnic group of interest.

Applied to voting rights cases, the logic of regression analysis is to determine to what degree, if any, the vote for a candidate increases in a linear fashion as the concentration of voters

6

of a given ethnicity in the precincts increases.  This is done by finding the equation for the line that best fits the scatterplot of precinct-level demographics (e.g., percent Hispanic as a proportion of voters in a precinct) and precinct-level support for a given candidate (e.g. percent of votes cast for candidate A). The intercept in this equation is an estimate of voting cohesion of one group (e.g., *non*-Hispanics) for the  candidate, and the sum of the intercept and the slope in the same equation is an estimate of voting cohesion of another group (e.g., Hispanics) for the same candidate.

Gary King's Ecological Inference (EI) procedure differs from Ecological Regression by recognizing that at least some of the statistical assumptions underlying regression analysis do not hold when one has aggregate data rather than individual data (as we do here). Specifically, the assumptions underlying the regression technique do not recognize that the data are bounded—that is, no more than 100% and no less than 0% of a given racial group can vote for a given candidate. As a consequence, regression can sometimes lead to unsatisfying conclusions, e.g., a model that predicts -10% of Hispanics supported a candidate, or relatedly that 130% of Hispanics supported another candidate. In addition, the regression technique does not utilize the information that is inherent in these bounds at the precinct level. For example, if we know that a precinct has 100 voters, of whom 90 are Hispanic, and 95 people voted for the Hispanic candidate, then our estimates for both Hispanic and non-Hispanic voters are bounded.  Given the 95 votes for the Hispanic candidate, the 10 non-Hispanic voters could not have cast fewer than 5 votes for the Hispanic candidate.  And if they did cast all five of the votes against the Hispanic candidate, then all 90 of the Hispanic voters must have cast their votes for the Hispanic candidate.  At the other extreme, all 10 of the non-Hispanic voters could have voted for the Hispanic candidate, in which case 85 of the 90 Hispanic voters would have voted for the Hispanic candidate and 5 would have had to vote for the non-Hispanic candidate.  Ecological Regression fails to utilize this deterministic

7

information and so, in some circumstances, does not use all the available data optimally. In contrast, Ecological Inference methods incorporate this information about the bounds for each precinct into the statistical analysis.

A second distinction of Ecological Inference is that it does not force the relationship to be linear across the precincts. As mentioned above, Ecological Regression assumes a linear relationship between the racial composition of precincts and the precinct vote returns. Ecological Inference, in contrast, allows the relationship between the size of the demographic group and support for a candidate to be non-linear. The other major difference is in the mechanism of the actual estimation of the parameters of the model. Ecological Regression uses a mathematical formula that, given a set of election data, produces a single specific estimated equation as described above. Ecological Inference, on the other hand, estimates the model parameters by an iterative procedure that, over a large number of repeated trials, yields an estimated model that may vary to some degree in repeated estimations, even given the exact same input data. While the details of this estimation procedure are mathematically complex, the key point is that Ecological Inference techniques use the available data in a potentially more efficient and less biased way than previous methods.

A limitation of the initial version of King's Ecological Inference was that it was limited to direct estimation of only a 2x2 table of election data. That is, it could be utilized directly only for elections with two candidates and two racial/ethnic groups. In practice, this was often sufficient, as many elections feature two major-party candidates, and the focus of the litigation was on Blacks versus non-Black voters, or Hispanics versus non-Hispanic voters. This 2x2 limitation has since been overcome with the introduction of publicly available software to perform what is called RxC Ecological Inference. This approach can be used when there are more than two candidates and/or

8

the relevant inquiry involves more than two voter groups.  As described below, RxC Ecological Inference also has the significant benefit of allowing inclusion of a "no vote" input for each voter group, and this yields estimates that account for differences in turnout across precincts.

Whichever version of EI is used to generate estimates of voter support for candidates by racial group, a researcher must input two types of data into the EI procedure.  First is the election data from the jurisdiction showing how many voters voted at each precinct and how many votes were cast for each of the candidates in each election.  Second, the researcher must provide demographic information about the relevant racial and/or ethnic characteristics of the voters in each precinct in the jurisdiction.  In states like Georgia that include questions regarding race and ethnicity on their voter registration forms, the resulting self-classification of voters can be used to provide precinct-level demographic data based on registered voters or actual voters that received ballots in a given precinct in a given election.  Where the focus is on Hispanic voters, a Spanish Surname list produced by the Census Bureau can be used as an alternative to voter self-reporting, in order to code registered or turned-out voters as Hispanic or non-Hispanic.

When information on the race or ethnicity of voters is not available, the precinct-level summary of the racial breakdown of the eligible voter population can be used instead.  In most cases, the standard input of demographic information is in the form of the "voting age population" (VAP) or more recently the "citizen voting age population" or "CVAP" data provided by the United States Census at the Census block or block group level and aggregated to the election precinct level.  The disadvantage of using something like CVAP is that while it tells you about racial and ethnic breakdown of the eligible population, the resulting proportions are accurate for the actual voters in a given election only if turnout is equal across the racial and ethnic groups of interest.  In most cases, and this is true in Islip, this assumption is clearly not appropriate.

Two alternatives have been developed to deal with the need to adjust for this problem of systematic turnout variation when performing ecological estimations. For Ecological Regression, the alternative of what is called "double regression" has been proposed, but it is limited by the lack of agreement on suitable indicators of statistical significance (or confidence intervals) for the resulting estimates of minority and majority cohesion.[1]   For Ecological Inference this was also an early limitation, but the move to RxC methods of estimation provided a solution.   Adding a category to the vote options that allowed for eligible voters (CVAP) to be characterized as voting for one of the candidates or choosing not to vote at all (for example candidate A, candidate B, and *no vote*), allowed both vote direction and voter turnout information to be incorporated into the EI estimation.

**Election Analysis**

Dr. McDonald provides a series of tables in his report that detail the election results in the Islip geography for elections from 2005 to 2019, including Town Council (Table 1, page 9, Townwide offices (Table 2, page 10), County elections (Table 3, page 11), Statewide offices (Table 4, page 12), and National offices (Table 5, page 13).   In total, there are 52 separate contests and a total of 60 positions elected (each of the eight Town Council elections are vote-for-two contests electing two persons).   In each of the 60 cases, Dr. McDonald's ER and EI analysis shows that the Democrat is the preferred candidate of Hispanic voters, and therefore any Democratic loss counts as a defeat for the Hispanic candidate of choice.   It is notable that the party of the candidate

---

[1] *See* B. Grofman and M. A. Barreto, *A reply to Zax's (2002) critique of Grofman and Migalski (1988): double-equation approaches to ecological inference when the independent variable is misspecified*, 37 Sociological Methods & Research, 599, 602 (2009) ("However, although data on [the proportion of votes cast by each race] are available in a few data sets, these data are quite rare in real voting and most other applications.  Thus, almost any practical use of aggregate data in race and voting studies to make inferences about individuals should include the insights from the double regression procedure." (quoting Gary King, Princeton University Press, *A Solution to the Ecological Inference Problem* (1997))).

is the defining characteristic here, not the race or ethnicity of the candidate, an issue that will be addressed in more detail below.

With regard to wins and losses, the tables suggest that Democrats can and do win majority support from the Islip voters. In the National office contests, the Democrat, and hence the preferred candidate of Hispanic voters, won in 8 of the 9 contests in Dr. McDonald's Table 5 when we total the votes cast within Islip, an 89% success rate, including at least one win in all six election years he included. In the Statewide office contests, the Democrat, and hence the preferred candidate of Hispanic voters, won in 9 of the 12 contests in Dr. McDonald's Table 4 when we total the votes cast within Islip, a 75% success rate, including at least one win in all four election years he included. In the County office contests, the Democrat, and hence the preferred candidate of Hispanic voters, won in 6 of the 11 contests in Dr. McDonald's Table 3 when we total the votes cast within Islip, a 55% success rate, including at least one win in all five election years he included, and in a seventh contest the Democrat lost by fewer than 200 votes. In the Townwide office contests other than the vote-for-two Town Council elections, the Democrat, and hence the preferred candidate of Hispanic voters, won in 2 of the 12 contests in Dr. McDonald's Table 2, a 17% success rate, and in a third contest the Democrat lost by fewer than 400 votes. In the vote-for-two Town Council contests, the Democrat, and hence the preferred candidate of Hispanic voters, won in 2 of the 16 contests in Dr. McDonald's Table 1, a 12% success rate. Overall, the Democrat, and hence the preferred candidate of Hispanic voters, won based on vote totals within Islip in 27 of the 60 contests, a 45% success rate.

The same pattern of mixed party results can be seen by looking at individual odd-year elections in which there were contests above the Township level. In the November 2019 contest, the two Democratic Town Council candidates lost, but a Democrat won the County Executive

11

election.  In the November 2017 contest, the two Democratic Town Council candidates lost, but a Democrat won the County DA election, and the Democratic candidate for County Sheriff almost won as well (48.9% to 49.2%).  In the November 2015 and November 2011 contests, the Democrats lost in the Township elections, but a Democrat won in the election for County Executive.  In the November 2007 contest, the Democrats won both of the Town Council seats, and also Town Supervisor.  In the November 2005 contest, the two Democratic Town Council candidates lost, but a Democrat won the County Sheriff election.

All of this indicates that the Democratic candidates preferred by the majority of Hispanic voters in Islip have won a majority of the total vote in Islip at every level of elections.  This fact, together with the rapid increase in Hispanic CVAP evident in the report of Dr. Beveridge, suggests that the upcoming 2021 Town Council elections could result in the election of one or two Hispanic candidates of choice.  On the topic of Hispanic CVAP growth, and the potential for continued growth, Dr. Beveridge notes on pages 20-21 of his 2019 report (attached as Exhibit 1 to his 2020 report) that:

> *When one compares the 2005–2009 five-year ACS with the 2013–2017 five-year ACS, the Latino CVAP proportion in Islip has increased as these younger Latino citizens reach voting age and the number of Latinos in Islip increases. In fact, Islip's Latino CVAP has continued to increase since the 2013–2017 five-year ACS (which is centered on 2015), because Islip's total Latino CVAP was 25.9% according to the 2017 one-year ACS. Because the proportion of Latino non-voting age citizens in Islip (about 36%) is greater than the Latino CVAP proportion (about 20%) according to the 2013–2017 five-year ACS, even without any migration of Latinos into Islip, the proportion of Latino CVAP will continue to grow. In addition, the non-Latino white population and CVAP have steadily declined in Islip, thus further increasing Latino proportions. Given these trends, it is reasonable to expect that Islip's Latino CVAP proportion has continued to increase since the 2013–2017 five-year ACS and the 2017 one-year ACS, and will continue to do so.*

As Dr. Beveridge's Table 1 on page 4 of his report shows, non-Hispanic whites made up over 65% of the citizens of voting age in Islip in the 2014-2018 ACS.  In contrast, only 48% of the under-18 citizens in Islip were non-Hispanic whites.  The continued replacement of the older, less

Hispanic population by the younger, more Hispanic population increases the potential for the election of a Hispanic candidate of choice in future Township elections.  Such success would be expected to lag population and registration change, as younger registrants and more recently relocated registrants tend to participate initially at much lower rates than older and more established registrants do.  Thus, past population and registration changes may not have their full impact until future elections.

**Polarized Voting Analysis**

In this section, I report EI estimates for the voting cohesion of Hispanic and non-Hispanic voters, for the same races that Dr. McDonald reports in his Table 7 (Town Council), Table 8 (other Township offices), Table 14 (County), Table 15 (Statewide), and Table 16 (National).  In my analysis, I correct for two flaws in Dr. McDonald's analysis, and in addition, in the vote-for-two Council elections, I produce my EI estimates in a manner that makes them more directly comparable to the EI estimates for the other vote-for-one contests.  All of these areas of difference in the technique used here are explained in more detail below in the respective sections.

**Vote-For-One Elections**

Dr. McDonald makes two significant errors in calculating the vote percentages in Townwide, vote-for-one, non-Council elections.  First, he fails to account for varying degrees of voter turnout in his Ecological Inference estimates.  Second, he fails to compare Hispanic voting behavior with non-Hispanic voting behavior, even though the relevant question is whether the majority (i.e., non-Hispanics) are voting as a bloc to defeat Hispanics.

Analysis that depends on CVAP data for estimates of racial and ethnic proportions needs to account for turnout unless there is clear evidence that turnout does not vary systematically across these categories.  Here it is clear from Dr. McDonald's report that he believes that there are

13

differences in turnout between these groups, and in fact, on pages 70-71 (Appendix A, paragraph 21) of his report Dr. McDonald describes how EI might go about testing combinations of turnout and cohesion estimates to see if they were possible given actual bounds.  However, the EI scripts that Dr. McDonald provided, which reveal how he obtains his EI estimates, indicate that his procedure did not allow for variations in turnout.  As explained above, the way to allow for variations in turnout under EI is to add an input for eligible voters who chose not to vote at all. This error was pointed out in my earlier declaration in this case, and in response Dr. McDonald has corrected for the failure to account for turnout by adding a corrected analysis of all of his "vote-for-one" elections (that is everything other than Town Council) in Table A1 in his Appendix A (pages 80-81).  The EI estimates he reports in Table A1 match more closely with the EI estimates I report below in Columns 5, 6 and 7 of Table 1.  While seeming to recognize this issue, Dr. McDonald continues to report the earlier flawed estimates for all of the tables in the main body of his report, and he provides no EI analysis that appropriately deals with turnout for any of the "vote-for-two" Town Council elections.[2]

    The second modification to the estimates provided in Dr. McDonald's report is to estimate the models as Hispanic versus all non-Hispanic voters.  This case concerns the ability of Hispanic voters to elect candidates of choice, and the appropriate *Gingles* three focus is potential bloc voting by non-Hispanic voters.  Dr. McDonald explains his separation of Blacks from all other non-Hispanics in reference to his concern for accurately estimating Hispanic voter cohesion.  As he

---

[2] Dr. McDonald states in paragraph 37 of his Appendix A (pages 78-79) that his "alternative approach to EI is possible in application to the various vote-for-one elections analyzed."  To be clear, the same approach is just as possible in vote-for-two elections, as shown in my Table 2.  Dr. McDonald vaguely suggests in paragraph 37 that he does not report these results for vote-for-two Town Council elections "[b]ecause the analysis of Town Council elections are central to this inquiry."  I disagree.  An analysis that is more appropriate because it accounts for turnout differences should be used for all elections in this case.  If anything it is more, not less, important to use the correct analysis for the Town Council elections.

states in his report: "Regression and ecological inference analyses provide a more detailed statement about the relationship than comes from simply visualizing the relationship in a graph. They supply numerical estimates for the level of support for Castro [an example candidate] by each of the three groups of voters (Latinos, non-Hispanic blacks, and whites). The reason for deriving separate vote support estimates for the three groups is to ensure that the direct relationship between the rise in Castro support across EDs as Latino CVAP percentages increase is not actually because non-Hispanic blacks residing in EDs with Latinos are, by themselves, the reason that support for Castro increases."  McDonald Report at 62, Appendix A.

It may indeed be useful to include an initial estimate breaking out Black support as a diagnostic to ensure that Hispanic cohesion was not being over-estimated.   However, Dr. McDonald does not simply use this separation of the non-Hispanic voters into non-Hispanic Blacks and non-Hispanic Whites for this diagnostic purpose.  Instead he goes on to make this separation central to his definition of racially polarized voting as it applies in this case.  He says (page 62): "From the separate numerical values, it is possible to provide reasonable and reliable estimations for the cohesion of Latino voters and the degree, if any, of white bloc voting in opposition to the Latino voters' preferred candidate. The degree of racially polarized voting, if any, is the difference between Latino and white voter support for the Latino preferred candidate when the groups prefer different candidates."

Treating non-Hispanic Blacks differently than any other non-Hispanic voters when it comes to assessing *Gingles* three is not an appropriate choice for assessing polarization when the focus of the *Gingles* inquiry is on Hispanics as the minority group.  When Hispanics are the minority group challenging an at-large election system, the majority group for *Gingles* three purposes is all non-Hispanics.  Collectively, it is the non-Hispanic voters that have the potential to

15

vote as a bloc to defeat Hispanic candidates of choice.  As noted above, Dr. McDonald states that "the degree of racially polarized voting, if any, is the difference between Latino and *white* voter support for the Latino preferred candidate when the groups prefer different candidates." McDonald Report at 62 (emphasis added).  This is not the case.  Here what is at issue is the difference between support from Latinos and support from non-*Latinos*, regardless of race.

Similarly, in a case like this one where the minority group is Hispanic, it is appropriate to include Hispanic Blacks with Hispanics, and that is exactly what Dr. McDonald did in his analysis. His "Latino" category includes everyone who selected the ethnic identity of "Hispanic origin" regardless of race.  As the Census Bureau notes: "For this census, Hispanic origins are not races. Hispanic origin can be viewed as the heritage, nationality, lineage, or country of birth of the person or the person's parents or ancestors before arriving in the United States. People who identify as Hispanic, Latino, or Spanish may be any race" (2020Census.gov explanation of question #8 on the 2020 Census form – "Is Person 1 of Hispanic, Latino, or Spanish origin?").  Thus Dr. McDonald's "Latino" category rightly includes all Hispanics including: White; Black or African American; American Indian or Alaska Native; Chinese; Filipino; Asian Indian; Vietnamese; Korean; Japanese; other Asian; Native Hawaiian; Samoan; Chamorro; other Pacific Islander; some other race.

Just as it is inappropriate when the focal minority is Hispanics to exclude Black, White, or Asian (etc.) Hispanics from the *Gingles* 1 or *Gingles* 2 assessment, it is likewise inappropriate to separate out non-Hispanic Blacks from other non-Hispanics, including Whites, Asians, Native Americans, and Hawaiian/Pacific Islanders (etc.).  That is what Dr. McDonald did here, including in his "White" category non-Hispanic Asians, non-Hispanic Native Americans, non-Hispanic Hawaiian/Pacific Islanders, and all other non-Hispanics *except* non-Hispanic Blacks.  McDonald

Report at 60, footnote 25. But even if Dr. McDonald had focused just on non-Hispanic Whites, that would have been inappropriate. As explained, the proper methodology is to compare Hispanics of all races to non-Hispanics of all races.

This point is subject to some confusion due to the dominance of VRA cases brought by Black plaintiffs, particularly in the era prior to the amendment of the Act to include language minorities. In a case where the minority group at issue is Blacks, the majority population is typically labeled "Whites," and hence the term "white bloc voting" is often used in these cases. But note that in these cases Hispanic Whites were not analyzed separately from other Whites, despite the fact that doing so would parallel what Dr. McDonald has done here in separating non-Hispanic Blacks from all other non-Hispanics. Notice also that the majority of Hispanics in the U.S. also identify themselves as White, making the "White majority" shorthand inexact and problematic when the plaintiffs represent a Hispanic minority group.

In a similar vein, the standard term "racially polarized voting" in VRA cases is a holdover from the era when most cases involved a Black minority group. In cases centered on a Hispanic minority group, a pattern where the cohesive choice of Hispanic voters is usually defeated at the polls by bloc voting on the part of non-Hispanic voters (whether White or not) cannot be properly termed racial polarization, as Hispanic or Latino are not racial classifications. The correct term would be "ethnic polarization," and it is sometimes used. That term makes it clearer that the groups to be compared are defined by ethnicity, not race, so each group must include all races. Generally, both the courts and the experts slip back into the older nomenclature of racial polarization, but that does not change the fact that the proper comparison is between Hispanics and non-Hispanics, regardless of race.

Table 1 below provides the results of three distinct EI estimation procedures.[3]  It includes only Democratic candidates because, as noted above, those candidates are the Latino-preferred candidates.  Each percentage in the table reflects the estimated percentage of the votes in a particular racial or ethnic group who voted for that candidate.  Working from right to left, columns 6, 7, and 8 simply copy Dr. McDonald's EI results from his various tables in the body of his report, for ease of comparison to the estimates that I have reported here.  Those estimates retain the two errors described above.  So in column 8, for instance, Dr. McDonald reported that 32% of non-Latino White[4] votes in the 2019 Town Supervisor election were cast for Murray.  Continuing, columns 3, 4, and 5 correct Dr. McDonald's failure to take turnout into account (and most closely resemble the "alternative" EI results he provides in Table A1).  So in column 5, for instance, one can now see that 38% of non-Latino White votes were cast for Murray in 2019.  Finally, columns 1 and 2 report the percentages after correcting Dr. McDonald's failure to analyze the entire non-Latino majority.  So column 2 shows that the non-Latino votes were cast for Murray at a rate of 41%.

The table shows that Dr. McDonald's estimates include erroneous results.  Looking first at columns 5 and 8, we can see that the general impact of accounting for turnout alone is to increase the estimate of non-Hispanic White crossover for Democratic candidates by an average of about 3 percentage points (from 40.0% to 43.1%). The increase varies slightly across the contests, but mostly stays in the 2 to 4 percentage point range.  Looking next to the estimates of Hispanic cohesion for Democratic candidates in columns 3 and 6, we can see that these estimates, while they do vary up or down in individual contests, are nonetheless largely unchanged overall,

_____

[3] The 95% confidence intervals around these estimates are provided in Appendix 1.

[4] As noted, Dr. McDonald's "non-Hispanic White" category actually includes non-Hispanics of all races except non-Hispanic Blacks.

18

declining by an average of only three-tenths of one percent (from 84.1% to 83.8%) when all the contests are averaged together. Similarly, the estimates of non-Hispanic Black cohesion for Democratic candidates in columns 4 and 7, though they vary up and down from contest to contest, are largely unchanged overall, declining by an average of only three-tenths of one percent (from 82.7% to 82.4%). Overall these changes show that accounting for turnout in the estimation procedure has little impact on Hispanic or non-Hispanic Black cohesion, but this change does indicate that non-Hispanic White crossover is about 3 percentage points higher than suggested by Dr. McDonald's estimates.

The results of an analysis performed with turnout in the model (as above), and with the majority group correctly specified as all non-Hispanics, is provided in column 1 of Table 1 for Hispanic voters and in column 2 for non-Hispanic voters. When these results are compared to the estimates for the three-way race/ethnicity model (with turnout in the estimation), the results show that non-Hispanic crossover for Democratic candidates increases by an average of almost three percentage points, from the 43.1% shown in column 5, to the 46.0% in column 2. This change to a more appropriate model of Hispanic versus non-Hispanic voter cohesion does not seem to have any general effect of inflating the estimates of Hispanic cohesion in the EI models, and in fact the average estimate of Hispanic cohesion declines from 83.8% (in column 3) to 81.2% (in column 1).

Taken together, the effect of properly allowing for differences in Hispanic and non-Hispanic turnout, and correctly contrasting Hispanic voter cohesion with all non-Hispanic voter cohesion, suggests a different picture of the voting patterns in these elections. For Hispanic cohesion the impact of these changes is modest, lowering the average estimate of Hispanic cohesion from 84.1% in Dr. McDonald's estimates to 81.2% in the estimates here. The impact on non-Hispanic crossover is about twice that large, increasing average crossover from 40.0% (for

19

non-Hispanic Whites) in Dr. McDonald's estimates to 46.0% (for all non-Hispanics) in the estimates here.  Looking only at the vote-for-one Township elections, average Hispanic voter cohesion moves down slightly from 80.5% to 79.8%, while average non-Hispanic crossover rises from 36.6% (for non-Hispanic Whites) to 43.0% (for all non-Hispanics).  These are not substantive differences in the level of Hispanic cohesion, as it remains around 80%, but the larger shift upward in non-Hispanic crossover is notable.  Crossover that is typically over 40%, and averages in the mid to high 40 percent range, seems at odds with the notion that non-Hispanic voters are voting in a cohesive bloc in opposition to the candidate of choice of Hispanic voters.

## Table 1: EI Estimates for All Vote-For-One Elections

| | | Alford EI Estimates with Turnout Included in the Estimation | | | | | McDonald EI Estimates | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Hispanic/non-Hispanic | | Non-Hispanic Blacks Separate | | | Non-Hispanic Blacks Separate | | |
| Column Number | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Contest/Year | Candidate | %Hispanic | %Non-Hispanic | %Hispanic | %Non-Hispanic Black | %Non-Hispanic white | %Hispanic | %Non-Hispanic Black | %Non-Hispanic white |
| SMD Prop. 2006 | Yes Vote | 54% | 46% | 55% | 57% | 45% | 55% | 56% | 44% |
| Town Supervisor 2019 | Murray (D) | 80% | 41% | 79% | 85% | 38% | 77% | 84% | 32% |
| Town Receiver 2019 | Currey (D) | 85% | 35% | 85% | 88% | 32% | 80% | 88% | 27% |
| Town Clerk 2019 | Fritz (D) | 86% | 40% | 87% | 87% | 36% | 88% | 80% | 31% |
| Town Supervisor 2015 | Licari (d) | 77% | 35% | 78% | 75% | 33% | 70% | 71% | 30% |
| Town Receiver 2015 | Castro (D) | 85% | 29% | 84% | 76% | 27% | 74% | 79% | 24% |
| Town Clerk 2015 | Fidelia (D) | 82% | 36% | 85% | 75% | 33% | 83% | 73% | 30% |
| Town Supervisor 2011 | Nolan (D) | 83% | 48% | 85% | 85% | 45% | 91% | 75% | 41% |
| Town Receiver 2011 | Rossifontana (D) | 82% | 40% | 87% | 82% | 38% | 86% | 80% | 34% |
| Town Clerk 2011 | Fields (D) | 80% | 46% | 84% | 83% | 43% | 88% | 79% | 39% |
| Town Supervisor 2007 | Nolan (D) | 66% | 69% | 77% | 83% | 68% | 84% | 88% | 65% |
| Town Receiver 2007 | Slinkosky (D) | 71% | 44% | 69% | 76% | 42% | 69% | 82% | 40% |
| Town Supervisor 2006 | Nolan (D) | 81% | 53% | 83% | 80% | 50% | 77% | 87% | 48% |
| **Town Office Election Average** | | **79.8%** | **43.0%** | **81.9%** | **81.3%** | **40.4%** | **80.5%** | **80.5%** | **36.6%** |
| County Exec 2019 | Bellone (D) | 82% | 53% | 86% | 89% | 50% | 92% | 87% | 45% |
| County Comptroller 2018 | Schneiderman (D) | 94% | 45% | 95% | 91% | 40% | 94% | 94% | 37% |
| County Clerk 2018 | Gregory (D) | 94% | 42% | 96% | 91% | 38% | 96% | 90% | 34% |
| County DA 2017 | Sini (D) | 65% | 64% | 86% | 86% | 61% | 95% | 89% | 56% |
| County Sheriff 2017 | Toulon (D) | 81% | 48% | 87% | 86% | 46% | 93% | 84% | 40% |
| County Exec 2015 | Bellone (D) | 77% | 54% | 82% | 82% | 51% | 88% | 84% | 48% |
| County Comptroller 2014 | Gaughran (D) | 91% | 42% | 91% | 88% | 39% | 95% | 88% | 43% |
| County Exec 2011 | Bellone (D) | 74% | 53% | 84% | 82% | 50% | 89% | 73% | 46% |
| County Clerk 2006 | Viloriafisher (D) | 80% | 45% | 81% | 83% | 42% | 76% | 87% | 40% |
| County Sheriff 2005 | Demarco (D) | 71% | 49% | 75% | 75% | 47% | 74% | 76% | 45% |
| County Treasurer 2005 | Crespo (D) | 72% | 32% | 68% | 73% | 30% | 67% | 61% | 28% |
| **County Election Average** | | **80.1%** | **47.9%** | **84.6%** | **84.2%** | **44.9%** | **87.2%** | **83.0%** | **42.0%** |
| Governor 2018 | Cuomo (D) | 95% | 48% | 95% | 93% | 44% | 97% | 95% | 40% |
| Atty Gen 2018 | James (D) | 94% | 48% | 96% | 93% | 44% | 96% | 95% | 41% |
| Comptroller 2018 | DiNapoli (D) | 93% | 55% | 94% | 90% | 51% | 96% | 87% | 50% |
| Governor 2014 | Cuomo (D) | 91% | 44% | 94% | 88% | 41% | 93% | 91% | 37% |
| Atty Gen 2014 | Schneiderman (D) | 89% | 45% | 92% | 86% | 41% | 90% | 91% | 38% |
| Comptroller 2014 | Dinapoli (D) | 89% | 50% | 92% | 88% | 46% | 95% | 88% | 43% |
| Governor 2010 | Cuomo (D) | 91% | 58% | 93% | 90% | 55% | 92% | 95% | 52% |
| Atty Gen 2010 | Schneiderman (D) | 90% | 42% | 91% | 89% | 39% | 91% | 88% | 35% |
| Comptroller 2010 | Dinapoli (D) | 91% | 43% | 91% | 89% | 40% | 90% | 86% | 36% |
| Governor 2006 | Spitzer (D) | 80% | 64% | 86% | 88% | 62% | 90% | 91% | 59% |
| Atty Gen 2006 | Cuomo (D) | 81% | 48% | 83% | 83% | 45% | 76% | 89% | 43% |
| Comptroller 2006 | Hevasi (D) | 81% | 52% | 87% | 87% | 50% | 88% | 88% | 47% |
| **State Election Average** | | **88.8%** | **49.8%** | **91.2%** | **88.7%** | **46.5%** | **91.2%** | **90.3%** | **43.4%** |
| US Senate 2018 | Gillibrand (D) | 95% | 51% | 96% | 92% | 47% | 96% | 95% | 43% |
| President 2016 | Clinton (D) | 96% | 41% | 97% | 91% | 36% | 95% | 92% | 32% |
| US Senate 2016 | Schumer (D) | 94% | 60% | 96% | 92% | 56% | 95% | 95% | 53% |
| President 2012 | Obama (D) | 95% | 48% | 96% | 94% | 44% | 96% | 95% | 42% |
| US Senate 2012 | Gillibrand (D) | 94% | 62% | 96% | 92% | 59% | 96% | 94% | 57% |
| US Senate 2010 Schumer | Schumer (D) | 89% | 57% | 92% | 92% | 54% | 93% | 92% | 51% |
| US Senate 2010 Gillibrand | Gillibrand (D) | 90% | 51% | 90% | 92% | 48% | 91% | 91% | 45% |
| President 2008 | Obama (D) | 94% | 49% | 94% | 90% | 45% | 96% | 93% | 43% |
| US Senate 2006 | Clinton (D) | 85% | 59% | 89% | 90% | 56% | 91% | 93% | 54% |
| **National Election Average** | | **92.4%** | **53.1%** | **94.0%** | **91.7%** | **49.4%** | **94.3%** | **93.4%** | **46.6%** |
| **All Office Election Average** | | **81.2%** | **46.0%** | **83.8%** | **82.4%** | **43.1%** | **84.1%** | **82.7%** | **40.0%** |

**Vote-For-Two Town Council Elections**

As mentioned above, the EI estimates for ethnic/racial voting patterns for the vote-for-two Council elections are not directly comparable to the estimates discussed above for the vote-for-one contests. This is true even if the comparisons are solely to results within Dr. McDonald's report. At the beginning of his discussion of the vote-for-two Council elections Dr. McDonald cautions that "it is proper to keep in mind that all candidate support percentages in both tables are votes received as percentages of *voters at the polls*, regardless of whether a voter cast a ballot in the Town Board election." McDonald Report at 18 n.10 (emphasis added). In contrast, Dr. McDonald's estimates in all of the vote-for-one elections are votes received as percentages *of votes cast*.[5]

Similarly, Dr. McDonald acknowledges that this difference between vote-for-two elections and vote-for-one elections means that the estimates for each are not directly comparable. In his footnote 14 on page 23, he states that, "some part of" the difference between his estimates in vote-for-one Township contests and vote-for-two Council contests "can be attributed to calculating candidate support as a percentage of voters at the polls (Council) versus as a percentage of votes cast for a particular office."

This lack of comparability between votes as a percentage of voters at the polls and votes as a percentage of votes cast is seen even in the reports of the election results that Dr. McDonald provides at the beginning of his report. In Dr. McDonald's Table 1 and 2 on pages 9-10, he provides percentages for all racial/ethnic groups together. In the vote-for-one Township elections

---

[5] Based on Dr. McDonald's backup information, it appears that he estimated votes received as a percentage of voters at the polls by treating each of the four candidates in the vote-for-two elections as if they had run in a separate contest. For example, to estimate the racial/ethnic voting for Guadron in 2019, Dr. McDonald counted votes for Guadron as one category and votes for everyone else, as well as non-votes, as the other category. He then performed an EI analysis to estimate the proportion of Hispanic, non-Hispanic Black, and other non-Hispanic voters at the polls that voted for Guadron. This same approach was repeated for each of the three remaining candidates.

on Table 2, the figures are votes received by each candidate as a percentage of votes cast.

Accordingly, the figures for the candidate pairs, like Democrat Licari (37.8%) and Republican

Carpenter (62.2%) in the 2015 Supervisor contest, have vote percentages that add to 100%.[6]  In

the same 2015 election in the vote-for-two contests reported in McDonald's Table 1 on page 9, the

figures are votes received by each candidate as a percentage of voters at the polls.  The Republicans

are at 53.6% and 52.7% of the vote while the Democrats are at 37.1% and 36.3%—clearly not

comparable to the vote-for-one proportions, because the numbers do not add up to 100%.  Indeed,

in vote-for-two elections the total number of potential votes is 200% of the voters at the polls, and

Dr. McDonald's numbers add up to less than 200% because some voters at the polls cast zero or

only one of their two potential votes. As Dr. McDonald notes, using the results of the 2017 Council

elections as reported in his Table 1 as an example, "Table 1 of the main body of my report reports

the vote percentages for all four candidates. They would sum to 200% if every Islip voter at the

polls cast two ballots. The sum of the four percentages is 172.6% (51.3 + 47.9 + 37.1 + 36.3 =

172.6)."  McDonald Report at 74 n.33.[7]

---

[6] The one exception is the 2006 contest for Supervisor, in which there was a third-party candidate not listed in Table 2.  With inclusion of that candidate, the percentages would add up to 100%.

[7] In Appendix A to his report, Dr. McDonald attempts to justify estimating votes as a percentage of voters at the polls in Town Council elections—even though these estimates are not comparable to estimates of votes as a percentage of votes cast, which he uses in all other elections.  Dr. McDonald's justifications are unpersuasive.

First, Dr. McDonald refers to percentages "of voters" and fails to address the difference between using voters *at the polls*, as he does, and using voters who participated in the contest at issue.  Some voters at the polls will not vote in Town Council elections, and for purposes of those contests, such voters are no different than registered voters who did not turn out at the polls at all.  Thus, for example, Dr. McDonald says (paragraph 31) that it is important to know "whether a candidate is identifiable as a group's candidate of choice in the sense of receiving support from a majority of the group's voters."  However, if some of a group's voters show up at the polls but do not vote in the contest at issue, then a candidate might receive support from a majority of a group's voters *in the contest* but a minority of a group's voters *at the polls*.  In these circumstances, either Dr. McDonald would say that this is *not* the group's candidate of choice, despite having received votes from a majority of the group's voters in the contest, or his methodology of using voters at the polls would not answer the question he poses.  Instead, a group's candidates of choice can sensibly be viewed as the candidates who would have won if only votes from one group (e.g., only Hispanic votes) were counted.  This question can be answered by using votes as a percentage of votes cast, just as Dr. McDonald does in all elections other than Town Council.

Second, Dr. McDonald notes that when using votes cast, one does not know the extent to which the estimates reflect "single-shot voting," where a voter casts only one of the two votes that he or she is allowed.  But when using voters

In addition to the issue of comparability, Dr. McDonald repeats the same estimation flaws that were discussed above for his vote-for-one elections. Namely, he fails to allow for turnout differences across racial/ethnic groups, and he improperly fails to include non-Hispanic Blacks with other non-Hispanic voters when estimating majority bloc voting.

Table 2 below provides the results of three distinct EI estimation procedures.[8] In columns 1 and 2, under the heading "Alford EI Estimates with Turnout in the Estimation," and the sub-headings "%Hispanic and Non-Hispanic%" are the estimates from what I believe to be the most appropriate model, with turnout included in the estimation and the contrast being between the voting behavior of Hispanics and non-Hispanics. The next three columns (3, 4, and 5) in the middle of Table 2 provide the results from a replication of Dr. McDonald's three-way breakout of Hispanic, non-Hispanic Black, and non-Hispanic White voters. Here, however, unlike in Dr. McDonald's results, the estimation procedure includes turnout in the estimation, thereby correcting one of the two flaws in Dr. McDonald's analysis. Finally, the last three columns (6, 7, and 8) on the far right of Table 2 re-present Dr. McDonald's EI results from his Table 7, transformed to be roughly equivalent as described below. Note that unlike the case with his "vote-for-one" elections discussed above and referenced in my Table 1, Dr. McDonald does not provide

at the polls, one does not know the extent to which the estimates reflect single-shot voting as opposed to voters at the polls not participating in the particular contest at all.

Third, and relatedly, Dr. McDonald states (paragraphs 29 and 32) that "we do not know how cohesive the minority voters are"–or, more generally, "what percentage of voters from each racial or ethnic group supported each candidate"—because four candidates receiving 40, 30, 20 and 10 percent of a group's votes might have received votes from 80, 60, 40, and 20 percent of the group's voters (if all cast both of their ballots) or 40, 30, 20, and 10 percent of the group's voters (if all cast only one of their two ballots). Again, Dr. McDonald disregards that his measure is voters *at the polls*. If only half of a group's voters at the polls participated in the contest at issue, the percentages of the group's voters *at the polls* casting ballots for the four candidates likewise could be only 40, 30, 20, and 10 percent, even though the percentages of the group's voters *in the contest* would be 80, 60, 40, and 20. Dr. McDonald cannot estimate the percentage of the group's voters *in the contest* who support each candidate, and he gives no reason in these circumstances not to assess group voting patterns based on the percentages of group votes that go to different candidates, just as in all other elections that he analyzes.

[8] The 95% confidence intervals around these estimates are provided in Appendix 2.

an "alternative" table to correct for his failure to include a consideration of turnout in his EI estimates for the "vote-for-two" Council elections.  See footnote 2 above.

The results for my EI estimations in Table 2, like those reported above in Table 1, are from a single EI estimation run for each contest, but here they include vote totals for each of the four candidates (in Table 1 the vote-for-one contests had two candidates in the estimation).  The estimates reported here are the proportion of the votes cast by a racial/ethnic group for each candidate.  For example, in the 2017 election, the estimates in column 2 of Table 2 indicate that non-Hispanics cast an estimated 30.7% of their votes for Bergin-Weichbrodt, 28.6% of their votes for O'Connor, 20.1% of their votes for Gonzalez, and 20.6% of their votes for Fenley.  To put the results in a form more comparable to the one-for-one contests, we can sum the proportions for the two Republican candidates, and do the same for the two Democratic candidates.  In this form, the results are more comparable to the two-party vote that is reported in all the vote-for-one contests in Table 1.  Here in the 2017 election, for example, non-Hispanic voters gave 59.3% of their votes to the Republican candidates and 40.7% of their votes to the Democratic candidates.

For the reasons mentioned above, these results, unlike the ones reported in Table 1, cannot be directly compared to Dr. McDonald's results for the same elections.  It nonetheless is possible to put Dr. McDonald's results from his Table 1 into a form that at least allows approximate comparison.  As noted earlier, Dr. McDonald's figures for each candidate's votes, as a percentage of voters at the polls, add up to 172.6% in the 2017 Council elections because there were 172.6 votes cast (rather than all 200 potential votes) for every 100 voters at the polls.  He stated that the four percentages "would sum to 200% if every Islip voter at the polls cast two ballots. The sum of the four percentages is 172.6% (51.3 + 47.9 + 37.1 + 36.3 = 172.6)."  McDonald Report at 74 n.33.

His estimates can be roughly adjusted by simply calculating the proportions that each of these four individual vote shares make up as a of a proportion of the actual total of 172.6%. Dividing each of the candidate percentages by 172.6 yields new percentages of 29.7 + 27.8 + 21.5 + 21.0 = 100%.

The results of this adjustment for each of the sets of cohesion estimates in Dr. McDonald's Table 7 are produced here in columns 6, 7, and 8 of Table 2 below. Using these proportions, adapted to votes cast rather than voters at the polls, allows us to make at least the rough comparison of Dr. McDonald's results for his fixed-turnout three-way analysis to my three-way analysis that properly accounts for differences in turnout (columns 3, 4 and 5). Thus, we can make this comparison to first assess the impact of accounting for turnout, and then to assess the impact of combining non-Hispanic Blacks with all other non-Hispanic voters, just as we did above for the vote-for-one elections in Table 1.

Looking first at columns 5 and 8, we can see that the general impact of accounting for turnout (correcting only one of Dr. McDonald's two errors) is to increase the estimate of non-Hispanic White[9] crossover for Democratic candidates by an average of 4 percentage points (from 35.2% to 39.2%). The increase varies slightly across the contests, but mostly stays in the 3 to 5 percentage point range. Looking next to the estimates of Hispanic cohesion for Democratic candidates in columns 3 and 6, we can see that these estimates, while they do vary up or down in individual contests, decline generally by an average of 2 percentage points (from 83.5% to 81.6%) when all the contests are averaged together. Similarly, the estimates of non-Hispanic Black cohesion for Democratic candidates in columns 7 and 4, though they vary up and down from

---

[9] Again, Dr. McDonald's "non-Hispanic White" category actually includes non-Hispanics of all races except non-Hispanic Blacks.

contest to contest, are largely unchanged overall, declining by an average of only three-tenths of one percent (from 81.9% to 81.6%). Overall these changes show that accounting for turnout in the estimation procedure suggests that non-Hispanic White crossover is about 4 percentage points higher than suggested by Dr. McDonald's estimates.

The results of an analysis performed with turnout in the model (as above), and the majority group correctly specified as all non-Hispanics, is provided in columns 1 and 2 of Table 2. When these results are compared to the estimates for the three-way race/ethnicity model (with turnout in the estimation), the results show that non-Hispanic crossover for Democratic candidates increases by an average of about 2 percentage points, from the 39.2% (for non-Hispanic Whites) shown in column 5, to the 41.7% (for all non-Hispanics) in column 2. This change to a more appropriate model of Hispanic versus non-Hispanic voter cohesion does not seem to have any general effect of inflating the estimates of Hispanic cohesion in the EI models, and in fact the average estimate of Hispanic cohesion declines from 81.3% (in column 3) to 77.5% (in column 1).

Taken together, the effect of (1) properly allowing for differences in turnout and (2) correctly contrasting Hispanic voter cohesion with all non-Hispanic voter cohesion, suggests patterns similar to that reported above for the various vote-for-one elections in Table 1. For Hispanic cohesion, the impact of these changes lowers the average estimate of Hispanic cohesion from 83.5% in Dr. McDonald's estimates to 77.5% in the estimates here. The impact on non-Hispanic crossover is to increase average non-Hispanic crossover from 35.2% (for non-Hispanic Whites) in Dr. McDonald's estimates to 41.7% (for all non-Hispanics) in the estimates here.

Properly estimated, the overall average of the results for the vote-for-two Township elections reported in columns 1 and 2 of Table 2 are similar to the overall average of those reported in columns 3 and 4 of Table 1 for the vote-for-one Township elections. In the vote-for-one

elections average Hispanic voter cohesion was 79.8%, and in the vote-for-two elections it is 77.5%. Average non-Hispanic crossover in the vote-for-one elections was 43.0%, and in the vote-for-two elections it is 41.7%. In both types of Township elections Hispanics are moderately cohesive at near 80%. Non-Hispanic crossover in both types of elections is over 40% (and the figure is over 39% even when non-Hispanic Blacks are improperly excluded from the non-Hispanic category). This is at odds with the notion that non-Hispanic voters are voting in a cohesive bloc in opposition to the candidate of choice of Hispanic voters.

**Table 2: EI Estimates for Islip Council Vote-for-Two Elections**

| | Alford EI Estimates with Turnout Included in the Estimation | | | | | McDonald EI Estimates as % of Votes | | |
| | Hispanic/non-Hispanic | | Non-Hispanic Blacks Separate | | | | Non-Hispanic Blacks Separate | |
| Column Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | %Hispanic | %Non-Hispanic | %Hispanic | %Non-Hispanic Black | %Non-Hispanic white | %Hispanic | %Non-Hispanic Black | %Non-Hispanic white |
| Candidate | | | | | | | | |
| Cochrane (R) | 9.2% | 30.1% | 7.6% | 6.2% | 31.7% | 7.1% | 5.9% | 34.5% |
| Mullen (R) | 8.8% | 29.9% | 7.5% | 5.7% | 31.5% | 6.3% | 7.6% | 34.1% |
| **Republicans** | **18.0%** | **60.0%** | **15.1%** | **11.9%** | **63.2%** | **13.4%** | **13.5%** | **68.6%** |
| Guadron (D) | 47.3% | 19.6% | 43.7% | 43.8% | 18.0% | 48.6% | 38.8% | 15.2% |
| Barde (D) | 34.7% | 20.4% | 37.5% | 44.3% | 18.7% | 38.0% | 47.8% | 16.2% |
| **Democrats** | **82.0%** | **40.0%** | **84.8%** | **88.1%** | **36.7%** | **86.6%** | **86.6%** | **31.4%** |
| Bergin-Weichbrodt (R) | 9.1% | 30.7% | 6.9% | 7.0% | 32.1% | 6.2% | 9.8% | 35.2% |
| O'Connor (R) | 9.3% | 28.6% | 7.4% | 7.5% | 29.9% | 5.6% | 9.0% | 32.9% |
| **Republicans** | **18.4%** | **59.3%** | **14.3%** | **14.5%** | **62.0%** | **11.8%** | **18.8%** | **68.1%** |
| Gonzalez (D) | 50.2% | 20.1% | 52.5% | 45.3% | 18.5% | 51.0% | 41.9% | 15.0% |
| Fenley (D) | 31.4% | 20.6% | 33.1% | 40.3% | 19.5% | 37.2% | 40.2% | 16.9% |
| **Democrats** | **81.6%** | **40.7%** | **85.7%** | **85.5%** | **38.0%** | **88.2%** | **82.1%** | **31.9%** |
| Cochrane (R) | 9.4% | 31.4% | 8.9% | 10.7% | 32.6% | 9.7% | 9.0% | 34.4% |
| Mullen (R) | 9.9% | 30.9% | 9.4% | 9.6% | 32.1% | 6.8% | 11.6% | 34.1% |
| **Republicans** | **19.2%** | **62.2%** | **18.3%** | **20.3%** | **64.7%** | **16.5%** | **20.6%** | **68.5%** |
| McDermott (D) | 42.4% | 19.3% | 42.8% | 41.8% | 17.9% | 42.0% | 42.4% | 16.1% |
| Pulitano (D) | 38.4% | 18.5% | 38.9% | 37.9% | 17.3% | 41.5% | 36.9% | 15.4% |
| **Democrats** | **80.8%** | **37.8%** | **81.7%** | **79.7%** | **35.3%** | **83.5%** | **79.4%** | **31.5%** |
| Flotteron (R) | 9.2% | 31.3% | 8.6% | 8.8% | 32.6% | 8.1% | 9.3% | 34.8% |
| Bergin-Weichbrodt (R) | 8.9% | 30.8% | 6.8% | 8.4% | 32.2% | 8.1% | 10.2% | 34.1% |
| **Republicans** | **18.1%** | **62.1%** | **15.4%** | **17.3%** | **64.8%** | **16.2%** | **19.5%** | **68.9%** |
| Fidelia (D) | 44.9% | 18.7% | 43.7% | 46.2% | 17.3% | 42.1% | 43.8% | 15.3% |
| Hafele (D) | 36.9% | 19.2% | 40.9% | 36.6% | 17.9% | 41.7% | 36.7% | 15.8% |
| **Democrats** | **81.9%** | **37.9%** | **84.6%** | **82.7%** | **35.2%** | **83.8%** | **80.5%** | **31.1%** |
| Cochrane (R) | 8.5% | 29.6% | 5.5% | 9.2% | 31.0% | 6.4% | 10.5% | 32.7% |
| Senft (R) | 7.0% | 29.5% | 7.1% | 6.2% | 30.8% | 4.3% | 6.4% | 33.2% |
| **Republicans** | **15.5%** | **59.1%** | **12.6%** | **15.5%** | **61.8%** | **10.8%** | **16.9%** | **66.0%** |
| Parrington (D) | 34.5% | 21.1% | 36.8% | 39.3% | 19.9% | 39.1% | 39.7% | 18.0% |
| Ortiz (D) | 50.0% | 19.8% | 50.6% | 45.2% | 18.3% | 50.1% | 43.4% | 16.1% |
| **Democrats** | **84.5%** | **40.9%** | **87.4%** | **84.5%** | **38.2%** | **89.2%** | **83.1%** | **34.0%** |
| Bergen (R) | 19.2% | 30.7% | 14.5% | 12.4% | 31.9% | 13.7% | 12.5% | 33.6% |
| Flotteron (R) | 18.0% | 28.2% | 15.5% | 12.9% | 29.1% | 8.9% | 12.5% | 31.3% |
| **Republicans** | **37.2%** | **59.0%** | **29.9%** | **25.3%** | **61.0%** | **22.6%** | **25.0%** | **64.9%** |
| Bodkin (D) | 30.9% | 22.0% | 34.0% | 38.5% | 21.0% | 40.3% | 37.8% | 18.9% |
| Morgo (D) | 31.9% | 19.1% | 36.1% | 36.2% | 18.0% | 37.1% | 37.2% | 16.2% |
| **Democrats** | **62.8%** | **41.0%** | **70.1%** | **74.7%** | **39.0%** | **77.4%** | **75.0%** | **35.1%** |
| Finley (R) | 15.9% | 23.6% | 12.4% | 10.3% | 24.6% | 12.0% | 7.9% | 25.8% |
| Schettino (R) | 15.8% | 21.3% | 10.4% | 9.1% | 22.3% | 10.2% | 6.0% | 23.6% |
| **Republicans** | **31.7%** | **44.9%** | **22.7%** | **19.4%** | **46.9%** | **22.2%** | **13.9%** | **49.5%** |
| Edwards (D) | 27.5% | 29.8% | 37.9% | 41.4% | 28.6% | 40.1% | 45.7% | 27.1% |
| Parrington (D) | 40.8% | 25.3% | 39.4% | 39.2% | 24.5% | 37.7% | 40.3% | 23.4% |
| **Democrats** | **68.3%** | **55.1%** | **77.3%** | **80.6%** | **53.1%** | **77.8%** | **86.1%** | **50.5%** |
| Bodkin (R) | 10.6% | 32.6% | 10.3% | 12.5% | 33.7% | 9.6% | 10.2% | 34.8% |
| Flotteron (R) | 11.2% | 27.2% | 11.1% | 10.7% | 28.1% | 8.7% | 7.6% | 29.3% |
| **Republicans** | **21.8%** | **59.8%** | **21.4%** | **23.2%** | **61.8%** | **18.3%** | **17.8%** | **64.1%** |
| Parrington (D) | 29.1% | 23.7% | 37.9% | 32.9% | 22.6% | 41.9% | 40.0% | 21.3% |
| Alvarez (D) | 49.1% | 16.5% | 40.8% | 43.8% | 15.5% | 39.9% | 42.1% | 14.6% |
| **Democrats** | **78.2%** | **40.2%** | **78.6%** | **76.8%** | **38.2%** | **81.7%** | **82.2%** | **35.9%** |
| **Average for Democrats** | **77.5%** | **41.7%** | **81.3%** | **81.6%** | **39.2%** | **83.5%** | **81.9%** | **35.2%** |
| **Average for Republicans** | **22.5%** | **58.3%** | **18.7%** | **18.4%** | **60.8%** | **16.5%** | **18.3%** | **64.8%** |

29

**Party Polarization versus Racial Polarization**

The role of party, as opposed to race or ethnicity, in accounting for the election patterns observed is clear at every level of the election analysis. Even a simple glance down the table of raw election results provided by Dr. McDonald in his Table 1 on page 9 of his report makes it obvious that the pattern here is partisan rather than racial or ethnic. In the five Council elections held in the current decade of elections from 2011 to 2019 the same pattern appears in every election. The two Republicans win with vote totals very similar to each other's, and their percentage of voters at the polls is always in the high 40s to low 50s. The two Democrats always lose with vote totals very similar to each other's, and their percentage of voters at the polls is always in the high 30s to low 40s. In other words, knowing only the party affiliation of a candidate we can say with a high degree of accuracy what the voter response to that candidate was in a Council election over the past decade. Democratic candidates have lost with the support of about 40% of the voters at the polls, and Republican candidates have won with the support of about 50% of the voters at the polls.

In contrast, knowing the ethnicity of a candidate tells us little if anything about how voters have responded to them at the polls. In 2019 one of the candidates, Guadron, was Hispanic. The other three candidates were non-Hispanic Whites. Guadron received 21,817 votes. His fellow Democrat, Barde, a non-Hispanic White, received 21,801 votes. In 2017 one of the candidates, Gonzalez, was Hispanic. The other three candidates were non-Hispanic Whites. Gonzalez received 23,302 votes. His fellow Democrat, Fenley, a non-Hispanic White, received 22,820 votes. In 2011, one of the candidates, Ortiz, was Hispanic. The other three candidates were non-Hispanic Whites. Ortiz received 20,617 votes. Her fellow Democrat, Parrington, a non-Hispanic White, received 20,748 votes. The fact that these candidates were both Democrats clearly mattered

30

to the support that they received from Islip voters.  The fact that one candidate was Hispanic and the other was non-Hispanic clearly *did not* affect their respective levels of support.[10]  Similarly, a glance at the other three election years in this decade where both Democrats were non-Hispanic (2009, 2013, and 2015) confirms this pattern.  In each of these years, the two Democrats had levels of support that were similar to each other's, and this was comparable to the similarity in levels of support received by the two Democratic candidates in each of the three elections where one of the two Democratic candidates was Hispanic.

In addition, in years when one of the two Democratic candidates was Hispanic, the Democratic candidates received levels of support (36.3% to 40.5% of voters at the polls) comparable to the levels received in the two election years in this decade when neither Democratic candidate was Hispanic (35.2% to 38.3%).  Each of the three Hispanic Democratic candidates in 2011, 2017, and 2019 also received total votes either greater than or within 150 votes of his or her non-Hispanic Democratic counterpart, and the range of vote totals for the three Hispanic Democrats (20,617 to 23,302) was 65% higher than the range of vote totals for the Democratic candidates in 2013 and 2015, when both pairs of candidates were non-Hispanic (12,533 to 14,089).

---

[10] Going back more than ten years ago, there was a greater difference between the vote totals of the two Democratic candidates in each election.  Dr. McDonald treats two of these three elections (2007 and 2009) as each involving two non-Hispanic White Democrats, and the fact that one non-Hispanic White Democrat received more voter support than the other does not suggest ethnic as opposed to partisan voting patterns.  For the third election, from 15 years ago, Dr. McDonald treats one of the White Democrats as Hispanic in his current report, but he did not treat her as Hispanic in his prior report.  I understand that the plaintiffs in this case also did not previously include the 2005 candidate when identifying past Hispanic candidates, and the 2011 Hispanic candidate, Ms. Ortiz, stated in her declaration that she was "the first candidate of color to run for a Town Board seat as the nominee of a major party in the history of Islip." In addition, Dr. McDonald's own estimates show the 2005 candidate as receiving less support from Hispanic voters than was received by the other Democratic candidate in the same year, and far less support (by more than 20 to more than 30 percentage points) than the Hispanic voter support for the three Hispanic Democratic candidates in 2011, 2017, and 2019.  Dr. McDonald seeks to avoid these issues by treating the 2005 candidate, Ms. Alvarez, as Hispanic based solely on her Hispanic surname—without regard to whether, for example, that is her maiden surname. McDonald Report at 19 n.13.  Especially given all of the indications that Ms. Alvarez is not in fact Hispanic, her Spanish surname is not a sufficient basis for treating her as a Hispanic Democratic candidate.

31

The same pattern of party as the clear dominant factor in these elections can be seen by looking deeper into the voting patterns of different racial and ethnic groups of voters.  In his Table 7, Dr. McDonald provides his EI estimates for these same Council elections.  Even if we set aside the above critique of Dr. McDonald's methodology, and take his results at face value, the dominance of party is clear.  The stark voting pattern is that non-Hispanic Whites give Republicans substantially more support than they give Democratic candidates.  Especially by comparison, the differences between Democratic candidates in terms of non-Hispanic support—even when one candidate is Hispanic and the other is not—are quite slight.  In fact, these differences lack statistical significance when Dr. McDonald's errors are corrected (and even in one case when they are not).

In the 2019 contest, 65% of non-Hispanic White voters at the polls supported the two Republican candidates.  The two Democrats received the support of less than a third of non-Hispanic White voters at the polls.  According to Dr. McDonald's estimates, Barde, the non-Hispanic White Democrat, did get slightly more support among non-Hispanic White voters than did Guadron, his Hispanic fellow Democrat.[11]  However, it is clear that both lost the election because being Democrats put them in the 30% range in support, while the winning Republicans were in the 65% range.  The charge that Guadron lost because the non-Hispanic White vote defeated a Hispanic candidate, as opposed to a Democratic candidate, is clearly disproven by the fact that in the same ballot the same non-Hispanic White vote defeated Barde, a non-Hispanic White Democratic candidate.

---

[11] Under the EI methodology, Dr. McDonald estimates a difference of only 2.0 percentage points in non-Hispanic White support for Guadron and Barde.  By comparison, he estimates that the non-Hispanic White support for each Republican candidate was more than 33 percentage points higher than their support for either Democrat—a difference more than *16 times* greater than the estimated difference between the Democrats.  (Under Ecological Regression, Dr. McDonald estimated a difference of only 1.6 percentage points between Guadron and Barde, and his confidence intervals overlap, meaning that the difference is not statistically significant and one cannot say with 95% confidence that either candidate received more support than the other.)  When I correct for Dr. McDonald's errors in EI, the 2.0 point figure goes down to 0.8 for non-Hispanic Whites and 0.7 for all non-Hispanics, and neither figure is statistically significant.

The same pattern is repeated in the 2017 contest where both Democrats, one Hispanic and one non-Hispanic White, received about half as much support from non-Hispanic White at the polls as their Republican fellow candidates received.[12]  Likewise, the 2011 contest shows this same pattern of party polarization, with both Democrats, one Hispanic and one non-Hispanic White, receiving about half the support from non-Hispanic White voters at the polls that their Republican fellow candidates received.[13]

Moreover, looking at the other two elections in this decade where both Democrats were non-Hispanic confirms this pattern. In each of these years, the two Democrats had levels of non-Hispanic White support that were similar to each other's, and this was comparable to the similarity in the levels of support received by the two Democratic candidates in each of the three elections where one of the two Democratic candidates was Hispanic.  All of the Democrats in these years were supported by non-Hispanic White voters at the polls at rates roughly half of that for the Republican candidates in those elections.

This general pattern is also evident across the full set of partisan general elections that Dr. McDonald considers in his report.  In all 60 cases, Dr. McDonald's ER and EI analysis shows that the Democrat in each contest is the preferred candidate of Hispanic voters.  This pattern is clearly partisan, with Hispanics uniformly giving majority support (typically around 70-80 percent) to the

---

[12] Again, Dr. McDonald's estimate of the difference in non-Hispanic White support for the Hispanic Democrat and the non-Hispanic White Democrat is slight, just 3.3 percentage points, and is overwhelmed by the difference in non-Hispanic White support for Republicans over Democrats, by around *10 times* that amount.  When I correct for Dr. McDonald's errors, the 3.3 point figure goes down to 1.0 for non-Hispanic Whites and 0.5 for all non-Hispanics, and neither figure is statistically significant.

[13] Dr. McDonald estimates that non-Hispanic White support was just 3.5 percentage points lower for the Hispanic Democrat than for the non-Hispanic White Democrat.  When I correct for Dr. McDonald's errors, the figure is 1.6 points for non-Hispanic Whites and 1.3 points for all non-Hispanic voters, and the latter figure is not statistically significant.  By comparison, Dr. McDonald estimates that non-Hispanic White support for the Republican candidates was about 28 to 31 points higher than their support for the Democratic candidates.  The non-Hispanic White support was similar for the two Democratic candidates in 2011 notwithstanding the fact that the non-Hispanic White Democrat was an incumbent and had been one of the two Democratic candidates for Town Council at least twice before.

Democratic candidates.  Non-Hispanic voters tilt Republican, but less solidly, with crossover support for the Democratic candidate typically in the range of 40-50 percent, and with a majority of non-Hispanic Whites supporting the Democratic candidate in 19 out of the 60 contests based on the estimates here in Tables 1 and 2 (and in 10 of the 60 contests based on the estimates in Dr. McDonald's tables).

The importance of partisan polarization in these elections is also revealed by looking at the only non-partisan election included in Dr. McDonald's examination of general elections, the 2006 referendum on moving from at-large to single-member districts in Town Council elections.  The first thing to note is that the EI point estimate of 55 percent Hispanic support for single-member districts is well below the 70-90% Hispanic cohesion reported in the partisan elections, as discussed above.  Moreover, in his discussion of that election Dr. McDonald did not conclude that the voting was racially polarized.  In addition, given the confidence intervals, Dr. McDonald is not able to conclude with 95% certainty that a majority of Hispanic voters supported single-member districts in that election.  As he notes, "the best estimates have a majority of Latino voters (and non-Hispanic black voters) supporting a change to a system using single-member districts, but the margins of error around those estimates leave room for doubt. Latino voters likely supported the change, but, if they did, their votes were not cohesively in support of the proposition to conclude with statistical confidence they offered majority support."  McDonald Report at 23.  Even if we were to rely on the point estimates, as noted above, 54-55 percent support among Hispanic voters does not suggest that they are politically cohesive on this issue, and indeed they seem heavily divided.  Similarly, his estimate of over 44 percent support of single-member districts among non-Hispanic White voters does not suggest cohesive opposition to single-member districts.

Note also that in Dr. McDonald's Tables 11 and 12 he reports a projection analysis based on Legislative District 9 (LD9), a majority Hispanic, and majority Democratic, single-member district wholly contained with Islip.  McDonald Report at 30-31.  Table 12 includes the 2006 referendum on moving Islip to a single-member district system.  As Dr. McDonald notes,  "while there is statistical uncertainty about the Latino majority preference for switching from an at-large to single-member district format, a majority of the voters (51 percent) in LD9 preferred to switch."  McDonald Report at 28.  For partisan elections, the votes within LD9, with its Hispanic and Democratic Party majorities, differ substantially from the Townwide votes in the same elections.  Licari, for example, in the 2015 Supervisor contest, moves from a losing 37.8% of the vote in all of Islip to a clearly winning 63.0% of the vote in the LD9 Election Districts.  That is a shift in the vote for Licari of over 25 percentage points between the vote within LD9 and the Townwide vote.  In contrast, for the one non-partisan election (the single-member district referendum), the difference between the vote breakdown in LD9 and the vote breakdown Townwide is a very modest five percentage points.

**A Direct Look at Party Versus Ethnicity**

We can look at this question of partisan versus ethnic polarization more directly in the two most recent Council elections, in 2017 and 2019.  This is because Dr. Beveridge provided information from the individual voter records for the November 2017 election that show the party registration of the voters who participated in each election district, and similar data for voters in the 2019 Council elections was provided by the Suffolk County Board of Elections.  Both elections also featured one Hispanic Democratic candidate, Gonzalez in 2017 and Guadron in 2019, so voters had both a party cue and an ethnic cue.

35

Appendices 3 and 4 below include Ecological Regression estimates for the 2017 Gonzalez Town Council contest and the 2019 Guadron Town Council contest.  These estimates replicate those reported by Dr. McDonald (in his Table 6, on page 21 of his report).  The replication of that analysis was performed using the same single equation regression approach that Dr. McDonald utilized.[14]  As we would expect, I was able to closely replicate Dr. McDonald's analysis (see appendices 3 and 4 for details), and the results are essentially the same.  My replication of Dr. McDonald's methodology has the estimated vote for Gonzalez in the 2017 contest among non-Hispanic Whites at 27.4% (Dr. McDonald 27.0%), among Hispanics at 74.0% (Dr. McDonald 74.0%), and among non-Hispanic Blacks at 84.7% (Dr. McDonald 85.0%).  The same is true for the 2019 contest with the estimated vote for Guadron among non-Hispanic Whites at 29.6% (Dr. McDonald 29.6%), among Hispanics at 68.5% (Dr. McDonald 68.7%), and among non-Hispanic Blacks at 84.7% (Dr. McDonald 85.7%).

Using the 2017 contest as an example, the actual regression estimation is reported as the equation for a line in the form of:

*Vote for Gonzalez = 27.4 + .466 * Hispanic% + .573 * non-Hispanic Black%*

This is translated into the estimates above by recognizing that the constant (27.4) represents the expected percent of the vote for Gonzalez in an Election District where both Hispanic% and non-Hispanic Black% are zero, and therefore drop out of the equation.  To compute the estimate of Hispanic cohesion, holding the proportion non-Hispanic Black constant, we evaluate the

---

[14] Note that, as discussed above, this regression analysis does not incorporate turnout, and so it bears one of the same errors that I identified in Dr. McDonald's estimates above.  But there is not an acceptable method for making that incorporation using Ecological Regression, as opposed to Ecological Inference.  In turn, Ecological Inference cannot be used to estimate the simultaneous effect of party and racial/ethnic variation.  This regression analysis also separates non-Hispanic Black voters from other non-Hispanic voters—the other error that I identified in Dr. McDonald's estimates.  Nevertheless, separating non-Hispanic Black voters here allows me to compare my analysis directly to Dr. McDonald's analysis for illustrative purposes, just as I did in Tables 1 and 2 above.

equation for an election district where the Hispanic proportion is 100% (and the non-Hispanic Black proportion is 0%). That would give us the constant (27.4) plus 46.6 (100 * .466) plus 0 (0 * .573) for an estimated share of the Hispanic vote of 74.0%. Likewise, to compute the estimate of non-Hispanic Black cohesion, we evaluate the equation for an election district where the non-Hispanic Black proportion is 100% (and the Hispanic proportion is 0%). That would give us the constant (27.4) plus 0 (0 * .466) plus 57.3 (100 * .573) for an estimated share of the non-Hispanic Black vote of 84.7%. Put another way, the Hispanic coefficient of .466 tells us that on average an increase of 10 percent in the proportion Hispanic in an election district would yield an expected increase in the vote for Gonzalez of 4.66 percent. And going from 0% Hispanic to 100% Hispanic (while holding the Black proportion constant at 0%) would increase the Gonzalez vote by 46.6% from 27.4% to 74.0%.

When we add a variable for the proportion of the voters in each Election District that were registered as Democrats, the role of party versus race/ethnicity is clear. The new regression estimation For Gonzalez in the 2017 Council contest (see Appendix 3 for details) that includes the variable for percent Democratic among voters is reported as the equation for a line in the form of:

*Vote for Gonzalez = 5.9 - .057 * Hispanic% - .004 * non-Hispanic Black% + .994 * Dem%*

In this equation we can see that the effect of the proportion Democratic is very clear. Holding the other variables constant, an increase of 10 percent in the proportion Democratic yields a nearly identical expected increase in the vote for Gonzalez of 9.94 percent. In contrast, holding the percent Democratic (and the percent non-Hispanic Black) constant, an increase of 10 percent in the proportion Hispanic changes the vote for Gonzalez by only .57 percent, and it actually *decreases* the Gonzalez vote by that small amount. Thus, if an election district had a Hispanic% of 50, a non-Hispanic Black% of 0, and a Dem% of 50, its estimated vote for Gonzalez would be

52.7% (5.9 – (.57 * 50) – (.004 * 0) + (.994 *50) = 52.7).  Increasing the Dem% by 10% (from 50 to 60) and holding the Hispanic% (and the non-Hispanic Black%) constant would also increase the estimated vote for Gonzales by 9.9% (to 62.6%).  But increasing the Hispanic% by 10% (from 50 to 60) and holding the Dem% (and the non-Hispanic Black%) constant would change the vote for Gonzalez by only  .57% (to 52.1%).  Again, this change not only is minimal but is a slight *decrease* in the vote for Gonzalez when the Hispanic% increases but the Dem% (and the non-Hispanic Black%) stays the same.  The non-Hispanic White CVAP proportion is simply one minus the sum of the proportion Hispanic and the proportion non-Hispanic Black,  Therefore it is also true that the impact of an increase in the proportion of non-Hispanic Whites when holding the Dem% (and the non-Hispanic Black%) constant is similarly minimal, and is an *increase* in the Gonzalez vote.

We can see this graphically in the scatterplot below in Figure 1.  Each point on the scatterplot represents one Election District, or voting precinct, in the Town of Islip.  The scatterplot shows the pattern of the relationship between the percentage of voters in the election who are registered Democrats and the percentage of votes for Gonzalez as a proportion of voters at the polls.  The regression line shows visually what the equation above suggests as well—that the vote for Gonzalez closely tracks the proportion of Democrats among the voters in the Election District.  The points representing each Election District are all close to the line and the relationship is clearly linear.  In contrast, Figure 2 shows the same sort of scatterplot, but the relationship is between the percentage of votes for Gonzalez (as a proportion of voters at the polls) and the proportion Hispanic CVAP in the Election District.  Here the scatter of Election Districts around the line is much larger.

**Figure 1: Scatterplot of Support for Gonzalez by Proportion Democrat**



**Figure 2: Scatterplot of Support for Gonzalez by Proportion Hispanic CVAP**



As an example, in Figure 2 the Election Districts where Gonzalez got votes from more than 60% of the voters at the polls range across most of the width of the graph, from below 20% Hispanic CVAP to above 60% Hispanic CVAP.  Only 5 of the over 40 Election Districts where Gonzalez received votes from more than 60% of the voters at the polls are in the range of over 60% Hispanic CVAP.  In contrast, in Figure 1 the Election Districts where Gonzalez got votes from more than 60% of the voters at the polls are mostly also in the range of more than 60% Democratic.  None are below 50% Democratic. Similarly, in the Election Districts between 20% and 40% Democrat, the share of voters at the polls casting votes for Gonzalez is also mostly between 20% and 40%.  In contrast, in the Election Districts between 20% and 40% Hispanic

CVAP, the share of voters at the polls casting votes for Gonzalez is almost never between 20% and 40%.

Figure 3 below provides another way to visualize this relationship.   The scatterplot again shows the pattern of the relationship between percent Democrat and percent vote for Gonzalez, with a reference line showing what we would expect if percent Democrat and percent vote for Gonzalez were exactly equal in every Election District.  In addition, the Election Districts are coded to indicate whether each has a Hispanic CVAP of less than 20%, 20% to 49%, or 50% and above.  The actual percent vote for Gonzalez typically falls above the reference line, indicating that Gonzalez does slightly better in most Election Districts than what we would expect from him getting only the votes of all of the Democrats (consistent with the positive 5.9% constant in the regression equation) .  This pattern is the same regardless of the CVAP proportion Hispanic in the Election District.

**Figure 3: Scatterplot of Support for Gonzalez by Proportion Democrat with Hispanic CVAP Categories**



The same basic pattern is clear for the 2019 Guadron contest as well. When we add a variable for the proportion of the voters in each Election District that were registered as Democrats, the role of party versus race/ethnicity is clear. The new regression estimation for Guadron in the 2019 Council contest (see Appendix 4 for details) that includes the variable for percent Democratic among voters is reported as the equation for a line in the form of:

*Vote for Guadron = 7.6 - .102 * Hispanic% + .017 * non-Hispanic Black% + .933 * Dem%*

In this equation we can see that the effect of the proportion Democratic is very clear. Holding the Hispanic% (and the non-Hispanic Black%) constant, an increase of 10 percent in the proportion Democratic yields a nearly identical expected increase in the vote for Guadron of 9.33

percent.  In contrast, holding the Dem% (and the non-Hispanic Black%) constant, an increase of 10 percent in the proportion Hispanic yields only a slight change—in fact, a *decrease*—in the vote for Guadron of 1.02 percent.  Thus, if an Election District had a Hispanic% of 50, a non-Hispanic Black% of 0, and a Dem% of 50, its estimated vote for Guadron would be 49.1% (7.6 – (.102* 50) + (.017 * 0) + (.933 *50) = 49.1).  Increasing the Dem% to 60 and holding the Hispanic % (and non-Hispanic Black%) constant would increase the estimated vote for Guadron by 9.3% to 58.4%, but increasing the Hispanic% to 60 and holding the Dem% (and non-Hispanic Black%) constant would change the vote for Guadron only very slightly, a *decrease* to 48.1%.  Since the non-Hispanic white CVAP proportion is simply one minus the sum of the proportion Hispanic and the proportion non-Hispanic Black, it is also true that the impact of changes in the proportion of non-Hispanic Whites when holding the Dem% (and the non-Hispanic Black%) constant is similarly minimal, and is an *increase* in the Guadron vote.  The scatterplots for the 2019 Guadron contest are very similar to those reported above for the 2017 Gonzalez contest and are included in Appendix 5.

In sum, both the regression equations and the scatterplots for these two recent Town Council elections support the importance of party in accounting for the patterns of support that we see in these elections.  Once we control for party, the influence of the race/ethnicity of voters is weak, if present at all.  All of this is consistent with the pattern discussed above for the election analysis where the candidate of choice of Hispanic voters is the Democrat.

**Dr. McDonald's Treatment of Party Polarization**

Dr. McDonald did not address or analyze the impact of partisan voting in his previous report in this case.  In his current report he offers several new pieces of evidence on this issue.  He acknowledges at the beginning of his discussion of racial versus partisan polarization that it is true

that elections in Islip "demonstrate certain patterns of partisan division" and that the "fact that an election is split on the basis of party, meaning that registered Democrats tend to vote for Democratic candidates and registered Republicans tend to vote for Republican candidates, is not unexpected." But he argues that it is not the case that "the patterns of partisan division in Islip mean that partisan politics explains election results that lead to the defeat of Latino preferred candidates for Town office." McDonald Report at 44. Each of his main arguments is taken in turn in the section below.

**Dr. McDonald's Assertions about Voter Support for Latino Democratic Candidates and Non-Latino White Democratic Candidates**

Dr. McDonald's first argument is that "When Latino Democratic candidates are on the ballot, Islip's Latino voters tend to provide relatively high support in comparison to other Democratic candidates on the ballot while white voters provide relatively low support." McDonald Report at 44. He illustrates this in reference to the Council elections discussed above. It is true that when one of the Democratic candidates is Hispanic, that candidate gets a modestly larger share of support from Hispanics than does the non-Hispanic Democratic candidate. However this boost is typically around ten percentage points, a difference that pales in comparison to the roughly 40 percentage point difference in the support Hispanics typically provide to non-Hispanic Democrats over non-Hispanic Republicans. In other words, party is a much larger influence on which candidates Hispanics support than is candidate ethnicity, and moreover party alone is sufficient to account for which candidates are favored by Hispanics.

The evidence is even weaker when Dr. McDonald turns to non-Hispanic voters. He notes that "White voters show a one to three point preference for white Democratic candidates over the Latino Democratic candidates." McDonald Report at 45. However, when I correct for Dr. McDonald's failure to account for variation in turnout, these small differences lack statistical

significance, meaning that there is not a reasonable degree of certainty whether non-Latino Whites gave more support to the Latino candidates or to the non-Latino White candidates.[15]   Even accepting Dr. McDonald's point estimates, this is an extremely modest impact for the ethnicity of the candidate in contrast to the impact of the party of the candidate, with the non-Hispanic White vote roughly 30 points lower for Democratic candidates than for Republican candidates.   Further, taken together, these two modest patterns (the somewhat higher Latino support for Hispanic Democrats than for non-Hispanic Democrats, and the slightly lower non-Hispanic White support for Hispanic Democrats than for non-Hispanic Democrats) do not account for the defeat of Hispanic candidates.   Non-Hispanic Democrats have overall vote totals that are very similar to— and as likely to be larger as they are to be smaller than—the vote totals of Hispanic Democratic candidates (see the discussion above of vote totals).   Certainly these modest offsetting differences provide no support for an argument that it is the ethnicity of the candidate rather than the party of the candidate that leads "to the defeat of Latino preferred candidates for Town office."   Instead, this evidence points strongly to the opposite conclusion.

Dr. McDonald also points to lower support from non-Latino White voters for the Latino Democrat who ran for Tax Receiver in 2015, as compared to the non-Latino White Democrats who ran for Supervisor and Clerk that year.   Dr. McDonald provides no basis for his apparent assumption that differences in support for Democrats seeking different offices (Tax Receiver versus Supervisor or Clerk) must reflect the different ethnicities of the candidates.[16]   His own

---

[15] See footnotes 11-13 above.   As noted, the same is true in two of the three elections even for non-Hispanic White support alone, and in the third election the non-Hispanic White candidate was an incumbent who had run for Town Council at least twice before.   Even under Dr. McDonald's erroneous methodology, he acknowledges that the slight differences are not statistically significant in one of the elections he analyzes.

[16] Also, as in the contests discussed above, the difference in non-Latino White voter support for the three Democratic candidates in 2015 was overwhelmed by the difference in non-Latino White voter support for Republicans versus Democrats generally.   The Democratic candidate who received the highest non-Latino White voter support, Supervisor candidate Licari, lost the election 62.2% to 37.8%.   McDonald Report Table 2.

estimates refute that assumption.  In *all* elections analyzed by Dr. McDonald for these offices, the Democratic candidates for Tax Receiver received lower levels of non-Latino White support than the Democratic candidates for Supervisor and Clerk, regardless of candidate race or ethnicity.  In 2007, for example, the non-Latino candidate at the top of the Democratic ticket received over 65% non-Latino White voter support according to Dr. McDonald, and won the election in a landslide. The Democratic candidate for Receiver that year received 39.7% non-Latino White voter support as estimated by Dr. McDonald, and lost.  Thus, Dr. McDonald is simply noting somewhat different partisan voting patterns for different offices.  He is not showing that the voting patterns are ethnic rather than partisan.  If anything, he is providing additional support for the conclusion that they are not.

**Dr. McDonald's Assertions about Partisan Voting Patterns in Town Elections Compared to Elections for Other Offices**

Dr. McDonald's second argument is that "In county, state, and national elections, there is a clear pattern of both Republicans and Democrats carrying the Town's vote."  McDonald Report at 46.  His point is that this pattern is not present in Town elections, where Republicans typically dominate.  But, significantly, the fact that Democrats have won majorities among Islip voters indicates that there is often sufficient white crossover voting in favor of Democratic candidates to allow them to win elections, including contests on the same ballots as Town elections.  Thus, there is no structural barrier to election of Latino-preferred candidates in Town elections.  The pattern that explains the difference between defeats in Town elections and frequent victories in other elections—the higher vote percentages for Republican candidates in Town elections than in other elections—is a partisan voting pattern.

Dr. McDonald goes on to suggest that, barring some other unnamed influence, Democrats should be winning more often in Town elections because Democrats outnumber Republicans

among registered voters in Islip.  On page 45 of his report, Dr. McDonald notes that "Voter registration by party reveals Islip to be a two-party competitive town, which in recent years leans Democrat. Contrary to normal competitive two-party politics, Islip voters persistently elect Republicans to town offices, excepting the special circumstances associated with the 2006 corruption scandal and its aftermath."  Importantly, however, while the local trend of increasing Democratic registration has brought Islip to the point of a competitive, even slightly Democratic-leaning, two-party balance in registration, the actual voters in Town elections still tilt Republican. In the 2017 general election, based on the voter data provided to Dr. McDonald by Dr. Beveridge, 32.3% of the voters that turned out for the election were registered Democrats, while 40.8% were registered Republicans, a net Republican advantage of more than 5,000 voters. In the 2019 election, based on the voter records provided by the Suffolk County Board of Elections, the Republican advantage was slightly lower, but still clear with 35.6% of the voters that turned out for the election registered as Democrats, and 40.3% registered as Republicans, a net Republican advantage of more than 3,000 voters.  Taking this into account means that the outcomes of elections for Town office are consistent with what Dr. McDonald would expect from partisan voting, and he would find it anomalous that Democratic candidates so frequently carry the Islip vote in County, Statewide, and National elections.

Even if (contrary to fact) Democrats rather than Republicans had an advantage in the number of actual voters, the "persistent[] elect[ion of] Republicans to town offices, none of whom are candidates of choice of Latino voters," would not mean that "[s]omething other than partisanship is holding down support for Latino voters' candidates of choice in Town office elections."  McDonald Report at 47.  It is important to be clear here.  When Dr. McDonald says "Latino voters' candidates of choice," he is not referring to Latino candidates, he is referring to

47

Democratic candidates.  All of the Democratic candidates are the candidates of choice of Hispanic voters in these elections.  More importantly, we already have seen that while something may be "holding down support" for Democratic candidates, it is not reluctance among non-Hispanic White voters to support Hispanic candidates, as non-Hispanic white Democratic candidates have been every bit as unsuccessful as Hispanic Democratic candidates.

Again, the fact that voters generally give less support to Democratic candidates in Town elections than in other elections merely indicates somewhat different partisan voting patterns in elections for different offices, not that the voting patterns are better characterized as ethnic than as partisan.  And those different partisan patterns can exist for obvious reasons having nothing to do with race or ethnicity.  Because Town, County, Statewide, and National officials all address different sets of issues, it is entirely unremarkable when the same set of voters is more attracted to a party's candidates at one level of government than at another.

**Dr. McDonald's Assertions About Republican Dominance in Town Elections**

Dr. McDonald relies throughout this section on a set of a regression analyses of voting by party and race in Town elections since 2013.  McDonald Report, Table 24.  The analysis is flawed in several important ways.  Most notably, to estimate the relative party shares of voters, Dr. McDonald relies on the party shares of all registered voters, rather than data on actual voters in a given election.  This is compounded by Dr. McDonald's decision to measure each party's strength in an Election District as the number of that party's registrants in the precinct divided by the total CVAP population of the precinct, rather than the total number of registrants in the precinct.

Accepting Dr. McDonald's Table 24 estimates despite these limitations, it is nonetheless clear that, properly interpreted, they do not support his claim that ethnicity rather than partisanship explains the pattern of voting in Islip elections.  Dr. McDonald notes that "Latino voters tend to

48

vote in ways consistent with expectations based on party."  Specifically, "Latino Democrats are mostly loyal to Democratic candidates."  McDonald Report at 49.  In addition, the average vote for Democratic candidates among non-Hispanic White Democrats is 80%.  Equally important is the pattern of voting among non-Hispanic White Democrats in the two Council elections where there was both a Hispanic candidate and a non-Hispanic White candidate.  In 2019, 83.7% of non-Hispanic White Democrats supported Guadron, a level above the 79.3% that provided support to Barde.  Similarly in 2017, 87.5% of non-Hispanic White Democrats supported Gonzalez, a level well above the 78.3% that provided support to Fenley.  Non-Hispanic Black Democrats also give high levels of support to Democratic candidates—including, under Dr. McDonald's estimates, more than 100% support to Latino Democratic candidates.  In short, the overall behavior of voters is clearly being driven heavily by partisan voting, and to the extent that the ethnicity of the candidate has had an impact, it has generally been to increase vote share for Hispanic candidates among Hispanic, non-Hispanic White, and non-Hispanic Black Democrats.

The estimated behavior of Dr. McDonald's "independent" category is also instructive.  As a threshold matter, independent voters give far less support to Democratic candidates than Democratic voters do.  The difference is generally about 40 to 50 percentage points, and the difference is remarkably consistent for all racial and ethnic groups—that is, for Latino Democrats versus independents; for non-Latino Black Democrats versus independents; and for non-Latino White Democrats versus independents.

According to Dr. McDonald, "Latino independents typically split their votes in the 40 to 60 percent range between the Republican and Democratic candidates."  McDonald Report at 49.  That characterization is misleading.  Hispanic independents provided an average of 43.6% support to Democratic candidates across these elections.  In fact, the Democratic candidate was the

candidate of choice of Hispanic independents (with more than 50% support) in only 3 of the 14 elections, and four Democratic candidates had less than 40% support from Hispanic independents. Looking at the two Hispanic candidates for Town Council, in 2019 Guadron had the support of only 44.1% of Hispanic independents and in 2017 Gonzalez had the support of only 42.0% of Hispanic independents.  While Hispanic independent support for these two Hispanic candidates was higher than their support for the non-Hispanic Democrat on the same ticket, the fact that they clearly were not candidates of choice strongly supports the conclusion that party is a more important factor than ethnicity even for Hispanic voters.  Absent Democratic party membership, Hispanics do not typically provide majority support to Democratic candidates even when those candidates are themselves Hispanic.

The estimates for Republican voting are difficult to interpret with any assurance.  There are no estimates reported for Hispanic Republicans, which Dr. McDonald attributes to his belief that there are too few Hispanic Republicans to allow estimation.  In his note below his Table 24 he states that "There are too few Latino and non-Hispanic black Republicans to estimate plausible numbers. In 2019, the Democrat, Republican, and nonaffiliated estimated registration percentages by racial/ethnic group were Latino (D = 66, R = 3, Non = 31), non-Hispanic black (D = 75, R = 0, Non = 26), and non-Hispanic white (D = 24, R = 42, Non = 34)."  McDonald Report at 51.  He does not indicate how these figures were estimated, but using the Spanish Surname coded voter file from the 2017 election provided to Dr. McDonald by Dr. Beveridge, we can simply sum up these categories.  Among the 2017 Islip voters there were 3,705 voters coded as Spanish surnamed, and of these 760 were also registered as Republicans, 2,166 were also registered as Democrats, and the remaining 779 were blank or some other party designation.  In percentage terms that means that 58.5% of the Hispanic voters were Democrats, 20.5% were Republicans, and 21.0% were

blank or other parties.  Clearly there are far more Republican Hispanics than Dr. McDonald's estimates would suggest.  Similarly, given that the proportion of Hispanic voters in the blank/other category (Dr. McDonald's "independents") is almost identical to the Republican proportion, it is difficult to see why he is able to estimate the voting patterns of Hispanic independents but not able to do so for Hispanic Republicans.

In any case, non-Hispanic White Republicans appear to be voting cohesively for Republican candidates, a fact that again provides clear evidence of the primacy of party.  The actual levels of that support are less clear.  Many of the estimates are impossible negative numbers, again suggesting estimation difficulties.  But even if we assume that the negative values simply indicate that no non-Hispanic White Republicans are voting for the Democratic candidate, the results again demonstrate that party is the driver here, not ethnicity.  Under that assumption, both Guadron and Barde received the same zero support from non-Hispanic White Republicans.  Similarly, in 2017, Gonzalez received zero support and Fenley very nearly zero (0.3%) support from non-Hispanic White Republicans.

Dr. McDonald fails to acknowledge the basic partisan patterns on his Table 24, which shows that Democratic registrants uniformly and strongly support Democratic candidates, regardless of voter or candidate ethnicity, that Republican registrants uniformly and strongly support Republican candidates, and that independents provide mixed support for Republican and Democratic candidates.  Dr. McDonald instead focuses on the precise levels of support provided by each category of voter, arguing that non-Hispanic Whites lean more Republican than is "normal."  Regardless whether one accepts that characterization, however, the same could be said about Hispanic independents under Dr. McDonald's definition of "normal" partisan politics.  As noted above, Hispanic independents prefer Republican candidates almost four times as often as

51

they prefer Democratic candidates.  In the overwhelming majority of elections, therefore, Latino and non-Latino White voters who are *not* Democrats have the same candidate of choice, and their preferred candidates are different than the preferred candidates of Latino and non-Latino White Democrats.  This reinforces the conclusion that the voting pattern in Islip is much better characterized as a partisan pattern than as an ethnic pattern.

In addition, Dr. McDonald's observations are consistent with the fact that non-Hispanic Whites have the lowest Democratic registration rate, non-Hispanic Blacks have the highest Democratic registration rate, and Latinos fall in between.  Under these circumstances, it is not surprising that Democratic voter support for Democrats is lowest among non-Hispanic Whites and highest among non-Hispanic Blacks, with Latinos in between.  Nor is it surprising that "independent" voter support for Democrats follows the same pattern.  And given that non-Hispanic White Republicans far outnumber non-Hispanic White Democrats, it is unsurprising that non-Hispanic White Republican voter support for Republicans also is quite strong.  Dr. McDonald cites nothing to suggest that it is not "normal" for a group with a higher proportion of Democrats to also have more loyal Democrats, and vice versa.

Overall, despite Dr. McDonald's characterization of these estimates of the joint effects of party and ethnicity, the results uniformly point to the dominance of party over ethnicity in accounting for the failure of Democratic candidates to gain election in Islip Town contests. Dr. McDonald merely shows that non-Latino Whites are more Republican and less Democratic than Latinos and (especially) more Republican and less Democratic than non-Latino Blacks—not only in terms of party registration but also in terms of voting patterns of each racial/ethnic group within a registrant group (e.g., non-Latino White Democrats versus Latino Democrats).  But we already knew that non-Latino Whites lean more Republican and less Democratic than other racial

52

and ethnic groups.  That is why the consistent success of Republican candidates in Town elections means that non-Latino White voters' candidates of choice are winning while Latino voters' candidates of choice are losing.  That is also why there is no structural barrier to the success of Latino voters' candidates of choice, who can win if Democratic candidates become more attractive relative to Republican candidates than they have been in the past—far from an impossible task, given that 45% of Democratic candidates at all levels have won more votes in Islip than their Republican opponents.

Once again, Dr. McDonald is pointing out specific features of the partisan patterns in Islip, which confirms rather than refutes that the pattern is partisan and not ethnic.  One cannot say that voting patterns are ethnic rather than partisan just because a higher proportion of Latinos than non-Latino Whites vote Democratic.  Nor can one say that voting patterns are ethnic rather than partisan just because a higher proportion of Latino *Democrats* than non-Latino White *Democrats* vote Democratic.  The voting pattern is partisan regardless of the degree to which Latinos' greater support for Democratic candidates is attributable to higher Democratic registration rates as opposed to stronger party loyalty.

**Dr. McDonald's Assertions About Elections in County Legislative District 9**

Dr. McDonald suggests that the pattern of results in the County Legislative District 9 (LD9) for 2013, 2015, and 2017 "show that Latino voters are not blindly voting on the Democratic party line, but will take account of candidate characteristics other than partisanship."  McDonald Report at 52.  Dr. McDonald offers no support for the notion that voting patterns are not partisan—and certainly no support for the notion that voting patterns are ethnic—unless they reflect "blind voting on the . . . party line."  Nor does he suggest that he found any Town Council election in which the

candidates did not present voters with a significant partisan choice.  For these reasons alone, his arguments about LD9 do not support his overall conclusions.

Furthermore, analysis of the LD9 elections does reveal partisan patterns.  Monica Martinez won the 2013 LD9 election with the support of a majority of both Hispanic and non-Hispanic voters, defeating incumbent Rick Montano first in the Democratic primary and again in the general election where he was running on the Working Families line.  In 2015, she was bumped off the Democratic ticket when fellow Democrat Giovanni Mata, backed by former legislator Montano, sued to challenge her qualifying petitions.[17]  In the 2015 general election, Martinez ran as the incumbent but on the Working Families, Independence, and Woman's Equality lines.  With the backing of the County Democratic Chairman, among others, she managed to narrowly win re-election over Mata in a contest with no Republican candidate.  In that election she had the narrow majority support of both Hispanic and non-Hispanic voters.  Note also that this unusual set of events in 2015 involving Montano was closely tied to the unusual events, also orchestrated by Montano, in the 2015 Town Democratic primary contests discussed below.  In 2017, Martinez returned to the Democratic party line and was re-elected easily, again with majority support from both Hispanic and non-Hispanic voters, over a Republican challenger.

Thus, Martinez in 2015 was the Democratic incumbent (having won as a Democrat in 2013); did not run as a Democrat only because her ballot petition was successfully challenged; received support from the County Democratic Chairman; and ran against a candidate aligned with opponents of the Democratic establishment.  Martinez also went on to win as a Democrat not only

---

[17] Information about the circumstances of the 2015 Islip and LD9 elections is drawn from press reports available at: https://www.longislandpress.com/2015/07/15/political-veteran-rick-montano-roils-islip-democrats-with-primary/; https://www.newsday.com/long-island/politics/spin-cycle/9th-ld-dissident-islip-dems-claim-fraud-in-martinez-petitions-1.10658449; https://www.longislandpress.com/2015/08/05/suffolk-pol-monica-martinez-concedes-democratic-primary/; https://www.newsday.com/long-island/columnists/joye-brown/giovanni-mata-s-candidacy-could-impact-islip-s-martinez-1.10721551.

in the 2017 LD9 contest but also in the 2018 State Senate election. In these circumstances, votes for Martinez in 2015 hardly indicate a general willingness to vote against Democratic candidates. This is well illustrated by the fact that Dr. McDonald's original report in this case characterized the 2015 Martinez-Mata contest as a *primary* election. Furthermore, while Martinez was able to prevail against the candidate on the Democratic party line in 2015, she did so only narrowly—by four percentage points—despite her incumbency. That fact is especially revealing given that two years later, Martinez defeated a Republican by 62 percentage points, more than *15 times* her margin over a Democrat. In this way, the 2015 election illustrates the importance of party.

Furthermore, none of these elections, including the 2013 primary, was racially polarized. Nothing here illustrates in any way the importance of ethnicity in these election outcomes. In short, however unusual the circumstances in the LD9 elections, the role of party is nonetheless clear, while in contrast there appears to be no evidence of a role for ethnic factors in characterizing the voting patterns in this series of elections.

**Dr. McDonald's Assertions About the 2015 Democratic Primaries for Town Offices**

Dr. McDonald's report discusses two types of elections that do not include a party signal—the 2006 referendum on moving from at-large to single-member districts in Town elections, and Democratic primaries. In the 2006 referendum, as discussed above, Dr. McDonald did not conclude that the voting was racially polarized. Hispanic cohesion was well below the level reported in the partisan elections, and, in fact, Dr. McDonald was not able to conclude with 95% certainty whether a majority of Hispanic voters supported or opposed single-member districts in that election. Similarly, non-Hispanic voters split almost evenly on the referendum.

On page 43 of his original report in this case, Dr. McDonald discussed two Democratic primaries in County Legislative District 9 (LD9). He reported:

55

> *Since 2005, three county LD9 elections have been contested:*
>
> > *2013 primary election: Martinez (D) vs. Montano (WF)*
> >
> > *2015 primary election: Mata (D) vs. Martinez (WF)*
> >
> > *2017 general election: Martinez (D) vs. King (R)*
>
> *Martinez, whether running on the Democratic or Working Families party line, was the preferred candidate of Latino voters in each election from 2013-17.*

Further, as Dr. McDonald notes in footnote 25 of his original report, "None of these elections were ethnically or racially polarized.  Latino and white voters in this area of the Town both supported the winning candidate in all three elections."   This discussion does not appear in his current report, but it remains useful, albeit only with some correction.  The 2013 election cycle in LD9 included both a Democratic primary and a general election.  The 2013 Democratic primary, as discussed above, featured Martinez against Montano, as did the 2013 general election that followed.  Neither the 2013 primary nor the 2013 general election was polarized, as the majority of both Hispanic and non-Hispanic voters favored Martinez in both the Democratic primary and the general election.  McDonald's reference to a 2013 primary is thus correct, although his listing of Montano as the Working Families (WF) candidate suggests he was conflating the primary and the subsequent general (in which Montano did indeed run on the Working Families line).  Dr. McDonald's reference to a 2015 primary is apparently in error, as there was no primary for the LD9 seat in 2015 (again see the discussion of the LD9 contests above).  Thus as corrected, these elections in LD9 actual provide four contests—one Democratic primary and three general elections, none of which demonstrated ethnic polarization.

In his most recent report, Dr. McDonald raises the issue of primaries again, but drops the discussion of the LD9 primary to focus on a primary that was not discussed in his original report— the 2015 Democratic primary for Town offices.  As mentioned above, this Town primary was related directly to the events in LD9 that led to the highly unusual circumstances of the 2015

general election in that district.  Rick Montano lost his place on the Democratic line in LD9 to Monica Martinez in the 2013 Democratic primary.  Despite being the long-serving incumbent, Montano lost 64% to 36%, and the estimated support for Montano was less than 40% both for Hispanic and for non-Hispanic voters.  He then also lost to Martinez in the general election where he challenged Martinez running on the Working Families line.  This time Montano lost by a margin of 71% to 29%, and again he was not the candidate of choice of Hispanic voters.

In 2015, Montano organized an insurgent challenge by Mata to Martinez in the LD9 Democratic primary, and a slate of candidates (Citizens United to Reform Islip), including himself, to run for the two Council seats, Supervisor, Receiver of Taxes, and Clerk in the Town of Islip. Mata and the Montano slate successfully petitioned to be placed on the primary ballot.  Mata also brought a successful challenge to the Martinez petition, while legal challenges to the petitions of Mata, the Montano slate, and the establishment slate for Town offices were defeated.  See footnote 17 above.

In this divisive environment, turnout for the 2015 Town primaries was especially low.  The Board of Elections website reports both votes cast and the pool of eligible voters.  In 2015, fewer than 2,000 votes were cast in each vote-for-one contest, and fewer than 4,000 votes were cast in the vote-for-two Town Council elections.  This represented less than 3% of the 65,726 registered Democrats in the Town.  According to figures provided by Dr. McDonald and Dr. Beveridge, fewer than 10 votes were cast in more than two-thirds of the Election Districts in the Town.  By comparison, the turnout rate was nearly four times as high in the 2013 LD9 primary, when 2,180 of 18,921 eligible voters participated—that is, more voters participated in the LD9 primary despite the fact that the number of eligible voters was less than 30% of the number for the 2015 Town primaries.

This entire situation was highly unusual, placing the 2015 Town Democratic primary clearly in the category of a special-circumstance election of limited general probative value.  In his discussion of the 2007 Town Council elections in his report, Dr. McDonald notes that the 2007 election was a special circumstance due to the criminal conviction of the then-Town Supervisor. He argues that the special circumstance means that the Democratic success in that election, and the levels of White support for the Democratic candidates, should not be viewed as indicative of general voter behavior in Islip elections.  The same caution must also apply here.

With that caution in mind, it is worth taking a closer look at the analysis of the 2015 primary provided by Dr. McDonald.  A key issue for any attempt to analyze primary elections is the mismatch between ethnic proportions of CVAP, which is the entire eligible population, and ethnic proportions of the much narrower group of the voters participating in the Democratic primary. This is true both because turnout in primaries is lower than in general elections, and because that low turnout draws from only one party.  In the case of the 2015 Democratic primary, the turnout was highest for the Town office of Supervisor and was still only a total of 1,937 voters, out of a CVAP of 297,848 (based on 2012-2016 estimates).  By comparison, 34,056 voters—more than 17 times as many—participated in the 2015 general election for Supervisor.  As Dr. McDonald notes, "Caution is advised in regard to interpreting the precise numbers because the vote support within an ED in association with the ethnic and racial composition of the ED involves only Democratic Party registrants. That is, it is not known that an ED with 40 percent Latino CVAP is an ED in which 40 percent of Democratic registrants are Latino."  McDonald Report at 53 n.21.  In this circumstance it is especially important to take advantage of an analytical model that allows for turnout to be included in the estimation process (such as the EI RxC model explained above and used to produce Tables 1 and 2 above in this report).  For his analysis of the 2015 primary as

reported in his Table 25, Dr. McDonald chose to provide only single regression estimates, despite recognizing the challenges of this estimation.[18]

Table 3 below provides an EI RxC analysis of the same contests included in Dr. McDonald's Table 25, using the data for these elections provided by Dr. McDonald. Whereas Dr. McDonald's estimates are based on simple regression, without accounting for variations between precincts in the turnout proportions of different racial and ethnic groups, the estimates in Table 3 are produced using the more appropriate EI RxC technique that incorporates an estimation for turnout at the Election District level.[19] As explained above in connection with Table 2, the vote-for-two Town Council estimates are of each group's votes cast for the candidate divided by the group's total votes cast in the contest. Table 3 also provides the sums of the estimates for the pair of establishment candidates and the pair of insurgent candidates.

[18] Dr. McDonald argues that "Nevertheless the analysis is robust enough to evaluate whether the voting patterns are ethnically/racially polarized." By this Dr. McDonald apparently means only whether a candidate was supported by more than 50% of Latino voters and less than 50% of non-Latino White voters. Beyond this, Dr. McDonald does not claim that the analysis is robust enough to use the actual figures on his Table 25. Furthermore, in support of his claim of adequate robustness, Dr. McDonald points to the scatterplot at Figure A5 of his Appendix. But he provides no support for his assumption that the scatterplot would be comparable if, instead of Latino CVAP percentage, the Latino percentage of Democratic registrants (or actual voters) was used. In addition, Dr. McDonald shows only the scatterplot for the one candidate as to whom there is—in his estimation—the highest likelihood of ethnic polarization as he defines it. Dr. McDonald also acknowledges that the scatterplot excludes more than two-thirds of election districts in the Town, and he concedes that including all data would "add[] noise." Apparently, if Dr. McDonald were to include all data points, he could not argue that the scatterplot suggests a robust enough analysis to evaluate even the narrow question of ethnic polarization (as defined by Dr. McDonald) in voting for this one candidate.

[19] So that the EI RxC results can be compared to Dr. McDonald's results, I have provided separate estimates for non-Latino Blacks. As explained above, this methodology also is useful for estimating Latino voter cohesion, which is not a point of significant difference for general elections in Islip but is an important issue for the primary elections analyzed in this section.

59

**Table 3: EI Estimates for 2015 Islip Democratic Primary**

| Office | Candidate | %Hispanic | Confidence Interval lower/upper | %Non-Hispanic Black | Confidence Interval lower/upper | %Non-Hispanic white | Confidence Interval lower/upper |
|---|---|---|---|---|---|---|---|
| Council | McDermott (D) | 23.9% | 18.4%/29.4% | 19.2% | 14.0%/24.6% | 37.8% | 34.0%/41.7% |
| | Pulitano (D) | 23.8% | 19.0%/28.6% | 17.0% | 12.3%/22.1% | 30.3% | 26.7%/33.8% |
| | **Dem. Party Slate** | **47.7%** | | **36.2%** | | **68.1%** | |
| Council | Ventura (D) | 29.3% | 22.2%/36.4% | 34.9% | 25.6%/44.6% | 17.1% | 13.5%/20.9% |
| | Currey (D) | 23.0% | 18.6%/27.7% | 28.9% | 21.5%/36.5% | 14.7% | 11.9%/17.9% |
| | **Montano Slate** | **52.3%** | | **63.8%** | | **31.8%** | |
| Supervisor | Licari (D) | 41.4% | 33.4%/50.2% | 38.0% | 28.2%/48.3% | 67.1% | 60.7%/73.1% |
| | Montano (D) | 58.6% | 49.8%/66.6% | 62.0% | 51.7%/71.8% | 32.9% | 26.9%/39.3% |
| Receiver of Taxes | Franco (D) | 43.1% | 35.5%/51.7% | 44.0% | 33.0%/56.0% | 31.0% | 25.3%/36.7% |
| | Castro (D) | 56.9% | 48.3%/64.4% | 56.0% | 44.0%/67.0% | 69.0% | 63.3%/74.7% |
| Clerk | Fidelia (D) | 56.5% | 47.2%/65.4% | 54.5% | 43.0%/65.5% | 75.3% | 70.1%/80.3% |
| | Guadron (D) | 43.5% | 34.6%/52.8% | 45.5% | 34.5%/57.0% | 24.7% | 19.7%/29.9% |

In the Town Council "vote-for-two" elections, it is clear that the estimates for non-Hispanic Whites (All Others) are somewhat different from those reported by Dr. McDonald, but nonetheless are broadly compatible.  Ventura and Curry are not the preferred candidates of non-Hispanic White voters, with Currey the least preferred, and collectively they have an estimated non-Hispanic White support of 32%.  McDonald also has Currey as the least preferred, and has support for both lower than 30%, but with Ventura at 29%.

The non-Hispanic White (All Others) estimates for the three "vote-for-one" elections show higher support for the insurgent candidates than in the estimates produced by Dr. McDonald. Specifically, non-Hispanic White support for Montano is at 33% here and 23% in Dr. McDonald's table, for Franco is at 31% here and 26% in Dr. McDonald's table, and for Guadron is at 25% here and 20% in Dr. McDonald's table.  Despite these difference, the broad conclusion—relying on

either Dr. McDonald's regression estimates or the EI estimates provided here—would be that non-Hispanic White voters did not support any of the insurgent slate candidates led by Rick Montano.

The EI estimates are also broadly compatible with Dr. McDonald's regression-based estimates for non-Hispanic Black voters. In the Town Council "vote-for-two" elections, Ventura and Curry are the preferred candidates of non-Hispanic Black voters, and collectively they have an EI-estimated non-Hispanic Black support of 64%, compared to roughly 70% support in Dr. McDonald's estimates. Likewise, the non-Hispanic Black estimates for the three "vote-for-one" elections show the same preferred candidates as the estimates produced by Dr. McDonald, with Montano at 62% here and 81% in McDonald's table, Franco at 44% both here and in McDonald's table, and Guadron at 45% here and 41% in McDonald's table. The broad conclusion, again relying on either Dr. McDonald's regression estimates or the EI estimates provided here, would be that non-Hispanic Black voters supported Rick Montano in the Town Supervisor contest, as well as both of Montano's fellow slate members in the Town Council contests, but they did not support Franco in the Receiver of Taxes contest or Guadron in the Town Clerk contest. Under both analyses, the confidence intervals do not provide 95% confidence as to whether a majority of non-Hispanic Black voters preferred either Franco or Guadron over their opponents.

Significantly, however, the EI estimates of Hispanic voter behavior contradict much of what Dr. McDonald reports from his regression-based estimates. In the Town Council elections, Ventura and Currey collectively net only 52% of the Hispanic vote, a total far from cohesive and clearly not statistically different from the 48% collective Hispanic support for the establishment Democrats (McDermott and Pulitano) favored by non-Hispanic White voters. In fact, the point estimate of Hispanic support is lower for Currey, at 23.0%, than for Pulitano, at 23.8%, and McDermott, at 23.9%. There is significant overlap between the confidence intervals around the

61

estimated Hispanic support for all four candidates, which are 18%-29%, 19%-29%, 22%-36%, and 19%-28%.  As a result, one cannot say with 95% confidence that any of the four candidates received stronger Latino support than any of the other candidates.  In any case it is clear that Hispanic voters did not provided cohesive support to the Montano-slate candidates in the Town Council contests.

In the Town Supervisor contest, the EI estimate of Hispanic support for Montano is 59%, well below Dr. McDonald's estimate of 87% support.  In the EI estimate, there is not a statistically significant difference between Hispanic support for Montano and for his opponent, with the lower bound of the 95% confidence interval, at 49.8%, reaching below 50%.  Even accepting the EI point estimate, over 41% of Hispanic voters supported Licari, showing a lack of cohesive Hispanic support for Montano.

This same lack of Hispanic cohesion is clear in both of the remaining Town contests.  The EI estimate shows 57% of Hispanic voters supporting Castro in the Town Receiver of Taxes contest.  Dr. McDonald's regression estimate for the same contest has *Franco* as the favored candidate, with 60% estimated support, but as Dr. McDonald notes "There is statistical ambiguity in the identification of Franco as the Latino voter candidate of choice, given the wide confidence interval around her estimated Latino support."  McDonald at 53 n.22.  McDonald goes on to say that "In all likelihood, however, Franco was the Latino voters' preferred candidate," but the EI estimate shows exactly the opposite.  While the confidence interval for the EI estimate of 57% Hispanic support for Castro, like Dr. McDonald's confidence interval around his estimate of 60% support for Franco, does extend slightly below 50%, it is more likely that *Castro* is the preferred candidate of Hispanic voters based on the EI estimates.  In any case, neither the regression estimates nor the more reliable EI estimates suggest that Hispanic voters provided cohesive support

for Franco or Castro.  Because the lower bound of the confidence interval for the estimates of Hispanic voter support reaches below 50%, we cannot reject the "null hypothesis" that in fact the Hispanic vote split 50-50, and was therefore completely non-cohesive.

In the Town Clerk contest, the EI estimate has 56.5% Hispanic support for Fidelia. Dr. McDonald's regression estimate for the same contest has *Guadron*, the Montano-slate candidate, as the favored candidate of Hispanics, with 65% estimated support.  The confidence interval for the EI estimate of 56.5% Hispanic voter support for Fidelia reaches below 50% to a lower bound of 47.2%, so we cannot reject the "null hypothesis" that in fact the Hispanic vote split 50-50, and was therefore completely non-cohesive.[20]  According to the more reliable EI estimate, it is more likely that a majority of Hispanic voters were opposed to rather than in favor of the Montano-slate candidate.

As noted above, the 2015 Democratic primary contest was a highly unusual election for Islip, but even setting aside its low probative value, the results of the EI analysis provided here offer no support for the notion that voting in the 2015 Democratic primary was ethnically polarized.  Hispanic voters did not give cohesive support to any of the candidates in this primary, and, in fact, there was not a statistically significant difference in Latino support for different

---

[20] As explained in the text, the EI estimates for the Receiver of Taxes contest indicate that Castro was the candidate of choice of Hispanic voters, while Dr. McDonald's regression estimates indicate that Franco was the likely candidate of choice.  Similarly, the EI estimates for the Town Clerk contest indicate that Fidelia was the candidate of choice of Hispanic voters, while Dr. McDonald's regression estimates indicate that Guadron was the likely choice.  In assessing these different estimates, it is instructive to look at the vote totals in this primary for the precincts within Legislative District 9 (LD9), which is heavily Hispanic.  According to Dr. McDonald's projection analysis (page 28), in every Town general election the candidates who won the vote within LD9 were also the preferred candidates of Hispanic voters Townwide.  That pattern is consistent with the EI estimates, and contrary to Dr. McDonald's estimates, in the 2015 primaries for Receiver of Taxes and Town Clerk.  In LD9, Castro received a total of 354 votes compared to Franco's total of 306 votes, and Fidelia received a total of 352 votes compared to Guadron's total of 301 votes—a 54% to 46% margin in both contests.  While this provides additional support for the EI estimates, the key point is the one explained earlier:  The EI methodology used here is clearly superior to Dr. McDonald's regression estimates because it accounts for precinct variations in turnout proportions for each racial and ethnic group.

candidates in any of the contests.  Therefore, by definition, non-Hispanic Whites did not vote as a bloc to defeat candidates cohesively supported by Hispanics.

Even if we focus on the candidates that most likely received greater Hispanic voter support, the overall pattern is not one of ethnic polarization.  In the Town Council contest, the two candidates with the highest estimated support from Hispanic voters were Ventura and McDermott. Ventura was also the most supported candidate among non-Hispanic Black voters, but was not one of the two top candidates for non-Hispanic White voters, and was not elected.  This could suggest some modest polarization in the voter response to Ventura's candidacy.  McDermott was not among the top two in terms of non-Hispanic Black support, but he was the second most supported candidate among Hispanic voters, meaning that he would have won if only Hispanic votes were counted.  McDermott in fact did win, and he was the most supported candidate among non-Hispanic White voters.   This could not be considered ethnic polarization.

In the Town Supervisor contest, Montano was the top choice of Hispanic voters and was also the top choice of non-Hispanic Black voters, but was clearly not the choice of non-Hispanic White voters, and was not elected.  This could suggest some modest polarization in the voter response to Montano's candidacy.  It is notable, however, that just two years earlier Montano, running as a long-time incumbent in LD9, had been opposed by more than 60% of Latino voters and had been soundly defeated.

In the 2015 Town Receiver of Taxes contest, Castro was the top choice of Hispanic voters, was also the top choice of non-Hispanic Black voters and of non-Hispanic White voters, and was elected.  This could not be considered ethnic polarization.  Similarly, in the Town Clerk contest, Fidelia was the top choice of Hispanic voters, was not the top choice of non-Hispanic Black voters,

but was the top choice of non-Hispanic White voters, and was elected. This could not be considered ethnic polarization.

In sum, the EI analysis suggests that Hispanic voters were simply not cohesive in their support of any of the candidates in the 2015 Democratic primary. Even if we set aside the lack of cohesion and look only at preferred candidates, three of the five contests result in the election of a preferred candidate of Hispanic voters with the support of non-Hispanic White voters. Dr. McDonald's analysis is based on primaries in a single election year in highly unusual circumstances, and even those primaries do not show that voting is Islip is ethnically polarized where partisanship is not an issue.[21]

**Dr. McDonald's Assertions About Trends in Party Registration and Latino CVAP**

Dr. McDonald notes that over time Republican registration numbers have declined and Democratic registration numbers have increased in Islip. He goes on to argue that as "a result of these trends, under normal partisan conditions, there would be a decline in the performance of Republican candidates for town office and an improvement in the performance of Latino-preferred candidates for town office. However, voter support for Republican candidates has not declined, and support for Latino preferred candidates of choice for town offices has not improved." McDonald at 54. While an increased percentage of Democratic registrants could alter the party balance in Islip, such success would be expected to lag population and registration change. That is because newly registered Democrats likely are mostly younger registrants and more recently relocated registrants, and these groups tend to participate initially at much lower rates than older

---

[21] I also have seen no evidence that the Democratic nominees for Town office in other years were not supported by Latino Democrats. Except when Montano assembled an insurgent slate after the loss of his LD9 seat (which included a loss among Latino Democrats in the LD9 primary), there has been no Democratic primary for Town office in the last decade. One of the Democrats' two candidates for Town Council has been Latino in the last two, and three of the last five, elections. In fact, the Latino Democratic candidate in 2019, Jorge Guadron, was one of the insurgent candidates from 2015. I understand that the Islip Democratic party chairman is Latino as well.

and more established registrants do.  And even after newer registrants begin participating in elections, one would expect it to take longer for them to being participating in local elections.[22]

In fact, effects of registration trends might already be emerging.  As calculated by Dr. McDonald, the Democratic Town Council candidates received voter support that was 2 to 3 percentage points higher in 2019 than in 2017, even though an incumbent Supervisor led the 2019 Republican slate.  The percentages for the Democratic Town Council candidates were higher in 2019 than in any election during the past decade except 2011, when one of the those candidates was an incumbent (who had run at least twice before) and the *Democratic* slate was led by an incumbent Supervisor who lost by fewer than 350 votes.

More fundamentally, even if Republican candidates maintain the same level of support with an increasingly Democratic electorate, this would not be evidence of racially or ethnically polarized voting in Islip.  Dr. McDonald suggests that "something other than partisanship is holding down support for Latino voters' candidates of choice."  McDonald Report at 55.  Note that by this he does not mean that something is holding down support for Latino candidates, only that something is delaying his anticipated increase in vote share for Democratic candidates. Dr. McDonald floats "racial backlash" as "one possible explanation" but does not attempt to support for the notion—and in candor does not even assert—that this has any truth.  As already noted, voters easily can have different partisan leanings in elections at different levels of government, so one who is motivated to register as a Democrat would not necessarily support Democratic candidates for Town office.  And voters' continued satisfaction with a Town

---

[22] As noted above, recent turnout proportions by party have not matched registration proportions.  Also, McDonald reports that there have been 9,000 new unaffiliated registrants along with the 11,000 new Democratic registrants. According to Dr. McDonald's Table 24, unaffiliated residents who are Latino or non-Latino White tend to vote more Republican in Town elections (and Dr. Beveridge reports that Latinos and non-Latino Whites are 87% of Islip's CVAP).

government long controlled by one party could counteract growing registration numbers for the party out of power. Furthermore, Dr. McDonald incorrectly focuses on ("possible") voter motivations rather than on group voting patterns that can be estimated and analyzed. His overall analysis fails to refute—and largely supports—the conclusion that voting patterns in Islip are better characterized as partisan rather than racial or ethnic.

**Dr. Rocha's Analysis of Latino Political Participation**

Dr. Rocha, in his report in the case, notes that Latino turnout is generally lower than non-Latino turnout nationally, and that the difference in turnout is only partially accounted for by socioeconomic differences. Turning specifically to Islip, Dr. Rocha provides a table on page 50 that summarizes several socioeconomic factors that he claims are hindering Latino participation in Islip elections. While the table does show that Latinos are relatively less well off than are non-Latino Whites in Islip, the absolute levels of these indicators are not in the range that we would usually associate with difficulties in participating in electoral politics. The median annual household income of Latino headed families is $82,515, 67% of Latinos are high school graduates, 46% are college graduates, and 67% are homeowners. These are all conservative estimates, because Dr. Rocha bases his estimates on the entire Latino population, rather than on the undoubtedly better off and better educated citizen Latino population that forms the proper base for understanding participation in elections. This is a significant issue in Islip because over 29% of voting-age Latinos in Islip are not U.S. citizens, and non-citizen adults tend to lag significantly behind citizens on all of these socioeconomic measures.

In discussing the potential effects of income on political participation, Dr. Rocha observes:

*"Income is an important predictor of political participation. Individuals with high levels of income vote more often than individuals with low levels of income. Income also affects participation. First, poorer individuals primarily devote their attention to matters related to day-to-day existence, which limits their attention to politics and thus reduces their*

67

*likelihood to participate in politics. Second, wealthier individuals are more likely to belong to social networks in which political participation is a norm, which creates an expectation of participation. Third, wealthier individuals typically have occupations that encourage participation and so are more like to participate in politics"*

*"Income is likewise an important predictor of political participation among Latinos. This relationship has been documented over nearly three decades of research. In federal general elections, Latinos earning over $54,000 are 50 percent more likely to vote than those earning less than $34,000—a stark contrast." Rocha Report at 47.*

The comparison cited by Dr. Rocha is not between Latinos earning $54,000 and those earning $34,000. It is instead a comparison between all Latinos earning anywhere above $54,000 and all those earning anywhere below $34,000. Clearly this has limited application to Islip, where the median Latino household income, at over $80,000, places most Latino households outside the category of "poorer individuals" referred to in this discussion. Most Latino households in Islip are in fact squarely in the over-$54,000 category that is the *highest* category of household income in the Fraga et al. book that Dr. Rocha cites in his discussion.

In that same book, Fraga et al. go on to note that in their highest income category (over $54,000 in household income), most individuals appear to have the information they need to participate in the political system, in contrast to those in the lowest category (less than $15,000). They write that "more than half of those respondents in the lowest income category and with the lowest educational attainment report not knowing where and how to register. By contrast, around two-thirds of the highest income and educational attainment groups have the necessary knowledge. The implications of this finding are curious. It suggests that better distribution of information and access to registration might conceivably add a considerable number of voters from low-socioeconomic-status cohorts to the electorate. By contrast, *nonvoters among the most well-off and middle-class cohorts have the information to register and, for one reason or another, have failed to do so*." Fraga et al. at 263-265 (emphasis added).

68

The latter observation is similar to Dr. Rocha's conclusion here that when he models participation as a joint function of percent Latino and his income, education and home-ownership variables, the most significant effect is percent Latino: "Of all the variables included in the multivariate regression models, Latino CVAP is the most resilient. Compared to each of the other variables in the model, the results for Latino CVAP are the most consistent with what is reported in the bivariate analyses, as evidenced by both the size of the coefficient estimate and statistical significance." Rocha Report at 63. In other words, the main driver of lower Latino participation in Islip is not the traditional Senate Report Factor 5 concerns of socioeconomic differences that result in reduced opportunity to participate in the political system. Instead, lower Latino participation in Islip seems to mirror the national pattern that Fraga et al. note is something of a puzzle. Certainly one need not look to local Islip explanations for what is clearly a much broader, national condition.

Furthermore, in analyzing turnout by Islip Latinos, Dr. Rocha does not attempt to control for other factors such as the proportion of younger citizens, the number of years living in the United States, or English-language proficiency, even though he concludes that the latter factor is a "significant predictor" of turnout. Rocha Report at 24. Dr. Rocha also analyzes Latinos as a single group, without assessing the mix of different ancestries and how that might affect political participation. For example, Fraga et al., who are cited by Rocha for income effects, observed "visible variation by national origin" in Latinos' self-reporting of registration and turnout, and they found "both unexpected and remarkable" variations between these Latino sub-groups in terms of unregistered citizens' self-reported knowledge of how and where to register to vote. Fraga et al. at 255, 265. An effort to explain patterns of Latino political participation in Islip would need to account for all of these factors and doubtless others as well.

69

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 27, 2020.

JOHN R. ALFORD

**APPENDIX 1**

**Islip Town Officials**

| Contest | Party | Candidate | N_H_Wht | lowCI | highCI | Black | lowCI | highCI | Hisp | lowCI | highCI | Not_H | lowCI | highCI | Hisp | lowCI | highCI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Supervisor 2019 | Democrat | murray | **0.38** | 0.37 | 0.39 | **0.85** | 0.75 | 0.91 | **0.79** | 0.67 | 0.89 | **0.41** | 0.40 | 0.42 | **0.80** | 0.71 | 0.88 |
| Supervisor 2019 | Republican | carpenter | **0.62** | 0.61 | 0.63 | **0.15** | 0.09 | 0.25 | **0.21** | 0.11 | 0.33 | **0.59** | 0.58 | 0.60 | **0.20** | 0.12 | 0.29 |
| Supervisor 2015 | Democrat | licari | **0.33** | 0.32 | 0.34 | **0.75** | 0.61 | 0.86 | **0.78** | 0.65 | 0.86 | **0.35** | 0.34 | 0.37 | **0.77** | 0.67 | 0.85 |
| Supervisor 2015 | Republican | carpenter | **0.67** | 0.66 | 0.68 | **0.25** | 0.14 | 0.39 | **0.22** | 0.14 | 0.35 | **0.65** | 0.63 | 0.66 | **0.23** | 0.15 | 0.33 |
| Supervisor 2011 | Democrat | nolan | **0.45** | 0.44 | 0.46 | **0.85** | 0.75 | 0.92 | **0.85** | 0.76 | 0.91 | **0.48** | 0.46 | 0.49 | **0.83** | 0.73 | 0.90 |
| Supervisor 2011 | Republican | croci | **0.55** | 0.54 | 0.56 | **0.15** | 0.08 | 0.25 | **0.15** | 0.09 | 0.24 | **0.52** | 0.51 | 0.54 | **0.17** | 0.10 | 0.27 |
| Supervisor 2007 | Democrat | nolan | **0.68** | 0.67 | 0.68 | **0.83** | 0.71 | 0.90 | **0.77** | 0.65 | 0.87 | **0.69** | 0.68 | 0.70 | **0.66** | 0.52 | 0.78 |
| Supervisor 2007 | Republican | datre | **0.32** | 0.32 | 0.33 | **0.17** | 0.10 | 0.29 | **0.23** | 0.13 | 0.35 | **0.31** | 0.30 | 0.32 | **0.34** | 0.22 | 0.48 |
| Supervisor 2006 | Democrat | nolan | **0.50** | 0.50 | 0.51 | **0.80** | 0.65 | 0.89 | **0.83** | 0.70 | 0.91 | **0.53** | 0.52 | 0.53 | **0.81** | 0.72 | 0.89 |
| Supervisor 2006 | Republican | green | **0.50** | 0.49 | 0.50 | **0.20** | 0.11 | 0.35 | **0.17** | 0.09 | 0.30 | **0.47** | 0.47 | 0.48 | **0.19** | 0.11 | 0.28 |
| Receiver 2019 | Democrat | currey | **0.32** | 0.31 | 0.33 | **0.88** | 0.81 | 0.94 | **0.85** | 0.72 | 0.92 | **0.35** | 0.34 | 0.36 | **0.85** | 0.78 | 0.91 |
| Receiver 2019 | Republican | welk | **0.68** | 0.67 | 0.69 | **0.12** | 0.06 | 0.19 | **0.15** | 0.08 | 0.28 | **0.65** | 0.64 | 0.66 | **0.15** | 0.09 | 0.22 |
| Receiver 2015 | Democrat | castro | **0.27** | 0.26 | 0.28 | **0.76** | 0.63 | 0.87 | **0.84** | 0.75 | 0.90 | **0.29** | 0.27 | 0.31 | **0.85** | 0.78 | 0.90 |
| Receiver 2015 | Republican | weik | **0.73** | 0.72 | 0.74 | **0.24** | 0.13 | 0.37 | **0.16** | 0.10 | 0.25 | **0.71** | 0.69 | 0.73 | **0.15** | 0.10 | 0.22 |
| Receiver 2011 | Democrat | rossifontar | **0.38** | 0.36 | 0.39 | **0.82** | 0.72 | 0.90 | **0.87** | 0.80 | 0.92 | **0.40** | 0.39 | 0.42 | **0.82** | 0.67 | 0.89 |
| Receiver 2011 | Republican | weik | **0.62** | 0.61 | 0.64 | **0.18** | 0.10 | 0.28 | **0.13** | 0.08 | 0.20 | **0.60** | 0.58 | 0.61 | **0.18** | 0.11 | 0.33 |
| Receiver 2007 | Democrat | slinkosky | **0.42** | 0.41 | 0.44 | **0.76** | 0.61 | 0.87 | **0.69** | 0.55 | 0.83 | **0.44** | 0.43 | 0.45 | **0.71** | 0.58 | 0.82 |
| Receiver 2007 | Republican | allen | **0.58** | 0.56 | 0.59 | **0.24** | 0.13 | 0.39 | **0.31** | 0.17 | 0.45 | **0.56** | 0.55 | 0.57 | **0.29** | 0.18 | 0.42 |
| Clerk 2018 | Democrat | fritz | **0.36** | 0.35 | 0.37 | **0.87** | 0.79 | 0.93 | **0.87** | 0.78 | 0.93 | **0.40** | 0.38 | 0.41 | **0.86** | 0.78 | 0.91 |
| Clerk 2018 | Republican | murray | **0.64** | 0.63 | 0.65 | **0.13** | 0.07 | 0.21 | **0.13** | 0.07 | 0.22 | **0.60** | 0.59 | 0.62 | **0.14** | 0.09 | 0.22 |
| Clerk 2015 | Democrat | fidelia | **0.33** | 0.32 | 0.34 | **0.75** | 0.63 | 0.86 | **0.85** | 0.77 | 0.90 | **0.36** | 0.34 | 0.38 | **0.82** | 0.71 | 0.89 |
| Clerk 2015 | Republican | murray | **0.67** | 0.66 | 0.68 | **0.25** | 0.14 | 0.37 | **0.15** | 0.10 | 0.23 | **0.64** | 0.62 | 0.66 | **0.18** | 0.11 | 0.29 |
| Clerk 2011 | Democrat | fields | **0.43** | 0.42 | 0.44 | **0.83** | 0.71 | 0.90 | **0.84** | 0.76 | 0.91 | **0.46** | 0.45 | 0.47 | **0.80** | 0.71 | 0.88 |
| Clerk 2011 | Republican | murray | **0.57** | 0.56 | 0.58 | **0.17** | 0.10 | 0.29 | **0.16** | 0.09 | 0.24 | **0.54** | 0.53 | 0.55 | **0.20** | 0.12 | 0.29 |
| | | | | | | | | | | | | | | | | | |
| SMD Prop 2006 | | Yes Vote | **0.45** | 0.45 | 0.46 | **0.57** | 0.43 | 0.71 | **0.55** | 0.42 | 0.68 | **0.46** | 0.45 | 0.46 | **0.54** | 0.41 | 0.66 |

**Suffolk County**

| Contest | Party | Candidate | N_H_Wht | lowCI | highCI | Black | lowCI | highCI | Hisp | lowCI | highCI | Not_H | lowCI | highCI | Hisp | lowCI | highCI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Executive 2019 | Democrat | bellone | 0.50 | 0.49 | 0.51 | 0.89 | 0.81 | 0.94 | 0.86 | 0.76 | 0.92 | 0.53 | 0.52 | 0.54 | 0.82 | 0.71 | 0.90 |
| Executive 2019 | Republican | kennedy | 0.50 | 0.49 | 0.51 | 0.11 | 0.06 | 0.19 | 0.14 | 0.08 | 0.24 | 0.47 | 0.46 | 0.48 | 0.18 | 0.10 | 0.29 |
| Exec 2015 | Democrat | bellone | 0.51 | 0.50 | 0.53 | 0.82 | 0.73 | 0.89 | 0.82 | 0.71 | 0.89 | 0.54 | 0.53 | 0.55 | 0.77 | 0.67 | 0.86 |
| Exec 2015 | Republican | oconnor | 0.49 | 0.47 | 0.50 | 0.18 | 0.11 | 0.27 | 0.18 | 0.11 | 0.29 | 0.46 | 0.45 | 0.47 | 0.23 | 0.14 | 0.33 |
| Exec 2011 | Democrat | bellone | 0.50 | 0.49 | 0.51 | 0.82 | 0.71 | 0.90 | 0.84 | 0.76 | 0.90 | 0.53 | 0.52 | 0.54 | 0.74 | 0.59 | 0.86 |
| Exec 2011 | Republican | carpenter | 0.50 | 0.49 | 0.51 | 0.18 | 0.10 | 0.29 | 0.16 | 0.10 | 0.24 | 0.47 | 0.46 | 0.48 | 0.26 | 0.14 | 0.41 |
| Sheriff 2017 | Democrat | toulon | 0.46 | 0.45 | 0.47 | 0.86 | 0.75 | 0.93 | 0.87 | 0.81 | 0.92 | 0.48 | 0.47 | 0.49 | 0.81 | 0.70 | 0.90 |
| Sheriff 2017 | Republican | zacarese | 0.54 | 0.53 | 0.55 | 0.14 | 0.07 | 0.25 | 0.13 | 0.08 | 0.19 | 0.52 | 0.51 | 0.53 | 0.19 | 0.10 | 0.30 |
| Sheriff 2005 | Democrat | demarco | 0.47 | 0.46 | 0.48 | 0.75 | 0.59 | 0.86 | 0.75 | 0.64 | 0.84 | 0.49 | 0.48 | 0.50 | 0.71 | 0.59 | 0.82 |
| Sheriff 2005 | Republican | tisch | 0.53 | 0.52 | 0.54 | 0.25 | 0.14 | 0.41 | 0.25 | 0.16 | 0.36 | 0.51 | 0.50 | 0.52 | 0.29 | 0.18 | 0.41 |
| Treasurer 2005 | Democrat | crespo | 0.30 | 0.29 | 0.31 | 0.73 | 0.57 | 0.84 | 0.68 | 0.53 | 0.82 | 0.32 | 0.31 | 0.33 | 0.72 | 0.59 | 0.82 |
| Treasurer 2005 | Republican | carpenter | 0.70 | 0.69 | 0.71 | 0.27 | 0.16 | 0.43 | 0.32 | 0.18 | 0.47 | 0.68 | 0.67 | 0.69 | 0.28 | 0.18 | 0.41 |
| DA 2017 | Democrat | sini | 0.61 | 0.61 | 0.62 | 0.86 | 0.78 | 0.92 | 0.86 | 0.79 | 0.92 | 0.64 | 0.63 | 0.64 | 0.65 | 0.54 | 0.76 |
| DA 2017 | Republican | perini | 0.39 | 0.38 | 0.39 | 0.14 | 0.08 | 0.22 | 0.14 | 0.08 | 0.21 | 0.36 | 0.36 | 0.37 | 0.35 | 0.24 | 0.46 |
| Comptroller 2018 | Democrat | schneidern | 0.40 | 0.39 | 0.41 | 0.91 | 0.86 | 0.95 | 0.95 | 0.93 | 0.97 | 0.45 | 0.43 | 0.46 | 0.94 | 0.91 | 0.96 |
| Comptroller 2018 | Republican | kennedy | 0.60 | 0.59 | 0.61 | 0.09 | 0.05 | 0.14 | 0.05 | 0.03 | 0.07 | 0.55 | 0.54 | 0.57 | 0.06 | 0.04 | 0.09 |
| Comptroller 2014 | Democrat | gaughran | 0.39 | 0.38 | 0.40 | 0.88 | 0.80 | 0.93 | 0.91 | 0.87 | 0.95 | 0.42 | 0.41 | 0.44 | 0.91 | 0.86 | 0.94 |
| Comptroller 2014 | Republican | kennedy | 0.61 | 0.60 | 0.62 | 0.12 | 0.07 | 0.20 | 0.09 | 0.05 | 0.14 | 0.58 | 0.56 | 0.59 | 0.09 | 0.06 | 0.14 |
| Clerk 2018 | Democrat | gregory | 0.38 | 0.37 | 0.38 | 0.91 | 0.84 | 0.95 | 0.96 | 0.94 | 0.97 | 0.42 | 0.40 | 0.43 | 0.94 | 0.92 | 0.96 |
| Clerk 2018 | Republican | pascale | 0.62 | 0.62 | 0.63 | 0.09 | 0.05 | 0.16 | 0.04 | 0.03 | 0.06 | 0.58 | 0.57 | 0.60 | 0.06 | 0.04 | 0.08 |
| Clerk 2006 | Democrat | viloriafishe | 0.42 | 0.41 | 0.43 | 0.83 | 0.73 | 0.91 | 0.81 | 0.68 | 0.89 | 0.45 | 0.43 | 0.46 | 0.80 | 0.68 | 0.89 |
| Clerk 2006 | Republican | pascale | 0.58 | 0.57 | 0.59 | 0.17 | 0.09 | 0.27 | 0.19 | 0.11 | 0.32 | 0.55 | 0.54 | 0.57 | 0.20 | 0.11 | 0.32 |

| State of New York | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contest | Party | Candidate | N_H_Wht | lowCI | highCI | Black | lowCI | highCI | Hisp | lowCI | highCI | Not_H | lowCI | highCI | Hisp | lowCI | highCI |
| Governor 2018 | Democrat | cuomo | **0.44** | 0.43 | 0.45 | **0.93** | 0.89 | 0.96 | **0.95** | 0.94 | 0.97 | **0.48** | 0.46 | 0.49 | **0.95** | 0.93 | 0.97 |
| Governor 2018 | Republican | molinaro | **0.56** | 0.55 | 0.57 | **0.07** | 0.04 | 0.11 | **0.05** | 0.03 | 0.06 | **0.52** | 0.51 | 0.54 | **0.05** | 0.03 | 0.07 |
| Governor 2014 | Democrat | cuomo | **0.41** | 0.40 | 0.42 | **0.88** | 0.80 | 0.93 | **0.94** | 0.91 | 0.96 | **0.44** | 0.43 | 0.46 | **0.91** | 0.86 | 0.94 |
| Governor 2014 | Republican | astorino | **0.59** | 0.58 | 0.60 | **0.12** | 0.07 | 0.20 | **0.06** | 0.04 | 0.09 | **0.56** | 0.54 | 0.57 | **0.09** | 0.06 | 0.14 |
| Governor 2010 | Democrat | cuomo | **0.55** | 0.54 | 0.56 | **0.90** | 0.84 | 0.94 | **0.93** | 0.90 | 0.96 | **0.58** | 0.57 | 0.59 | **0.91** | 0.86 | 0.94 |
| Governor 2010 | Republican | paladino | **0.45** | 0.44 | 0.46 | **0.10** | 0.06 | 0.16 | **0.07** | 0.04 | 0.10 | **0.42** | 0.41 | 0.43 | **0.09** | 0.06 | 0.14 |
| Governor 2006 | Democrat | spitzer | **0.62** | 0.61 | 0.62 | **0.88** | 0.79 | 0.93 | **0.86** | 0.77 | 0.92 | **0.64** | 0.63 | 0.64 | **0.80** | 0.69 | 0.88 |
| Governor 2006 | Republican | faso | **0.38** | 0.38 | 0.39 | **0.12** | 0.07 | 0.21 | **0.14** | 0.08 | 0.23 | **0.36** | 0.36 | 0.37 | **0.20** | 0.12 | 0.31 |
| State AG 2018 | Democrat | james | **0.44** | 0.43 | 0.45 | **0.93** | 0.87 | 0.96 | **0.96** | 0.94 | 0.97 | **0.48** | 0.47 | 0.49 | **0.94** | 0.92 | 0.97 |
| State AG 2018 | Republican | wofford | **0.56** | 0.55 | 0.57 | **0.07** | 0.04 | 0.13 | **0.04** | 0.03 | 0.06 | **0.52** | 0.51 | 0.53 | **0.06** | 0.03 | 0.08 |
| Atty Gen 2014 | Democrat | schneidern | **0.41** | 0.40 | 0.42 | **0.86** | 0.77 | 0.93 | **0.92** | 0.88 | 0.95 | **0.45** | 0.43 | 0.46 | **0.89** | 0.83 | 0.93 |
| Atty Gen 2014 | Republican | cahill | **0.59** | 0.58 | 0.60 | **0.14** | 0.07 | 0.23 | **0.08** | 0.05 | 0.12 | **0.55** | 0.54 | 0.57 | **0.11** | 0.07 | 0.17 |
| Atty Gen 2010 | Democrat | schneidern | **0.39** | 0.38 | 0.40 | **0.89** | 0.80 | 0.94 | **0.91** | 0.86 | 0.95 | **0.42** | 0.40 | 0.43 | **0.90** | 0.86 | 0.94 |
| Atty Gen 2010 | Republican | donovan | **0.61** | 0.60 | 0.62 | **0.11** | 0.06 | 0.20 | **0.09** | 0.05 | 0.14 | **0.58** | 0.57 | 0.60 | **0.10** | 0.06 | 0.14 |
| Atty Gen 2006 | Democrat | cuomo | **0.45** | 0.44 | 0.46 | **0.83** | 0.71 | 0.91 | **0.83** | 0.73 | 0.90 | **0.48** | 0.47 | 0.49 | **0.81** | 0.69 | 0.89 |
| Atty Gen 2006 | Republican | pirro | **0.55** | 0.54 | 0.56 | **0.17** | 0.09 | 0.29 | **0.17** | 0.10 | 0.27 | **0.52** | 0.51 | 0.53 | **0.19** | 0.11 | 0.31 |
| Comptroller 2018 | Democrat | napoli | **0.51** | 0.50 | 0.52 | **0.90** | 0.82 | 0.95 | **0.94** | 0.92 | 0.96 | **0.55** | 0.54 | 0.56 | **0.93** | 0.90 | 0.96 |
| Comptroller 2018 | Republican | trichter | **0.49** | 0.48 | 0.50 | **0.10** | 0.05 | 0.18 | **0.06** | 0.04 | 0.08 | **0.45** | 0.44 | 0.46 | **0.07** | 0.04 | 0.10 |
| Comptroller 2014 | Democrat | dinapoli | **0.46** | 0.45 | 0.47 | **0.88** | 0.79 | 0.93 | **0.92** | 0.86 | 0.95 | **0.50** | 0.48 | 0.51 | **0.89** | 0.83 | 0.94 |
| Comptroller 2014 | Republican | antonacci | **0.54** | 0.53 | 0.55 | **0.12** | 0.07 | 0.21 | **0.08** | 0.05 | 0.14 | **0.50** | 0.49 | 0.52 | **0.11** | 0.06 | 0.17 |
| Comptroller 2010 | Democrat | dinapoli | **0.40** | 0.38 | 0.41 | **0.89** | 0.79 | 0.95 | **0.91** | 0.86 | 0.95 | **0.43** | 0.42 | 0.44 | **0.91** | 0.87 | 0.94 |
| Comptroller 2010 | Republican | wilson | **0.60** | 0.59 | 0.62 | **0.11** | 0.05 | 0.21 | **0.09** | 0.05 | 0.14 | **0.57** | 0.56 | 0.58 | **0.09** | 0.06 | 0.13 |
| Comptroller 2006 | Democrat | hevasi | **0.50** | 0.49 | 0.51 | **0.87** | 0.77 | 0.93 | **0.87** | 0.76 | 0.93 | **0.52** | 0.51 | 0.53 | **0.81** | 0.69 | 0.90 |
| Comptroller 2006 | Republican | callaghan | **0.50** | 0.49 | 0.51 | **0.13** | 0.07 | 0.23 | **0.13** | 0.07 | 0.24 | **0.48** | 0.47 | 0.49 | **0.19** | 0.10 | 0.31 |

**U.S. National**

| Contest | Party | Candidate | N_H_Wht | lowCI | highCI | Black | lowCI | highCI | Hisp | lowCI | highCI | | Not_H | lowCI | highCI | Hisp | lowCI | highCI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| President 2016 | Democrat | clinton | **0.36** | 0.35 | 0.37 | **0.91** | 0.86 | 0.95 | **0.97** | 0.95 | 0.98 | | **0.41** | 0.40 | 0.42 | **0.96** | 0.94 | 0.97 |
| President 2016 | Republican | trump | **0.64** | 0.63 | 0.65 | **0.09** | 0.05 | 0.14 | **0.03** | 0.02 | 0.05 | | **0.59** | 0.58 | 0.60 | **0.04** | 0.03 | 0.06 |
| President 2012 | Democrat | obama | **0.44** | 0.43 | 0.45 | **0.94** | 0.90 | 0.96 | **0.96** | 0.95 | 0.98 | | **0.48** | 0.47 | 0.49 | **0.95** | 0.92 | 0.97 |
| President 2012 | Republican | romney | **0.56** | 0.55 | 0.57 | **0.06** | 0.04 | 0.10 | **0.04** | 0.02 | 0.05 | | **0.52** | 0.51 | 0.53 | **0.05** | 0.03 | 0.08 |
| President 2008 | Democrat | obama | **0.45** | 0.45 | 0.46 | **0.90** | 0.83 | 0.94 | **0.94** | 0.91 | 0.96 | | **0.49** | 0.48 | 0.50 | **0.94** | 0.90 | 0.96 |
| President 2008 | Republican | mccain | **0.55** | 0.54 | 0.55 | **0.10** | 0.06 | 0.17 | **0.06** | 0.04 | 0.09 | | **0.51** | 0.50 | 0.52 | **0.06** | 0.04 | 0.10 |
| US Senate 2018 | Democrat | gillibrand | **0.47** | 0.46 | 0.48 | **0.92** | 0.87 | 0.96 | **0.96** | 0.94 | 0.97 | | **0.51** | 0.50 | 0.52 | **0.95** | 0.93 | 0.97 |
| US Senate 2018 | Republican | farley | **0.53** | 0.52 | 0.54 | **0.08** | 0.04 | 0.13 | **0.04** | 0.03 | 0.06 | | **0.49** | 0.48 | 0.50 | **0.05** | 0.03 | 0.07 |
| US Senate 2016 | Democrat | schumer | **0.56** | 0.56 | 0.57 | **0.92** | 0.87 | 0.96 | **0.96** | 0.94 | 0.97 | | **0.60** | 0.59 | 0.61 | **0.94** | 0.91 | 0.96 |
| US Senate 2016 | Republican | long | **0.44** | 0.43 | 0.44 | **0.08** | 0.04 | 0.13 | **0.04** | 0.03 | 0.06 | | **0.40** | 0.39 | 0.41 | **0.06** | 0.04 | 0.09 |
| US Senate 2012 | Democrat | gillibrand | **0.59** | 0.58 | 0.60 | **0.92** | 0.86 | 0.95 | **0.96** | 0.94 | 0.97 | | **0.62** | 0.62 | 0.63 | **0.94** | 0.92 | 0.97 |
| US Senate 2012 | Republican | long | **0.41** | 0.40 | 0.42 | **0.08** | 0.05 | 0.14 | **0.04** | 0.03 | 0.06 | | **0.38** | 0.37 | 0.38 | **0.06** | 0.03 | 0.08 |
| US Senate 2010 A | Democrat | schumer | **0.54** | 0.53 | 0.55 | **0.92** | 0.87 | 0.96 | **0.92** | 0.89 | 0.95 | | **0.57** | 0.56 | 0.58 | **0.89** | 0.84 | 0.94 |
| US Senate 2010 A | Republican | townsend | **0.46** | 0.45 | 0.47 | **0.08** | 0.04 | 0.13 | **0.08** | 0.05 | 0.11 | | **0.43** | 0.42 | 0.44 | **0.11** | 0.06 | 0.16 |
| US Senate 2010 B | Democrat | gillibrand | **0.48** | 0.47 | 0.49 | **0.92** | 0.85 | 0.96 | **0.90** | 0.85 | 0.94 | | **0.51** | 0.50 | 0.52 | **0.90** | 0.85 | 0.93 |
| US Senate 2010 B | Republican | dioguardi | **0.52** | 0.51 | 0.53 | **0.08** | 0.04 | 0.15 | **0.10** | 0.06 | 0.15 | | **0.49** | 0.48 | 0.50 | **0.10** | 0.07 | 0.15 |
| US Senate 2006 | Democrat | clinton | **0.56** | 0.56 | 0.57 | **0.90** | 0.84 | 0.95 | **0.89** | 0.80 | 0.94 | | **0.59** | 0.58 | 0.60 | **0.85** | 0.76 | 0.91 |
| US Senate 2006 | Republican | spencer | **0.44** | 0.43 | 0.44 | **0.10** | 0.05 | 0.16 | **0.11** | 0.06 | 0.20 | | **0.41** | 0.40 | 0.42 | **0.15** | 0.09 | 0.24 |

**APPENDIX 2**

**Islip Town Council**

| Contest | Party | Candidate | N_H_Wht | lowCI | highCI | Black | lowCI | highCI | Hisp | lowCI | highCI | Not_H | lowCI | highCI | Hisp | lowCI | highCI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Council 2019 | Republican | Cochrane | 31.7% | 31.2% | 32.2% | 6.2% | 3.7% | 9.4% | 7.6% | 4.9% | 12.0% | 30.1% | 29.6% | 30.6% | 9.2% | 6.1% | 13.1% |
| Council 2019 | Republican | Mullen | 31.5% | 31.0% | 32.0% | 5.7% | 3.4% | 8.7% | 7.5% | 4.5% | 12.4% | 29.9% | 29.4% | 30.5% | 8.8% | 5.8% | 12.8% |
| Council 2019 | Democrat | Guadron | 18.0% | 17.3% | 18.8% | 43.8% | 26.2% | 60.9% | 47.3% | 30.0% | 60.8% | 19.6% | 18.7% | 20.5% | 47.3% | 35.9% | 57.6% |
| Council 2019 | Democrat | Barde | 18.7% | 18.0% | 19.4% | 44.3% | 27.5% | 61.0% | 37.5% | 24.7% | 52.1% | 20.4% | 19.4% | 21.2% | 34.7% | 24.8% | 47.0% |
| Council 2017 | Republican | oconnor | 29.9% | 29.4% | 30.3% | 7.5% | 4.4% | 11.6% | 7.4% | 4.9% | 10.6% | 28.6% | 28.2% | 29.1% | 9.3% | 5.8% | 13.9% |
| Council 2017 | Republican | berginweichbrodt | 32.1% | 31.6% | 32.5% | 7.0% | 4.1% | 11.0% | 6.9% | 4.6% | 10.0% | 30.7% | 30.2% | 31.1% | 9.1% | 6.1% | 12.8% |
| Council 2017 | Democrat | gonzalez | 18.5% | 17.9% | 19.2% | 45.3% | 28.8% | 59.7% | 52.5% | 41.2% | 64.1% | 20.1% | 19.2% | 21.0% | 50.2% | 34.1% | 63.8% |
| Council 2017 | Democrat | fenley | 19.5% | 18.9% | 20.1% | 40.3% | 25.4% | 56.6% | 33.1% | 22.6% | 44.1% | 20.6% | 19.9% | 21.2% | 31.4% | 19.5% | 45.2% |
| Council 2015 | Republican | mullen | 32.1% | 31.6% | 32.7% | 9.6% | 6.1% | 14.6% | 9.4% | 5.9% | 15.0% | 30.9% | 30.2% | 31.5% | 9.9% | 6.3% | 14.3% |
| Council 2015 | Republican | cochrane | 32.6% | 32.0% | 33.2% | 10.7% | 6.4% | 17.1% | 8.9% | 5.4% | 13.3% | 31.4% | 30.8% | 32.0% | 9.4% | 6.3% | 13.5% |
| Council 2015 | Democrat | pulitano | 17.3% | 16.6% | 18.1% | 37.9% | 25.5% | 51.2% | 38.9% | 26.3% | 49.3% | 18.5% | 17.6% | 19.4% | 38.4% | 28.2% | 49.4% |
| Council 2015 | Democrat | mcdermott | 17.9% | 17.2% | 18.7% | 41.8% | 29.2% | 54.4% | 42.8% | 32.5% | 54.0% | 19.3% | 18.2% | 20.1% | 42.4% | 31.9% | 54.0% |
| Council 2013 | Republican | flotteron | 32.6% | 32.0% | 33.2% | 8.8% | 4.9% | 13.8% | 8.6% | 5.7% | 12.4% | 31.3% | 30.7% | 32.0% | 9.2% | 5.9% | 13.4% |
| Council 2013 | Republican | berginweichbrodt | 32.2% | 31.6% | 32.7% | 8.4% | 4.9% | 13.0% | 6.8% | 4.4% | 9.9% | 30.8% | 30.1% | 31.4% | 8.9% | 5.9% | 13.0% |
| Council 2013 | Democrat | hafele | 17.9% | 17.2% | 18.6% | 36.6% | 23.2% | 50.6% | 40.9% | 30.4% | 51.3% | 19.2% | 18.2% | 20.2% | 36.9% | 25.7% | 47.8% |
| Council 2013 | Democrat | fidelia | 17.3% | 16.5% | 18.0% | 46.2% | 32.2% | 60.0% | 43.7% | 31.8% | 53.7% | 18.7% | 17.7% | 19.7% | 44.9% | 33.6% | 56.1% |
| Council 2011 | Republican | senft | 30.8% | 30.3% | 31.3% | 6.2% | 3.6% | 10.2% | 7.1% | 4.7% | 10.3% | 29.5% | 29.0% | 30.0% | 7.0% | 4.7% | 10.0% |
| Council 2011 | Republican | cochrane | 31.0% | 30.5% | 31.5% | 9.2% | 5.2% | 14.1% | 5.5% | 3.5% | 8.0% | 29.6% | 29.0% | 30.1% | 8.5% | 5.4% | 12.5% |
| Council 2011 | Democrat | parrington | 19.9% | 19.3% | 20.6% | 39.3% | 23.5% | 56.2% | 36.8% | 26.1% | 48.2% | 21.1% | 20.2% | 21.9% | 34.5% | 24.4% | 45.8% |
| Council 2011 | Democrat | ortiz | 18.3% | 17.5% | 18.9% | 45.2% | 27.6% | 62.6% | 50.6% | 38.7% | 61.0% | 19.8% | 18.8% | 20.8% | 50.0% | 38.5% | 60.6% |
| Council 2009 | Republican | flotteron | 29.1% | 28.6% | 29.6% | 12.9% | 8.1% | 18.9% | 15.5% | 10.5% | 21.2% | 28.2% | 27.8% | 28.6% | 18.0% | 12.8% | 24.0% |
| Council 2009 | Republican | bergen | 31.9% | 31.4% | 32.5% | 12.4% | 7.7% | 17.9% | 14.5% | 10.0% | 19.6% | 30.7% | 30.3% | 31.2% | 19.2% | 13.8% | 25.4% |
| Council 2009 | Democrat | morgo | 18.0% | 17.3% | 18.6% | 36.2% | 25.6% | 46.7% | 36.1% | 27.8% | 45.2% | 19.1% | 18.6% | 19.5% | 31.9% | 23.8% | 40.5% |
| Council 2009 | Democrat | bodkin | 21.0% | 20.3% | 21.6% | 38.5% | 28.0% | 49.8% | 34.0% | 25.9% | 43.3% | 22.0% | 21.4% | 22.4% | 30.9% | 23.1% | 40.0% |
| Council 2007 | Republican | schettino | 22.3% | 21.9% | 22.7% | 9.1% | 5.7% | 13.6% | 10.4% | 6.7% | 15.1% | 21.3% | 20.9% | 21.7% | 15.8% | 10.9% | 22.4% |
| Council 2007 | Republican | finley | 24.6% | 24.1% | 25.0% | 10.3% | 6.3% | 15.4% | 12.4% | 7.7% | 18.4% | 23.6% | 23.2% | 24.0% | 15.9% | 10.6% | 22.0% |
| Council 2007 | Democrat | parrington | 24.5% | 23.8% | 25.2% | 39.2% | 25.4% | 53.6% | 39.4% | 26.1% | 53.4% | 25.3% | 24.6% | 25.9% | 40.8% | 29.0% | 54.3% |
| Council 2007 | Democrat | edwards | 28.6% | 27.9% | 29.3% | 41.4% | 25.9% | 56.6% | 37.9% | 23.1% | 52.9% | 29.8% | 29.3% | 30.3% | 27.5% | 18.3% | 38.3% |
| Council 2005 | Republican | flotteron | 28.1% | 27.6% | 28.7% | 10.7% | 6.4% | 16.4% | 11.1% | 6.9% | 16.8% | 27.2% | 26.7% | 27.7% | 11.2% | 7.6% | 15.4% |
| Council 2005 | Republican | bodkin | 33.7% | 33.1% | 34.3% | 12.5% | 8.0% | 18.1% | 10.3% | 6.8% | 14.9% | 32.6% | 32.0% | 33.2% | 10.6% | 6.9% | 15.7% |
| Council 2005 | Democrat | parrington | 22.6% | 21.9% | 23.4% | 32.9% | 19.3% | 51.2% | 37.9% | 24.1% | 51.7% | 23.7% | 23.0% | 24.4% | 29.1% | 19.9% | 40.3% |
| Council 2005 | Democrat | alvarez | 15.5% | 14.8% | 16.3% | 43.8% | 27.0% | 58.7% | 40.8% | 25.7% | 55.1% | 16.5% | 15.6% | 17.4% | 49.1% | 36.7% | 59.8% |

**APPENDIX 3**

## Model Summary

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .860[a] | .740 | .737 | 121.044701717496570 |

a. Predictors: (Constant), pernhblack, perhisp

## ANOVA[a,b]

| Model | | Sum of Squares | df | Mean Square | F | Sig. |
|---|---|---|---|---|---|---|
| 1 | Regression | 9079003.815 | 2 | 4539501.908 | 309.825 | .000[c] |
| | Residual | 3194096.719 | 218 | 14651.820 | | |
| | Total | 12273100.535 | 220 | | | |

a. Dependent Variable: gonzalez_vpct

b. Weighted Least Squares Regression - Weighted by voters

c. Predictors: (Constant), pernhblack, perhisp

## Coefficients[a,b]

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | 27.407 | .642 | | 42.682 | .000 |
| | perhisp | .466 | .044 | .493 | 10.663 | .000 |
| | pernhblack | .573 | .059 | .449 | 9.707 | .000 |

## Coefficients[a,b]

| Model | | 95.0% Confidence Interval for B | |
|---|---|---|---|
| | | Lower Bound | Upper Bound |
| 1 | (Constant) | 26.141 | 28.672 |
| | perhisp | .380 | .552 |
| | pernhblack | .457 | .689 |

a. Dependent Variable: gonzalez_vpct

b. Weighted Least Squares Regression - Weighted by voters

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .944[a] | .890 | .889 | 78.725691279278350 |

a. Predictors: (Constant), PcDem, pernhblack, perhisp

**ANOVA[a,b]**

| Model | | Sum of Squares | df | Mean Square | F | Sig. |
|---|---|---|---|---|---|---|
| 1 | Regression | 10928192.155 | 3 | 3642730.718 | 587.752 | .000[c] |
| | Residual | 1344908.379 | 217 | 6197.734 | | |
| | Total | 12273100.535 | 220 | | | |

a. Dependent Variable: gonzalez_vpct

b. Weighted Least Squares Regression - Weighted by voters

c. Predictors: (Constant), PcDem, pernhblack, perhisp

**Coefficients[a,b]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | 5.916 | 1.312 | | 4.508 | .000 |
| | perhisp | -.057 | .042 | -.060 | -1.370 | .172 |
| | pernhblack | -.004 | .051 | -.003 | -.077 | .939 |
| | PcDem | 99.433 | 5.756 | .997 | 17.273 | .000 |

**Coefficients[a,b]**

| Model | | 95.0% Confidence Interval for B | |
|---|---|---|---|
| | | Lower Bound | Upper Bound |
| 1 | (Constant) | 3.330 | 8.503 |
| | perhisp | -.139 | .025 |
| | pernhblack | -.104 | .096 |
| | PcDem | 88.087 | 110.779 |

a. Dependent Variable: gonzalez_vpct

b. Weighted Least Squares Regression - Weighted by voters

**APPENDIX 4**

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .934[a] | .871 | .870 | 4.89105 |

a. Predictors: (Constant), PCDem100, pernhblack, perhisp

**ANOVA[a,b]**

| Model | | Sum of Squares | df | Mean Square | F | Sig. |
|---|---|---|---|---|---|---|
| 1 | Regression | 35043.775 | 3 | 11681.258 | 488.299 | .000[c] |
| | Residual | 5167.223 | 216 | 23.922 | | |
| | Total | 40210.998 | 219 | | | |

a. Dependent Variable: PcGuadronVoters100

b. Weighted Least Squares Regression - Weighted by CountWeight

c. Predictors: (Constant), PCDem100, pernhblack, perhisp

**Coefficients[a,b]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | 7.584 | 1.375 | | 5.514 | .000 |
| | perhisp | -.102 | .039 | -.127 | -2.591 | .010 |
| | pernhblack | .017 | .054 | .013 | .314 | .754 |
| | PCDem100 | .933 | .055 | 1.030 | 16.926 | .000 |

a. Dependent Variable: PcGuadronVoters100

b. Weighted Least Squares Regression - Weighted by CountWeight

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .837[a] | .701 | .698 | 7.44287 |

a. Predictors: (Constant), perhisp, pernhblack

**ANOVA[a,b]**

| Model | | Sum of Squares | df | Mean Square | F | Sig. |
|---|---|---|---|---|---|---|
| 1 | Regression | 28190.002 | 2 | 14095.001 | 254.439 | .000[c] |
| | Residual | 12020.996 | 217 | 55.396 | | |
| | Total | 40210.998 | 219 | | | |

a. Dependent Variable: PcGuadronVoters100

b. Weighted Least Squares Regression - Weighted by CountWeight

c. Predictors: (Constant), perhisp, pernhblack

**Coefficients[a,b]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | 29.623 | .674 | | 43.936 | .000 |
| | pernhblack | .561 | .065 | .431 | 8.599 | .000 |
| | perhisp | .389 | .040 | .484 | 9.645 | .000 |

a. Dependent Variable: PcGuadronVoters100

b. Weighted Least Squares Regression - Weighted by CountWeight

**APPENDIX 5**







**EXHIBIT 1**

# John R. Alford
Curriculum Vitae
March, 2020

Dept. of Political Science
Rice University - MS-24
P.O. Box 1892
Houston, Texas 77251-1892
713-348-3364
jra@rice.edu

## Employment:
Full Professor, Rice University, 2015 to present.
Associate Professor, Rice University, 1985-2015.
Assistant Professor, University of Georgia, 1981-1985.
Instructor, Oakland University, 1980-1981.
Teaching-Research Fellow, University of Iowa, 1977-1980.
Research Associate, Institute for Urban Studies, Houston, Texas, 1976-1977.

## Education:
Ph.D., University of Iowa, Political Science, 1981.
M.A., University of Iowa, Political Science, 1980.
M.P.A., University of Houston, Public Administration, 1977.
B.S., University of Houston, Political Science, 1975.

## Books:
*Predisposed: Liberals, Conservatives, and the Biology of Political Differences.* New York: Routledge, 2013. Co-authors, John R. Hibbing and Kevin B. Smith.

## Articles:
"Political Orientations Vary with Detection of Androstenone," with Amanda Friesen, Michael Gruszczynski, and Kevin B. Smith. **Politics and the Life Sciences**. (forthcoming, 2020).

"Intuitive ethics and political orientations: Testing moral foundations as a theory of political ideology." with Kevin Smith, John Hibbing, Nicholas Martin, and Peter Hatemi. **American Journal of Political Science**. (April, 2017).

"The Genetic and Environmental Foundations of Political, Psychological, Social, and Economic Behaviors: A Panel Study of Twins and Families." with Peter Hatemi, Kevin Smith, and John Hibbing. **Twin Research and Human Genetics**. (May, 2015.)

"Liberals and conservatives: Non-convertible currencies." with John R. Hibbing and Kevin B. Smith. **Behavioral and Brain Sciences** (January, 2015).

"Non-Political Images Evoke Neural Predictors Of Political Ideology." with Woo-Young Ahn, Kenneth T. Kishida, Xiaosi Gu, Terry Lohrenz, Ann Harvey, Kevin Smith, Gideon Yaffe, John Hibbing, Peter Dayan, P. Read Montague. **Current Biology**. (November, 2014).

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 91 of 103 PageID #: 5115

"Cortisol and Politics: Variance in Voting Behavior is Predicted by Baseline Cortisol Levels." with Jeffrey French, Kevin Smith, Adam Guck, Andrew Birnie, and John Hibbing. **Physiology & Behavior**. (June, 2014).

"Differences in Negativity Bias Underlie Variations in Political Ideology." with Kevin B. Smith and John R. Hibbing. **Behavioral and Brain Sciences**. (June, 2014).

"Negativity bias and political preferences: A response to commentators Response." with Kevin B. Smith and John R. Hibbing. **Behavioral and Brain Sciences**. (June, 2014).

"Genetic and Environmental Transmission of Political Orientations." with Carolyn L. Funk, Matthew Hibbing, Kevin B. Smith, Nicholas R. Eaton, Robert F. Krueger, Lindon J. Eaves, John R. Hibbing. **Political Psychology**, (December, 2013).

"Biology, Ideology, and Epistemology: How Do We Know Political Attitudes Are Inherited and Why Should We Care?" with Kevin Smith, Peter K. Hatemi, Lindon J. Eaves, Carolyn Funk, and John R. Hibbing. **American Journal of Political Science**. (January, 2012)

"Disgust Sensitivity and the Neurophysiology of Left-Right Political Orientations." with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **PlosONE**, (October, 2011).

"Linking Genetics and Political Attitudes: Re-Conceptualizing Political Ideology." with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **Political Psychology**, (June, 2011).

"The Politics of Mate Choice." with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Journal of Politics**, (March, 2011).

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" with Peter Hatemi, John Hibbing, Sarah Medland, Matthew Keller, Kevin Smith, Nicholas Martin, and Lindon Eaves, **American Journal of Political Science**, (July, 2010).

"The Ultimate Source of Political Opinions: Genes and the Environment" with John R. Hibbing in **Understanding Public Opinion**, 3rd Edition eds. Barbara Norrander and Clyde Wilcox, Washington D.C.: CQ Press, (2010).

"Is There a 'Party' in your Genes" with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Political Research Quarterly**, (September, 2009).

"Twin Studies, Molecular Genetics, Politics, and Tolerance: A Response to Beckwith and Morris" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (December, 2008). This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

"Political Attitudes Vary with Physiological Traits" with Douglas R. Oxley, Kevin B. Smith, Matthew V. Hibbing, Jennifer L. Miller, Mario Scalora, Peter K. Hatemi, and John R. Hibbing, **Science**, (September 19, 2008).

"The New Empirical Biopolitics" with John R. Hibbing, **Annual Review of Political Science**, (June, 2008).

"Beyond Liberals and Conservatives to Political Genotypes and Phenotypes" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (June, 2008). This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 92 of 103 PageID #: 5116

"Personal, Interpersonal, and Political Temperaments" with John R. Hibbing, **Annals of the American Academy of Political and Social Science**, (November, 2007).

"Is Politics in our Genes?" with John R. Hibbing, **Tidsskriftet Politik**, (February, 2007).

"Biology and Rational Choice" with John R. Hibbing, **The Political Economist**, (Fall, 2005)

"Are Political Orientations Genetically Transmitted?" with John R. Hibbing and Carolyn Funk, **American Political Science Review**, (May, 2005). (The main findings table from this article has been reprinted in two college level text books - Psychology, 9th ed. and Invitation to Psychology 4th ed. both by Wade and Tavris, Prentice Hall, 2007).

"The Origin of Politics: An Evolutionary Theory of Political Behavior" with John R. Hibbing, **Perspectives on Politics**, (December, 2004).

"Accepting Authoritative Decisions: Humans as Wary Cooperators" with John R. Hibbing, **American Journal of Political Science**, (January, 2004).

"Electoral Convergence of the Two Houses of Congress" with John R. Hibbing, in **The Exceptional Senate**, ed. Bruce Oppenheimer, Columbus: Ohio State University Press, (2002).

"We're All in this Together: The Decline of Trust in Government, 1958-1996." in **What is it About Government that Americans Dislike?**, eds. John Hibbing and Beth Theiss-Morse, Cambridge: Cambridge University Press, (2001).

"The 2000 Census and the New Redistricting," **Texas State Bar Association School Law Section Newsletter**, (July, 2000).

"Overdraft: The Political Cost of Congressional Malfeasance" with Holly Teeters, Dan Ward, and Rick Wilson, **Journal of Politics** (August, 1994).

"Personal and Partisan Advantage in U.S. Congressional Elections, 1846-1990" with David W. Brady, in **Congress Reconsidered** 5th edition, eds. Larry Dodd and Bruce Oppenheimer, CQ Press, (1993).

"The 1990 Congressional Election Results and the Fallacy that They Embodied an Anti-Incumbent Mood" with John R. Hibbing, **PS** 25 (June, 1992).

"Constituency Population and Representation in the United States Senate" with John R. Hibbing. **Legislative Studies Quarterly**, (November, 1990).

"Editors' Introduction: Electing the U.S. Senate" with Bruce I. Oppenheimer. **Legislative Studies Quarterly**, (November, 1990).

"Personal and Partisan Advantage in U.S. Congressional Elections, 1846-1990" with David W. Brady, in **Congress Reconsidered** 4th edition, eds. Larry Dodd and Bruce Oppenheimer, CQ Press, (1988). Reprinted in The Congress of the United States, 1789-1989, ed. Joel Silby, Carlson Publishing Inc., (1991), and in The Quest for Office, eds. Wayne and Wilcox, St. Martins Press, (1991).

"Can Government Regulate Fertility? An Assessment of Pro-natalist Policy in Eastern Europe" with Jerome Legge. **The Western Political Quarterly** (December, 1986).

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 93 of 103 PageID #: 5117

"Partisanship and Voting" with James Campbell, Mary Munro, and Bruce Campbell, in **Research in Micropolitics. Volume 1 - Voting Behavior**. Samuel Long, ed. JAI Press, (1986).

"Economic Conditions and Individual Vote in the Federal Republic of Germany" with Jerome S. Legge. **Journal of Politics** (November, 1984).

"Television Markets and Congressional Elections" with James Campbell and Keith Henry. **Legislative Studies Quarterly** (November, 1984).

"Economic Conditions and the Forgotten Side of Congress: A Foray into U.S. Senate Elections" with John R. Hibbing, **British Journal of Political Science** (October, 1982).

"Increased Incumbency Advantage in the House" with John R. Hibbing, **Journal of Politics** (November, 1981). Reprinted in The Congress of the United States, 1789-1989, Carlson Publishing Inc., (1991).

"The Electoral Impact of Economic Conditions: Who is Held Responsible?" with John R. Hibbing, **American Journal of Political Science** (August, 1981).

"Comment on Increased Incumbency Advantage" with John R. Hibbing, Refereed communication: **American Political Science Review** (March, 1981).

"Can Government Regulate Safety? The Coal Mine Example" with Michael Lewis-Beck, **American Political Science Review** (September, 1980).

# Awards and Honors:

CQ Press Award - 1988, honoring the outstanding paper in legislative politics presented at the 1987 Annual Meeting of the American Political Science Association. Awarded for "The Demise of the Upper House and the Rise of the Senate: Electoral Responsiveness in the United States Senate" with John Hibbing.

# Research Grants:

National Science Foundation, 2009-2011, "Identifying the Biological Influences on Political Temperaments", with John Hibbing, Kevin Smith, Kim Espy, Nicolas Martin and Read Montague. This is a collaborative project involving Rice, University of Nebraska, Baylor College of Medicine, and Queensland Institute for Medical Research.

National Science Foundation, 2007-2010, "Genes and Politics: Providing the Necessary Data", with John Hibbing, Kevin Smith, and Lindon Eaves. This is a collaborative project involving Rice, University of Nebraska, Virginia Commonwealth University, and the University of Minnesota.

National Science Foundation, 2007-2010, "Investigating the Genetic Basis of Economic Behavior", with John Hibbing and Kevin Smith. This is a collaborative project involving Rice, University of Nebraska, Virginia Commonwealth University, and the Queensland Institute of Medical Research.

Rice University Faculty Initiatives Fund, 2007-2009, "The Biological Substrates of Political Behavior". This is in assistance of a collaborative project involving Rice, Baylor College of Medicine, Queensland Institute of

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 94 of 103 PageID #: 5118

Medical Research, University of Nebraska, Virginia Commonwealth University, and the University of Minnesota.

National Science Foundation, 2004-2006, "Decision-Making on Behalf of Others", with John Hibbing. This is a collaborative project involving Rice and the University of Nebraska.

National Science Foundation, 2001-2002, dissertation grant for Kevin Arceneaux, "Doctoral Dissertation Research in Political Science: Voting Behavior in the Context of U.S. Federalism."

National Science Foundation, 2000-2001, dissertation grant for Stacy Ulbig, "Doctoral Dissertation Research in Political Science: Sub-national Contextual Influences on Political Trust."

National Science Foundation, 1999-2000, dissertation grant for Richard Engstrom, "Doctoral Dissertation Research in Political Science: Electoral District Structure and Political Behavior."

Rice University Research Grant, 1985, Recent Trends in British Parliamentary Elections.

Faculty Research Grants Program, University of Georgia, Summer, 1982. Impact of Media Structure on Congressional Elections, with James Campbell.


## Papers Presented:

"The Physiological Basis of Political Temperaments" 6th European Consortium for Political Research General Conference, Reykjavik, Iceland (2011), with Kevin Smith, and John Hibbing.

"Identifying the Biological Influences on Political Temperaments" National Science Foundation Annual Human Social Dynamics Meeting (2010), with John Hibbing, Kimberly Espy, Nicholas Martin, Read Montague, and Kevin B. Smith.

"Political Orientations May Be Related to Detection of the Odor of Androstenone" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, Amanda Balzer, Michael Gruszczynski, Carly M. Jacobs, and John Hibbing.

"Toward a Modern View of Political Man: Genetic and Environmental Transmission of Political Orientations from Attitude Intensity to Political Participation" Annual meeting of the American Political Science Association, Washington, DC (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Genetic and Environmental Transmission of Political Involvement from Attitude Intensity to Political Participation" Annual meeting of the International Society for Political Psychology, San Francisco, CA (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Are Violations of the EEA Relevant to Political Attitudes and Behaviors?" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, and John Hibbing.

"The Neural Basis of Representation" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with John Hibbing.

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 95 of 103 PageID #: 5119

"Genetic and Environmental Transmission of Value Orientations" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with Carolyn Funk, Kevin Smith, Matthew Hibbing, Pete Hatemi, Robert Krueger, Lindon Eaves, and John Hibbing.

"The Genetic Heritability of Political Orientations: A New Twin Study of Political Attitudes" Annual Meeting of the International Society for Political Psychology, Dublin, Ireland (2009), with John Hibbing, Cary Funk, Kevin Smith, and Peter K Hatemi.

"The Heritability of Value Orientations" Annual meeting of the Behavior Genetics Association, Minneapolis, MN (2009), with Kevin Smith, John Hibbing, Carolyn Funk, Robert Krueger, Peter Hatemi, and Lindon Eaves.

"The Ick Factor: Disgust Sensitivity as a Predictor of Political Attitudes" Annual meeting of the Midwest Political Science Association, Chicago, IL (2009), with Kevin Smith, Douglas Oxley Matthew Hibbing, and John Hibbing.

"The Ideological Animal: The Origins and Implications of Ideology" Annual meeting of the American Political Science Association, Boston, MA (2008), with Kevin Smith, Matthew Hibbing, Douglas Oxley, and John Hibbing.

"The Physiological Differences of Liberals and Conservatives" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Kevin Smith, Douglas Oxley, and John Hibbing.

"Looking for Political Genes: The Influence of Serotonin on Political and Social Values" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Peter Hatemi, Sarah Medland, John Hibbing, and Nicholas Martin.

"Not by Twins Alone:  Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the American Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Matthew Keller, Nicholas Martin, Sarah Medland, and Lindon Eaves.

"Factorial Association: A generalization of the Fulker between-within model to the multivariate case" Annual meeting of the Behavior Genetics Association, Amsterdam, The Netherlands (2007), with Sarah Medland, Peter Hatemi, John Hibbing, William Coventry, Nicholas Martin, and Michael Neale.

"Not by Twins Alone:  Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the Midwest Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Nicholas Martin, and Lindon Eaves.

"Getting from Genes to Politics:  The Connecting Role of Emotion-Reading Capability" Annual Meeting of the International Society for Political Psychology, Portland, OR, (2007.), with John Hibbing.

"The Neurological Basis of Representative Democracy."  Hendricks Conference on Political Behavior, Lincoln, NE (2006), with John Hibbing.

"The Neural Basis of Representative Democracy"  Annual meeting of the American Political Science Association, Philadelphia, PA (2006), with John Hibbing.

"How are Political Orientations Genetically Transmitted?  A Research Agenda"  Annual meeting of the Midwest Political Science Association, Chicago Illinois (2006), with John Hibbing.

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 96 of 103 PageID #: 5120

"The Politics of Mate Choice"   Annual meeting of the Southern Political Science Association, Atlanta, GA (2006), with John Hibbing.

"The Challenge Evolutionary Biology Poses for Rational Choice"   Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing and Kevin Smith.

"Decision Making on Behalf of Others"  Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions"   Annual meeting of the Midwest Political Science Association, Chicago Illinois (2005), with John Hibbing and Carolyn Funk.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions" Annual meeting of the American Political Science Association, Chicago Illinois (2004), with John Hibbing and Carolyn Funk.

"Accepting Authoritative Decisions:  Humans as Wary Cooperators" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2002), with John Hibbing

"Can We Trust the NES Trust Measure?" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2001), with Stacy Ulbig.

"The Impact of Organizational Structure on the Production of Social Capital Among Group Members" Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (2000), with Allison Rinden.

"Isolating the Origins of Incumbency Advantage:  An Analysis of House Primaries, 1956-1998" Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (2000), with Kevin Arceneaux.

"The Electorally Indistinct  Senate," Norman Thomas Conference on Senate Exceptionalism, Vanderbilt University; Nashville, Tennessee; October (1999), with John R. Hibbing.

"Interest Group Participation and Social Capital" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (1999), with Allison Rinden.

"We're All in this Together:  The Decline of Trust in Government, 1958-1996." The Hendricks Symposium, University of Nebraska, Lincoln. (1998)

"Constituency Population and Representation in the United States Senate," Electing the Senate; Houston, Texas; December (1989), with John R. Hibbing.

"The Disparate Electoral Security of House and Senate Incumbents," American Political Science Association Annual Meetings; Atlanta, Georgia; September (1989), with John R. Hibbing.

"Partisan and Incumbent Advantage in House Elections," Annual Meeting of the Southern Political Science Association (1987), with David W. Brady.

"Personal and Party Advantage in U.S. House Elections, 1846-1986" with David W. Brady, 1987 Social Science History Association Meetings.

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 97 of 103 PageID #: 5121

"The Demise of the Upper House and the Rise of the Senate: Electoral Responsiveness in the United States Senate" with John Hibbing, 1987 Annual Meeting of the American Political Science Association.

"A Comparative Analysis of Economic Voting" with Jerome Legge, 1985 Annual Meeting of the American Political Science Association.

"An Analysis of Economic Conditions and the Individual Vote in Great Britain, 1964-1979" with Jerome Legge, 1985 Annual Meeting of the Western Political Science Association.

"Can Government Regulate Fertility?  An Assessment of Pro-natalist Policy in Eastern Europe" with Jerome Legge, 1985 Annual Meeting of the Southwestern Social Science Association.

"Economic Conditions and the Individual Vote in the Federal Republic of Germany" with Jerome S. Legge, 1984 Annual Meeting of the Southern Political Science Association.

"The Conditions Required for Economic Issue Voting" with John R. Hibbing, 1984 Annual Meeting of the Midwest Political Science Association.

"Incumbency Advantage in Senate Elections," 1983 Annual Meeting of the Midwest Political Science Association.

"Television Markets and Congressional Elections:  The Impact of Market/District Congruence" with James Campbell and Keith Henry, 1982 Annual Meeting of the Southern Political Science Association.

"Economic Conditions and Senate Elections" with John R. Hibbing, 1982 Annual Meeting of the Midwest Political Science Association. "Pocketbook Voting:  Economic Conditions and Individual Level Voting," 1982 Annual Meeting of the American Political Science Association.

"Increased Incumbency Advantage in the House," with John R. Hibbing, 1981 Annual Meeting of the Midwest Political Science Association.


## Other Conference Participation:

Roundtable Participant – Closing Round-table on Biopolitics; 2016 UC Merced Conference on Bio-Politics and Political Psychology, Merced, CA.

Roundtable Participant "Genes, Brains, and Core Political Orientations" 2008 Annual Meeting of the Southwestern Political Science Association, Las Vegas.

Roundtable Participant "Politics in the Laboratory" 2007 Annual Meeting of the Southern Political Science Association, New Orleans.

Short Course Lecturer, "What Neuroscience has to Offer Political Science" 2006 Annual Meeting of the American Political Science Association.

Panel chair and discussant, "Neuro-scientific Advances in the Study of Political Science" 2006 Annual Meeting of the American Political Science Association.

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 98 of 103 PageID #: 5122

Presentation, "The Twin Study Approach to Assessing Genetic Influences on Political Behavior" Rice Conference on New Methods for Understanding Political Behavior, 2005.

Panel discussant, "The Political Consequences of Redistricting," 2002 Annual Meeting of the American Political Science Association.

Panel discussant, "Race and Redistricting," 1999 Annual Meeting of the Midwest Political Science Association.

Invited participant, "Roundtable on Public Dissatisfaction with American Political Institutions", 1998 Annual Meeting of the Southwestern Social Science Association.

Presentation, "Redistricting in the '90s," Texas Economic and Demographic Association, 1997.

Panel chair, "Congressional Elections," 1992 Annual Meeting of the Southern Political Science Association.

Panel discussant, "Incumbency and Congressional Elections," 1992 Annual Meeting of the American Political Science Association.

Panel chair, "Issues in Legislative Elections," 1991 Annual Meeting of the Midwest Political Science Association.

Panel chair, "Economic Attitudes and Public Policy in Europe," 1990 Annual Meeting of the Southern Political Science Association

Panel discussant, "Retrospective Voting in U.S. Elections," 1990 Annual Meeting of the Midwest Political Science Association.

Co-convener, with Bruce Oppenheimer, of Electing the Senate, a national conference on the NES 1988 Senate Election Study. Funded by the Rice Institute for Policy Analysis, the University of Houston Center for Public Policy, and the National Science Foundation, Houston, Texas, December, 1989.

Invited participant, Understanding Congress: A Bicentennial Research Conference, Washington, D.C., February, 1989.

Invited participant--Hendricks Symposium on the United States Senate, University of Nebraska, Lincoln, Nebraska, October, 1988

Invited participant--Conference on the History of Congress, Stanford University, Stanford, California, June, 1988.

Invited participant, "Roundtable on Partisan Realignment in the 1980's", 1987 Annual Meeting of the Southern Political Science Association.

## Professional Activities:

### Other Universities:

Invited Speaker, Annual Lecture, Psi Kappa -the Psychology Club at Houston Community College, 2018.

Case 2:18-cv-03549-GRB-ST Document 198-3 Filed 09/16/20 Page 99 of 103 PageID #: 5123

Invited Speaker, Annual Allman Family Lecture, Dedman College Interdisciplinary Institute, Southern Methodist University, 2016.

Invited Speaker, Annual Lecture, Psi Sigma Alpha – Political Science Dept., Oklahoma State University, 2015.

Invited Lecturer, Department of Political Science, Vanderbilt University, 2014.

Invited Speaker, Annual Lecture, Psi Kappa -the Psychology Club at Houston Community College, 2014.

Invited Speaker, Graduate Student Colloquium, Department of Political Science, University of New Mexico, 2013.

Invited Keynote Speaker, Political Science Alumni Evening, University of Houston, 2013.

Invited Lecturer, Biology and Politics Masters Seminar (John Geer and David Bader), Department of Political Science and Biology Department, Vanderbilt University, 2010.

Invited Lecturer, Biology and Politics Senior Seminar (John Geer and David Bader), Department of Political Science and Biology Department, Vanderbilt University, 2008.

Visiting Fellow, the Hoover Institution, Stanford University, 2007.

Invited Speaker, Joint Political Psychology Graduate Seminar, University of Minnesota, 2007.

Invited Speaker, Department of Political Science, Vanderbilt University, 2006.


**Member:**

Editorial Board, Journal of Politics, 2007-2008.

Planning Committee for the National Election Studies' Senate Election Study, 1990-92.

Nominations Committee, Social Science History Association, 1988


**Reviewer for:**

American Journal of Political Science
American Political Science Review
American Politics Research
American Politics Quarterly
American Psychologist
American Sociological Review
Canadian Journal of Political Science
Comparative Politics
Electoral Studies
Evolution and Human Behavior
International Studies Quarterly

Journal of Politics
Journal of Urban Affairs
Legislative Studies Quarterly
National Science Foundation
PLoS ONE
Policy Studies Review
Political Behavior
Political Communication
Political Psychology
Political Research Quarterly
Public Opinion Quarterly
Science
Security Studies
Social Forces
Social Science Quarterly
Western Political Quarterly

## University Service:

Member, University Parking Committee, 2016-2020.

Member, University Benefits Committee, 2013-2016.

Internship Director for the Department of Political Science, 2004-2018.

Member, University Council, 2012-2013.

Invited Speaker, Rice Classroom Connect, 2016.

Invited Speaker, Glasscock School, 2016.

Invited Speaker, Rice Alumni Association, Austin, 2016.

Invited Speaker, Rice Alumni Association, New York City, 2016.

Invited Speaker, Rice TEDxRiceU , 2013.

Invited Speaker, Rice Alumni Association, Atlanta, 2011.

Lecturer, Advanced Topics in AP Psychology, Rice University AP Summer Institute, 2009.

Scientia Lecture Series: "Politics in Our Genes: The Biology of Ideology" 2008

Invited Speaker, Rice Alumni Association, Seattle, San Francisco and Los Angeles, 2008.

Invited Speaker, Rice Alumni Association, Austin, Chicago and Washington, DC, 2006.

Invited Speaker, Rice Alumni Association, Dallas and New York, 2005.

Director: Rice University Behavioral Research Lab and Social Science Computing Lab, 2005-2006.

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 101 of 103 PageID #: 5125

University Official Representative to the Inter-university Consortium for Political and Social Research, 1989-2012.

Director: Rice University Social Science Computing Lab, 1989-2004.

Member, Rice University Information Technology Access and Security Committee, 2001-2002

Rice University Committee on Computers, Member, 1988-1992, 1995-1996; Chair, 1996-1998, Co-chair, 1999.

Acting Chairman, Rice Institute for Policy Analysis, 1991-1992.

Divisional Member of the John W. Gardner Dissertation Award Selection Committee, 1998

Social Science Representative to the Educational Sub-committee of the Computer Planning Committee, 1989-1990.

Director of Graduate Admissions, Department of Political Science, Rice University, 1986-1988.

Co-director, Mellon Workshop: Southern Politics, May, 1988.

Guest Lecturer, Mellon Workshop: The U.S. Congress in Historical Perspective, May, 1987 and 1988.

Faculty Associate, Hanszen College, Rice University, 1987-1990.

Director, Political Data Analysis Center, University of Georgia, 1982-1985.


## External Consulting:

Expert Witness, Christian Ministerial Alliance et al v. Arkansas, racially polarized voting analysis, 2020.

Consulting Expert, Sarasota County, VRA challenge to district map, 2020.

Expert Witness, Kumar v. Frisco ISD, TX, racially polarized voting analysis, 2019.

Expert Witness, Flores et al. v. Town of Islip, NY, racially polarized voting analysis, 2018.

Expert Witness, Tyson v. Richardson ISD, racially polarized voting analysis, 2018.

Expert Witness, Dwight v. State of Georgia, racially polarized voting analysis, 2018.

Expert Witness, NAACP v. East Ramapo Central School District, racially polarized voting analysis, 2018.

Expert Witness, Georgia NAACP v. State of Georgia, racially polarized voting analysis, 2018.

Expert Witness, Arismendez v. Coastal Bend College, racially polarized voting analysis, 2017.

Expert Witness, United States v. City of Eastpoint, racially polarized voting analysis, 2017.

Expert Witness, Georgia NAACP v. Gwinnett County, racially polarized voting analysis, 2017.

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 102 of 103 PageID #: 5126

Expert Witness for the State of Texas, Lopez, et al v. Abbott, a challenge to the current system of statewide at-large elections for the Texas Supreme Court and the Texas Court of Criminal Appeals, including election analysis, and racially polarized voting analysis, 2017.

Expert witness for the State of Texas, Perez, et al v State of Texas (and consolidated cases), challenge to adopted Texas election districts for the US Congress and the Texas House of Representatives, 2011-2017.

Expert Witness for Coppell ISD, Jain v. Coppell ISD, racially polarized voting analysis, 2016.

Consultant, City of Clute, Texas – Demographic analysis and redrawing of election districts, 2015.

Expert Witness for Carrollton-Farmers Branch ISD, Ramos v. Carrollton-Farmers Branch ISD, racially polarized voting analysis, 2015.

Expert Witness for Coahoma County, Columbus Partee, et al. v. Coahoma County, Mississippi, racially polarized voting analysis, 2015.

Expert Witness for the State of Louisiana, Terrebonne Parish NAACP v. Jindal, racially polarized voting analysis, 2015.

Expert Witness for the City of Pasadena, Patino v. City of Pasadena, racially polarized voting analysis, 2015.

Expert Witness for the City of St. Gabriel, York v. City of St. Gabriel, racially polarized voting analysis, 2014.

Consultant, Houston ISD – Incorporation of North Forest ISD, and the consequent redrawing of all nine board member election districts including demographic analysis, board and public hearing presentations and support for pre-clearance submission, 2014.

Expert Witness for Grand Prairie ISD, Rodriguez v. Grand Prairie ISD, racially polarized voting analysis, 2014.

Expert Witness for Irving ISD, Benevides, v Irving ISD, racially polarized voting analysis, 2014.

Expert Witness for Pasadena ISD, Garcia-Sonnier et al v., racially polarized voting analysis, 2013.

Expert witness for the City of Yakima, Montes v. City of Yakima, challenge to Yakima, Washington At-Large City Council Elections, 2012.

Consultant, Lamar ISD – redrawing of all board member election districts including demographic analysis and redrawing of election districts, board and public hearing presentations, and support for pre-clearance submission, 2012.

Expert witness for Harris Co, Rodriguez, et. al. v., challenge to adopted Harris County Commissioners' Court precincts, 2011.

Consultant, City of Baytown – redrawing of all board member election districts including demographic analysis and redrawing of election districts, board and public hearing presentations, and support for pre-clearance submission, 2011.

Consultant, Goose Creek ISD – redrawing of all board member election districts including demographic analysis and redrawing of election districts, board and public hearing presentations, and support for pre-clearance submission, 2011.

Case 2:18-cv-03549-GRB-ST   Document 198-3   Filed 09/16/20   Page 103 of 103 PageID #: 5127

Consultant, San Antonio Water System – Analysis of preclearance issues related to merger with BexarMet Water Authority, 2011.

Expert witness for the State of Texas, Texas v US, preclearance suit for Texas statewide districts, 2011.*

Expert witness for the State of Texas, Davis v Perry (and consolidated cases), challenge to adopted Texas Senate districts, 2011.

Expert witness for the State of Texas, Perez, et al v State of Texas (and consolidated cases), challenge to adopted Texas statewide districts, 2011-2017.

Expert witness, Fabela, et al. v City of Farmers Branch, Farmers Branch city council at large district challenge, 2011.

Expert Witness, El Paso Apartment Owners Assoc. v City of El Paso, analysis of racial patterns in housing occupancy, 2009.

Expert Witness, Benevides, v Irving ISD, racially polarized voting analysis, 2008-2009.

Expert Witness, Benevides, v City of Irving, racially polarized voting analysis, 2008-2009.